UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

**THE HUMANE SOCIETY OF
THE UNITED STATES**
2100 L St., NW
Washington, DC  20037,

                    Plaintiff,

          v.                                                      Civ. No. 07-623 (CKK)

**AMAZON.COM, INC.**
1200 12th Avenue South
Suite 1200
Seattle, WA  98144,

**JOHN DOE d/b/a UNDERGROUND
PITBULL BREEDERS ASSOCIATION,**

**JOHN DOE d/b/a
STREETHEATDVD.COM,**

**MARBURGER PUBLISHING CO., INC.
d/b/a THE GAMECOCK**
210 Highway 45 North
Hartford, AR  72938,

**DOWD PUBLISHERS d/b/a
THE FEATHERED WARRIOR**
1812 Hwy 70-71 East
DeQueen, AR  71832,

**MAGAZINE EXPRESS, INC.**
5724 Highway 280 East
Birmingham, AL  35242,

**JOHN DOES III – XX,**

                    Defendants.

**FIRST AMENDED COMPLAINT**

**(Action Pursuant to the District of Columbia Consumer Protection Procedures Act
For Injunctive and Declaratory Relief and Statutory Monetary Penalties;
With Jury Demand)**

Plaintiff The Humane Society of the United States, in its own capacity and in a representative capacity, on behalf of all its members, alleges unlawful trade practices pursuant to the Consumer Protection Procedures Act ("CPPA"), D.C. CODE ANN. § 28-3904, and files this Amended Complaint with jury demand. This action for statutory penalties and appropriate injunctive relief arises from Defendants' purposeful marketing, sale, and shipment of graphic dog fighting videos and cockfighting magazines in violation of federal felony criminal prohibitions and District of Columbia animal welfare laws.

The videos and magazines depict and/or describe actual animal cruelty, as well as animal fights staged for the purposes of: (1) producing and selling more copies of the videos for commercial gain; and (2) unlawfully promoting and furthering the criminal enterprises of dog fighting and cockfighting. In particular, the magazines contain hundreds of criminal solicitations and feature advertisements for fighting birds, fighting dogs, and other contraband that render them unlawful under the following statutory schemes: the Federal Animal Welfare Act, 7 U.S.C. § 2156; the federal Depiction of Animal Cruelty Statute, 18 U.S.C. § 48; the D.C. Cruelty to Animals Statute, D.C. CODE ANN. §§ 22-1015(a)(1), (a)(5); the federal conspiracy statute, 18 U.S.C. § 371; and the D.C. conspiracy law, D.C. CODE ANN. § 22-1805a(a). All such statutory violations are actionable by way of private right of action available to organizational plaintiffs, such as The Humane Society of the United States, under the CPPA, D.C. CODE ANN. §§ 28-3904(a), (f), (x); 28-3905(k)(1).

## SUBJECT MATTER JURISDICTION

1.   The Court has subject matter jurisdiction over statutory claims in this matter pursuant to D.C. CODE ANN. § 28-3905(k)(1), and subject matter jurisdiction over equitable claims in this matter pursuant to D.C. CODE ANN. § 11-921.

## PERSONAL JURISDICTION

2.   The Court has personal jurisdiction over Defendants pursuant to D.C. CODE ANN. §§ 13-334, 13-423(a)(1), because the allegations and claims for relief herein arise from Defendants' transaction of business in the District of Columbia, through which Defendants, whether by maintenance of a website or by direct mailing of materials including the unlawful dog fighting videos and cockfighting magazines into the District of Columbia, purposefully directed their business activities to the District of Columbia and its resident consumers.

## THE PARTIES

3.   Plaintiff The Humane Society of the United States (hereinafter "The HSUS") is a nonprofit animal protection organization headquartered in the District of Columbia and incorporated in Delaware, with over 25,000 members and constituents in the District of Columbia, and more than 9.5 million members and constituents nationwide.

4.   Defendant Amazon.com, Inc. (hereinafter "Amazon") is a Delaware corporation with its headquarters at 1200 12th Street, Suite 1200, Seattle, Washington, 98144, that regularly transacts business in the District of Columbia, including through its websites and through the mail service of the United States Postal Service; and that advertises its website and the products on its website to consumers in the District of Columbia.

5.   Defendant John Doe d/b/a "UNDERGROUND PITBULL BREEDERS ASSOCIATION" (hereinafter "John Doe d/b/a UPBA") is a fictitious entity named in the dog

fighting video described in paragraphs 48-56 below as the "present[er]" of that video. No other individual or corporate identities appear in either the content of the video or on its cover or packaging, and the real identities and street addresses of the individuals who created the video are unknown at this time.

6.    Defendant John Doe d/b/a "StreetHeatDVD.com" (hereinafter "John Doe d/b/a Street Heat") is an unincorporated entity named in the dog fighting video described in paragraph 57 below as the presenter of that video, with no verifiable street address, incorporation, or license to do business in any state. As printed on the cover of the dog fighting video, Defendant John Doe d/b/a Street Heat also does business under the fictitious name "50/50 Ent.," and lists a false address on a street that does not exist. No other individual or corporate identities appear in either the content of the video or on its packaging, and the real identities and street addresses of the individuals who created the video are unknown at this time.

7.    Defendant Dowd Publishers is an unincorporated entity owned and operated by Verna Dowd, doing business as The Feathered Warrior, with its headquarters at 1812 Highway, 70-71 East, DeQueen, Arkansas 71832, that regularly transacts business in the District of Columbia, including through the mail service of the United States Postal Service; its products are advertised and sold on the website of Defendant Amazon, which is used by District of Columbia residents to purchase dog fighting videos and cockfighting magazines.

8.    Defendant Marburger Publishing Co., Inc., d/b/a The Gamecock, is an Arkansas corporation with its headquarters in Hartford, Arkansas, and a business address of 210 Highway 45 North, Hartford, Arkansas 72938; its corporate registration with the Arkansas Secretary of State lists no street address for either the corporation or its registered agent. Defendant Marburger Publishing regularly transacts business in the District of Columbia, including through

4

the mail service of the United States Postal Service; its products are advertised and sold on the website of Defendant Amazon, which is used by District of Columbia residents to purchase dog fighting videos and cockfighting magazines.

9.      Defendant Magazine Express, Inc. is an Alabama corporation with its headquarters at 5724 Highway 280 East, Birmingham, Alabama 35242, that services magazine subscriptions and regularly transacts business in the District of Columbia; the magazine subscriptions it purveys are advertised and sold on the website of Defendant Amazon, which is used by District of Columbia residents to purchase dog fighting videos and cockfighting magazines; the magazines are shipped into the District of Columbia through the mail service of the United States Postal Service.

10.      Defendants John Does III-XX are employees, officers, or agents of Defendants Amazon, Dowd Publishers, Marburger Publishing, Magazine Express, John Doe d/b/a UPBA, and John Doe d/b/a Street Heat, who, acting within the scope of their employment or agency, with intent to benefit their respective employer or company for whom they are acting as an agent, committed the acts described below, including soliciting, entering into, authorizing, requesting, or otherwise ratifying the Agreements described below in paragraphs 85-90, by which the parties agreed to, among other terms, share profits from the publication, distribution, marketing, and sale of publications and videos that promote unlawful animal fighting ventures.

## STATUTORY FRAMEWORK

**A.      District of Columbia Consumer Protection Procedures Act**

11.      The District of Columbia Consumer Protection Procedures Act ("CPPA") provides that:

> A person, whether acting for the interests of itself, its members, or the general public, may bring an action under this chapter in the Superior Court of the District

of Columbia seeking relief from the use by any person of a trade practice in violation of a law of the District of Columbia . . . .

D.C. CODE ANN. § 28-3905(k)(1).

12.    It is a violation of District of Columbia law, and therefore an unlawful trade practice under the CPPA, *id.*, "*whether or not any consumer is in fact misled, deceived or damaged thereby*, for any person to:

> (a) represent that goods or services have a source, sponsorship, approval, certification, accessories, characteristics, ingredients, uses, benefits, or quantities that they do not have, . . .
>
> (e) misrepresent as to a material fact which has a tendency to mislead;
>
> (f) fail to state a material fact if such failure tends to mislead, . . . [or]
>
> (x) sell consumer goods in a condition or manner not consistent with that warranted by . . . operation or requirement of federal law."

*Id.* § 28-3904 (emphasis added).

13.    Additionally, "the CPPA's extensive enforcement mechanisms apply not only to the unlawful trade practices proscribed by § 28-3904, but to all other statutory and common law prohibitions." *Osbourne v. Capital City Mortgage Corp.*, 727 A.2d 322, 325-26 (D.C. 1999).

14.    The CPPA allows for treble damages, or $1,500 per violation, whichever is greater, as well as reasonable attorney's fees, punitive damages, an injunction against the unlawful trade practice, "additional relief as may be necessary to restore to the consumer money or property . . . which may have been acquired by means of the unlawful trade practice," and "any other relief the court deems proper." D.C. CODE ANN. § 28-3905(k)(1).

B.    <u>Federal Depiction of Animal Cruelty Statute</u>

15.    The Federal Depiction of Animal Cruelty statute makes it a federal crime, punishable by a fine and up to five years in prison, to "knowingly create[ ], sell[ ], or possess[ ] a

6

depiction of animal cruelty with the intention of placing that depiction in interstate or foreign

commerce for commercial gain." 18 U.S.C. § 48(a). A "depiction of animal cruelty" is

> any visual or auditory depiction, including any . . . motion-picture film, video
> recording, electronic image, or sound recording of conduct in which a living
> animal is intentionally maimed, mutilated, tortured, wounded, or killed, if such
> conduct is illegal under Federal law or the law of the State in which the creation,
> sale, or possession takes place, regardless of whether the maiming, mutilation,
> torture, wounding, or killing took place in the State.

*Id.* § 48(c)(1). The statute does not apply to "any depiction that has serious religious, political,

scientific, educational, journalistic, historical, or artistic value." *Id.* § 48(b).

**C.    Federal Animal Welfare Act**

16.    On May 3, 2007, President Bush signed into law the Federal Animal Fighting

Prohibition Enforcement Act of 2007, H.R. 137/S. 261, Public Law No. 110-22 ("the Act"). The

Act, which amends the animal fighting provisions of the federal Animal Welfare Act ("AWA"),

7 U.S.C. § 2156, goes into effect immediately.

17.    As amended by the Act, it is now a felony for "any person" to "knowingly use the

mail service of the United States Postal Service or any instrumentality of interstate commerce for

*commercial speech* for purposes of *promoting or in any other manner furthering* an animal

fighting venture." Pub. L. No. 110-22, § 3, 121 Stat. 88 (2007) (amending 7 U.S.C. § 2156(c))

(emphasis added).

18.    In addition to this statutory modification, the legislative history accompanying the

Act makes clear Congress's findings that the mailing of animal fighting publications such as

those at issue here "promot[es]" or "further[s]" animal fighting in violation of 7 U.S.C. §

2156(c). For instance, as House lead sponsor Rep. Elton Gallegly (R-CA) explained,

"cockfighting magazines . . . *promote* animal fights in every State—they are sent to or read by

buyers in many States, who buy the fighting animals and implements and then use them in

7

animal fights in States where cockfighting is illegal." 110 CONG. REC. E656 (daily ed. Mar. 28, 2007).

19.    Rep. Gallegly also stated:

subsection (c) of section 26 of the Animal Welfare Act, which is about interstate instrumentalities and commercial speech, prohibits the websites and the magazines where fighting animals are advertised for sale. These publications are commercial speech, and also clearly promote animal fighting.

110 CONG. REC. E656 (daily ed. Mar. 28, 2007).

20.    Rep. Gallegly continued:

[t]he [magazines] advertise fighting animals and weapons for sale in interstate commerce. For example, over the last 12 months, there have been over 1,600 pages worth of advertisements for illegal interstate commercial transactions in the *two main cockfighting magazines*.

*Id.* (emphasis added).

21.    In the House Judiciary Committee report, the only Congressional report to accompany the Act, the Judiciary Committee, explaining the "need for the legislation," found that "[t]he animal fighting industry continues to thrive . . . . despite 50 State laws that ban dogfighting and 48 State laws that ban cockfighting [because] [n]umerous nationally circulated animal fighting magazines still *promote* these cruel practices, and advertise fighting animals and the accouterments of animal fighting." H.R. REP. NO. 110-27, at 2 (2007) (emphasis added).

22.    The Chairman of the House Subcommittee on Crime and Terrorism, which held hearings on the bill, stated on the floor of the House that "[n]umerous nationally circulated animal fighting magazines advertise fighting animals. . . . [t]hankfully, H.R. 137 will seek to bring an end to these practices." 110 CONG. REC. H3032 (Mar. 26, 2007) (remarks of Rep. Scott).

23.    Other members of the House Subcommittee on Crime and Terrorism noted that materials such as the publications at issue here promote or further animal fighting in violation of the law.  Rep. Sheila Jackson-Lee explained that "[r]azor-sharp knives known as 'slashers' and ice pick-like gaffs . . . used only in cockfights, are sold through cockfighting magazines. . . ." 110 CONG. REC. H3035 (daily ed. Mar. 26, 2007).  Rep. Jackson-Lee further noted that "there has been a dramatic increase in the number of animal fighting raids by state and local authorities. Yet numerous nationally circulated animal fighting magazines still *promote* these cruel practices and advertise fighting animals and the accoutrements of animal fighting." *Id.* (emphasis added).

24.    The Senate also made specific findings that materials like the publications at issue here "promote" animal fighting in violation of 7 U.S.C. § 2156.  Lead sponsor Senator Maria Cantwell, introducing the bill on the Senate floor, stated that "the animal fighting industry . . . continues unabated nationwide.  These enterprises depend on interstate commerce, as evidenced by the animal fighting magazines that advertise and *promote* them." 110 CONG. REC. S451 (Jan. 11, 2007) (emphasis added).  Senator Cantwell explained that "[c]ockfighting magazines . . . contain hundreds of advertisements for mail-order knives and gaffs revealing a thriving interstate market for the weapons used in cockfights." *Id.*

25.    The Act also adds an express felony ban on the transport and delivery of the cockfighting knives and gaffs which are prominently advertised in the publications at issue here. It is now a felony

> for any person to knowingly sell, buy, transport, or deliver in interstate or foreign commerce a knife, a gaff, or any other sharp instrument attached, or designed, or intended to be attached, to the leg of a bird for use in an animal fighting venture.

Pub. L. No. 110-22, § 3, 121 Stat. 88 (2007) (amending 7 U.S.C. §2156(e)). Each issue of the publications at issue here contains hundreds of advertisements for the sale, purchase, transport, and delivery of knives and gaffs in interstate or foreign commerce, as described below.

26.    In passing the Act, members of Congress stated that the "cockfighting magazines with all of their advertisements for contraband . . . are basically just catalogs, with hundreds of advertisements per issue for illegal transactions," whereby "[t]he sellers are just soliciting the buyers to commit criminal acts," 110 CONG. REC. E656 (daily ed. Mar. 28, 2007) (remarks of Rep. Gallegly).

27.    The AWA also makes it a federal crime for "any person" to "knowingly sell, buy, transport, deliver, or receive for purposes of transportation, in interstate or foreign commerce, any dog or other animal for purposes of having the dog or other animal participate in an animal fighting venture." *Id.* § 2156(b).

28.    The Act also upgrades the criminal penalty for violating 7 U.S.C. § 2156 from a misdemeanor to a felony.    Each violation is punishable by up to three years in prison and a $250,000 fine. *See* Pub. L. No. 110-22, § 3, 121 Stat. 88 (2007) (amending 7 U.S.C. §2156(i) and 18 U.S.C. § 49); 18 U.S.C. § 3571 (setting default fine provision for felony).

**D.    District of Columbia Cruelty to Animals Statute**

29.    The D.C. Cruelty to Animals Statute makes it a felony punishable by up to a $25,000 fine or 5 years in prison for each violation, for "any person" to

> organize[   ], sponsor[ ], conduct[ ], stage[ ], *promote*[ ], [be] employed at, collect[ ] an admission fee for, or bet[ ] or wager[ ] any money or other valuable consideration on the outcome of an exhibition between two or more animals of fighting, baiting or causing injury to each other.

D.C. CODE ANN. § 22-1015(a)(1) (emphasis added).    It is also a felony, punishable by up to a $25,000 fine or 5 years in prison for each violation, for "any person" to "aid[ ] or abet[ ]" any of

the unlawful acts specified in D.C. CODE ANN. § 22-1015(a), including the "promot[ion]" of animal fighting. *Id.* § 22-1015(a)(5).

30.    The D.C. Cruelty to Animals Statute also makes it a felony, punishable by up to a $25,000 fine or 5 years in prison for each violation, for "any person" to "own[ ], train[ ], buy[ ], sell[ ], offer[ ] to buy or sell, steal[ ], transport[ ], or possess[ ] any animal with the intent that it engage in any [animal fighting or baiting] exhibition. . ." *Id.* § 22-1015(a)(2).

**E.    Other Federal and District of Columbia Laws**

31.    It is unlawful for "two or more persons [to] conspire . . . to commit any offense against the United States," 18 U.S.C. § 371, or to "conspire . . . to commit a criminal offense" under District of Columbia law. D.C. CODE ANN. § 22-1805a(a).

32.    Under federal law, "[w]hoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal." 18 U.S.C. § 2(a). Additionally, "[w]hoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal." *Id.* § 2(b).

33.    In addition to the specific aiding and abetting provisions of the D.C. Cruelty to Animals Statute described above, District of Columbia law also provides that "all persons advising, inciting, or conniving at the offense, or aiding or abetting the principal offender, shall be charged as principals and not as accessories." D.C. CODE ANN. § 22-1805.

## FACTS GIVING RISE TO PLAINTIFF'S CLAIMS FOR RELIEF

**A.    Dog Fighting and Cockfighting in the District of Columbia and in the United States**

34.    Dog fighting is illegal in every state and in the District of Columbia. Cockfighting is prohibited in all or part of all fifty states, with statewide prohibitions in effect in

forty-nine states and the District of Columbia. Additionally, thirty-six states prohibit the sale, purchase, and/or possession of fighting animals or implements, and twenty-seven states and the District of Columbia further criminalize other acts that "promote," D.C. CODE ANN. § 22-1015(a)(1), or "further" animal fighting, such as "advertising" or "us[ing] any means of communication for the purpose of promoting [ ] a fight." *See, e.g.,* FLA. STAT. ANN. § 828.122(2)(d) (West 2006); COLO. REV. STAT. ANN. § 18-9-204(1)(b)(V).

35.    On May 9, 2007, the Louisiana House of Representatives voted 101-1 to become the final state to ban cockfighting. On May 15, 2007, the Louisiana Senate voted 34-4 to ban cockfighting. This legislation is still pending and has not yet been signed into law.

36.    At an animal fight, two or more animals specially trained and bred for aggression are pitted against one another in a small enclosure and provoked by their handlers to attack the other animal, usually until one or both of the animals dies from injuries inflicted in the fight, with gamblers betting on the outcome. Birds fight with knives or "gaffs" affixed to their legs. Dogs and birds wounded or killed in a fight suffer painful, disfiguring, and debilitating injuries, including lacerations, ruptured organs, broken or severed limbs, gouged eyes, punctured lungs, head injuries, broken necks and backs, internal bleeding, shock, and partial or full paralysis.

37.    If an animal loses a fight by running away, it causes the handler embarrassment and loss of reputation. A runaway dog's handler will often electrocute her as punishment, using a car battery or other crude methods. Handlers of runaway roosters have been observed slamming the birds into walls as punishment.

38.    If a bird is injured but not killed after the fight, it is customary for the handler not to provide veterinary care, food, or water for the animal, but rather, to abandon the animal, causing the animal to suffer from injuries, starvation, or dehydration for up to several days

12

before dying. At raids, officials have observed injured, live animals trapped at the bottom of trash barrels under the bodies of dead animals. These animals may suffer for several days before being crushed in a trash compactor or otherwise disposed of.

39.    Fighting birds and dogs are typically injected with steroids, speed, and other substances before the fight, including blood-clotting drugs expressly designed and marketed to ensure that gravely wounded animals will fight longer, thereby deliberately prolonging the animals' suffering prior to death. Handlers also inflict pain upon the roosters by sawing or shearing off certain appendages for the purpose of fighting, including the birds' waddles, combs, and spurs. Dog fighters also create painful stimuli in order to provoke the dogs' aggression prior to the fight, such as by sewing bottle caps into the dogs' skin or burning the dogs' paw pads with cigarette lighters.

40.    Dog fighters typically obtain fighting dogs by purchasing dogs from, or using the breeding or "stud services" of, breeders who are known to selectively breed and train dogs for gameness, and whose reputation is based on these dogs' "victories" in fights.

41.    To train dogs for fighting or to be sold for fighting purposes, dog fighters and the breeders and sellers of fighting dogs use smaller or less aggressive "bait" dogs (and cats) whom the fighting dogs maim or kill for practice. Fighters obtain "bait" dogs by breeding them, or from "Free to a Good Home" advertisements, or from puppy mills, or by stealing them from homes and back yards.

42.    Each year, hundreds of millions, and possibly billions of dollars of unreported income changes hands at cockfights and dog fights from illegal gambling, in addition to entry fees and prize money. Some cockfighting events involve hundreds of matches, with prizes in the tens of thousands of dollars. Accordingly, handlers often travel across state lines to fight

animals, as documented by the Federal Bureau of Investigation ("FBI"). FBI Special Agents have observed children as young as six years old taking bets at animal fights.

43.    A variety of criminal activities, including gambling, drug possession, rape, illegal weapon possession, and homicide have been associated with animal fighting. Drug money is also laundered through animal fighting operations.

44.    Because of the gambling, money, weapons, and illegal drugs involved, dog fighting and cockfighting contributes to a rise in other types of crime in the affected communities, such as personal violence and property crime.

45.    The gambling associated with dog fighting and cockfighting is illegal in every state, and those who cross state lines or use the mail service to "promote . . . or facilitate the promotion" of such gambling also violate federal racketeering laws. *See, e.g.*, 18 U.S.C. § 1952.

46.    Cockfighting also poses a public health and biosecurity threat. As confirmed by the World Health Organization, cockfighting was responsible for at least eight human cases of avian influenza between January 2004 and April 2005, due to the bloody nature of the fights, and the fact that cockfighters occasionally put their mouths over the heads of wounded birds to resuscitate them during the fight. In 2003, the Governor of California declared a State of Emergency after cockfighting birds from Mexico spread Exotic Newcastle Disease to poultry flocks in the United States, resulting in the deaths of 3.4 million birds and the loss of more than 200 million dollars, including reimbursements made to poultry producers at taxpayer expense.

47.    Dog fighting also threatens public health and safety, by increasing the risk to law enforcement officers and to the public – especially children and the elderly – of dog bites and dog attacks. Dog fighting also facilitates the spread of transmissible diseases from dog to dog and dog to human, such as heartworm and rabies.

**B.**     **Defendants' Sale of Dog Fighting Videos**

48.     On or before 2004, Defendant John Doe d/b/a UPBA produced a digital video disc entitled "UNLEASHED: THE REALEST PITBULL ACTION CAUGHT ON TAPE" (hereinafter "*Unleashed*"), containing nearly two hours of video footage in which approximately twenty live dogs are actually and intentionally maimed, mutilated, tortured, wounded, and killed.

49.     Specifically, *Unleashed* depicts approximately twelve dog fights whereby two unneutered dogs at a time are placed within a small enclosure made of plywood panels four feet high, and baited and taunted until they begin to attack one another, with a camera operator hovering closely over the animals. According to the content of the video, some of the dogs used are puppies, with one described as "11 months old." At least one of the dogs is also a female who has recently given birth. After each match the dogs or their bodies are removed and a new pair is placed into the enclosure.

50.     Over the course of two hours, *Unleashed* depicts hundreds if not thousands of injuries being inflicted upon these twenty dogs, leading to the death of at least one (as confirmed by the producers in the text displayed during the video), and the likely deaths of at least several others, based on the severity of their wounds at the moment the camera cuts to the next match. For instance, in one sequence of *Unleashed*, a dog pulls at the trachea of a second dog with a large neck laceration at the end of a fight; the mortally wounded dog appears to be deceased, as he is on his back with all four paws in the air, eyes closed, covered from head to tail in blood.

51.     Throughout this video, hundreds of puncture wounds, lacerations, and avulsions are inflicted upon the dogs. The dogs have large pieces of skin pulled off their shoulders, necks, faces, and the tops of their heads; these pieces of severed tissue can sometimes be seen in the dirt of the ring. The dogs bite through the paws, ears, legs, and genitals of one another. Their

wounds become contaminated with dirt and weeds, and the blood from their wounds smears across all four walls of the plywood enclosure. Dogs who start the fight with white fur appear to have been soaked in red paint by the end of the fight. By the end of each fight the dogs often struggle to breathe because they are near collapse and their mouths are filled with dirt and blood.

52.    When the dogs give up and try to escape they are prevented from exiting through cracks in the boards by people standing on the other side of the boards, who can be seen only by their pants and boots. During most of the sequences, the dogs' growls, screams, and vocalizations cannot be heard because they are muted out, and the audio consists instead of rap music. Much of the music has violent themes, such as one song about the "murder" of "the family, the lawyer, the jurors and the judge . . . the district attorney." None of the music is properly attributed to its source, and appears to have been used in violation of copyright laws.

53.    The final "Chapter" of *Unleashed* contains more than thirty minutes of ten second clips that alternate between excerpts of the dog fight sequences in prior chapters, and video clips of nude women undertaking various sexual acts. Often, the alternating clips will show dogs being shaken violently by their necks, followed by women shaking violently.

54.    The events depicted in *Unleashed*, and staged for the purpose of producing *Unleashed*, are unlawful in every state, and are punishable as a felony in 48 states. Copies of *Unleashed* were found and seized by law enforcement authorities at a recent raid of a dog fighting compound in Columbus, Ohio.

55.    The dog fights featured in *Unleashed* were staged for the purpose of producing and selling *Unleashed* for commercial gain, as demonstrated by, among other things, the fact that the camera operator is waiting for the dogs in the ring and follows them around closely; not even

16

the dogs' handlers are in the ring. Furthermore, none of the other people attending the dog fight are visible in *Unleashed*, although their voices can be heard in the final chapter.

56.      Unlike most DVDs, the true identity of the producer or distributor of *Unleashed* is not shown on either the label of *Unleashed*, or its container or packaging, or in the content of *Unleashed*. The video footage states only that it is "present[ed]" by the "UNDERGROUND PITBULL BREEDERS ASSOCIATION," a fictitious entity with no known street address, incorporation, or license to do business in any state. None of the individuals involved in the making of *Unleashed* are identified by name or face.

57.      On or before April, 2006, Defendant John Doe d/b/a Street Heat produced a digital video disc entitled "HOOD FIGHTS VOL. 2: THE ART OF THE PIT" (hereinafter "*Hood Fights*"), containing approximately forty minutes of video footage in which approximately twenty live dogs are actually and intentionally maimed, mutilated, tortured, wounded, and killed. The dog fighting footage in *Hood Fights* is identical to the footage described in paragraphs 48-55 – it appears to have been copied directly from *Unleashed*.

58.      Defendants Amazon, John Doe d/b/a UPBA, and John Doe d/b/a Street Heat knowingly create, sell, or possess *Unleashed* and *Hood Fights* (hereinafter collectively referred to as "the Videos") – depictions of animal cruelty – with the intention of placing that depiction in interstate or foreign commerce for commercial gain, in the District of Columbia and other jurisdictions where dog fighting is illegal; and/or aid or abet in the same.

59.      The Videos do not have serious religious, political, scientific, educational, journalistic, historical, or artistic value. There is no context, commentary, historical or documentary reference for the dog fighting.

60.     The production, distribution, marketing, and sale of the Videos also promote and further unlawful animal fighting ventures. The Videos employ popular music to glamorize and make light of animal fighting. They desensitize viewers to the violent nature of animal fighting by using music for the audio content while muting out the animals' vocalizations.

61.     Defendants Amazon, John Doe d/b/a UPBA, and John Doe d/b/a Street Heat, and their employees and agents, knowingly distribute the Videos through the mail service of the U.S. Postal Service for the purpose of promoting and furthering unlawful animal fighting, and/or aid and abet in their distribution for the purpose of promoting and furthering unlawful animal fighting.

**C.     Defendants' Sale of Cockfighting Magazines**

62.     At all times relevant to this action, Defendants Dowd Publishers and Marburger Publishing published, and continue to publish, respectively, *The Feathered Warrior* and *The Gamecock* (hereinafter "the Publications") – two monthly catalog-type publications that feature hundreds of advertisers and thousands of products per monthly issue. Advertisements comprise approximately 64 percent of the total content of the Publications as measured over a twelve month period – a total of over 2,500 advertisements for commercial transactions.

63.     Of these advertisements – more than 1,700 pages' worth as measured over a twelve month period – over 90 percent are criminal solicitations. For instance, 34 percent of these advertisements propose commercial transactions for fighting animals or fighting paraphernalia that are illegal *everywhere*, because the transactions are prohibited by state law in the seller's jurisdiction, and their interstate or international sale, purchase or shipment is also prohibited by federal law. The remaining 66 per cent of these advertisements propose

commercial transactions for fighting animals or fighting paraphernalia that are illegal if purchased anywhere in the world except the state in which the seller resides.

64.    For instance, the Publications contain advertisements for fighting birds who "want to hurt something," such as one in particular that was marketed for his fighting prowess on the basis that he had impaled an opposing bird "through [the] neck and kill[ed] [him] outright." THE FEATHERED WARRIOR 1 (Verna Dowd, ed., July 2006).

65.    The Publications also advertise dogs intended for fighting purposes, including dogs bred and sold by dog fighting kingpin Floyd Boudreaux. *See id.* at 63. Boudreaux was arrested in March of 2005 and presently awaits trial on forty-eight felony counts of animal fighting, based on the breeding and sale of dogs intended for fighting.

66.    The Publications also advertise animal fighting venues for purchase, such as the "Sally Gap Game Club," a "10,000 Sq. Ft." cockfighting club that "Is Up And Running!!!!" in Kentucky, where cockfighting is illegal. THE GAMECOCK 37 (J.C. Griffiths, ed., Dec. 2006). Cockfighting pits and cages are pictured in the advertisement, along with rows of bleachers where spectators observe the fights. *Id.*

67.    A recent undercover investigation confirmed that the sole function of this facility is to host unlawful animal fighting events. Specifically, the seller of the cockfighting pit told an investigator by telephone that the weekly events feature both "short knife" and "long knife" cockfights, and that prospective purchasers of the pit need not worry about being prosecuted because the local sheriff already knew about the pit and would not take action. Undercover video footage taken on February 3, 2007 reveals over four hundred people from several states in attendance at the Sally Gap Game Club, with an estimated $500,000 in illegal wagers being handled by the house. None of this income, on information and belief, is reported to the Internal

Revenue Service as required by law. Therefore, the Publication in which this advertisement appears promotes and furthers unlawful animal fighting ventures and other crimes.

68. The Publications also advertise actual animal fighting events in jurisdictions where cockfighting is illegal. *See, e.g.,* THE FEATHERED WARRIOR 5 (Apr. 2004) (listing schedule for Oklahoma cockfights, months after Oklahoma Supreme Court had affirmed the validity of the statewide cockfighting ban, which also makes it a felony to advertise a cockfight).

69. The advertisements for specific animal fights contain information not found in any other print periodical, without which a gambler or fight participant would not be able to attend, such as entry fees and required "memberships," weapons classifications, driving directions, cockfighting rules, and the telephone number that will ring in the fighting "Pit." *See id.* at 10 (July 2006) (advertising "Long Knife Derby"); THE GAMECOCK 34 (July 2006) (explaining how the "Rules of Cockfighting" operate when the birds kill each other at the same time, and describing the referee's "examination to determine if a cock is actually dead, not just dying").

70. The Publications also list the results and champions from recent cockfights, including fights in states where cockfighting is illegal. *See, e.g.,* THE FEATHERED WARRIOR 61 (July 2006); *id.* at 37 (Jan. 2004). These accolades, including "victories" at "derbies" or cockfights in jurisdictions where cockfighting is illegal, are then used by winning handlers and breeders to market and sell birds intended for fighting and to obtain premium prices based on their fighting reputation. THE GAMECOCK 103, 107 (Feb. 2006) (advertising birds for sale that were illegally transported in interstate commerce and fought at illegal cockfights in Virginia, Alabama, California, Kentucky, Tennessee, Texas, Oklahoma, and Hawai'i).

71.    The advertisements also include cockfighting supplies such as "gaffs" or knives attached to the legs of birds for purposes of fighting. *See, e.g., id.* at 117 (Jan. 2006) (Tennessee supplier advertising fighting blades that are designed for "maximum cutting and penetration"); *id.* at 99 (June 2004) (listing fighting gaffs and blades for sale that "cut the fowl in good place, it bounce to roll on the ground and dead [sic]"). The sale, purchase, and transport of these implements is unlawful.

72.    The Publications also advertise steroids, "speed," and other drugs for fighting purposes. *See, e.g.,* THE FEATHERED WARRIOR 12, 15 (Jan. 2006) (advertising hormones that encourage "pure aggression" to "prepare your cock for battle"); THE GAMECOCK 21 (July 2006) (advertising injectable "blood clotting solution" that "can and does help your cocks [sic] chances by stopping internal bleeding fast"); *id.* at page T (Jan. 2004) (advertising injectable "Nicoramin" stimulant that allows birds to "fight longer even when injured"). The sale, purchase, and transport of these drugs is prohibited by the AWA and the laws of twenty-three states, and may also violate controlled substances laws.

73.    Advertising in *The Gamecock* costs up to $2,118 for a single advertisement per year; advertising in *The Feathered Warrior* costs up to $1,155 for a single advertisement per year. *Id.* at 64 (Jan. 2006); THE FEATHERED WARRIOR 67 (July 2006). The publisher of *The Feathered Warrior* lists an email address and phone number by which advertisers and consumers in the District of Columbia and elsewhere could contact the publication. *Id.* at 60 (Jan. 2006).

74.    The Publications are found at seventy-five percent or more of all law enforcement raids of illegal animal fights. Judges and juries have considered possession of the Publications to be evidence of criminal culpability under animal cruelty prohibitions. *See, e.g., Com. v. Balog,*

672 A.2d 319, 322-24 (Pa. Super. Ct. 1996) (affirming cockfighting conviction on basis of circumstantial evidence including "36 magazines on fighting birds, and two sets of [gaffs]").

76. On May 19, 2007, federal, state and local law enforcement officers raided a cockfighting facility near Van Buren, Arkansas and arrested more than 80 people on federal and state animal fighting, animal cruelty, and gambling charges. Two of the individuals arrested on multiple charges have substantial ties to *The Gamecock* publication.

76. The first is Bill Ray McNatt, who was arrested for "animal cruelty" and "operating a gambling house." Mr. McNatt is the owner of "Cherokee Game Farm Supply," a regular advertiser in *The Gamecock* that offers a "full line of game fowl supplies." *See* THE GAMECOCK at 90 (Jul. 2006) (listing "Bill McNatt" in the advertisement as the seller). At the time of the raid, Mr. McNatt was selling cockfighting equipment at a stand next to the cockfighting pit. Therefore, Mr. McNatt now faces criminal animal fighting charges for doing the same thing that he does every month – only to a much wider audience – in *The Gamecock*.

77. Police officers also reported that roosters seized during the raid had been injected with methamphetamines. Local reports state that the "concession stand" sold "needles to inject vitamins, or even methamphetamine, to get roosters ready to fight." The concession stand is also identified in the Affidavit of FBI Special Agent T. Akins, which was filed in federal court on May 21, 2007 in support of the government's *in rem* forfeiture complaint against the property on which the cockfighting pit was located.

78. The second individual is Hayden C. Hise, who was arrested on charges of "operating a gambling house, criminal use of property, animal cruelty, and engaging in gambling." Investigators identified Mr. Hise as the "head referee" who was presiding over the cockfighting matches at the pit at the time of the raid.

79.    *The Gamecock* publishes fight results and photographs of fight winners submitted by "HCH" – or Hayden C. Hise.   *See, e.g.*, THE GAMECOCK 53, 82, 85, 120 (July 2006).   On information and belief, the fighting facility identified in those photographs as "the Outback" is the Arkansas pit raided by law enforcement on May 19, 2007.

80.    The publisher of a dog fighting magazine pled guilty last year in Pennsylvania to two felony animal fighting and conspiracy charges based entirely on his publishing and distributing the magazine, under a statute that prohibits "encouraging" animal fighting, similar to the AWA and D.C. Cruelty to Animals Statute provisions at issue here.   *See Com. v. Fricchione*, Crim. No. 0012396-2004 (Pa. Ct. Comm. Pleas, sentenced March 13, 2006).

81.    Like the Publications here, the dog fighting magazines at issue in the *Fricchione* criminal action listed the winners from recent animal fights, advertised fighting animals marketed based on their "victories" in those fights, advertised dog fighting implements, and contained some non-advertising content.

82.    On information and belief, most of the fighting animals and fighting implements advertised in the Publications are not advertised in any other medium, paper or electronic.

83.    Defendants Amazon, Dowd Publishers and Marburger Publishing, and their employees and agents, knowingly publish and distribute the Publications through the mail service of the U.S. Postal Service for the purpose of promoting and/or furthering unlawful animal fighting ventures; and/or aid and abet in their distribution for the purpose of promoting and/or furthering unlawful animal fighting.

84.    The publication, distribution, marketing, and sale of the Publications promotes and furthers hundreds if not thousands of specific unlawful animal fighting ventures, including those expressly named in the text and advertisements of the Publications, as well as those that are

not expressly named but would not exist but for the real-time commercial cockfighting infrastructure provided by the Publications.

**D.    The Agreements to Publish, Distribute, Market, Promote, and Sell the Publications**

85.    On information and belief, Defendant Amazon, through its website, is the only retail seller of subscriptions to the Publications; its website is the only way consumers in the District of Columbia and elsewhere can find and purchase subscriptions to the Publications over the internet, or by any other means besides contacting the publishers directly by written mail or by telephone as listed only in the Publications themselves.  The Defendant magazine publishers do not presently maintain their own web sites.

86.    On information and belief, and on a date prior to June 2005, employees, officers, or agents of Defendants Amazon, Magazine Express, and Dowd Publishers, respectively; acting within the scope of their employment or agency; and with the intent to benefit their employer company or the company on whose behalf they were acting; and at the request of or with the approval, ratification, authorization, or tolerance of the appropriate manager(s), or officer(s), or executive(s) of that company; entered into one or more agreements or arrangements with at least one of the other Defendants named in this paragraph, in writing or otherwise (hereinafter "Agreements"), by which: (1) Defendant Amazon would list *The Feathered Warrior* on Amazon's website for retail sale, in exchange for a percentage of the retail price of each subscription purchased from Amazon's website, and would transmit the remainder of the subscription price to either Defendant Magazine Express or Defendant Dowd Publishers; and/or (2) Defendant Dowd Publishers would deliver hard copies of each issue of *The Feathered Warrior* either to Defendant Amazon or its agent, Defendant Magazine Express, or directly to the consumers whose name and mailing address Defendant Amazon provided to the Defendant

Dowd Publishers; and/or (3) Defendant Amazon would arrange, through its agent, Defendant

Magazine Express, for the delivery of those hard copies of *The Feathered Warrior*, by the mail

service of the U.S. Postal Service, to consumers who purchased that publication from Defendant

Amazon's website.

87.     Likewise, on information and belief, on a date prior to June 2005, employees,

officers, or agents of Defendants Amazon, Magazine Express, and Marburger Publishing,

respectively; acting within the scope of their employment or agency; and with the intent to

benefit their employer company or the company on whose behalf they were acting; and at the

request of or with the approval, ratification, authorization, or tolerance of the appropriate

manager(s), or officer(s), or executive(s) of that company; entered into one or more agreements

or arrangements with at least one of the other Defendants named in this paragraph, in writing or

otherwise, by which: (1) Defendant Amazon would list *The Gamecock* on Amazon's website for

retail sale, in exchange for a percentage of the retail price of each subscription purchased from

Amazon's website, and would transmit the remainder of the subscription price to either

Defendant Magazine Express or Defendant Marburger Publishing; and/or (2) Defendant

Marburger Publishing would deliver hard copies of each issue of *The Gamecock* either to

Defendant Amazon or its agent, Defendant Magazine Express, or directly to the consumers

whose name and mailing address Defendant Amazon provided to the Defendant Marburger

Publishing; and/or (3) Defendant Amazon would arrange, on its own or through its agent,

Defendant Magazine Express, for the delivery of those hard copies of *The Gamecock*, by the

mail service of the U.S. Postal Service, to consumers who purchased that publication from

Defendant Amazon's website.

88.     By their actions as described in this Section, the Defendants described in this Section, and their employees, officers, or agents, all sought by their actions to make the Agreements successful, because the Defendants had and have a financial stake in the Publications' success, based on the number of subscriptions to the Publications that are sold. Defendants Amazon and Magazine Express combined, cooperated, agreed, and otherwise conspired with Defendants Dowd Publishers and Marburger Publishing to sell as many subscriptions to the Publications as possible.

89.     The effect of the Agreements – namely, the promotion and furthering of unlawful animal fighting ventures – is unlawful.  On information and belief, the Agreements have, at their base, a stream of illicit revenue generated by illegal gambling on animal fighting that furthers the promotion of illegal animal fights in the forty-nine states where such activity is prohibited. Specifically, both animals and implements unlawfully advertised in the Publications are used at unlawful animal fights, where handlers and others obtain illegal profits.  The revenue generated by advertisers through the Publications is not only unlawful in and of itself, but also directly furthers unlawful animal fighting ventures, as the animals and goods involved are in turn used to commit crimes and to procure money illegally.  The Publications are therefore a central part of an unlawful revenue scheme.

90.     As described further below, Defendant Amazon had actual and constructive knowledge that its marketing, sale, and shipment of the Publications were unlawful; Defendant Amazon nevertheless continued to intentionally assist Defendants Dowd Publishers and Marburger Publishing, using its website and its paid advertising on other popular websites to purposefully procure subscribers for Defendants Dowd Publishers and Marburger Publishing.

Defendants Dowd Publishers and Marburger Publishing purposefully caused Defendants Amazon and Magazine Express to use the mail service to deliver the Publications to purchasers.

**E.    The Distribution, Marketing, and Sale of the Videos and the Publications**

91.    Beginning in October, 2006 and June, 2006, respectively, or earlier, Defendant Amazon sold *Unleashed* and *Hood Fights* on its Marketplace website, as supplied by third-party merchants. A link to the webpage where Amazon sells *Unleashed* is the first link displayed whenever a user types in the search term "Pitbull" for DVDs on Defendant Amazon's search engine. The "Product Description," in its entirety, states "Pitbull action caught on tape."

92.    Defendant Amazon keeps a percentage of each purchase made on its Marketplace website and transmits the buyer's address to the third-party merchant. Defendant Amazon is one of only three internet sellers of the Videos.

93.    Defendant Amazon knowingly sells the Videos. On October 17, 2006, a member of the public alerted Defendant Amazon to the fact that *Unleashed* contained actual scenes of animal fighting and asked that Defendant discontinue its sale of the video. In response, Defendant Amazon told the consumer that her request amounted to "censorship" and stated that it would "continue to make controversial works available in the United States and everywhere else, except where they are prohibited by law."

94.    Similarly, Plaintiff alerted Amazon to the unlawful nature of *Hood Fights* in June, 2006.

95.    Beginning in June 2005 or earlier, and pursuant to the Agreements described in paragraphs 85-90, Defendant Amazon sold, and continues to sell, the Publications on its website. Each of the Publications has its own web page on the Amazon website that lists the title, retail price, number of issues, and a "Product Description." For both Publications, Defendant

Amazon's web page states that the consumer's "name and mailing address will be shared with the appropriate publisher."

96.    Defendant Amazon's "Product Description" for *The Feathered Warrior* states that the publication "is a trade magazine devoted to [ ] the . . . fighting of gamefowl." Defendant Amazon's "Product Description" for *The Gamecock* states that the publication contains "[a]rticles on gamefowl, poultry diseases, sport [*i.e.,* fighting] results, advertising of supplies for proper care of gamefowl and some history of gamefowl."

97.    These "Product Descriptions" were either transmitted to Defendant Amazon or its agent, Defendant Magazine Express, from the respective Defendant publishers, or were developed by employees or agents of Defendant Amazon after reviewing the Publications.

98.    In July of 2005, Plaintiff notified executives at Defendant Amazon in writing that Defendant Amazon's marketing and sale of the Publications violates the AWA, and requested that Defendant Amazon discontinue its marketing and sale of the Publications. Plaintiff also explained that the advertisements in the Publications proposed unlawful commercial transactions.

99.    After several unreturned follow-up phone calls and letters, Plaintiff sent another letter on July 18, 2006 to executives at Defendant Amazon stating that the Publications were still being marketed and sold by Amazon in violation of federal law, and that Plaintiff would initiate this civil action unless Defendant agreed to cease its promotion and sale of the Publications.

100.    On or before July 18, 2006, Amazon also listed a single set of "Phillippine Cockfighting Slasher Knives" on its Marketplace website through a third party seller for $500.00. The Amazon website listing for the Slasher Knives stated that the knives were the

"Most Lethal Slashers Money can Buy," and "[g]uaranteed to stay sharp and lethal even after several usages."

101.    Amazon actively markets the Publications through advertisements, some of which are expressly listed as paid advertisements on several popular websites such as Yahoo! Shopping, mySimon.com, aMagArea.com, DealTime.com, Verizon SuperPages.com, Epinions.com, and the banner ad that appears at the top of Google.com following specific searches. Those advertisements all feature live links by which a consumer clicks on the text and is sent directly to the pages on Amazon's website where Amazon sells the Publications.

102.    Defendant Amazon also actively markets the Videos and the Publications using various promotions on its own website. For instance, Defendant Amazon advertises one of the Publications on the selling page of the other, under the heading "Better Together," which offers a price promotion if the buyer purchases both, rather than just one, of the Publications.

103.    Defendant Amazon also actively markets the Videos and the Publications by advertising them on the selling page of other items, under the heading "Customers who bought this item also bought . . ." which displays the purchases of other consumers who bought the listed Publication.

104.    On Defendant Amazon's "Policies, Glossary, and FAQs" web page, which consumers can access from the "Help" page that is linked to all of the specific product web pages on Defendant Amazon's website, Amazon states that it will not sell of a broad range of potentially objectionable yet lawful materials on its website – twenty-three categories in all, including sexually explicit materials and anything else "we [Defendant Amazon] deem offensive," which "is probably about what you would expect."

105.    Defendant Amazon also represents that sellers on its websites, presumably including Defendant Amazon itself, "are expected to conduct proper research to ensure that the items posted to our . . . sites are in compliance with all local, state, national, and international laws." Defendant Amazon also states that "the items we prohibit" include "Illegal items," such as "any product which may lead to the production of an illegal item or illegal activity."

106.    In order to "visit" or "shop" at Amazon.com, consumers must "accept" and "agree" to Defendant Amazon's "conditions of use," which states that Defendant Amazon's "other policies," such as its "policies" regarding "Illegal items" as described in paragraph 105, "also govern your visit to Amazon.com." These policies and the conditions of use are expressly incorporated into each consumer transaction as indicated on the ordering page.

107.    Defendant Amazon's terms and conditions, insofar as they are expressly incorporated in every consumer transaction that occurs with respect to the website, constitute warranties and/or affirmative representations that (1) the items sold are not illegal; and (2) that those items will not give rise to illegal activities if they are possessed and/or used.

108.    In breach of the express warranties and/or affirmative representations conveyed within Defendant Amazon's sales terms and conditions, the Videos and cockfighting publications constitute prohibited "illegal items" and are not presented in a condition consistent with that warranted by Amazon because they are not in compliance with applicable federal and state laws.

109.    Additionally, anyone who "visit[s] or shop[s]" on the Amazon Marketplace site, where the Video is sold, must also "accept" the "Participation Agreement." The Participation Agreement requires sellers to "comply with all applicable laws, statutes, and regulations." The

Participation Agreement is expressly incorporated into each consumer transaction as indicated on the ordering page.

110.    Contrary to the terms of the Participation Agreement, Defendant Amazon and the merchant producers and distributors of the Videos, Defendants John Doe d/b/a UPBA, and John Doe d/b/a Street Heat, have failed to comply with federal animal cruelty laws and the D.C. Cruelty to Animals statute, rendering them liable for unlawful trade practices proscribed by the CPPA.

111.    On information and belief, a substantial percentage, and perhaps even a majority, of all new subscriptions to the Publications are sold by Amazon.  For instance, the Publications consistently rank in the top one percent and top five percent, respectively, of all magazine subscriptions sold on Amazon.com.

112.    If unlawful animal fighting ventures are promoted or in any other manner furthered, more people will participate in those animal fighting ventures, and therefore more people will purchase subscriptions to the Publications in order to compare prices, read fight results, find the location and dates of upcoming fights, and order fighting animals and paraphernalia.  Concomitantly, more people will purchase subscriptions to the Publications from Defendant Amazon.

113.    If Defendants did not advertise and sell the Publications and distribute them through the mail service, there would be no retail outlet for, no internet promotion and advertising of, and no internet sale of subscriptions to the Publications in the District of Columbia and elsewhere, and the Publications' circulation would therefore be substantially reduced.    Likewise, if Defendants did not market and sell the Videos, there would be substantially fewer Videos sold.

114.    In turn, less illegal animal fighting and fighting animal trafficking would occur in the District of Columbia and surrounding areas if Defendants ceased their marketing and sale of the Videos and the Publications, because both the Videos and the Publications promote and further unlawful animal fighting, as described above.  Without the magazines, animal fighters in the District of Columbia and elsewhere would have substantially reduced access to sellers and buyers of fighting animals and other implements intended to be used in unlawful animal fighting, and would also have substantially reduced access to information about how and where to attend specific animal fights.

**E.    Harm To District of Columbia Consumers**

115.    Consumers in the District of Columbia have purchased each of the Publications – and, on information and belief, the Videos – from Defendant Amazon.  Consumers in the District of Columbia have also viewed the web pages for the Publications and Videos on Defendant Amazon's website.

116.    Based on the representations made by Defendant Amazon in its "conditions of use," "Policies," and "Participation Agreement" – all of which "bind" and are an inherent part of consumer transactions – consumers believe that the sale and content of products sold on Amazon.com, including the Videos and the Publications, "comply with all applicable laws, statutes, and regulations," including the AWA, the federal Depiction of Animal Cruelty statute, and the D.C. Cruelty to Animals Statute, and reasonably rely on that representation when making purchases.

117.    On information and belief, many consumers are misled by Defendant Amazon's express representations that the content and sale of the Videos and Publications "adhere to all applicable laws" and do not "lead to the production of an illegal item or illegal activity," and

would not complete the transactions if they knew that the products did not comport with federal criminal prohibitions and the animal welfare law of the District of Columbia. Furthermore, Defendant Amazon's website nowhere identifies the Videos in question as ones that contain unlawful unlawful depictions of actual animal cruelty.

118.    Whether or not consumers are actually misled by these material misrepresentations and/or omissions of material fact, the sale of the Videos and Publications clearly causes harm to consumers within the District of Columbia.

119.    According to Defendant Amazon's website, "Customers who bought [*Unleashed*] also bought" from Amazon a DVD called "Off the Chain," which is clearly identified on Amazon's website as an anti-dogfighting "documentary [about] the world of dog fighting and how it [has] damaged the [pit bull] breed." It is unlikely that consumers would purchase both if Defendant Amazon had not failed to state the material fact that *Unleashed* depicted actual dog fighting and other forms of animal cruelty and, unlike "Off the Chain," was not an anti-dog fighting video.

120.    If Defendants had not engaged in violations of the CPPA by agreeing to advertise, sell, publish, and distribute the Videos and Publications in a manner contrary to federal criminal prohibitions concerning animal fighting and the D.C. animal welfare law, District of Columbia residents would not have suffered pecuniary loss, *i.e.*, they would not have expended funds to obtain the Videos and subscribe to the Publications.

## F.    **Health and Safety Harms**

121.    As explained above, Defendants' advertisement and sale of, and agreement to publish, distribute by mail service, market, and sell the Publications and the Videos, including in the District of Columbia, "promotes" and "furthers" unlawful animal fighting in the District of

Columbia, thereby resulting in more illegal animal fighting than there would be if Defendants did not advertise and sell the Publications, or agree to publish, distribute by mail service, market, and sell the Publications or the Videos.

122.    Animal fighting imminently harms the health and safety of District of Columbia residents because, as explained above, animal fighting ventures involve illegal gambling and drug and weapons trafficking, all of which increase the risk that District of Columbia citizens and members of the public will be victimized by violent crime and property crime. Therefore, Defendants' ongoing publishing, distributing through the mail service, marketing, and sale of the Publications and the Videos, all of which promote and further unlawful animal fighting, substantially increases the risk of harm to the health and safety of District of Columbia residents. These injuries will be redressed if Plaintiff prevails in this action.

123.    Likewise, increased animal fighting caused by Defendants' advertisement and sale of, and agreement to publish, distribute by mail service, market, and sell the Publications and the Video also imminently harms the health and safety of D.C. residents because, as explained above, cockfighting spreads Avian influenza and other diseases that are transmissible to other animals and to humans, exposing D.C. citizens to a substantially increased risk of health harms. Dog fighting also threatens public health and safety, by increasing the risk of dog bites and dog attacks, and by facilitating the spread of transmissible diseases, such as rabies and heartworm. These injuries will be redressed if Plaintiff prevails in this action.

**G.    Harm To Plaintiff and Its Members**

124.    Plaintiff is the nation's largest animal protection organization with nearly ten million members and constituents. For more than five decades, The HSUS has engaged in public education, advocacy, training and legislative activities to curb animal fighting. Plaintiff was

instrumental in securing the passage of the Federal Animal Welfare Act Amendments of 1976, 2002, and 2007 relating to animal fighting. Plaintiff also works toward the enactment and strengthening of animal fighting laws in each of the United States, including the D.C. Cruelty to Animals Statute.

125.    In addition to these efforts, Plaintiff has also been called upon by law enforcement agencies to participate in dozens of law enforcement raids at animal fighting ventures and to provide direct care and shelter for fighting animals seized by law enforcement agents, at a total cost to Plaintiff of hundreds of thousands of dollars' worth of equipment, transportation, veterinary supplies, and personnel.

126.    For instance, on May 15, 2005, Plaintiff provided critical animal handling and technical expertise in a law enforcement raid on an unlawful commercial cockfighting and gamefowl breeding operation in Fiddletown, California owned by one of the advertisers in the Publications – where police arrested 28 people for cockfighting and seized copies of the Publications as evidence. In addition, Plaintiff also provided an emergency grant to pay for the care of the 58 roosters seized as evidence pending trial, and to build makeshift housing after the affected communities could no longer make room for the aggressive birds in their animal shelter dog runs without euthanizing more stray or surrendered dogs. The owner awaits trial on felony charges but nonetheless continues to advertise fighting birds in the Publications, where his advertisements state that the compound is "still alive and – well!" and that he will continue to "ship" fighting birds "Anytime, anywhere." THE GAMECOCK at page Y (Mar. 2006).

127.    Additionally, Plaintiff participated at the request of Louisiana State Police, U.S. Customs agents, and local SWAT teams, in the law enforcement action on March 9, 2005 that resulted in the arrest of fighting dog breeder Floyd Boudreaux, who now awaits trial on forty-

eight felony counts of dog fighting arising out of his breeding and sale of dogs for fighting purposes. Despite the pending felony charges, Boudreaux's fighting dogs and "stud service" have been advertised for sale in the five most recent issues of one of the Publications.

128.    Plaintiff is presently assisting federal and state law enforcement officers with investigations in preparation for upcoming raids at animal fighting ventures in several jurisdictions, which are promoted and furthered by Defendants' unlawful actions.

129.    Defendants' actions impair and frustrate Plaintiff's ability to pursue its goals, because the proliferation of illegal animal fighting caused by Defendants' unlawful acts requires Plaintiff to divert its limited organizational and programmatic resources to law enforcement actions and the care and handling of fighting animals seized at raids. These resources would otherwise be spent on programmatic and advocacy activities to prevent cruelty to animals, in furtherance of Plaintiff's goals. Plaintiff's injuries will be redressed if Plaintiff prevails in this action, because if Defendants cease their unlawful actions, animal fighting and trafficking in fighting animals and implements in the District of Columbia and elsewhere will be substantially reduced, and Plaintiff will not be required to divert its programmatic resources to assist with law enforcement actions against illegal animal fighting ventures. Additionally, members of Plaintiff who live in the District of Columbia are at risk of harms to their health and safety from increased cockfighting and animal fighting caused by Defendants' actions, as described in paragraphs 34-114 above. These injuries will be redressed if Plaintiff prevails in this action.

### PLAINTIFF'S CLAIMS FOR RELIEF

### COUNT I– Violations of the Consumer Protection Procedures Act Based on the Federal Depiction of Animal Cruelty Statute

130.    Plaintiff hereby incorporates by reference all the preceding paragraphs as if fully set forth herein.

131.    Plaintiff brings Claim One in its individual and representative capacity against Defendants Amazon, John Doe d/b/a UPBA, and John Doe d/b/a Street Heat on Plaintiff's own behalf and on behalf of affected consumers and the general public, pursuant to the CPPA, which allows any person to bring an action in the Superior Court of the District of Columbia for the interests of itself, its members, or the general public, seeking relief from the use by any person of a trade practice in violation of a law of the District of Columbia.    D.C. CODE ANN. § 28-3905(k)(1).

132.    By producing, distributing through the mail service, marketing, and selling the Videos in D.C. and other jurisdictions where dog fighting is unlawful, Defendants Amazon, John Doe d/b/a UPBA, and John Doe d/b/a Street Heat "knowingly create[ ], sell[ ], or possess[ ] a depiction of animal cruelty with the intention of placing that depiction in interstate or foreign commerce for commercial gain." 18 U.S.C. § 48(a).    By engaging in trade practices that violate federal law, Defendants are therefore also violating the CPPA. D.C. CODE ANN. §§ 28-3904(x), 28-3905(k)(1).

133.    Additionally, and in the alternative, Defendant Amazon, by marketing and selling the Videos, aids and abets Defendants John Doe d/b/a UPBA and John Doe d/b/a Street Heat in knowingly creating, selling, or possessing a depiction of animal cruelty with the intention of placing that depiction in interstate or foreign commerce for commercial gain.    By engaging in trade practices that violate federal law, *see* 18 U.S.C. §§ 2(a), (b), Defendants Amazon, John Doe d/b/a UPBA, and John Doe d/b/a Street Heat are therefore also violating the CPPA. D.C. CODE ANN. §§ 28-3904(x), 28-3905(k)(1).

134.    These unlawful trade practices have caused and will continue to cause injuries as described in paragraphs 34-129.

## COUNT II – Violations of the Consumer Protection Procedures Act Based on the Federal Animal Welfare Act

135.    Plaintiff hereby incorporates by reference all the preceding paragraphs as if fully set forth herein.

136.    Plaintiff brings Claim Two in its individual and representative capacity against all Defendants, on Plaintiff's own behalf and on behalf of affected consumers and the general public, pursuant to the CPPA, which allows any person to bring an action in the Superior Court of the District of Columbia for the interests of itself, its members, or the general public, seeking relief from the use by any person of a trade practice in violation of a law of the District of Columbia. D.C. CODE ANN. § 28-3905(k)(1).

137.    By publishing, distributing through the mail service, marketing, and selling the Publications and the Videos, Defendants knowingly use the mail service of the U.S. Postal Service for the purpose of promoting or in any other manner furthering unlawful animal fighting ventures, in violation of the AWA, 7 U.S.C. § 2156(c). By engaging in trade practices that violate the AWA, Defendants are therefore also violating the CPPA. D.C. CODE ANN. §§ 28-3904(x), 28-3905(k)(1).

138.    Additionally, and in the alternative, Defendants Amazon and Magazine Express, by distributing through the mail service, marketing, and selling the Publications and the Videos, are aiding and abetting Defendants Dowd Publishers, Marburger Publishing, John Doe d/b/a UPBA, and John Doe d/b/a Street Heat in knowingly using the mail service of the U.S. Postal Service for the purpose of promoting or in any other manner furthering unlawful animal fighting ventures, in violation of federal law. *See* 18 U.S.C. §§ 2(a), (b). By engaging in trade practices that violate federal law, Defendants Amazon and Magazine Express are therefore also violating the CPPA. D.C. CODE ANN. §§ 28-3904(x), 28-3905(k)(1).

139.    These unlawful trade practices have caused and will continue to cause Plaintiff injuries as described in paragraphs 34-129.

## COUNT III – Violations of the Consumer Protection Procedures Act Based on the District of Columbia Cruelty to Animals Statute

140.    Plaintiff hereby incorporates by reference all the preceding paragraphs as if fully set forth herein.

141.    Plaintiff brings Claim Three in its individual and representative capacity against all Defendants, on Plaintiff's own behalf and on behalf of affected consumers and the general public, pursuant to the CPPA. D.C. CODE ANN. § 28-3905(k)(1).

142.    By publishing, distributing through the mail service, marketing, and selling the Publications and the Videos to District of Columbia residents, Defendants "promote" exhibitions between two or more animals of fighting, baiting or causing injury to each other, in violation of the D.C. Cruelty to Animals Statute, D.C. CODE ANN. § 22-1015(a)(1).

143.    By engaging in trade practices that violate the D.C. Cruelty to Animals Statute, Defendants are therefore also violating the CPPA, D.C. CODE ANN. §§ 28-3904, 28-3905(k)(1).

144.    Additionally, and in the alternative, Defendants Amazon and Magazine Express, by distributing through the mail service, marketing, and selling the Publications and the Videos, are aiding and abetting Defendants Dowd Publishers, Marburger Publishing, John Doe d/b/a UPBA, and John Doe d/b/a Street Heat in "promot[ing]" exhibitions between two or more animals of fighting, baiting or causing injury to each other, in violation of D.C. CODE ANN. §§ 22-1015(a)(1), (a)(5). By engaging in trade practices that violate the D.C. Cruelty to Animals Statute, Defendants Amazon and Magazine Express are therefore also violating the CPPA, D.C. CODE ANN. §§ 28-3904(x), 28-3905(k)(1).

145.    These unlawful trade practices have caused and will continue to cause Plaintiff injuries as described in paragraphs 34-129.

### COUNT IV – Violations of the Consumer Protection Procedures Act Based on Material Misrepresentations

146.    Plaintiff hereby incorporates by reference all the preceding paragraphs as if fully set forth herein.

147.    Plaintiff brings Claim Four in its individual and representative capacity against Defendant Amazon, on Plaintiff's own behalf and on behalf of affected consumers and the general public, pursuant to the CPPA.  D.C. CODE ANN. § 28-3905(k)(1).

148.    By its marketing and sale of the Publications and the Videos, and by representing that the Publications and the Videos have an approval, certification, or characteristics that they do not have, namely, that the content of the Publications and the Videos and their sale is legal, thereby misrepresenting as to a material fact which has a tendency to mislead, Defendant Amazon is violating the Consumer Protection Procedures Act, D.C. CODE ANN. §§ 28-3904(a), 28-3904(e), 28-3905(k)(1).

149.    This unlawful trade practice has caused and will continue to cause Plaintiff injuries as described in paragraphs 34-129.

### COUNT V – Violations of the Consumer Protection Procedures Act Based on Failure to State a Material Fact

150.    Plaintiff hereby incorporates by reference all the preceding paragraphs as if fully set forth herein.

151.    Plaintiff brings Claim Five in its individual and representative capacity against Defendant Amazon, on Plaintiff's own behalf and on behalf of affected consumers and the general public, pursuant to the CPPA.  D.C. CODE ANN. § 28-3905(k)(1).

152. By its ongoing advertising and sale of the Publications and the Videos, and by failing to state a material fact where such failure tends to mislead, namely, failing to state that the content of the Publications and the Videos and their sale is illegal, Defendant Amazon is violating the Consumer Protection Procedures Act, D.C. CODE ANN. §§ 28-3904(f), 28-3905(k)(1).

153. This unlawful trade practice has caused and will continue to cause Plaintiff injuries as described in paragraphs 34-129.

## COUNT VI – Violations of the Consumer Protection Procedures Act Based on the District of Columbia Conspiracy Law

154. Plaintiff hereby incorporates by reference all the preceding paragraphs as if fully set forth herein.

155. Plaintiff brings Claim Six in its individual and representative capacity against Defendants Amazon, Marburger Publishing, Dowd Publishers, Magazine Express, and John Does III-XX ("Magazine Defendants"), on Plaintiff's own behalf and on behalf of affected consumers and the general public, pursuant to the CPPA. D.C. CODE ANN. § 28-3905(k)(1).

156. By entering into one or more Agreements, as described in paragraphs 85-90, to publish, distribute through the mail service, market, and sell each of the Publications, the Magazine Defendants conspired to commit a criminal offense under District of Columbia law, namely, "promot[ing]" exhibitions between two or more animals of fighting, baiting or causing injury to each other, in violation of the District of Columbia conspiracy law, D.C. CODE ANN. § 22-1805a(a).

157. By engaging in trade practices that violate the District of Columbia conspiracy law, D.C. CODE ANN. § 22-1805a(a), Defendants are therefore also violating the CPPA, D.C. CODE ANN. §§ 28-3904, 28-3905(k)(1).

158.    These unlawful trade practices have caused and will continue to cause Plaintiff injuries as described in paragraphs 34-129.

### COUNT VII -- Violations of the Consumer Protection Procedures Act Based on Federal Conspiracy Law

159.    Plaintiff hereby incorporates by reference all the preceding paragraphs as if fully set forth herein.

160.    Plaintiff brings Claim Seven in its individual and representative capacity against the Magazine Defendants, on Plaintiff's own behalf and on behalf of affected consumers and the general public, pursuant to the CPPA. D.C. CODE ANN. § 28-3905(k)(1).

161.    By entering into one or more Agreements, as described in paragraphs 85-90, to publish, distribute through the mail service, market, and sell each of the Publications, the Magazine Defendants conspired to commit an offense against the United States, namely, knowingly using the mail service of the U.S. Postal Service for the purpose of promoting or in any other manner furthering unlawful animal fighting ventures, in violation of 18 U.S.C. § 371.

162.    By engaging in trade practices that violate the federal conspiracy law, 18 U.S.C. § 371, Defendants are therefore also violating the CPPA, D.C. CODE ANN. §§ 28-3904(x), 28-3905(k)(1).

163.    These unlawful trade practices have caused and will continue to cause Plaintiff injuries as described in paragraphs 34-129.

### RELIEF REQUESTED

WHEREFORE, Plaintiff, individually and in its representative capacity, requests judgment and the following relief:

A.     Declaratory judgment that Defendants' ongoing distribution through the mail service, marketing, and sale of the Videos and each of the Publications; the aiding and abetting of same; and/or Agreements to do the same; violate the Federal Animal Welfare Act, 7 U.S.C. § 2156; the federal Depictions of Animal Cruelty Statute, 18 U.S.C. § 48; the D.C. Cruelty to Animals Statute, D.C. CODE ANN. §§ 22-1015(a)(1), (a)(5); the federal conspiracy statute, 18 U.S.C. § 371; the D.C. conspiracy law, D.C. CODE ANN. § 22-1805a(a); and the D.C. Consumer Protection Procedures Act, D.C. CODE ANN. §§ 28-3904(a), (f), (x); 28-3905(k)(1);

B.     All appropriate injunctive relief, including an Order that Defendants permanently cease and desist from unlawful trade practices in violation of D.C. CODE ANN. § 28-3905(k)(1)(D), namely, possessing, distributing by mail, marketing, and/or selling the Videos and the Publications that promote and further the illegal criminal enterprises of dog fighting and cockfighting;

C.     Treble damages, or $1,500 per violation, whichever is greater, payable to Plaintiff on behalf of its members and consumers in the District, *id.* § 28-3905(k)(1)(A);

D.     Additional relief as may be necessary to restore to the consumer the money or property which was acquired by means of the unlawful trade practice, *id.* § 28-3905(k)(1)(E);

E.     Reasonable attorney's fees and costs, *id.* § 28-3905(k)(1)(B), (F); and

F.     Such other and further relief as the Court deems proper, *id.* § 28-3905(k)(1)(F).

Respectfully submitted,

_____
Ethan Carson Eddy (D.C. Bar No. 496406)


_____
Jonathan R. Lovvorn (D.C. Bar No. 461163)
THE HUMANE SOCIETY OF THE UNITED STATES
2100 L Street, N.W.
Washington, D.C. 20037
(202) 676-2329
(202) 778-6132 (fax)
eeddy@hsus.org

*Counsel for Plaintiff The Humane Society of the United States*


Stuart Philip Ross (D.C. Bar No. 031658)
ROSS, DIXON & BELL, LLP
2001 K Street, N.W.
Washington, D.C. 20006
(202) 662-2000

*Of Counsel for Plaintiff*



## JURY DEMAND

Plaintiff hereby demands a trial by jury of this matter.


_____
Ethan Carson Eddy
Jonathan R. Lovvorn
Counsel for Plaintiff

June 6, 2007