IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                                            )
**THE HUMANE SOCIETY OF**                 )
**THE UNITED STATES,**                          )
                                                            )
                              Plaintiff,              )        Civ. No. 07-623 (CKK)
                                                            )
          v.                                              )
                                                            )
**AMAZON.COM, INC., ET AL.,**              )
                                                            )
                              Defendants.           )
_____)

### PLAINTIFF'S CONSOLIDATED MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

*Of Counsel:*

Stuart Philip Ross
Sarhana Livingston
ROSS, DIXON & BELL, LLP
2001 K Street, N.W.
Washington, D.C. 20006
(202) 662-2000

Ethan Carson Eddy
Jonathan R. Lovvorn

THE HUMANE SOCIETY OF THE UNITED STATES
2100 L Street, N.W.
Washington, D.C. 20037
(202) 676-2329
(202) 778-6132 (fax)

**TABLE OF CONTENTS**

**Page**

TABLE OF CONTENTS ................................................................................. i

TABLE OF AUTHORITIES ........................................................................ iv

INTRODUCTION ......................................................................................1

BACKGROUND ........................................................................................5

1. Statutory Framework .............................................................................5

   A.  District Of Columbia Consumer Protection Procedures Act ...................5

   B.  The Federal Depiction Of Cruelty Act ...................................................6

   C.  The Federal Animal Welfare Act .............................................................6

   D.  The District Of Columbia Cruelty To Animals Statute ...........................6

   E.  Other Federal And District Of Columbia Statutes ..................................6

2. Defendants' Marketing, Shipment, and Sale of Illegal Animal Fighting Materials ...........7

3. Procedural History ................................................................................9

ARGUMENT ...........................................................................................10

I.  THIS COURT HAS PERSONAL JURISDICTION OVER ALL DEFENDANTS ........11

   A.  This Court Has Specific Jurisdiction Over Marburger For Its Sales And Shipment Of The Publications In The District Of Columbia ...................12

      1. *Marburger Transacts And Has Transacted Business In The District* ................12

      2. *Plaintiff's Claims Arise From The Business Marburger Transacts In The District* ...................14

      3. *Marburger Purposefully Availed Itself Of, And Had Constitutionally Sufficient Minimum Contacts With, The District* .................14

      4. *This Court's Exercise Of Personal Jurisdiction Over Marburger Would Not Offend Traditional Notions Of Fair Play And Substantial Justice* .....................15

   B.  Alternatively, Personal Jurisdiction Is Proper Over All Defendants For Unlawful Trade Practices They Commit Jointly Through And On Defendant Amazon's Website ...................17

   C.  If The Court Has Any Doubt As To Personal Jurisdiction, Plaintiff Is Entitled To Jurisdictional Discovery To Further Support Allegations In The Amended Complaint ...................20

II.  PLAINTIFF HAS ALLEGED SUFFICIENT ARTICLE III STANDING ....................22

    A.  Plaintiff Has Standing To Sue In Its Own Right To Stop Harms To It As An
       Organization From Defendants' Unlawful Trade Practices .......................................23

       1.  *Plaintiff Has Alleged A Cognizable Injury* ...........................................................23

       2.  *Plaintiff's Financial Injuries Are Directly Traceable To Defendants'*
          *Unlawful Acts* ......................................................................................................27

       3.  *Plaintiff's Injury Is Also Directly Redressable By The Relief Sought* .................30

       4.  *The D.C. Legislature Has Removed Prudential Barriers To Standing* ...............31

    B.  Plaintiff Also Has Standing To Sue On Behalf Of Its Members In The District Of
       Columbia Who Are Harmed By Defendants' Unlawful Trade Practices .................32

       1.  *Plaintiff's Members Would Have Standing To Sue In Their Own Right* ..............33

       2.  *The Interests Plaintiff Seeks To Protect Are Germane To Its Organizational*
          *Purpose* ...............................................................................................................35

    C.  If The Court Finds That Plaintiff Lacks Article III Standing, The Matter Must
       Be Remanded Back To The Superior Court .............................................................36

III.  THE COMPLAINT STATES CLAIMS UPON WHICH RELIEF MAY BE
     GRANTED UNDER THE CPPA ..........................................................................36

    A.  The CPPA Is A Broadly Worded Remedial Statute That Provides Plaintiff
       A Right Of Action To Remedy Defendants' Unlawful Trade Practices ...................37

    B.  CPPA Claims Do Not Require That Predicate Violations Be Separately
       Actionable ................................................................................................................38

    C.  D.C. Code § 28-3904 Is Not Limited To Warranty Actions .....................................44

IV.  Defendants' Merits Arguments Are Premature And Unavailing ...................................45

    A.  The Communications Decency Act Does Not Immunize Defendants' Unlawful
       Trade Practices .......................................................................................................45

       1.  *The CDA Does Not Immunize Criminal Use Of The Mail, Which Is Not*
          *Speech Or Website Content, But Action* ..............................................................47

       2.  *Even If Plaintiff's Claims Were Premised Solely On Internet Content As*
          *Opposed To Actions, The CDA Defense Still Fails Because Amazon Is The*
          *"Provider," At Least "In Part," Of The "Content" At Issue* ..............................50

    B.  Defendants' First Amendment Argument Is Meritless ..............................................53

       1.  *The Publications And Their Advertisement And Sale On Amazon.Com Are*
          *Plainly Commercial Speech* .................................................................................54

       2.  *There Is No First Amendment Protection For Commercial Speech That*
          *Proposes Illegal Commercial Transactions* .........................................................58

3.  *The Remaining Central Hudson Factors Also Refute Defendants' First Amendment Defense* ...................................................................................60

4.  *Defendants' Other Arguments For Avoiding Central Hudson Are Also Unavailing* ..........................................................................................................63

5.  *Plaintiff's Requested Relief Does Not Amount To A Prior Restraint* ..................65

C.  Defendants' Overbreadth And Vagueness Challenges Must Also Be Rejected ........65

D.  Defendants' Claim That Distributors Do Not Have To Conform Their Conduct To The Animal Welfare Act Is Baseless And Premature...........................................67

E.  Plaintiff's Claims Concerning The Dog Fighting Videos Are Not Moot .................72

Conclusion...........................................................................................................................75

# TABLE OF AUTHORITIES

**Page**

## CASES

44 Liquormart, Inc. v. Rhode Island,
  517 U.S. 484 (1996) ........................................................................................... 60

ALDF v. Glickman,
  154 F.3d 426 (D.C. Cir. 1998) ........................................................................... 23

Abigail Alliance for Better Access to Developmental Drugs v. Eschenbach,
  469 F.3d 129 (D.C. Cir. 2006) ........................................................................... 24

Adams v. A.B. & A., Inc.,
  613 A.2d 858 (D.C. 1992) ........................................................................... passim

America Federation of Government Employees, AFL-CIO v. Rumsfeld,
  321 F.3d 139 (D.C. Cir. 2003) ........................................................................... 32

Anthony v. Yahoo, Inc.,
  421 F. Supp. 2d 1257 (N.D. Cal. 2006) ............................................................ 53

Arista Records, Inc. v. Sakfield Holding Co.,
  314 F. Supp. 2d 27 (D.D.C. 2004) ............................................................. 11,15

Atwater v. District of Columbia Department of Consumer & Regulatory Affairs,
  566 A.2d 462 (D.C. 1989) ................................................................................... 44

Auvil v. CBS 60 Minutes,
  800 F. Supp. 928 (E.D. Wash. 1992) ................................................................ 69

Barnes v. Glen Theatres, Inc.,
  501 U.S. 560 (1991) ........................................................................................... 61

Bates v. State Bar of Arizona,
  433 U.S. 350 (1977) ........................................................................................... 66

Batzel v. Smith,
  351 F.3d 904 (9th Cir. 2003) ............................................................................. 51

Bell Atlantic Corp. v. Twombly,
  127 S. Ct. 1955 (2007) ....................................................................................... 10

Bennett v. Spear,
  520 U.S. 154 (1997) ........................................................................................... 23

Beno v. Shalala,
    30 F.3d 1057 (9th Cir. 1994) ................................................................. 31

Blisscraft of Hollywood v. United Plastics Co.,
    294 F.2d 694 (2d Cir. 1961) ................................................................... 74

Blumenthal v. Drudge,
    992 F. Supp. 44 (D.D.C. 1998) ............................................................... 14

Board of Trustees of the State University of New York v. Fox,
    492 U.S. 469 (1989) ................................................................................ 55

Bolger v. Youngs Drug Products Corp.,
    463 U.S. 60 (1983) ........................................................................... passim

Broder v. Cablevision Systems Corp.,
    418 F.3d 187 (2d Cir. 2005) ................................................................... 40

Brunson v. Kalil & Co.,
    404 F. Supp. 2d 221 (D.D.C. 2005) ........................................................ 16

Burman v. Phoenix Worldwide Industrial,
    437 F. Supp. 2d 142 (D.D.C. 2006) ........................................................ 14

Capital Broadcasting Co. v. Mitchell,
    333 F. Supp. 582 (D.D.C. 1971) ............................................................ 58

Carafano v. Metrosplash.com, Inc.,
    339 F.3d 1119 (9th Cir. 2003) ................................................................ 46

Carey v. Population Services International,
    431 U.S. 678 (1977) ................................................................................ 63

Caribbean Broad. System, Ltd. v. Cable & Wireless PLC,
    148 F.3d 1080 (D.C. Cir. 1998) .............................................................. 21

Central Hudson Gas & Electric Corp. v. Public Serv. Commission of New York,
    447 U.S. 557 (1980) ........................................................................... passim

Cheshire Mortgage Service, Inc. v. Montes,
    612 A.2d 1130 (Conn. 1992) .................................................................. 40

Chicago Lawyers' Commission for Civil Rights Under the Law, Inc. v. Craigslist, Inc.,
    461 F. Supp. 2d 681 (N.D. Ill. 2006) ..................................................... 47

Circuit City Stores v. Adams,
    532 U.S. 105 (2001) ................................................................................ 45

City of Houston v. Hill,
    482 U.S. 451 (1987) ........................................................................................ 66

Columbia Rope Co. v. West,
    142 F.3d 1313 (D.C. Cir. 1998) ...................................................................... 73

Common Cause v. Federal Election Commission,
    108 F.3d 413 (D.C. Cir. 1997) ........................................................................ 26

Commonwealth v. Fricchione,
    Crim. No. 0012396-2004 (Pa. Ct. Comm. Pleas, sentenced March 13, 2006) ................ 69

Conboy v. AT&T Corp.,
    241 F.3d 242 (2d Cir. 2001),  cited in Amazon at 18-19 ................................. 40

Cooper v. First Government Mortg. & Investors Corp.,
    206 F. Supp. 2d 33 (D.D.C. 2002) .................................................................. 38

Corbis Corp. v. Amazon.com, Inc.,
    351 F. Supp. 2d 1090 (W.D. Wash. 2004) ................................................ 47, 50

Diamond Chemical Co., Inc. v. Atofina Chemicals, Inc.,
    268 F. Supp. 2d 1 (D.D.C. 2003) .................................................................... 21

Dimeo v. Max,
    433 F. Supp. 2d 523 (E.D. Pa. 2006) ............................................................. 46

District Cablevision Ltd. Partnership v. Bassin,
    828 A.2d 714 (D.C. 2003) ............................................................... 17, 31, 44

Doe I v. State of Israel,
    400 F. Supp. 2d 86 (D.D.C. 2005) .................................................................. 19

Doe v. GTE Corp.,
    347 F.3d 655 (7th Cir. 2003) .......................................................................... 46

Doe v. Stincer,
    175 F.3d 879 (11th Cir. 1999) ........................................................................ 32

Donato v. Moldow,
    865 A.2d 711 (N.J. Super. 2005) .................................................................... 46

E.E.O.C. v. St. Francis Xavier Parochial School,
    117 F.3d 621 (D.C. Cir. 1997) ........................................................................ 10

Eder Brothers, Inc. v. Wine Merchants of Conn., Inc.,
    880 A.2d 138 (Conn. 2005) ............................................................................ 40

Edmond v. USPS Gen'l Counsel,
    953 F.2d 1398 (D.C. Cir. 1992) ................................................................. 11

Edmond v. United States Postal Serv. Gen'l Counsel,
    949 F.2d 415 (D.C. Cir. 1991) ................................................................... 18

Edmonson v. Pearce,
    91 P.3d 605 (Okla. 2004) ........................................................................... 63

Eimann v. Soldier of Fortune Magazine, Inc.,
    880 F.2d 830 (5th Cir. 1989) ...................................................................... 70

El-Fadl v. Central Bank of Jordan,
    75 F.3d 668 (D.C. Cir. 1996) ....................................................................... 4

Environmental Research International, Inc. v. Lockwood Greene Eng'rs, Inc.,
    355 A.2d 808 (D.C. 1976) ..................................................................... 12, 13

FC Investment Group LC v. IFX Markets, Ltd.,
    479 F. Supp. 2d 30 (D.D.C. 2007) ...................................................... passim

FC Investment Group LC v. Lichtenstein,
    441 F. Supp. 2d 3 (D.D.C. 2006) ............................................................... 14

Fair Housing Council v. Roommates.com, LLC,
    489 F.3d 921 (9th Cir. 2007) ................................................................ 48,53

Federal Election Commission v. Akins,
    524 U.S. 11 (1998) ..................................................................................... 34

First Chicago International v. United Exch. Co.,
    836 F.2d 1375 (D.C. Cir. 1988) ................................................................. 10

Fletcher v. District of Columbia,
    481 F. Supp. 2d 156 (D.D.C. 2007) ........................................................... 10

Friends of the Earth v. Laidlaw Environmental Services,
    528 U.S. 167 (2000) ................................................................................... 30

Gentry v. eBay, Inc.,
    99 Cal. App. 4th 816 (2002) ...................................................................... 53

Gomez v. Toledo,
    446 U.S. 635 (1980) ................................................................................... 54

Good Impressions, Inc. v. Britton,
    169 F. Supp. 866 (D.D.C. 1958) ................................................................ 68

Grayned v. City of Rockford,
    408 U.S. 104 (1972) ................................................................................... 67

Griggs v. WMATA,
    66 F. Supp. 2d 23 (D.D.C. 1999) ............................................................. 10

Hakki v. Zima Co.,
    No. 03-9183, 2006 WL 852126 (D.C. Super. Ct. Mar. 28, 2006) ................... 38

Havens Realty Corp. v. Coleman,
    455 U.S. 363 (1982) ................................................................................... 23

Heroes, Inc. v. Heroes Foundation,
    958 F. Supp. 1 (D.D.C. 1998) .................................................................... 18

Hill v. Colorado,
    530 U.S. 703 (2000) ................................................................................... 66

Howard v. Riggs National Bank,
    432 A.2d 701 (D.C. 1981) ......................................................................... 37

Humane Society of the United States v. Hodel,
    840 F.2d 45 (D.C. Cir. 1988) ..................................................................... 35

Hunt v. Wash. State Apple Advertising Commission,
    432 U.S. 333 (1977) ................................................................................... 23

Hy Cite Corp. v. BadBusinessBureau.com,
    418 F. Supp. 2d 1142 (D. Ariz. 2005) ........................................................ 53

International Shoe Co. v. Washington,
    326 U.S. 310 (1945) ................................................................................... 16

Jin v. Ministry of State Sec.,
    335 F. Supp. 2d 72 (D.D.C. 2004) ............................................................ 20

Judicial Watch, Inc. v. Department of Justice,
    432 F.3d 359 (D.C. Cir. 2005) ................................................................... 32

Jungquist v. Sheikh Sultan Bin Khalifa Al Nahyan,
    115 F.3d 1020 (D.C. Cir. 1997) ................................................................. 17

Keeton v. Hustler Magazine,
    465 U.S. 770 (1984) ................................................................................... 14

Kolender v. Lawson,
    461 U.S. 352 (1983) ................................................................................... 66

Kulko v. California Superior Court,
    436 U.S. 84 (1978) ........................................................................................... 16

Lamar Outdoor Adver., Inc. v. Mississippi State Tax Commission,
    701 F.2d 314 (5th Cir. 1983) ........................................................................... 63

Larson v. Valente,
    456 U.S. 228 (1982) ......................................................................................... 30

Lerman v. Flynt Distributing Co, Inc.,
    745 F.2d 123 (2d Cir. 1984) ............................................................................ 69

Lewis v. Time, Inc.,
    83 F.R.D. 445 (E.D. Cal. 1979) ....................................................................... 67

Los Angeles Police Department v. United Reporting Publ'g Corp.,
    528 U.S. 32 (1999) ........................................................................................... 65

Lowe v. S.E.C.,
    472 U.S. 181 (1985) (emphasis added) ........................................................... 65

Lujan v. Defenders of Wildlife,
    504 U.S. 555 (1992) ........................................................................................... 4

McConnell v. Federal Election Commission,
    540 U.S. 93 (2003) ........................................................................................... 67

Medical Solutions, Inc. v. C Change Surgical LLC,
    468 F. Supp. 2d 130 (D.D.C. 2006) ................................................................ 21

Mosely v. Board of Education of City of Chicago,
    434 F.3d 527 (7th Cir. 2006) ........................................................................... 60

National Treasury Employees Union v. U.S.,
    101 F.3d 1423 (D.C. Cir. 1996) ...................................................................... 26

National Wrestling Coaches Association v. Department of Education,
    366 F.3d 930 (D.C. Cir. 2004) ........................................................................ 28

Natural Resources Defense Council v. Environmental Protection Agency,
    464 F.3d 1 (D.C. Cir. 2006) ............................................................................ 33

Ohralik v. Ohio State Bar Association,
    436 U.S. 447 (1978) ......................................................................................... 54

Osbourne v. Capital City Mortg. Corp.,
    727 A.2d 322 (D.C. 1999) .......................................................................... 37, 44

Payne Enterprises, Inc. v. United States,
    837 F.2d 486 (D.C. Cir. 1988) ....................................................................... 74

Perfect 10, Inc. v. Amazon.com, Inc.,
    487 F.3d 701 (9th Cir. 2007) ......................................................................... 73

Petersan v. ChartOne, Inc.,
    Civ. No. 03-8328 (D.C. Super., Aug. 2, 2004) .............................................. 32

Pitney Bowes v. USPS,
    27 F. Supp. 2d 15 (D.D.C. 1998) .................................................................... 4

Pittsburgh Press Co. v. Pittsburgh Commission on Human Relations,
    413 U.S. 376 (1973) .............................................................................. passim

Posadas de Puerto Rico Associate v. Tourism Co.,
    478 U.S. 328 (1986) ...................................................................................... 61

Ramirez de Arellano v. Weinberger,
    745 F.2d 1500 (D.C. Cir. 1984) ...................................................................... 4

Randolph v. ING Life Insurance and Annuity Co.,
    486 F. Supp. 2d 1 (D.D.C. 2007) ........................................................ 4, 5, 22

Roe v. Wade,
    410 U.S. 113 (1973) ...................................................................................... 74

Schneider v. Amazon.com,
    31 P.3d 37 (Wash. Ct. App. 2001) ................................................................ 46

Schuler v. U.S.,
    617 F.2d 605 (D.C. Cir. 1979) ...................................................................... 10

Scrivani v. Vallombroso,
    916 A.2d 827 (Conn. App. Ct. 2007) ............................................................ 40

Second Amendment Foundation v. U.S. Conf. of Mayors,
    274 F.3d 521 (D.C. Cir. 2001) ...................................................................... 10

Sierra Club v. Morton,
    405 U.S. 727 (1972) ...................................................................................... 25

Simon v. Eastern Ky. Welfare Rights Organization,
    426 U.S. 26 (1976) ........................................................................................ 27

Smith v. United States,
    431 U.S. 291 (1977) ...................................................................................... 67

Speyer v. Barry,
    588 A.2d 1147 (D.C. 1991) ....................................................................... 23

Stabilisierungsfonds Fur Wein v. Kaiser Stuhl Wine Distributors Pty. Ltd.,
    647 F.2d 200 (D.C. Cir. 1981) ................................................................ 16

Stevens v. Superior Court,
    89 Cal. Rptr. 2d 370 (Cal. Ct. App. 1999) ........................................ 40

Stoner v. eBay, Inc.,
    56 U.S.P.Q. 2d 1852, 2000 WL. 1705637 (Cal. Super. 2000) ........................ 47

Stop Youth Addiction, Inc. v. Lucky Stores, Inc.,
    950 P.2d 1086 (Cal. 1998) ....................................................................... 38

The Casbah, Inc. v. Thone,
    651 F.2d 551 (8th Cir. 1981) ................................................................. 60

Thompson v. Western States Medical Ctr.,
    535 U.S. 357 (2002) ................................................................................. 58

Trintec Industrial v. Pedre Promotional Products,
    395 F.3d 1275 (Fed. Cir. 2005) ........................................................... 19

United Food & Commercial Workers Union Local 751 v. Brown Group, Inc.,
    517 U.S. 544 (1996) ................................................................................. 32

United States v. Thompson,
    118 F. Supp. 2d 723 (W.D. Tex. 1998) .............................................. 70

United States v. Michael Vick,
    3:07-CR-274 (E.D. Va., indictment filed Jul. 17, 2007) ............................... 2, 33

United States v. W.T. Grant Co.,
    345 U.S. 629 (1953) ................................................................................. 73

Va. State Board of Pharmacy v. Va. Citizens Consumer Council, Inc.,
    425 U.S. 748 (1976) ................................................................................. 55

Vitek v. Jones,
    445 U.S. 480 (1980) ................................................................................. 73

Western States,
    535 U.S. at 367 ........................................................................................ 59

Whitmore v. Arkansas,
    495 U.S. 149 (1990) ................................................................................. 26

Williams v. The Purdue Pharma Co.,
    297 F. Supp. 2d 171 (D.D.C. 2003) ................................................................ 32

World-Wide Volkswagen Corp. v. Woodson,
    444 U.S. 286 (1980) ....................................................................................... 13

Youming Jin v. Ministry of State Sec.,
    335 F. Supp. 2d 72 (D.D.C. 2004) ................................................................ 17

Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio,
    471 U.S. 626 (1985) ....................................................................................... 65

Zeran v. America Online, Inc.,
    129 F.3d 327 (4th Cir. 1997) ......................................................................... 46

Zippo Manufacturing Co. v. Zippo Dot Com, Inc.,
    952 F. Supp. 1119 (W.D. Pa. 1997) ......................................................... 18, 19

## FEDERAL STATUTES

Animal Welfare Act,

    7 U.S.C. § 2156(a) ......................................................................................... 30

    7 U.S.C. § 2156(b) .................................................................................. 2, 59, 63

    7 U.S.C. § 2156(c) ................................................................................ 2, 6, 29, 65

    7 U.S.C. § 2156(g)(3) ...................................................................................... 67

Depiction of Animal Cruelty Act,

    18 U.S.C. § 48(a) ............................................................................................. 6

Communications Decency Act,

    47 U.S.C. § 230(c)(1) ...................................................................................... 48

    47  U.S.C. § 230(c)(2)(A) .......................................................................... 45, 49

    47 U.S.C. § 230(f)(2) ....................................................................................... 46

    47 U.S.C. § 230(f)(3) .................................................................................. 52, 53

## STATE STATUTES

Cal. Bus. & Prof. Code § 17200 ..................................................................... 40

D.C. Code § 13-423(a)(1) .................................................................................... 12, 17

D.C. Code § 22-1015 ............................................................................................... 29

D.C. Code § 22-1015(a)(1) ........................................................................................ 6

D.C. Code § 22-1805 ........................................................................................ 7, 8, 9

D.C. Code § 22-1805a(a) ........................................................................................... 7

D.C. Code § 28:2-312 .............................................................................................. 44

D.C. Code § 28-3901 ......................................................................................... 37, 45

D.C. Code § 28-3904 ............................................................................................... 31

D.C. Code § 28-3904(x) .......................................................................................... 41

D.C. Code § 28-3905(k)(1) .................................................................................. 5, 31

D.C. Code § 28-3905(k)(1)(A) ................................................................................ 36

Mass. Gen. Laws ch. 93A, § 2 ............................................................................... 41

## MISCELLANEOUS

110 Cong. Rec. H3032 (Mar. 26, 2007) ..................................................................... 3

110 Cong. Rec. E656 (Mar. 28, 2007) ................................................................. 3, 54

H.R. Rep. No. 94-801 (1976) .................................................................................. 61

S. Rep. No. 106-297 (2000) .................................................................................... 61

## INTRODUCTION

Amazon.com and its business associates in the animal fighting industry attempt to obscure the issues presented in this case with more than 800 pages of briefing — all of which ignore the critical fact that the Amended Complaint only concerns a very narrow category of conduct – *i.e.,* the solicitation of commercial transactions in animal fighting paraphernalia that are patently illegal under federal and state law. Amended Complaint ("Am. Compl.") ¶¶ 63-66, 71. Although Amazon advertises and sells more than 40 different books, magazines, and videos that discuss, glorify, and chronicle dog fighting and cockfighting, the Amended Complaint only concerns two of these items (*The Gamecock and The Feathered Warrior*), and presents no quarrel with Amazon's advertising and sale of dozens of other morally objectionable animal fighting materials.

The Amended Complaint focuses on these two publications because this case is about illegal conduct, not the suppression of unpopular speech, ideas, or discussions concerning dog fighting and cockfighting. The critical distinction that Amazon fails to grasp – or, more specifically, hopes the Court will fail to grasp – is between *printing* Constitutionally protected discussions *about* animal fighting, and the *advertising and sale* of fighting knives, drugs, fighting roosters, and even an entire operational cockfighting pit in violation of federal law. *Id.* ¶¶ 62-84.[1]

---

[1] Notably, a third cockfighting magazine sold on Amazon.com – *Grit and Steel* – is not at issue here because, in response to a court ruling upholding the 2002 amendments to the Animal Welfare Act, which added a prohibition on interstate commerce in fighting birds, the publisher announced that it would "not [ ] take any advertisement on gaffs and/or knives that would be used in the fighting of gamefowl," nor advertisements for "derby winners [fighting birds] even from the LEGAL STATES," nor any other "products used in fighting ventures." GRIT AND STEEL 4, 5, 63 (Jul. 2005).

Although Amazon represents in its motion that *The Gamecock* will no longer advertise "gaffs and spurs," Amazon Mot. to Dismiss (hereinafter "Amazon") at 39 n.16, this is neither accurate nor sufficient to cure to the ongoing legal violations. In fact, both publications continue to advertise not only illegal gaffs and spurs, *see*, *e.g.*, Pendleton Decl., Ex. 4 (reproducing THE GAMECOCK 19 (Jun. 2007)); *id.*, Ex. 5 (reproducing THE FEATHERED WARRIOR 13 (Jun. 2007)), but also hundreds of fighting animals. *See id.* The Humane Society's position has always been that if the Defendants would simply agree not to include such illegal solicitations in their publications, as *Grit and Steel* has, this case would not be necessary.

As described in the Amended Complaint (the only legitimate source of facts for purposes of this motion to dismiss), *The Gamecock* and *The Feathered Warrior* consist predominantly of criminal solicitations – more than 1,700 pages' worth of such solicitations measured over a twelve month period – with a few discussions about animal fighting sprinkled here and there in order to set up exactly the type of bogus Constitutional smokescreen for criminal conduct proffered by the Defendants in their moving papers. Indeed, one of the publications has repeatedly advertised fighting dogs from a notorious dog fighter whose vast trafficking enterprise makes the venture detailed in the indictment in *United States v. Michael Vick*, 3:07-CR-274 (E.D. Va., indictment filed Jul. 17, 2007), look modest. *Id.* ¶ 65. The dog fighting videos sold by Defendants are even more problematic, as they contain footage of the actual wounding and graphic killing of twenty live dogs, staged for the purpose of distributing and selling videos for commercial gain. *Id.* ¶¶ 48-61.[2]

As described in the Amended Complaint, Defendants' conduct in advertising, selling, and shipping criminal solicitations to traffic in illegal goods violates the plain language of the federal Animal Welfare Act ("AWA"), which was recently amended to make it a felony to "knowingly use the mail service of the United States Postal Service or any instrumentality of interstate commerce for *commercial speech* for purposes of *promoting or in any other manner furthering* an animal fighting venture." 7 U.S.C. § 2156(c) (emphasis added). It is also a felony to buy, sell, or ship in interstate commerce the animals and weapons advertised and sold by the thousands through the publications. *See* 7 U.S.C. §§ 2156(b), (e).

Notably, these criminal solicitations – and the specific publications at issue in this case – were recently identified by Congress as one of the driving forces behind the 2007 amendments strengthening the animal fighting provisions of the Animal Welfare Act. *See* Pub. L. No. 110-22,

---

[2] Moreover, since this action was originally filed, the final two states have banned cockfighting, severely undercutting if not utterly obliterating the premise of most of Defendants' First Amendment arguments. *See*, *e.g.*, Dowd Mot. to Dismiss (hereinafter "Dowd") at 7, 18, 23; Amazon Mot. to Dismiss (hereinafter "Amazon") at 2, 6, 34, 38. Notwithstanding these critical legal developments, Defendants brazenly persist in their profitable yet illegal conduct, in the hopes that they can get this Court to recognize a First Amendment right to advertise contraband.

121 Stat. 88 (2007). As the Chairman of the House Subcommittee on Crime and Terrorism stated, the amendments were intended to address "animal fighting magazines [that] advertise fighting animals." 110 CONG. REC. H3032 (Mar. 26, 2007). The lead sponsor of that legislation further expained that "over the last 12 months, there have been over 1,600 pages worth of advertisements for illegal interstate commercial transactions in the *two main cockfighting magazines*." 110 CONG. REC. E656 (Mar. 28, 2007). The House Judiciary Committee report additionally found that "[t]he animal fighting industry continues to thrive . . . . [because] [n]umerous nationally circulated animal fighting magazines still *promote* these cruel practices, and advertise fighting animals and the accouterments of animal fighting." H.R. REP. NO. 110-27, at 2 (2007) (emphasis added).

These legal violations, in turn, are actionable under the District of Columbia Consumer Protection Procedures Act ("CPPA"), which provides that any "person, whether acting for the interests of itself, its members, or the general public, may bring an action under this chapter in the Superior Court of the District of Columbia seeking relief from the use by any person of a trade practice in violation of a law of the District of Columbia" or of "any federal law," regardless of "whether or not any consumer is in fact misled, deceived or damaged thereby." D.C. CODE §§ 28-3904, 28-3905(k)(1); *Adams v. A.B. & A., Inc.*, 613 A.2d 858, 865 (D.C. 1992).

Nevertheless, recognizing the difficulty in defending against this narrow claim – which is based on criminal commercial conduct rather than political speech – Defendants grossly misrepresent the conduct challenged by Plaintiff in this case, the facts pled in the Amended Complaint, the causes of action presented, and the applicable law. For example, in its zeal to disparage the Humane Society and its 10 million members and constituents as some kind of book-burning mob determined to suppress free speech, Amazon even goes so far as to claim that the Humane Society's lawsuit seeks to ban all "editorial, news, and political content" concerning animal fighting, Amazon at 1, and "have all copies of the magazines seized and destroyed." *Id.* at 10. Such overwrought claims simply have no basis in either reality or the allegations in the Amended Complaint. It is well-settled that a defendant cannot obtain a Rule 12(b) dismissal by

distorting the allegations in the Complaint until they fit defendant's theory for why the Complaint purportedly fails to state a cause of action. *See Ramirez de Arellano v. Weinberger*, 745 F.2d 1500, 1521 (D.C. Cir. 1984) (declining to dismiss the complaint "on the basis of deliberate distortions of the plaintiffs' case").

In this case, the vast majority of Defendants' arguments for dismissal are not even relevant to the claims raised, but instead explain why a hypothetical straw man lawsuit to suppress "pure speech" about animal fighting cannot survive a motion to dismiss. Most of Defendants' other arguments are dependent on a self-serving characterization of hotly contested factual issues – such as whether the animals advertised are strictly for "showing," Amazon at 39 n.16, or whether they are, on their face, meant for "major competition in gaff, short knife, & long knife," Pendleton Decl., Ex. 4 (reproducing THE GAMECOCK 49 (Jun. 2007)) – which cannot properly be resolved at the motion to dismiss stage. *See Pitney Bowes v. USPS*, 27 F. Supp. 2d 15, 19 (D.D.C. 1998).

Those few relevant legal arguments presented in the papers are so interspersed with merits arguments and irrelevant sidebars that it is virtually impossible to formulate a coherent response. Accordingly, for the convenience of the Court, Plaintiff will respond in the appropriate order for consideration of a 12(b) motion, rather than attempting to track Defendants' scattershot approach. Thus, Plaintiff will begin by discussing why this action properly asserts personal jurisdiction over the Defendants, and how Defendants' objections to jurisdiction cannot be resolved without appropriate discovery concerning their internally inconsistent statements regarding their contacts with the forum. *See El-Fadl v. Cent. Bank of Jordan*, 75 F.3d 668, 676 (D.C. Cir. 1996).

Plaintiff will then explain why the Amended Complaint adequately alleges Article III jurisdiction. This will include an explanation for why Defendants' suggestion that Plaintiff has not *proven* injury and redressability is irrelevant at the pleading stage, *see Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992), and how the Court should remand this action to the Superior Court if any defect in subject matter jurisdiction is found. *Randolph v. ING Life Ins. and Annuity Co.*, 486 F. Supp. 2d 1, 6 (D.D.C. 2007) (Kollar-Kotelly, J.).

Plaintiff will then explain why the Amended Complaint states a viable cause of action under the CPPA, including why that cause of action is not preempted by federal laws that do not provide a private right of action, and which are not invoked as a cause of action in the Amended Complaint.

Finally, Plaintiff will explain why each of the merits arguments advanced are insufficient to warrant dismissal at this time, including Defendants' claims under the Communications Decency Act, the First Amendment, and other miscellaneous defenses. Most importantly, Plaintiff will explain how Amazon's paradoxical claim that it is simultaneously not the "publisher or speaker" for purposes of the Communications Decency Act, Amazon at 30, but at the same time somehow engaged in First Amendment protected "[p]ublication" and "speech," *id.* at 43, highlights the fundamental defect in Amazon's entire theory for dismissal of this action at the pleading stage.

## BACKGROUND

**1.   Statutory Framework**

**A.      District of Columbia Consumer Protection Procedures Act**

The CPPA provides that "[a] person, whether acting for the interests of itself, its members, or the general public, may bring an action under this chapter in the Superior Court of the District of Columbia seeking relief from the use by any person of a trade practice in violation of a law of the District of Columbia" or of "any federal law." D.C. CODE § 28-3905(k)(1); *Adams v. A.B. & A., Inc.*, 613 A.2d 858, 861-62 (D.C. 1992). It is a violation of District of Columbia law, and therefore an unlawful trade practice under the CPPA, "*whether or not any consumer is in fact misled, deceived or damaged thereby*, for any person to:

> (a) represent that goods or services have a source, sponsorship, approval, certification, accessories, characteristics, ingredients, uses, benefits, or quantities that they do not have;

> (e) misrepresent as to a material fact which has a tendency to mislead;

> (f) fail to state a material fact if such failure tends to mislead, . . . [or]

> (x) sell consumer goods in a condition or manner not consistent with that warranted by . . . operation or requirement of federal law."

*Id.* § 28-3904 (emphasis added).

### B.    The Federal Depiction of Animal Cruelty Act

The Federal Depiction of Animal Cruelty statute makes it a federal crime to "knowingly create[ ], sell[ ], or possess[ ] a depiction of animal cruelty with the intention of placing that depiction in interstate or foreign commerce for commercial gain." 18 U.S.C. § 48(a). A "depiction of animal cruelty" is

> any visual or auditory depiction, including any . . . motion-picture film . . . in which a living animal is intentionally maimed, mutilated, tortured, wounded, or killed, if such conduct is illegal under Federal law or the law of the State in which the creation, sale, or possession takes place, regardless of whether the maiming, mutilation, torture, wounding, or killing took place in the State.

*Id.* § 48(c)(1). The statute does not apply to "any depiction that has serious religious, political, scientific, educational, journalistic, historical, or artistic value." *Id.* § 48(b).

### C.    The Federal Animal Welfare Act

Under the federal Animal Welfare Act ("AWA"), it is a felony for "any person" to "knowingly use the mail service of the United States Postal Service or any instrumentality of interstate commerce for *commercial speech* for purposes of *promoting or in any other manner furthering* an animal fighting venture." 7 U.S.C. § 2156(c) (emphasis added). It is also a felony to buy, sell, or ship fighting animals and gaffs or knives in interstate commerce. *Id.* § 2156(b), (e).

### D.    The District of Columbia Cruelty to Animals Statute

The D.C. Cruelty to Animals Statute makes it a felony for "any person" to

> organize[ ], sponsor[ ], conduct[ ], stage[ ], *promote*[ ], [be] employed at, collect[ ] an admission fee for, or bet[ ] or wager[ ] any money or other valuable consideration on the outcome of an exhibition between two or more animals of fighting, baiting or causing injury to each other.

D.C. Code § 22-1015(a)(1) (emphasis added). It is also a felony for "any person" to "aid[ ] or abet[ ]" any of the unlawful acts specified in D.C. Code § 22-1015(a). *Id.* § 22-1015(a)(5).

### E.    Other Federal and District of Columbia Statutes

It is unlawful for "two or more persons [to] conspire . . . to commit any offense against the United States," 18 U.S.C. § 371, or to "conspire . . . to commit a criminal offense" under District of

Columbia law. D.C. CODE § 22-1805a(a). Under federal law, "[w]hoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal." 18 U.S.C. § 2(a); *see also id.* § 2(b). District of Columbia law also provides that "all persons advising, inciting, or conniving at the offense, or aiding or abetting the principal offender, shall be charged as principals and not as accessories." D.C. CODE § 22-1805.

**2.      Defendants' Marketing, Shipment, and Sale of Illegal Animal Fighting Materials**

As described in paragraph 48 of the Amended Complaint, on or before 2004, Defendant John Doe d/b/a Underground Pitbull Breeders Association ("UPBA") produced a video entitled "UNLEASHED: THE REALEST PITBULL ACTION CAUGHT ON TAPE" ("*Unleashed*"), containing nearly two hours of video footage in which approximately twenty live dogs are actually and intentionally maimed, mutilated, tortured, and killed. The events depicted in *Unleashed*, and staged for the purpose of producing it, are unlawful in every state. *Id.* ¶ 54.

As described in paragraph 57 of the Amended Complaint, on or before April, 2006, Defendant John Doe d/b/a Street Heat produced a digital video disc entitled "HOOD FIGHTS VOL. 2: THE ART OF THE PIT" (hereinafter "*Hood Fights*"). The dog fighting footage in *Hood Fights* appears to have been copied directly from *Unleashed*. *Id.* These two videos do not have serious religious, political, scientific, educational, journalistic, historical, or artistic value. *Id.* ¶ 59.

As alleged in paragraph 58 of the Amended Complaint, Defendants Amazon, John Doe d/b/a UPBA, and John Doe d/b/a Street Heat knowingly create, sell, or possess *Unleashed* and *Hood Fights* (hereinafter collectively referred to as "the Videos") with the intention of placing that depiction in interstate or foreign commerce for commercial gain, in the District and other jurisdictions where dog fighting is illegal; and/or aid or abet in the same.

As described in paragraph 62 of the Amended Complaint, defendants Dowd Publishers and Marburger Publishing publish, respectively, *The Feathered Warrior* and *The Gamecock* (hereinafter "the Publications") – two monthly catalog-type publications that feature hundreds of advertisers and thousands of products per monthly issue – approximately 64 percent of the total content of the

Publications as measured over a twelve month period. Over 90 percent of the advertisements – more than 1,700 pages' worth as measured over a twelve month period – are solicitations to commit crimes. *Id.* ¶ 63. For instance, 34 percent of these advertisements propose commercial transactions for fighting animals or fighting paraphernalia that are illegal *everywhere*, because the transactions are prohibited by state law in the seller's jurisdiction, and their interstate or international sale, purchase or shipment is also prohibited by federal law. *Id.*

For instance, as recounted in paragraph 64 of the Complaint, the Publications contain advertisements for fighting birds who "want to hurt something," such as one in particular that was marketed for his fighting prowess on the basis that he had impaled an opposing bird "through [the] neck and kill[ed] [him] outright." The Publications also advertise dogs intended for fighting purposes, including dogs bred and sold by dog fighting kingpin Floyd Boudreaux. *Id.* ¶ 65. The Publications also advertise animal fighting venues for purchase, such as the "Sally Gap Game Club," a "10,000 Sq. Ft." cockfighting club that "Is Up And Running!!!!" in Kentucky, where cockfighting is illegal. *Id.* ¶ 66. The Publications also advertise actual animal fighting events in jurisdictions where cockfighting is illegal. *Id.* ¶ 68. The Publications also advertise cockfighting "gaffs" or knives, as well as steroids, "speed," and other drugs for fighting purposes. *Id.* ¶¶ 71-72.

Paragraphs 83 and 91-114 of the Amended Complaint allege that defendants Amazon, Dowd Publishers and Marburger Publishing, and their employees and agents, knowingly publish and distribute the Publications through the mail service of the U.S. Postal Service for the purpose of promoting and/or furthering unlawful animal fighting ventures; and/or aid and abet in their distribution for the purpose of promoting and/or furthering unlawful animal fighting. The Amended Complaint further alleges that Amazon is the only retail seller of subscriptions to the Publications, *id.* ¶ 85, and that defendants have entered into various illegal "Agreements" to jointly sell, market, and ship the Publications. *Id.* ¶¶ 85-90. Paragraph 101 of the Amended Complaint alleges that Amazon actively markets the Publications through advertisements created by Amazon, some of which are expressly listed as paid advertisements on several popular websites such as Yahoo!

Shopping, mySimon.com, aMagArea.com, DealTime.com, Verizon SuperPages.com, Epinions.com, and the banner ad that appears at the top of Google.com following specific searches.

The Amended Complaint alleges that Amazon makes express warranties and affirmative representations that the items sold are lawful, in that "the items we prohibit" include "Illegal items," such as "any product which may lead to the production of an illegal item or illegal activity." *Id.* ¶¶ 104-110. Paragraph 108 of the Amended Complaint also alleges that, because the Videos and Publications are in fact "illegal items" that do "lead to the production of an . . . illegal activity," they are not presented in a condition consistent with that warranted by Amazon.

**3.     Procedural History**

Nineteen months after first bringing these legal violations to Amazon's attention, and having been rejected by Amazon on several subsequent requests that it discontinue its sale of the Publications, Plaintiff brought an action on February 8, 2007 in the Superior Court of the District of Columbia to stop the unlawful trade practices of Defendants under the broadly phrased CPPA. On March 30, 2007, prior to answering Plaintiff's Complaint in Superior Court, all Defendants filed a Notice of Removal to this Court. Having invoked the jurisdiction of the Court in the first place, Defendants now press the Court to dismiss for lack of subject matter jurisdiction – an approach that amounts to no more than a delay tactic, since a removed case *must* be remanded as opposed to dismissed on that basis, as explained below.

On July 10, 2007, Plaintiff filed a related case, *The Humane Society of the United States v. United States Postal Service*, Civ. No. 07-1233 (CKK), an action under the Administrative Procedure Act ("APA") challenging the Postal Service's refusal to implement the AWA amendment enacted on May 3, 2007 with respect to the Publications at issue in this case. Because that action presents the same core merits as this action, but is based on a narrow and discrete Administrative Record, Plaintiff respectfully suggests that judicial economy would be served best if the Court were to adjudicate *HSUS v. USPS* first, since the resolution that action would, as a practical matter, most

likely moot further proceedings in this action. At least one of the defendants in this case supports this course of action, and none of the other parties has yet objected. *See* Marburger at 37-38.

## ARGUMENT

None of Defendants' arguments supports dismissal of any of Plaintiff's claims under either Fed. R. Civ. P. 12(b)(1), 12(b)(2), or 12(b)(6). Under Rule 12(b)(1), the Court may grant a Rule 12(b)(1) motion only if it finds Plaintiff's claims to be "wholly insubstantial and frivolous." *E.E.O.C. v. St. Francis Xavier Parochial School*, 117 F.3d 621, 623 (D.C. Cir. 1997); *Bell Atlantic Corp. v. Twombly*, 127 S.Ct. 1955, 1965 (2007) (well-pleaded complaint may proceed even if it appears 'that a recovery is very remote and unlikely'").

Defendants face a similarly onerous burden under 12(b)(2), since it is well-settled that a plaintiff "need only make a *prima facie* case for personal jurisdiction to survive a motion to dismiss" under Rule 12(b)(2), *Fletcher v. Dist. of Columbia*, 481 F. Supp. 2d 156, 168 (D.D.C. 2007) (citing *First Chicago Int'l v. United Exch. Co.,* 836 F.2d 1375, 1378 (D.C. Cir. 1988)), and can do so by "alleg[ing] specific acts connecting [the] defendant with the forum." *Second Amendment Found. v. U.S. Conf. of Mayors*, 274 F.3d 521, 524 (D.C. Cir. 2001).

The Court may dismiss on a Rule 12(b)(6) motion only "if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *See Griggs v. WMATA*, 66 F. Supp. 2d 23, 26 (D.D.C. 1999).  In addition, in evaluating Defendants' arguments for dismissal under both Rule 12(b)(1) and 12(b)(6), "the complaint must be liberally construed in favor of the plaintiff," *Schuler v. U.S.*, 617 F.2d 605, 608 (D.C. Cir. 1979), and "the court must accept as true all well-pleaded factual allegations and draw all reasonable inferences in favor of the plaintiff." *Pitney Bowes*, 27 F. Supp. 2d at 19.

Applying those principles here, Defendants are simply not entitled to the early dismissal they seek in this case. Indeed, as explained below, Plaintiff's Amended Complaint unquestionably presents "substantial" and "non-frivolous" claims under the CPPA – which is all that is required to withstand Defendants' jurisdictional arguments under Rule 12(b)(1). *E.E.O.C.*, 117 F.3d at 623.

The Amended Complaint also survives Marburger's 12(b)(2) motion, as it alleges "specific acts connecting [each] defendant with the forum." *Second Amendment Foundation*, 274 F.3d at 524. Nor is there any merit to Defendants' arguments for dismissal pursuant to 12(b)(6), since Defendants fail to discharge their heavy burden to show that it is "clear that no relief could be granted under any set of facts that could be proved consistent with the allegations" in the Amended Complaint. *Griggs*, 66 F. Supp. 2d at 26. Unable to meet these standards, each of Defendants' arguments for dismissal instead relies upon premature challenges to the *veracity* of Plaintiff's well-pled allegations or self-serving merits arguments that Defendants' actions are lawful. Accordingly, as explained below, the motions to dismiss should be denied.

## I.       THIS COURT HAS PERSONAL JURISDICTION OVER ALL DEFENDANTS

Despite admitting that it has advertised, sold, and shipped its goods to consumers in the District for years, Griffiths Decl. ¶¶ 10-12, and that it continues to engage in such consumer transactions, *id.*, one of the Defendants – Marburger – attempts to argue that this Court's assertion of jurisdiction over claims arising from those acts would be unconstitutional.[3] *See* Marburger at 25-26. This assertion is utterly without merit. Personal jurisdiction over Marburger is proper under two independent bases – either for the transactions it consummates directly in D.C., or under this Circuit's conspiracy jurisdiction precedent. As discussed above, a plaintiff "need only make a *prima facie* case for personal jurisdiction to survive a motion to dismiss" under Rule 12(b)(2), *Fletcher*, 481 F. Supp. 2d at 168, and any factual discrepancies are resolved in favor of the plaintiff. *Arista Records, Inc. v. Sakfield Holding Co.*, 314 F. Supp. 2d 27, 30 (D.D.C. 2004). Here, the Amended Complaint's detailed jurisdictional allegations far exceed this lenient standard.

---

[3] Defendant Dowd has not effectively contested personal jurisdiction. It refers to Rule 12(b)(2) only in the first line of its motion, and makes no further mention of – let alone substantive argument in support of – any defense under that Rule. The Court of Appeals has admonished that "unless a legal argument is appropriately identified as such – appearing in a section of the brief devoted to that argument and not as an obscure or passing reference . . . with citations to authorities in its favor – the argument is waived." *Edmond v. USPS Gen'l Counsel*, 953 F.2d 1398, 1400 (D.C. Cir. 1992); *see also* Fed. R. Civ. P. 12(h) (personal jurisdiction waived if not argued in Rule 12 motion).

**A.    This Court has specific jurisdiction over Marburger for its sales and shipment of the publications in the District of Columbia.**

The Court has personal jurisdiction over any "person . . . transacting any business in the District of Columbia." D.C. CODE § 13-423(a)(1). To establish personal jurisdiction under this subsection, "a plaintiff must demonstrate that: (1) the defendant transacted business in the District of Columbia; (2) the claim arose from the business transacted in the District; (3) the defendant had minimum contacts with the District; and (4) the Court's exercise of personal jurisdiction would not offend 'traditional notions of fair play and substantial justice.'" *FC Inv. Group LC v. IFX Markets, Ltd.*, 479 F. Supp. 2d 30, 38-39 (D.D.C. 2007).

Subsection (a)(1) of the long-arm statute allows the exercise of personal jurisdiction to the fullest extent permitted by the Constitution. *See Envtl. Research Int'l, Inc. v. Lockwood Greene Eng'rs, Inc.,* 355 A.2d 808, 810-11 (D.C. 1976) (en banc). The constitutional inquiry focuses on "'whether the defendant purposefully established minimum contacts in the forum state,' . . . or 'purposefully availed itself of the privilege of conducting business in the forum state,' and whether the defendant's conduct in connection with that forum is such that it 'should reasonably anticipate being haled into court there.'" *FC Inv. Group*, 479 F. Supp. 2d at 38-39 (quoting *Asahi Metal Indus. Co. v. Superior Court,* 480 U.S. 102, 108-09 (1987)). Additionally, a plaintiff's jurisdictional allegations "must arise from the same conduct of which it complains." *Id.* (quoting D.C. CODE § 13-423(b)). Plaintiff's detailed jurisdictional allegations satisfy each element.

1)    *Marburger transacts and has transacted business in the District.*

The Amended Complaint alleges – and Marburger's submission to the Court confirms – that Marburger has engaged in direct business transactions with D.C. residents. *See* Am Compl. ¶ 115; Griffiths Decl. ¶¶ 10-12.[4] Each of these transactions resulted in Marburger making consumer

---

[4] Marburger also publishes and/or sells at least eleven other titles that, unlike the Publications, are merely *about* animal fighting, as opposed to *The Gamecock*'s inclusion of hundreds of advertisements for contraband, and are not at issue in this lawsuit. *See* THE GAMECOCK 63 (Jul. 2006). Mr. Griffiths' declaration does not address business transactions in the District involving those publications. *See* Griffiths Decl. Nor has Dowd given any information regarding its transactions in the District with respect to the twenty-eight other titles it sells, that do not include

shipments by mail into the District at least five times, and possibly dozens of times each. *See id.* Marburger therefore clearly "transact[s] any business" in D.C. under the long arm statute. *Envtl. Research*, 355 A.2d at 811 ("even a small amount of in-jurisdiction business activity is generally enough to permit the conclusion that a nonresident defendant has transacted business here").

Marburger's attempt to disqualify one of these numerous transactions in D.C. by labeling it as the "unilateral activity" of the consumer must be rejected. Marburger at 22. Marburger's self-serving description of consumers' purchases as "unilateral," *id.*, finds no support in either the common-sense definition of the word "purchase" – *i.e.*, a transaction between a consumer and a merchant could *never* be "unilateral" – or the applicable case law. Marburger has not alleged, for example, that consumers purchased the publications in another forum and brought them to the District for the purpose of asserting venue. *See World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 314 (1980) (consumer purchased car in New York and then "unilateral[ly]" drove it to Oklahoma, where consumer sought to venue accident claim).

Nor is there any authority – and Marburger cites none – for the bizarre proposition that a defendant's business transactions can be disqualified for personal jurisdiction on the sole basis of what the seller *believes to be* the consumer's *reasons* for purchasing an item. As this Court has already stated, because Ms. Wisor's reasons for subscribing to the Publication go toward a "*factual conclusion[ ] outside of the scope of the Complaint*," Marburger "misguidedly assumes that it can 'prove' a lack of personal jurisdiction via one deposition" that might ascertain those reasons. Mem. Op. at 5 (May 1, 2007) (emphasis added). Even if Marburger could establish the consumer's reason or reasons for purchasing the product, and disqualify the transaction on that basis, jurisdiction would still attach based on its other business transactions with District residents, admitted by Marburger to have taken place as recently as March 2005. Griffiths Decl. ¶ 12. This Court has

---

hundreds of advertisements for contraband. *See* Pendleton Decl., Ex. 5 (reproducing THE FEATHERED WARRIOR 0, 59, 60, 65, 66 (Jun. 2007) (advertising other Dowd titles).

scrutinized contacts dating back as far as eight years when assessing personal jurisdiction. *See*, *e.g.*, *FC Inv. Group LC v. Lichtenstein*, 441 F. Supp. 2d 3, 6 (D.D.C. 2006).[5]

       2)     *Plaintiff's claims arise from the business Marburger transacts in the District.*

The Amended Complaint plainly satisfies the requirement that the claims "must arise from the same conduct" – *i.e.*, business transactions in the forum – "of which it complains." *FC Inv. Group*, 479 F. Supp. 2d at 38-39 (quoting D.C. CODE § 13-423(b)). Each of the claims is premised directly on Plaintiff's allegations that Defendants unlawfully sell, advertise, and ship the Publications into the District. *See, e.g.,* Am. Compl. ¶ 115. Plaintiff's claims are not, for example, premised upon a mere phone call made into the District, *see Burman v. Phoenix Worldwide Indus.*, 437 F. Supp. 2d 142 (D.D.C. 2006), or a single private meeting in the District between defendants. *See Second Amendment Found.*, 274 F.3d at 523.[6]

       3)     *Marburger purposefully availed itself of, and had constitutionally sufficient minimum contacts with, the District.*

Marburger attempts to evade jurisdiction by claiming that it "has not offered the magazine for sale at newsstands" and has not "advertised the magazine in the District of Columbia." Marburger at 25. The former is irrelevant and the latter is incorrect. As this Court made clear in *Blumenthal v. Drudge*, 992 F. Supp. 44, 54 (D.D.C. 1998), the fact that a defendant has "never advertised . . . in physical locations or in local newspapers in the District of Columbia," is immaterial. Marburger admits to having made several, and perhaps dozens of, shipments of the Publication into the District directly to consumers. Griffiths Decl. ¶¶ 10-12. It has thus engaged in

---

[5] Marburger's attempt to distinguish the result in *Keeton v. Hustler Magazine*, 465 U.S. 770 (1984), is also futile. *Keeton* does not establish a hard and fast rule that a business must sell tens of thousands of products into the forum before general jurisdiction attaches, but simply examined the volume of the publisher's circulation in conjunction with other factors. *Keeton* is also irrelevant here because the Court has *specific* jurisdiction over Marburger.

[6] Marburger is also mistaken that this element of personal jurisdiction requires Plaintiff to conclusively prove that the harms alleged are caused by Marburger's actions. *See* Marburger at 23. Not only does this conflate personal jurisdiction with standing, it also grossly overstates the factual showing required of Plaintiff at this early point in the litigation.

at least the minimum contacts necessary to confer jurisdiction. *See Arista*, 314 F. Supp. 2d at 31 ("a single act by defendant in the jurisdiction can be sufficient to . . . confer [specific] jurisdiction").

Even if it had not made these direct contacts with the District, Marburger's marketing of the Publication by way of the Amazon website also demonstrates purposeful availment and minimum contacts. In *Arista*, this Court found that that the defendant "purposefully directed its actions at the District" where it operated a website that "was accessible to persons in the District of Columbia. . . . *[w]hether or not defendant's advertising plan was targeted at District of Columbia residents specifically*" 314 F. Supp. 2d at 32; *see also Asahi*, 480 U.S. at 112 ("marketing the product through a distributor" is evidence of "intent or purpose to serve the market in the forum State").

Here, the very fact that the Defendants elected to advertise, sell, and distribute the Publications on a website that proclaims itself "Earth's biggest" retailer, and which expects sales of $14.30 *billion* dollars in 2007, Amazon.com, *News Release: Amazon.com Announces Second Quarter Sales* (Jul. 24, 2007), in and of itself strongly suggests purposeful availment by Marburger. *See also* Zapolsky Decl., Ex. E (extolling to magazine publishers that "[h]aving your titles listed on Amazon.com is a great way to find new subscribers. . . . We want to help [you] find customers who would be ideal subscribers"). When a business entity chooses as its exclusive retailer the most prolific retailer "on Earth," any sales consummated through the retailer's aggressive marketing efforts can hardly be called "random, isolated, or fortuitous." *Keeton*, 465 U.S. at 774. By using Amazon as its exclusive marketing and distributing agent, Marburger relied upon Amazon's proven and publicly-touted ability to market and sell to District of Columbia consumers.

4)       *This Court's exercise of personal jurisdiction over Marburger would not offend traditional notions of fair play and substantial justice.*

Despite admitting to having sold *and shipped* its products to several District consumers over the past few years, Marburger makes the astonishing argument that it "had no reason to foresee that it would be sued" in this forum.[7] Marburger at 27. A corporation that sells and ships a product to a

---

[7] The actual number of shipments is as of yet unknown to Plaintiff, as Marburger's disclosures in its motion regarding its present and recent subscribers in the District are incomplete. Marburger has not

consumer has every reason to foresee legal action in the forum where that transaction is consummated. In fact, Marburger consulted its own subscription records in confirming that it had engaged in consumer transactions directly with District residents. Griffiths Decl. ¶ 9. Given this actual knowledge, Marburger could have "act[ed] to alleviate the risk of burdensome litigation by procuring insurance, passing the expected costs on to customers, or, if the risks are too great, severing its connection with the State." *World-Wide Volkswagen*, 444 U.S. at 297.

It is difficult to see how it offends "traditional notions of fair play and substantial justice" to subject Marburger to suit under District laws governing consumer transactions, where it has repeatedly sought out and then consummated such transactions in the forum. *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945). A business entity that advertises, sells, and ships products into the District can "reasonably anticipate being haled into court there" under the consumer protection statutes that govern those transactions. *World-Wide Volkswagen*, 444 U.S. at 297; *see also Stabilisierungsfonds Fur Wein v. Kaiser Stuhl Wine Distributors Pty. Ltd.*, 647 F.2d 200, 205 (D.C. Cir. 1981). Here, between aggressively marketing its products through Amazon, and *actually selling and delivering* its products to each of several consumers in the District eleven times per year, Marburger's "own action[s] [are] such as to put it on notice of the possibility of defending itself in the forum state." *Brunson v. Kalil & Co.*, 404 F. Supp. 2d 221, 234 (D.D.C. 2005).

Any burden on Marburger from appearing in this action does not outweigh the other factors to be considered in determining whether the Court's exercise of jurisdiction works "substantial justice." The Court must also give due consideration to Plaintiff's choice to seek relief in the forum, *see Kulko v. California Superior Court*, 436 U.S. 84, 92 (1978), especially where, as here, Plaintiff is headquartered in the forum. Defendants do not merely ignore this factor, but instead make the outlandish argument that Plaintiff's preference for the forum actually operates to *deprive* this Court

---

indicated, for example, how long its District consumers maintained their subscriptions. *See* Griffiths Decl. ¶¶ 10-12. Marburger also fails to describe any contacts that were initiated prior to three years ago. *Id.* ¶ 9.

of jurisdiction. *Marburger* at 26 (no "fair play" due to Plaintiff's "belie[f]" that certain District laws "are malleable enough to provide a basis for this action"). That position turns fair play on its head.[8]

> **B.     Alternatively, personal jurisdiction is proper over all Defendants for unlawful trade practices they commit jointly through and on Defendant Amazon's website.**

Even if *Marburger* had not repeatedly consummated consumer transactions in D.C., personal jurisdiction is nonetheless proper under this Circuit's "conspiracy jurisdiction" rule, with respect to Claims Six and Seven, as well as the portions of Claims Two and Three that allege aiding and abetting, all of which are based on the unlawful trade practices *Marburger* commits jointly with other Defendants by way of Amazon's website.

The D.C. long-arm statute authorizes personal jurisdiction over any person who "transact[s] any business" either "directly or *by an agent*." D.C. CODE § 14-423(a)(1) (emphasis added). Under this part of the long-arm statute, a plaintiff can "establish personal jurisdiction under a conspiracy theory" by "plead[ing] with particularity 'the conspiracy as well as the overt acts within the forum taken in furtherance of the conspiracy.'" *Jungquist v. Sheikh Sultan Bin Khalifa Al Nahyan*, 115 F.3d 1020, 1031-32 (D.C. Cir. 1997) (citations omitted). A plaintiff must also show purposeful availment by the non-resident defendant. *See Youming Jin v. Ministry of State Sec.*, 335 F. Supp. 2d 72, 79 (D.D.C. 2004). Plaintiff easily satisfies all three requirements.

**First**, the Amended Complaint describes with particularity (to the extent known to Plaintiff without discovery) the unlawful "Agreements" between Defendants to distribute the Publications. *See* Am. Compl. ¶¶ 85-90, 97, 112. These allegations are far more than the mere "[b]ald spectulation or [ ] conclusory statement that individuals are co-conspirators" that the Court of Appeals has deemed to be insufficient for purposes of conspiracy jurisdiction. *Jungquist,* 115 F.3d

---

[8] The Court must also weigh the District's interests in preventing unlawful trade practices, *Dist. Cablevision Ltd. P'ship v. Bassin*, 828 A.2d 714, 722-23 (D.C. 2003) (the CPPA manifests the D.C. legislature's strong interest in "'assur[ing]' that a just mechanism exists to remedy *all* improper trade practices.'"), and the "the shared interest of the several States in furthering fundamental substantive social policies." *World-Wide Volkswagen*, 444 U.S. at 292. Undoubtedly, the District and many other states have a shared interest in preventing animal fighting and the attendant illegal gambling and trafficking in animals, weapons, and blood-clotting drugs. *See* Am. Compl. ¶¶ 34-47.

at 1031. Rather, Plaintiff's allegations regarding the Agreements explain in detail how the unlawful trade practices alleged could not occur but for the joint actions of the Defendants. *See* Am. Compl. ¶¶ 85-90, 97, 112. Such allegations clearly meet the "unusually particularized pleading" standard for conspiracy jurisdiction in this Circuit. *Edmond v. United States Postal Serv. Gen'l Counsel*, 949 F.2d 415, 428 (D.C. Cir. 1991) (Silberman, J., concurring in part). Indeed, Defendants' voluminous attachments to the motions to dismiss bear out, at least in part, Plaintiff's allegations. *See* Griffiths Decl. ¶ 6 (describing, in part, Marburger's "arrangement" with Defendant Magazine Express).

**Second**, the Amended Complaint also describes with particularity the specific overt acts taken within D.C. in furtherance of Defendants' unlawful agreements. *See* Am. Compl. ¶¶ 2, 7-8, 73, 83, 95-96, 101-103, 115 (detailed allegations explaining exactly how all Defendants "purposefully directed their business activities to the District of Columbia and its resident consumers"). Amazon's overt acts in D.C. are imputed to Marburger for purposes of conspiracy jurisdiction. *See FC Inv. Group*, 479 F. Supp. 2d at 41-42; *see also Heroes, Inc. v. Heroes Foundation*, 958 F. Supp. 1, 3 (D.D.C. 1998) (personal jurisdiction proper based on third party's internet "marketing" in D.C., because defendant was "the beneficiary" of the transactions advertised).

These overt acts by Amazon amount to "minimum contacts" for personal jurisdiction purposes even though they are internet-based. To determine whether an entity's internet-based activity suffices for personal jurisdiction, this Circuit employs the approach first set forth in *Zippo Manufacturing Co. v. Zippo Dot Com, Inc.*, 952 F. Supp. 1119 (W.D. Pa. 1997), *cited in Gorman v. Ameritrade Holding Corp.*, 293 F.3d 506, 513 (D.C. Cir. 2002). The court in *Zippo* reasoned that "the likelihood that personal jurisdiction can be constitutionally exercised is directly proportionate to the nature and quality of commercial activity that an entity conducts over the Internet." *Id.* at 1124. Thus, the *Zippo* court established a sliding scale between purely "passive" websites where "defendant has simply posted information," and fully "interactive" sites where "a defendant clearly does business over the internet." *Id.* at 1124. With respect to the latter, "personal jurisdiction is

proper," and even for purely "passive" sites, jurisdiction can be established if there are other connections to the forum. *Id.*

Not only does the Amazon page where the Publications are sold "clearly do[ ] business over the internet" – which would suffice in and of itself to confer personal jurisdiction under *Gorman* and *Zippo, see id.* – but, as described in the Amended Complaint, and bolstered by the attachments submitted by Amazon in support of its motion to dismiss, it is difficult to imagine a more interactive website than the one on which the Publications are sold. For instance, Amazon tracks consumers' browsing and purchasing to enable Amazon to make targeted advertisements. *See* Zapolsky Decl., Ex. A (website referring to "your recommendations," *i.e.*, suggested purchases made by Amazon to the consumer). Each product page on Amazon is replete with interactive marketing features. *See* Am. Compl. ¶¶ 102-03 (describing the "Better Together and "Customers who bought this item also bought . . ." interactive marketing measures); Zapolsky Decl., Ex. A; *id.* (website printout displaying interactive marketing techniques such as "Add to Wish List"; "Add to Shopping List"; "Add to Wedding Registry"; "Tell a Friend"). Amazon's website is thus at the very far end of the *Zippo* spectrum, and personal jurisdiction based on these marketing contacts is proper.

Even if the website at issue was not sufficiently "interactive," personal jurisdiction over Marburger nonetheless attaches because "personal jurisdiction may be based *in part* on a defendant's maintenance of a website that, in conjunction with other contacts with the District of Columbia, supports an inference of purposeful availment." *Doe I v. State of Israel*, 400 F. Supp. 2d 86, 121 (D.D.C. 2005) (emphasis in original). Marburger has already admitted to multiple, ongoing, and actual sales requiring eleven deliveries per year each into D.C., *see* Section I(A)(1) *supra*, and there may be other contacts not yet made known to Plaintiff.

**Finally,** Plaintiff has also shown that Marburger purposefully availed itself of the forum, *see* Section I(A)(3) *supra*. Moreover, as case law cited by Marburger makes clear, personal jurisdiction attaches so long as Marburger "had *some* responsibility for [Amazon's] advertising of [its] products." *Trintec Indus. v. Pedre Promotional Prods.*, 395 F.3d 1275, 1281 (Fed. Cir. 2005); *see*

*also Jin v. Ministry of State Sec.*, 335 F. Supp. 2d 72, 80 (D.D.C. 2004). In sum, Marburger markets its product into the District jointly with Amazon, sold and sells products directly to District consumers, ships products directly to consumers in the District, takes funds from those transactions, creates ongoing monthly arrangements for delivery into the District with those consumers, and has actual knowledge of those sales. Marburger's contacts with this forum are thus direct, purposeful, repeated, and ongoing. Even without the benefit of further discovery, it is plain that the Court's exercise of personal jurisdiction over Marburger is not in any way unconstitutional.

### C.    *If the Court has any doubt as to personal jurisdiction, Plaintiff is entitled to jurisdictional discovery to further support allegations in the Amended Complaint.*

Defendants' own admissions that they transact business in the District conclusively establish the Court's personal jurisdiction.  However, if the Court finds that the allegations in the Amended Complaint do not support personal jurisdiction over all Defendants, or that Defendants' contradictory statements obscure the Court's ability to resolve personal jurisdiction, Plaintiff requests the opportunity to conduct limited jurisdictional discovery to resolve these contradictory statements, and to obtain specific information withheld by Defendants regarding their contacts with the forum as explained below.

For example, Defendants' own sworn statements concerning who controls the commercial transactions at issue all contradict one another, and that inconsistency in and of itself precludes dismissal on this basis. Specifically, Marburger asserts that personal jurisdiction does not attach because it "has had no input into, let alone any type of control over, the contents of anything on Amazon." *See* Griffiths Decl. ¶ 8. However, Amazon's general counsel attested that "the publisher provides the image, description, pricing, and other details." Zapolsky Decl. ¶ 5; *see also id.*, Ex. E (explaining how the "Magazine Publisher" submits to Amazon the "cover image," "terms and pricing," and product "description," which Amazon edits).  Obviously, one of the parties is not presenting all relevant facts to the Court.

Until these inconsistencies are resolved through discovery, the Court is precluded from dismissing this action for lack of personal jurisdiction. *Trintec*, 395 F.3d at 1283 (remanding for

discovery where defendant's responsibility for website content was unclear). Indeed, this Court has already found that, "[b]ased on the record before the Court" at that time, which included jurisdictional allegations identical to those in the Amended Complaint, "Plaintiff would also be entitled to discovery on Defendant Marburger's contacts with the District of Columbia if Defendant Marburger filed a motion to dismiss on this basis." Mem. Op. at 6 (May 1. 2007); *see also State of Israel*, 400 F. Supp. 2d at 122 (preserving right to take jurisdictional discovery where plaintiff "request[s]" it in its "opposition papers" to motion to dismiss); *El-Fadl*, 75 F.3d at 676 ("plaintiff faced with a motion to dismiss for lack of personal jurisdiction is entitled to reasonable discovery, lest the defendant defeat the jurisdiction of a federal court by withholding information").[9]

In light of the requirement that Plaintiff must make a "detailed showing of what discovery it wishes to conduct or what results it thinks such discovery would produce," *Medical Solutions, Inc. v. C Change Surgical LLC*, 468 F. Supp. 2d 130, 135-36 (D.D.C. 2006) (internal citations omitted), Plaintiff states that it would seek discovery in order to:

- Reconcile Defendants' contradictory statements regarding who has ultimate control over the substance of the website where the Publications are sold;
- Ascertain Dowd's and Marburger's contacts with the forum other than the marketing, sale, and shipping of the Publications, such as the sale of the combined thirty-nine other print titles sold by the publisher Defendants;
- Discover Marburger's subscriptions and other contacts in the District prior to 2005;
- Discover Dowd's prior sale and shipment of the Publications into the District; and
- Reconcile the contradiction between the Defendants' statements as to the publishers' knowledge of Amazon's role in selling their products.

This is far more than necessary to demonstrate "at least a good faith belief that such discovery will enable it to show that the court has personal jurisdiction over the defendant." *Caribbean Broad. Sys., Ltd. v. Cable & Wireless PLC*, 148 F.3d 1080, 1090 (D.C. Cir. 1998).

---

[9] This Court has denied motions to dismiss conspiracy claims in order to permit a plaintiff to take jurisdictional discovery "even [where] Plaintiff has not made out a prima facie case of jurisdiction." *Diamond Chemical Co., Inc. v. Atofina Chemicals, Inc.*, 268 F. Supp. 2d 1, 15 (D.D.C. 2003) (Kollar-Kotelly, J.).

## II.    PLAINTIFF HAS ALLEGED SUFFICIENT ARTICLE III STANDING

Having invoked the Court's Article III jurisdiction by removing this case from an Article I Court that is not bound by Article III's "case or controversy" requirement, Defendants now claim that the Complaint should be dismissed because it does not plead standing to sue within the meaning of Article III. As demonstrated below, this jurisdictional shell game is unavailing for two reasons. First, foreseeing defendants' transparent ploy to maneuver this action into federal court for the express purpose of trying to dismiss it on standing grounds, the Amended Complaint includes detailed allegations demonstrating Article III standing on any of several independent bases.

Second, as this Court recently held, "'[w]hen it appears that a district court lacks subject matter jurisdiction over a case that has been removed from a state court, the district court must remand the case.'" *Randolph*, 486 F. Supp. 2d at 7 (citing *Republic of Venezuela v. Philip Morris Inc.,* 287 F.3d 192, 196 (D.C. Cir. 2002)). Therefore, even if Defendants' removal/dismissal tactic were to prevail, it will accomplish nothing but a lengthy delay in the resolution of Plaintiff's claims, during which time Defendants' unlawful trade practices continued unabated. This course of conduct finds no sanction in the removal statute; indeed, the removal statute itself provides for the allowance of attorneys' fees and costs in such circumstances – a right Plaintiff intends to avail itself of if Defendants' ploy succeeds. *See* 28 U.S.C. § 1447(c).

In any event, Defendants' arguments that Plaintiff lacks Article III standing fail to even acknowledge – let alone address – the detailed standing allegations in the Amended Complaint. In some cases, Defendants go beyond merely ignoring Plaintiff's allegations, and instead falsely state that Plaintiff has not made such allegations. *Compare*, *e.g.*, Amazon at 27 ("HSUS does not allege that anyone . . . purchased a dog fighting video from . . . Amazon" *with* Am. Compl. ¶ 115 ("Consumers in the District of Columbia have purchased . . . on information and belief, the Videos – from Defendant Amazon"). To the extent Defendants do acknowledge a few of Plaintiff's many standing allegations, Defendants prematurely attack the truth of these allegations. *See*, *e.g.*, Amazon at 26 (challenging allegations as to Plaintiff's financial costs). However, where, as here, "there is no

factual record before the court, and standing is challenged on the pleadings, we accept as true all of the material allegations in the complaint and construe them in the light most favorable to the complaining party." *Speyer v. Barry*, 588 A.2d 1147, 1159 n.24 (D.C. 1991).

Further, many of Defendants' standing assertions rely upon the Court accepting Defendants' characterization of the merits. *See*, *e.g.*, Amazon at 23-25 (premising causation and redressability upon a finding that Defendants' actions promote or further animal fighting, which goes to the merits of all claims). However, in resolving any standing issue on a 12(b)(1) motion, the Court must assume that Plaintiff is correct on the merits of its claims. *ALDF v. Glickman*, 154 F.3d 426, 441 (D.C. Cir. 1998) (*en banc*) (accepting the "plaintiffs' legal theory of this case . . . for purposes of determining . . . standing"). Since Plaintiff's detailed jurisdictional allegations can in no way be described as "wholly insubstantial and frivolous," *E.E.O.C.*, 117 F.3d at 623, and since Defendants' extensive factual attacks must be rejected as premature, the motions to dismiss should be denied.

### A.    Plaintiff has standing to sue in its own right to stop harms to it as an organization from Defendants' unlawful trade practices.

To satisfy Article III standing: (1) a plaintiff must suffer an "injury in fact;" (2) the injury must be "fairly traceable" to defendant's actions; and (3) the injury must be "redressed by a favorable decision." *Bennett v. Spear*, 520 U.S. 154, 162 (1997). An organization can have standing on its own behalf, *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378-79 (1982), or on behalf of its members. *Hunt v. Wash. State Apple Advertising Comm'n*, 432 U.S. 333, 343 (1977).

#### 1)    Plaintiff has alleged cognizable injury.

The discrete, measurable financial harms to Plaintiff alleged in the Amended Complaint more than suffice to demonstrate cognizable injury in fact under *Havens Realty* and Circuit precedent applying that decision. In *Havens*, the plaintiff organization alleged that it "has been frustrated by defendants' [unlawful] practices" and that it "has had to devote significant resources to identify and counteract the defendant's [sic] racially discriminatory [ ] practices." *Havens*, 455 U.S. at 379. Finding that this bare allegation sufficed for Article III standing, the Supreme Court held that "drain on an organization's resources . . . constitutes far more than simply a setback to the

organization's abstract social interests" and is therefore a "concrete and demonstrable injury to the organization's activities." *Id.*

Courts in this Circuit have "applied *Havens Realty* to justify organizational standing in a wide range of circumstances." *Abigail Alliance for Better Access to Developmental Drugs v. Eschenbach*, 469 F.3d 129, 133 (D.C. Cir. 2006). In *Abigail Alliance*, the Court of Appeals found organizational standing where the plaintiff had alleged that "[d]efendant's conduct has frustrated [plaintiff organization's] efforts to assist its members *and the public* . . . and its other activities, including counseling, referral, advocacy, and educational services." *Id.* at 132-33 (citing *Havens Realty*, 455 U.S. at 378-79) (emphasis added). The court also found that the defendant's actions had "caused a drain on [plaintiff organization's] resources *and time* because the organization has had to divert significant time and resources from these activities toward helping its members and the public address" harm caused by the defendant. *Id.* (emphasis added).

Plaintiff's allegations here far exceed those found to be sufficient in *Havens Realty* and in *Abigail Alliance*. For example, the Complaint alleges that:

> Defendants' actions impair and frustrate Plaintiff's ability to pursue its goals, because the proliferation of illegal animal fighting caused by Defendants' unlawful acts requires Plaintiff to *divert* its limited organizational and programmatic resources to law enforcement actions and the care and handling of fighting animals seized at raids. These resources would otherwise be spent on programmatic and advocacy activities to prevent other cruelty to animals, in furtherance of Plaintiff's goals.

Am. Compl. ¶ 129 (emphasis added). More specifically, the Amended Complaint states that Plaintiff is routinely summoned by law enforcement agencies to assist at raids of animal fighting compounds that advertise in the Publications. *See id.* ¶¶ 125, 128. For instance, Plaintiff provided

> critical animal handling and technical expertise in a law enforcement raid on an unlawful commercial cockfighting and gamefowl breeding operation in Fiddletown, California *owned by one of the advertisers in the Publications* – where police arrested 28 people for cockfighting and seized copies of the Publications as evidence. In addition, Plaintiff also provided an emergency grant to pay for the care of 58 roosters seized as evidence pending trial, and to build makeshift housing after the affected communities could no longer make room for the aggressive birds in their animal shelter dog runs without euthanizing more stray or surrendered dogs.

*Id.* ¶ 126 (emphasis added). This unlawful venture would never have grown to be a 700-bird animal fighting compound without the nationwide purchasing audience provided by the Publications. *See id.* (advertising in the Publications even after the raid and proprietor's arrest that he will "ship" fighting birds "Anytime, anywhere"). When Plaintiff diverts its funds to respond to these illegal ventures, it does so "at a total cost to Plaintiff of hundreds of thousands of dollars' worth of equipment, transportation, veterinary supplies, and personnel." *Id.* ¶ 125. These financial injuries are no doubt "particular, concrete injur[ies]." *Sierra Club v. Morton*, 405 U.S. 727, 740 n.16 (1972).

Just days ago, Plaintiff was called upon in an unexpected and emergency fashion to handle and provide care for fighting birds seized from a large animal fighting operation at which copies of THE GAMECOCK were found. *See* Mark Hedlund, *Cops Offer Closer Look at Cockfighting Ring*, ABC News 10 Sacramento (July 5, 2007) (picturing and quoting Plaintiff's officer); Kris Pickel, *Birds Go Missing From Busted Cockfighting Farm*, CBS 13 News (July 11, 2007) (describing Plaintiff's involvement in raid and subsequent housing of animals); *see also* Am. Compl. ¶ 128 (alleging ongoing involvement in law enforcement operations). Plaintiff has expended thousands of dollars on this operation to date and its expenses are ongoing.

Defendants' dismissive characterization of the Humane Society's organizational duties as "self-inflicted," and a mere "budgetary choice[ ]," Amazon at 26, is belied by the plain language of the Amended Complaint, which alleges that these emergency expenditures are paid for by resources "divert[ed] [from] its limited organizational and programmatic resources." Am. Compl. ¶ 129. Such financial outlays are obviously not a mere "budgetary choice," since they are reactive, unplanned, and, as stated on the face of the Amended Complaint, *diverted* from other funding streams. *Id.* Plaintiff would vastly prefer that these diverted "resources . . . otherwise be spent" – as originally planned – "on programmatic and advocacy activities to prevent cruelty to animals, in furtherance of Plaintiff's goals." *Id.* Indeed, this is why Plaintiff has chosen to file suit to put an end to these unexpected expenditures. Defendants' skepticism amounts to nothing more than a premature factual attack on the Amended Complaint, and must be rejected. *Pitney Bowes*, 27 F. Supp. 2d at 19.

Even if Plaintiff *could* "budget" in advance for law enforcement raids of an unknown number and scope, such financial costs are still not impermissibly "self-inflicted," Amazon at 26, because local authorities often make clear that without our assistance, they will not enforce the laws against these animal fighters, who will then continue to abuse animals. Few if any local agencies possess sufficient expertise or resources to seize, handle, and subsequently house, feed, provide veterinary assistance to, and care for large numbers of highly aggressive animals for the entirety of the suspect's criminal proceedings and appeals. Municipalities are often forced to drop or settle charges due to the crushing financial burden of caring for seized fighting animals such as those advertised in the Publications. *See* Courtney Johnson, *25 pit bulls to be put to sleep*, The Badger-Herald (Madison, Wisc.) (Jan. 31, 2007) (dropping charges against dog fighter because city spent $200,000 on the care of seized dogs and had no more money to spend). This is the quintessential "presence of a direct conflict between the defendant's conduct and the [Plaintiff] organization's mission." *Nat'l Treasury Employees Union v. U.S.*, 101 F.3d 1423, 1430 (D.C. Cir. 1996).

These injuries are also "actual or imminent, not conjectural or hypothetical," *Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990), because these financial expenditures continue even as this brief is filed. Moreover, it is only a matter of time before Plaintiff is called upon again to assist with a raid at another one of the large-scale animal fighting compounds that advertise fighting animals for sale nationwide in the self-described "trade publications," Dowd at 5, of that industry. *See* Am. Compl. ¶ 74 ("The Publications are found at seventy-five percent or more of all law enforcement raids of illegal animal fights"). These measurable financial injuries are much "more than simply a setback to the organization's abstract social interests." *Common Cause v. Federal Election Comm'n*, 108 F.3d 413, 417 (D.C. Cir. 1997).[10]

---

[10] Dowd asserts that Plaintiff cannot conclusively "establish that the challenged acts have harmed it personally." Dowd at 20. Plaintiff fully intends to *establish* that Defendants' acts have harmed it, but at this early stage it need only have *alleged* such harm. *See Warth*, 422 U.S. at 501. Defendants' only other attempt to challenge to Plaintiff's organizational standing is the undifferentiated charge that "All of the allegations of harm that HSUS sets out in its complaint are speculative at best." Dowd at 26. But, as demonstrated above, even a cursory reading of the complaint reveals that Plaintiff's harms are tangible, ongoing, and substantial, and not in any way speculative.

> 2)    *Plaintiff's financial injuries are directly traceable to Defendants' unlawful acts.*

Plaintiff has also sufficiently alleged – and is prepared to conclusively *prove*, at the appropriate juncture – that its well-pled injuries are also "fairly" traceable to Defendants' unlawful actions. *Simon v. Eastern Ky. Welfare Rights Org.*, 426 U.S. 26, 41-42 (1976). Defendants' principal traceability argument is that since they are not alleged to have participated directly in animal fights, any harm to Plaintiff from the animal fighting ventures promoted by their unlawful acts is not sufficiently direct. *See* Amazon at 23. However, this reflects a fundamental misunderstanding of both the Complaint's allegations and applicable case law.

As alleged in the Amended Complaint, without being able to advertise in the nationwide "trade publications" for their "industry," Dowd at 5, animal fighting compounds like those described with specificity in the Amended Complaint would not exist at all, or would not grow to such a large scale that Plaintiff's assistance would be required during law enforcement actions against the advertisers. Am. Compl. ¶¶ 84, 126, 127. These compounds are not independent animal fights that buyers of fighting animals advertised in the Publications may or may not choose to participate in. Amazon at 23. Rather, these animal fighting compounds engage in nationwide trafficking directly through the Publications.

For instance, the California Game Farm, a prominent advertiser in the Publications, trafficks illegally in interstate commerce through the Publications and grew to be a 700-animal breeding and fighting compound in order to meet the demand of its nationwide consumer base provided by the Publications. *Id.* ¶ 126.[11] This compound was raided by law enforcement with Plaintiff's critical animal handling and technical expertise, and Plaintiff "provided an emergency grant to pay for the care of the 58 roosters seized as evidence pending trial, and to build makeshift housing after the affected communities could no longer make room for the aggressive birds in their animal shelter

---

[11] *See also* THE GAMECOCK 5 (Oct. 2005) ("Gamecock gives you coverage second to none, reaching many, many more potential customers, resulting in more sales"); *see also* Zapolsky Decl., Ex. D (admitting that "Having your titles listed on Amazon.com is a great way to find new subscribers. . . . We want to help [you] find customers who would be ideal subscribers").

dog runs without euthanizing more stray or surrendered dogs." *Id.* At the raid, police "seized copies of the Publications as evidence" of criminal activity. *Id.* Although the owner awaits trial on felony charges, the compound nonetheless continues to advertise fighting birds in the Publications, where his advertisements state that the compound is "still alive and – well!" and that he will continue to "ship" fighting birds "Anytime, anywhere." *Id.* (citing THE GAMECOCK at page Y (Mar. 2006)); *see also* Pendleton Decl., Ex. 5 (reproducing The FEATHERED WARRIOR 63 (Jun. 2007)).

Even without this direct connection to the specific illegal animal fighting ventures that advertise in the Publications, Plaintiff's allegations of harm are nonetheless traceable to Defendants' unlawful acts. Specifically, Plaintiff alleged that Defendants' unlawful

> publication, distribution, marketing, and sale of the Publications promotes and furthers hundreds if not thousands of specific unlawful animal fighting ventures, including those expressly named in the text and advertisements of the Publications, as well as those that are not expressly named but would not exist but for the real-time commercial cockfighting infrastructure provided by the Publications.

Am. Compl. ¶ 84. The Court of Appeals has made clear that even where causation and redressability are based on the "independent choices" of a third party, standing is nonetheless proper where the plaintiff "adduce[s] facts showing that those choices have been or will be made in such manner as to produce causation and permit redressability of injury." *Nat'l Wrestling Coaches Ass'n v. Dept. of Educ.*, 366 F.3d 930, 938 (D.C. Cir. 2004). Plaintiff has adduced several such facts -- alleging with specificity that third parties who illegally buy fighting animals through the Publications will make the "independent choice" to stop using those animals in illegal animal fights if Plaintiff prevails. For instance, the Amended Complaint alleges:

- "most of the fighting animals and fighting implements advertised in the Publications are not advertised in any other medium, paper or electronic." Am. Compl. ¶ 82;
- "The Publications are found at seventy-five percent or more of all law enforcement raids of illegal animal fights." *Id.* ¶ 74.
- "people [ ] purchase subscriptions to the Publications in order to compare prices, read fight results, find the location and dates of upcoming fights, and order fighting animals and paraphernalia." *Id.* ¶ 112;
- "less illegal animal fighting and fighting animal trafficking would occur . . . if Defendants ceased their marketing and sale of . . . the Publications." *Id.* ¶ 114.

- "Without the magazines, animal fighters . . . would have substantially reduced access to sellers and buyers of fighting animals and other implements intended to be used in unlawful animal fighting, and would also have substantially reduced access to information about how and where to attend specific animal fights." *Id.* ¶ 114;
- The annual cost of a single-page advertisement in the Publications is more than $2,000, *id.* ¶ 73, which strongly suggests that those animals advertised for fighting purposes are in fact being purchased and used in animal fights for the lucrative gambling proceeds.
- The Publications are "the real-time commercial . . .infrastructure" of the animal fighting industry. *Id.* ¶ 84.

The Amended Complaint also sufficiently alleges causation with respect to Amazon:

- Amazon is the exclusive retail seller of subscriptions of the Publications. *Id.* ¶ 85.
- Amazon's website is the only way consumers "can find and purchase subscriptions to the Publications over the internet, or by any other means besides contacting the publishers directly by written mail or by telephone as listed only in the Publications themselves." *Id.*
- "If Defendants did not advertise and sell the Publications and distribute them through the mail service, there would be no retail outlet for, no internet promotion and advertising of, and no internet sale of subscriptions . . . and the Publications' circulation would therefore be substantially reduced. *Id.* ¶ 113.
- "a substantial percentage, and perhaps even a majority, of all new subscriptions to the Publications are sold by Amazon. For instance, the Publications consistently rank in the top one percent and top five percent, respectively, of all magazine subscriptions sold on Amazon.com." *Id.* ¶ 111.

Although Defendants evidently disagree with these detailed factual allegations, Defendants cannot conflate the causation analysis with the merits of their defense that their unlawful acts do not actually "promote" or "further" unlawful animal fighting ventures in violation of federal and D.C. statutes. 7 U.S.C. § 2156(c); D.C. CODE § 22-1015.

Perhaps most conspicuously, Defendants' traceability arguments also fail utterly to address Plaintiff's allegations that Defendants' unlawful acts cause illegal animal fighting by *advertising illegal animal fights*. Am. Compl. ¶ 68 (citing THE FEATHERED WARRIOR 5 (Apr. 2004) (listing schedule for Oklahoma cockfights, after Oklahoma Supreme Court had affirmed the validity of the statewide cockfighting ban)); *see also* Pendleton Decl., Ex. 5 (reproducing THE FEATHERED WARRIOR 6 (Jun. 2007) (advertising upcoming Louisiana cockfights with "entry fee," despite state law prohibition effective August 2007 on cockfights with entry fees and other types of wagering)).

Nor can Defendants explain how it does not promote or further illegal animal fights to publish the results and winners from those fights. Am. Compl. ¶ 79. [12]

> 3)      *Plaintiff's injury is also directly redressable by the relief sought.*

Plaintiff also satisfies its "relatively modest" burden at this stage of the litigation to show that the alleged harms are "likely" to "be redressed by a favorable decision" of the Court. *Bennett*, 520 U.S. at 162. Defendants' assertion that it "cannot be shown that the complete cessation of the activities by defendants alleged by plaintiff to be illegal would have *any* impact on . . . animal fights," Dowd at 10 (emphasis added), is not only a blatant attack on the truth of the allegations in the Amended Complaint, but also overstates Plaintiff's burden. The Supreme Court has made clear that a plaintiff satisfies the redressability requirement when it shows that a favorable decision will receive *some* of its injuries, and "need not show [it] will relieve [ ] *every* injury." *Larson v. Valente*, 456 U.S. 228, 243 n.15 (1982) (emphasis in original); *see also Friends of the Earth v. Laidlaw Envtl. Servs.*, 528 U.S. 167, 192 (2000) (redressability when relief merely deterred conduct).

The Amended Complaint also alleges that:

> Plaintiff's injuries will be redressed if Plaintiff prevails in this action, because if Defendants cease their unlawful actions, animal fighting and trafficking in fighting animals and implements in the District of Columbia and elsewhere will be substantially reduced, and Plaintiff will not be required to divert its programmatic resources to assist with law enforcement actions against illegal animal fighting ventures.

Am. Compl. ¶ 129. Even if Plaintiff was required to point to specific facts showing redressability, rather than relying on the Amended Complaint's general allegation of redress – which is *not* the

---

[12] Defendants also fail to address the Complaint's allegations that Defendants' unlawful acts promote specific animal fights because the Publications' "advertisements for specific animal fights contain information not found in any other print periodical, without which a gambler or fight participant would not be able to attend, such as entry fees and required 'memberships,' weapons classifications, driving directions, cockfighting rules, and the telephone number that will ring in the fighting 'Pit.'" Am. Compl. ¶ 69 (quoting THE FEATHERED WARRIOR 10 (Jul. 2006) (advertising "Long Knife Derby"). Even if an animal fight is to take place in a jurisdiction where it is not banned by state law, the fight is nonetheless illegal under federal law if any of the animals at the fight traveled across state lines. 7 U.S.C. § 2156(a). For this independent reason, illegal animal fights are also "fairly traceable" to Defendants' unlawful acts. Am. Compl. ¶ 84.

applicable standard at a motion to dismiss – it would not change the result here, because Plaintiff *has* alleged such specific facts. *See* Am. Compl. ¶¶ 68, 73, 74, 79, 82, 84, 85, 111-14, 126-27. Indeed, a plaintiff must only show that the relief "is *likely* to redress his injury, not that a favorable decision *will inevitably* redress his injury." *Beno v. Shalala*, 30 F.3d 1057, 1065 (9th Cir. 1994) (emphasis added). Thus, defendants' attack on the veracity of Plaintiff's allegations is premature.

4)    <em>The D.C. Legislature has removed prudential barriers to standing.</em>

Amazon asserts that the CPPA's zone of interest is limited to "consumer protection from fraudulent business practices," and thus Plaintiff's claim is barred. Amazon at 21. The only authority Amazon cites for this myopic reading of the statute is Dowd's brief, *see id.*, which in turn cites no authority for this proposition whatsoever. However, the Court need look no further than the plain language of the CPPA to see that the District of Columbia legislature has purposefully *eliminated* all prudential barriers to standing.

The CPPA confers a right of action upon any "person, whether acting for the interests of itself, its members, or the general public," D.C. CODE § 28-3905(k)(1), to bring an action to redress any and "*all* improper trade practices," *Bassin*, 828 A.2d at 722-23 (emphasis in original), regardless of "*whether or not any consumer is in fact misled, deceived or damaged thereby.*" D.C. CODE § 28-3904 (emphasis added). This cause of action was formerly limited to injured consumers, but in 2000, the District of Columbia legislature removed the both the injury requirement and the requirement that the plaintiff be a consumer. *See* D.C. Law 13-172, § 1402 (Oct. 19, 2000).

D.C. courts applying the CPPA since this amendment have recognized that by crafting this right of action so broadly, the legislature has, as a policy choice, effectively removed prudential barriers to suit, in order to encourage enforcement by private parties. For instance, in a CPPA case where the "Plaintiff does not claim that he suffered any personal and direct injury as a result of [the alleged unlawful trade practices]," Judge Terrell nonetheless found that the plaintiff had standing under D.C. CODE § 28-3905(k)(1) because "Plaintiff is a person taking legal action to stop the unconscionable activities of Defendant. Plaintiff clearly falls within the broad domain of 'any

person [acting] in the interest of the general public.'" *Petersan v. ChartOne, Inc.*, Civ. No. 03-8328 (D.C. Super., Aug. 2, 2004). Indeed, the Supreme Court has reached the same result where a federal statute expressly authorizes "any person" to file suit. *Bennett*, 520 U.S. at 164 (interpreting Endangered Species Act).[13] Defendants may not like that the broadly worded CPPA creates a concomitantly broad zone of interests, but that grievance is better redressed to the legislative body that removed the prudential barrier in the first place.

Given the D.C. legislature's purposeful elimination of prudential barriers to standing, it is all the more difficult for Defendants to show, as case law cited by Amazon requires, that Plaintiff's interests "are so marginally related to or *inconsistent with* the purposes implicit in the statute that it cannot reasonably be assumed that [the legislature] intended to permit the suit." *Am. Fed. of Gov't Employees, AFL-CIO v. Rumsfeld*, 321 F.3d 139, 143 (D.C. Cir. 2003). Plaintiff's interest in stopping unlawful trade practices not only is not "incongruent with the statutory purposes," which is all the Court need find for zone of interests purposes, *Judicial Watch, Inc. v. Dep't of Justice*, 432 F.3d 359, 365 (D.C. Cir. 2005) (Williams, J., concurring) – but is exactly what the broad and remedial statute is intended to facilitate.

### B.    *Plaintiff also has standing to sue on behalf of its members in the District of Columbia who are harmed by Defendants' unlawful trade practices.*

Plaintiff's standing allegations as to its members also suffice. An association such as Plaintiff "has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *United Food & Commercial Workers Union Local 751 v. Brown Group, Inc.*, 517 U.S. 544, 553 (1996). The individual members need not be named. *Doe v. Stincer*, 175 F.3d 879, 882 (11th Cir. 1999).

---

[13] *Williams v. The Purdue Pharma Co.*, 297 F. Supp. 2d 171 (D.D.C. 2003), cited by Defendants, is not to the contrary. There, Judge Collyer dismissed a removed CPPA action for lack of subject matter jurisdiction, as opposed to remanding, but did not address either prudential standing or the CPPA provision invoked by Plaintiff here as the basis for its cause of action.

1)    *Plaintiff's members would have standing to sue in their own right.*

Plaintiff's members would clearly have standing to sue in their own right to redress the substantially heightened risk of serious bodily injury and illness they are exposed to from Defendants' unlawful acts. Specifically, the Amended Complaint alleges that Defendants' unlawful promotion and furthering of animal fights and of trafficking in fighting animals harms the health and safety of Plaintiff's members, by placing them an increased risk of dog attacks, zoonotic disease, and the violent crimes that invariably accompany animal fighting. *See* Am. Compl. ¶¶ 121-23, 129. Defendants attempt to trivialize these grave harms, but again, at this early stage of the litigation, such a factual attack is premature and must be rejected.

As the Court of Appeals has recognized, "variations in risk" suffice for injury-in-fact so long as they are "non-trivial." *Natural Res. Def. Council v. Envtl. Protection Agency*, 464 F.3d 1, 6 (D.C. Cir. 2006) (citations omitted). The variation in risk alleged by Plaintiff is anything other than "trivial." As alleged in the Amended Complaint, Defendants' unlawful acts result directly in the illegal trafficking of thousands of specially trained, hyper aggressive fighting animals, *see* Am. Compl. ¶¶ 62-65, 123, as well as the promotion and furthering of the illegal animal fighting ventures at which those animals are ultimately fought to their deaths. *Id.* ¶¶ 112, 114, 121, 123. It is beyond question that these thousands of animals pose a distinct public health and public safety risk where they are housed and fought, as alleged by Plaintiff. *See id.* ¶¶ 121-23. The transport and trafficking of thousands of fighting animals also poses a distinct public safety risk, since these specially trained and hyper aggressive animals are difficult to safely transport. *See United States v. Vick*, 3:07-CR-274 (E.D. Va., indictment filed Jul. 17, 2007) (detailing interstate trafficking and transport of fighting dogs between Maryland and Virginia).

Contrary to Defendants' assertion, it is not necessary for Plaintiff to demonstrate which of its members "live in proximity to animal fighting ventures," Amazon at 25, to sufficiently allege, at this early stage, that its members are at an increased risk of physical harm. *See NRDC*, 464 F.3d at 7 (declining to require plaintiff to show which of its 500,000 members nationwide were at increased

risk of nonfatal illness from chemical exposures permitted by defendant agency). At the pleading stage, Plaintiff need not prove the actual magnitude of the increase in risk. *See id.*, 464 F.3d at 6.

Indeed, the Court of Appeals has held that even where a plaintiff organization could demonstrate – at the merits stage – that its members faced an increased risk amounting to a "1 in 200,000" probability of developing a "nonfatal" disease, such a showing sufficed to "take a suit out of the category of the hypothetical." *Natural Res. Def. Council*, 464 F.3d at 6-7. Similarly, in *Mountain States Legal Foundation v. Glickman*, the Court of Appeals found associational standing based on an increased risk of injury from forest fires to the plaintiff's members, who occasionally hiked in the forest at issue in the defendant agency's logging rule. *See* 92 F.3d 1228, 1235 (D.C. Cir. 1996). The injuries alleged by Plaintiff are well within these broad parameters.[14]

As with the cognizable injuries-in-fact to Plaintiff itself, Plaintiff's members' injuries are traceable to Defendants' unlawful acts, and redressable by the relief sought. *See* Am. Compl. ¶¶ 122-23, 129. Again, plaintiffs need only allege, and need not prove, causation and redressibility at the motion to dismiss stage. *Lujan*, 504 U.S. at 561. Likewise, both Plaintiff and its members also fall within the broad zone of interests of the CPPA. *See* Section II(A)(4) *supra*. Plaintiff's members thus have standing to bring this action in their own right. [15]

---

[14] Nor is there any merit to Defendants' claim that Plaintiff fails to allege a cognizable injury simply because its members' injuries are shared by other members of the public. Amazon at 25. The Supreme Court has rejected the argument that an alleged injury cannot support standing even if it is widely shared, so long as it is "concrete." *Fed. Election Comm'n v. Akins*, 524 U.S. 11, 24 (1998) (bar on "generalized grievances" occurs when harm is widely shared *and* of an "abstract nature").

[15] Defendants devote their remaining briefing on this issue to two standing theories Plaintiff has not even alleged. Amazon's excursus on "psychological distress" from "the mere knowledge that animal fighting activity takes place," Amazon at 24-25, has no bearing on this case, as Plaintiff did not allege such harm. Nor is it true that Plaintiff has alleged that its members "seek out and attend animal fighting for the purposes of assisting law enforcement." Amazon at 25.

2) *The interests Plaintiff seeks to protect are germane to its organizational purpose.*

Plaintiff also meets the second part of the *Hunt* test, because "the interests it seeks to protect are germane to the organization's purpose." 432 U.S. at 343. The Court of Appeals has characterized the germaneness test as "undemanding," requiring an organization to show "mere pertinence between litigation subject and organizational purpose." *Humane Soc'y of the United States v. Hodel,* 840 F.2d 45, 58 (D.C. Cir. 1988). Commenting on the associational standing of Plaintiff in another matter, the Court of Appeals stated that the "litigation interest" advanced on behalf of its members need not "be central to a group's organic purpose." *Id.*, at 53 n.10.

As explained above, the interests Plaintiff seeks to advance are the protection of its members from serious bodily injury and illness caused by the fighting animals trafficked by the thousands through the Publications. Am. Compl. ¶¶ 121, 123. Plaintiff also seeks to protect its members from the personal and property crimes that invariably accompany the animal fighting promoted and furthered by Defendants' unlawful acts. *Id.* ¶ 122. Plaintiff's mission, as described in its publicly-available mission statement, is "to create a humane and sustainable world for all animals—a world that will also benefit people . . . through education, advocacy, public policy reform, and the empowerment of our supporters." It is untenable to suggest that this "litigation subject" is not "pertinen[t]" to the organization's purpose. *Humane Society*, 840 F.2d at 58.

More specifically, Plaintiff has decades of expertise on dog bite prevention and dangerous dogs – with a special emphasis on animals abused in fighting – including field work, policy development, educational materials, academic studies, community outreach, animal sheltering and handling, and training.[16] Plaintiff has also taken a leading role in addressing the animal-to-human transmission of zoonotic diseases from fighting animals.[17] In light of these long-standing

---

[16] *See, e.g.,* HSUS Trains Tennessee Law Enforcement on Recognizing and Dealing with Potentially Dangerous Dogs; Dog Bite Prevention for Law Enforcement and Other First Responders; Making Dog Bite Prevention a Community Affair (all available at http://www.hsus.org).

[17] *See, e.g.,* If Avian Influenza Arrives in the United States: Advice for Protecting Yourself and Your Pets; HSUS Calls on Congress to Crack Down on Illegal Cockfighting Activity to Reduce Risk of Bird Flu; Cockfighting and the Spread of Bird Flu; Animal Protection Organization Calls on World

community programs, it cannot be said that the prevention of dog attacks and other human injuries and illness from fighting animals are "issues as to which the organization[ ] [it]sel[f] enjoy[s] little expertise and about which few of [its] members demonstrably care." *Id.*, 840 F.2d at 57. Accordingly, defendants' germaneness challenge must be rejected.[18]

### C.    If the Court finds that Plaintiff lacks Article III standing, the matter must be remanded back to the Superior Court.

As demonstrated above, the allegations in Plaintiff's Amended Complaint more than suffice to show Article III standing at this early stage of the litigation. However, should this Court find those allegations insufficient, the proper course is to remand the matter to Superior Court rather than dismissing outright. *See Randolph*, 486 F. Supp. at 7 (Kollar-Kotelly, J.). In *Randolph*, after defendants removed the action, this Court found that the plaintiffs lacked Article III standing. Rather than simply dismissing the removed case for lack of standing, as the court did in the *Williams* case relied upon by Defendants, this Court instead followed the "clear instruction" in 28 U.S.C. § 1447(c) that "'[w]hen it appears that a district court lacks subject matter jurisdiction over a case that has been removed from a state court, the district court must remand the case.'" *Id.*, 486 F. Supp. at 7 (citing *Republic of Venezuela,* 287 F.3d at 196). Therefore, this Court should remand rather than dismiss if it finds it lacks subject matter jurisdiction.

## III.    THE COMPLAINT STATES CLAIMS UPON WHICH RELIEF MAY BE GRANTED UNDER THE CPPA

Defendants' motions to dismiss read as though Plaintiff had brought its claims for relief directly under the AWA and the D.C. Cruelty to Animals statute. Defendants either misunderstand

---

*Health Organization to Combat Cockfighting as Key Factor in Spread of Avian Flu* (all available at http://www.hsus.org).

[18] Plaintiff also meets the final requirement for associational standing – that "neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt,* 432 U.S. at 343. Plaintiff has requested declaratory and injunctive relief, which does not require "individualized proof" to apportion any award, and therefore is "properly resolved in a group context." *Id.* at 344. To the extent the Amended Complaint seeks damages, they are based on a statutory formula, and do not require individualized accounting. D.C. CODE § 28-3905 (k)(1)(A).

or misconstrue Plaintiff's claims. As even a cursory reading of the Amended Complaint reveals, this case is brought under the CPPA, not the AWA. For the reasons that follow, Plaintiff properly states claims under the CPPA.[19]

**A.**    ***The CPPA is a broadly worded remedial statute that provides Plaintiff a right of action to remedy Defendants' unlawful trade practices.***

As discussed above, the primary claim in this case has only a few required elements – each of which is clearly alleged in the Amended Complaint.  Thus, the CPPA confers a right of action upon any "person, whether acting for the interests of itself, its members, or the general public," if they allege that a defendant engages in "trade practices" that are either "in violation of a law of the District of Columbia" or in a "manner not consistent with that warranted by … operation or requirement of federal law." D.C. CODE §§ 28-3904; 28-3905(k)(1). A cause of action will lie regardless of "whether or not any consumer is in fact misled, deceived or damaged thereby." *Id.*

The D.C. legislature substantially broadened the CPPA in 2000, replacing the prior version of section 28-3905(k)(1), which formerly limited the cause of action to "[a]ny *consumer who suffers any damages* as a result of the use or employment by any person of a trade practice in violation of a law of the District of Columbia within the Jurisdiction of the Department [of Consumer and Regulatory Affairs]." *See* D.C. Law 13-172, § 1402, 47 D.C.R. 6308 (Oct. 19, 2000) (modifying statute).[20] The D.C. council also instructed, in the text of the statute, that the CPPA is to "be construed and applied liberally to promote its purpose." D.C. CODE § 28-3901.

D.C. courts have thus recognized that the CPPA's "extensive enforcement mechanisms apply not only to the unlawful trade practices proscribed by § 28-3904, but to all other statutory and common law prohibitions." *Osbourne v. Capital City Mortg. Corp.*, 727 A.2d 322, 325-26 (D.C.

---

[19] Defendants' arguments on this point do not apply to Claims Four and Five, which plead violations of the CPPA based on the violations specifically enumerated in § 28-3904 of the CPPA – namely, misrepresenting as to a material fact which has a tendency to mislead, and failing to state a material fact where such failure tends to mislead. D.C. CODE §§ 28-3904(a), 28-3904(e).

[20] To the extent that *Howard v. Riggs National Bank*, 432 A.2d 701, 709 (D.C. 1981), stood for the proposition advanced by Amazon – namely, that a CPPA plaintiff must be a consumer in a "consumer-merchant" relationship – that has been overruled by the 2000 CPPA amendments.

1999). The District Court has also recognized that the CPPA "defines its terms comprehensively so that it can provide a remedy for *all* improper trade practices." *Cooper v. First Gov't Mortg. & Investors Corp.*, 206 F. Supp. 2d 33, 35 (D.D.C. 2002); *Adams*, 613 A.2d at 861-62 (CPPA provides right of action where defendant "sold consumer goods in violation of §§ 28:2-312 through 2-318 or of *any* federal law") (citing § 28-3904(x)) (emphasis added). The CPPA thus manifests an express legislative intent to provide a private right of action to remedy "anything that can properly be called a [trade] practice and that at the same time is forbidden by law." *Stop Youth Addiction, Inc. v. Lucky Stores, Inc.*, 950 P.2d 1086, 1090 (Cal. 1998) (construing identically-worded unlawful trade practice law upon which the CPPA was modeled).[21]

### B.    *CPPA claims do not require that predicate violations be separately actionable.*

Faced with this uniquely expansive and remedial cause of action, and an Amended Complaint that clearly alleges "trade practices" that are both "in violation of a law of the District of Columbia" and in a "manner not consistent with that warranted by … operation or requirement of federal law," Am. Compl. ¶¶ 11, 12, 136, 137, Defendants advance two arguments in an attempt to severely curtail the scope of the CPPA, each of which reflects a fundamental misreading of the CPPA's plain language. In fact, Defendants make scant mention of the CPPA at all, which is understandable given that nothing in either the CPPA or its legislative history supports Defendants' request to ignore the D.C. legislature's decision to provide an expansive cause of action.

First, Defendants argue that "private rights of action to enforce federal law must be created by Congress," and that "the AWA does not provide a private action." Amazon at 15; Dowd at 13. This point, however, simply has no bearing on this case, as Plaintiff is enforcing a *state* law that

---

[21] *Hakki v. Zima Co.*, No. 03-9183, 2006 WL 852126 (D.C. Super. Ct. Mar. 28, 2006), relied upon heavily by Defendants, is not similar to this action in any respect. It involved a different provision of the CPPA than that invoked here, did not allege any predicate violations, and was resolved on statute of limitations and retroactivity grounds.

provides an express private right of action. There is nothing in the Complaint that could even remotely be construed as an attempt to invoke a private right of action under federal law.[22]

Defendants would require predicate violations of the CPPA to be separately actionable under federal law. Although this question has not yet been addressed in D.C., Defendants' position has been squarely rejected by both federal and state courts interpreting unlawful trade practice acts of identical scope, and for good reason. To hold otherwise would deprive the States of the right to stop trade practices that clearly violate federal laws in their jurisdiction – even where federal law enforcement officials choose not to initiate prosecution.

For instance, in *Optivus Tech., Inc. v. Ion Beam Applications S.A.*, the Federal Circuit made clear that "[a]lthough [the federal predicate violation] provides . . . no private right of action . . . a private plaintiff may bring [an] action" under the California state unlawful trade practices law nonetheless. 469 F.3d 978, 986 (Fed. Cir. 2006) (quotation omitted). Thus, a private plaintiff may bring an action under the California law, like the CPPA, even when the unlawful trade practice "violates a [predicate] statute for the direct enforcement of which there is no private right of action." *Stop Youth Addiction*, 950 P.2d at 1093. "Such unlawful business practices are 'independently actionable under [the unlawful trade practices act] and subject to the distinct remedies provided

---

[22] Defendants' assertion that Plaintiff seeks to "enforce a federal statute," Dowd at 14, grossly misconstrues Plaintiff's claims. True "enforcement" of the federal laws at issue would result in arrest, substantial jail time, fines, and forfeiture of assets. The remedy sought by Plaintiff is that provided for by the CPPA, which is merely to stop a trade practice that the D.C. legislature has deemed to be unlawful. This matter is thus wholly unlike any of the cases proffered by Defendants on this point, *see* Amazon at 16 (citing *International Primate*, *Whispering Pines*, *Moor-Jankowski*, *PAWS*, *In Defense of Animals*, and *Bajalo*), each of which, without exception, involved claims brought directly under the AWA, without any reference to a separate statutory cause of action. These authorities merely stand for the common sense proposition that parties may not sue directly under a statute where there is no private right of action *in that statute*. Plaintiff has no quarrel with that basic proposition. But it is of no matter here. Plaintiff does not need, and has not alleged, an *implied* right, because the D.C. legislature has equipped it with an *express* right of action.

thereunder.'" *Stevens v. Superior Court*, 89 Cal. Rptr. 2d 370, 375 (Cal. Ct. App. 1999) (citations omitted).[23]

Similarly, a Connecticut law that, like the CPPA, deems predicate violations of federal law to be actionable under the state unlawful trade practices law, *see Cheshire Mortgage Service, Inc. v. Montes*, 612 A.2d 1130, 1143 (Conn. 1992), allows redress for such violations "regardless of whether the underlying statute conveyed a private right of action that could stand alone." *Eder Bros., Inc. v. Wine Merchants of Conn., Inc.*, 880 A.2d 138, 150 (Conn. 2005); *see also Scrivani v. Vallombroso*, 916 A.2d 827, 832 n.5 (Conn. App. Ct. 2007).

As in California and Connecticut, the D.C. legislature is not – contrary to Defendants' protestations – required to obtain Congressional permission when deciding, as a policy matter, which trade practices it deems to be unlawful in the District. Like the UCL, the CPPA "works by 'borrow[ing]' violations of other laws and treating those transgressions, when committed as a business activity, as 'unlawful business practices.'" *Stevens*, 89 Cal. Rptr. 2d at 375 (citations omitted). State legislatures are free to incorporate federal law by reference, and very often do. However, under Defendants' contorted logic, state lawmakers could never reference or "borrow," *id.*, federal law without somehow "overrid[ing] Congress[ ]." Dowd at 19.

Second, Defendants rely heavily upon a contrary line of case law from Massachusetts, New York, and North Carolina, interpreting those jurisdictions' differently-worded unlawful trade practice laws, in an attempt to show that the *District of Columbia's* unlawful trade practice law cannot be used to redress predicate violations of federal law. *Broder v. Cablevision Systems Corp.*, 418 F.3d 187, 199 (2d Cir. 2005) and *Conboy v. AT&T Corp.*, 241 F.3d 242, 258 (2d Cir. 2001),

---

[23] Like the CPPA, California's unfair competition law ("UCL") provides a private right of action to redress "*any unlawful,* unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising." CAL. BUS. & PROF. CODE § 17200 (emphasis added). The California Supreme Court has construed this to mean that "[v]irtually any law--federal, state or local--can serve as a predicate for a section 17200 action." *Stevens*, 89 Cal. Rptr. 2d at 375; *compare Adams*, 613 A.2d at 861-62 (CPPA makes actionable trade practice that violates "*any* federal law") (citing § 28-3904(x), emphasis added).

cited in *Amazon* at 18-19, both involve a state law that limits a private right of action to "deceptive acts or practices," and does not, unlike the CPPA, expressly recognize predicate violations of other laws. Since the *Broder* and *Conboy* courts found the definition of "deceptive acts" in that statute to be self-contained, the courts therefore declined to recognize an implied predicate violation where the plaintiff could not show that the violation of the other statute amounted to a "deceptive" practice. *See Broder*, 418 F.3d at 199 (finding that "the text of [the deceptive practices law]" does not "suggest[ ] that the New York legislature intended to cast its net so broadly" to incorporate predicate violations of federal law); *compare Adams*, 613 A.2d at 862 (CPPA provides private right of action where defendant "sold consumer goods in violation of . . . *any* federal law") (citing D.C. CODE § 28-3904(x)) (emphasis added).

Similarly, in *Animal Legal Defense Fund Boston, Inc. v. Provimi Veal Corp.*, the court found that the alleged predicate violations fell outside the scope of the violations made actionable by the unfair trade practices statute in Massachusetts. 626 F. Supp. 278, 284 (D. Mass. 1986). There, the plaintiffs alleged violations based on state animal cruelty laws, *see id.* at 280, but the unfair trade practices act and regulations at issue were limited, on their face, to predicate violations of "statutes, rules, regulations or laws . . . intended to provide the consumers of this Commonwealth protection" and "Federal *consumer protection* statutes." 940 MASS. CODE REGS. § 3.16; MASS. GEN. LAWS ch. 93A, § 2 (emphasis added). In fact, the *Provimi* court stated that where the unfair trade practices law "explicitly provides that violations of [other laws] can be enforced [as] a . . . private action" under that statute, such a violation would be actionable. *Provimi*, 626 F. Supp. at 281. In short, each of these cases relied upon by Defendants only proves Plaintiff's point – if the D.C. legislature had intended to limit the reach of the CPPA in the manner urged by Defendants, it certainly could have done so, as these jurisdictions have done. It did not.

While relying heavily upon precedents involving state unlawful trade practice laws that are nothing like the CPPA, Defendants carefully avoid the leading and most fully developed case on this issue, which interprets a law of substantively identical wording and scope to the CPPA, and in

which the position Defendants advance here was considered at length and flatly rejected. In *Stop Youth Addiction*, the California Supreme Court addressed that state's Unfair Competition Law ("UCL"), which allowed "any person acting for the interests of itself, its members or the general public" – the same phrased used in the CPPA – to institute a civil action to redress "any unlawful, unfair or fraudulent business act," which, like D.C. courts, California courts had construed to include "anything that can properly be called a business practice and that at the same time is forbidden by law," including violations of any federal law, and violations of the Penal Code. 950 P.2d at 1090.

In that case, the for-profit plaintiff corporation sought $10 billion in damages to redress defendants' sales of tobacco to minors, which, plaintiff alleged, violated state criminal laws. In response, defendants – like Defendants here – argued that plaintiff had failed to state a claim, on the basis that it "should not be permitted to use the UCL to obtain relief, indirectly, for violation of an underlying statute – Penal Code 308 – that [plaintiff] is not authorized to enforce directly," because "the Legislature did not include an express private right of action in the enforcement scheme for the underlying law." *Id.* at 1091. The court rejected defendants' position, reasoning that "as we have long recognized, it is in enacting the UCL itself, and not by virtue of particular predicate statutes, that the Legislature has conferred upon private plaintiffs 'specific power' . . . to prosecute" unlawful trade practices. *Id.* (citation omitted). The court thus held that "'whether a private right of action should be *implied* under [the predicate] statute . . . is immaterial since any unlawful business practice . . . may be redressed by a private action'" under the UCL. *Id.* at 1091 (citations omitted); *id.* (proper inquiry is "the Legislature's intent in enacting and amending the UCL," rather than the underlying predicate law).

Likewise here, Plaintiff does not need, and has not asked, the Court to recognize an *implied* right of action under the predicate statutes, because the D.C. legislature has supplied it with an *express* right of action in the CPPA. The California court also rejected the defendants' mischaracterization of the plaintiff's action as an attempt to "circumvent the absence of a private

right of action under [the] Penal Code," because "[i]t does not follow . . . that a private UCL action that 'borrows violations' . . . of [the criminal statute] to establish predicate 'unlawful' business activity is barred." *Id.* at 1094 (citations omitted). There, as here, defendants "mischaracterize[ ] [plaintiff's] position. [Plaintiff] does not contend a 'private right of action' exists for it (or any other private plaintiff) to proceed under Penal Code section 308. [Plaintiff] seeks relief from alleged [unlawful trade practices], not to enforce the Penal Code." *Id.* at 1094; *id.* at 1101 ("[plaintiff] seeks to enforce *the UCL*") (emphasis in original).[24]

Although the court acknowledged that the statutory "standing provisions" were "lax," it admonished that the Defendant's concerns about the breadth of the statutory language "are best addressed to the Legislature." *Id.* at 1102. Indeed, not long after the court's decision in *Stop Youth Addiction*, the UCL was amended to the liking of the defendants and their supporting amici. *See* Initiative Measure, Proposition 64, § 2 (amended Nov. 2, 2004). Similarly here, the Court should decline Defendants' invitation to act as a superlegislature and opine as to the wisdom of the CPPA. Defendants evidently dislike the CPPA, but that is not a valid basis for evading its dictates. Plaintiff has clearly stated claims upon which relief may be granted under the CPPA.[25]

---

[24] Here, as in California, the D.C. legislature had a chance to constrict the scope of the predicate violations made actionable by the CPPA when it amended that statute in 2000, long after the D.C. Court of Appeals had construed the CPPA predicate violations to extend to "any federal law," *Adams*, 613 A.2d at 862, but chose not to do so. The California court reasoned that "had the Legislature at any time desired to change the UCL so as to restrict its application to situations where the predicate statute expressly provides for private action, it undeniably has had ample time to do so." *Stop Youth Addiction*, 950 P.2d at 1092. As with the CPPA, "whenever the Legislature has acted to amend the UCL, it has done so only to expand its scope, never to narrow it." *Id.* at 1097.

[25] Defendants' argument that Plaintiff's joint liability claims fail as a matter of law is derivative of other arguments which Plaintiff has already thoroughly refuted. As explained in this Section, it is immaterial that the conspiracy violations are not independently actionable, because Plaintiff has *not* brought "a cause of action *under* 18 U.S.C. § 371," Amazon at 54 (emphasis added), or the other predicate violations that form the basis of Plaintiff's claims under the CPPA. As with the other predicate violations, Plaintiff's detailed factual allegations adequately state a claim. The Amended Complaint describes with particularity (to the extent known without discovery) the unlawful "Agreements" between Defendants to distribute the Publications. *See* Am. Compl. ¶¶ 85-90, 97. As explained in Section I(B) *supra*, Plaintiff's allegations clearly meet the pleading standard for conspiracy and aiding and abetting in this Circuit. *See Edmond*, 949 F.2d at 428. On a motion to

**C.** *D.C. Code § 28-3904 is not limited to warranty actions.*

Despite the D.C. Court of Appeals' repeated holding that § 28-3904(x) of the CPPA provides redress where consumer goods are sold "in violation of [D.C. Code] §§ 28:2-312 through 2-318 or of *any* federal law," *Adams*, 613 A.2d at 862 (citing § 28-3904(x)) (emphasis added), Dowd would limit the reach of § 28-3904(x) to claims based on the breach of an implied or express warranty. Dowd at 15, 18. That cramped construction finds no support in the law.[26]

As D.C. courts have recognized, "[w]hile the CPPA enumerates a number of specific unlawful trade practices . . . the enumeration is not exclusive." *Bassin*, 828 A.2d at 723 ("[t]rade practices that violate other laws . . . fall within the purview of the CPPA"); *see also Atwater v. District of Columbia Dep't of Consumer & Regulatory Affairs*, 566 A.2d 462, 466 (D.C. 1989) ("the [CPPA] obviously contemplates that procedures and sanctions provided by the Act will be used to enforce trade practices made unlawful by other statutes"). This construction gives effect to the "main purpose of the CPPA," which is "to 'assure that a just mechanism exists to remedy *all* improper trade practices.'" *Bassin*, 828 A.2d at 723 (quoting D.C. CODE § 28-3901(b)(1)) (emphasis added). D.C. courts have made clear that "[t]rade practices that violate other laws, including the common law, also fall within the purview of the CPPA." *Id.*; *accord Osbourne,* 727 A.2d at 325-26 ("[T]he CPPA's extensive enforcement mechanisms apply not only to the unlawful trade practices proscribed by § 28-3904, but to all other statutory and common law prohibitions").

In thus repeatedly construing the CPPA to reach predicate violations of "any federal law," D.C. courts have evidently already rejected the narrow construction that Dowd prefers, and instead given the term "warranted" its ordinary meaning – which is a transitive verb, *i.e.*, permitted. *See*, *e.g.*, AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE (4th ed. 2000) (defining warranted as "To grant authorization or sanction to (someone); authorize or empower"). Had the legislature intended to limit its scope to actions over warranties, it could have used the noun form of

---

dismiss, it is Plaintiff's allegations that are scrutinized, and not the "evidence," Amazon at 54, Defendants apparently think is required to be submitted with a complaint.

[26] Even if the Court were to accept this strained view, it would only affect Claims I, II, and VII.

that word, as it has elsewhere. *See, e.g.,* D.C. CODE § 28:2-312, cited in Dowd at 15. Indeed, as Dowd points out in its own brief, warranty provisions are *already* among the CPPA's other enumerated violations. *See* Dowd at 15. Dowd's preferred construction would render those provisions superfluous – a disfavored construction. *Circuit City Stores v. Adams*, 532 U.S. 105, 113 (2001). Dowd's artificially limiting interpretation would also contravene the CPPA's mandate that it is to "be construed and applied liberally to promote its purpose." D.C. CODE § 28-3901.

## IV.    DEFENDANTS' MERITS ARGUMENTS ARE PREMATURE AND UNAVAILING

In addition to their jurisdictional arguments, Defendants raise a host of premature, internally inconsistent, and highly fact-dependent merits arguments, none of which warrants dismissal at this early stage. Indeed, Defendants' characterization of the relevant facts shifts with each of the arguments they raise. For instance, as explained further below, for First Amendment purposes, Amazon asserts that it engages in protected "publication" or "speech," Amazon at 43, while its Communications Decency Act argument asserts that it is *not* a "publisher or speaker". *Id.* at 30 (emphasis added). At other times, Amazon characterizes itself as a "conduit" *id.* at 39 or a "passive pass-through." *Id.* at 32. These shifting characterizations underscore the fact-intensive and premature nature of these merits arguments, and why they are better held in abeyance until the facts are developed through discovery. *See Pitney Bowes*, 27 F. Supp. 2d at 19. Even if the Court were inclined to hear these arguments now, none of them has the slightest merit,

### A.    The Communications Decency Act does not immunize Defendants' unlawful trade practices.

One of the Defendants – Amazon – asserts complete immunity on the basis of the Communications Decency Act ("CDA"), which provides immunity for websites that allow the posting of third-party content, where the website "*restrict[s]* access to or availability of material that the provider or user considers to be obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable, whether or not such material is constitutionally protected." 47

U.S.C. § 230(c)(2)(A) (emphasis added).[27] The CDA has been applied to bar "tort-based lawsuits" that treat passive websites as the speakers whose speech they host. *Zeran v. America Online, Inc.*, 129 F.3d 327, 330 (4th Cir. 1997).

This matter – which addresses the sale, *shipment*, and aggressive marketing of unlawful materials – is thus wholly unlike the claims advanced in every CDA case to date. In this action, Amazon is not a passive chat room host, *see Donato v. Moldow*, 865 A.2d 711 (N.J. Super. 2005); a dating service, *Carafano v. Metrosplash.com, Inc.*, 339 F.3d 1119, 1123 (9th Cir. 2003); or a company that merely provides the cable infrastructure for an internet connection, *Doe v. GTE Corp.*, 347 F.3d 655, 659-60 (7th Cir. 2003). Rather, it is a retailer that sells, *ships*, and markets the contraband goods in question – not by way of a passive third-party sales platform, but on its own primary website, as a result of *its* decision to advertise, sell and ship those items.

More specifically, Amazon's immunity claim fails because two of the three required elements are not satisfied. Namely, Amazon cannot show that the asserted claims treat the defendant as a publisher or speaker of information, nor that the information at issue is provided solely by a third party "information content provider" ("ICP"). *Schneider v. Amazon.com*, 31 P.3d 37, 39 (Wash. Ct. App. 2001). The absence of any of these elements is fatal to a CDA immunity claim, and thus Amazon's attempted CDA defense should be rejected outright. However, to the extent the Court considers dismissal of some of the claims as to Amazon on this basis, the Defendants' internally inconsistent statements as to which of them *is* in fact the "publisher" of the information in question, prevent the Court from resolving this issue at this time. At a minimum, Plaintiff is entitled to discovery to resolve those factual inconsistencies, as explained below.[28]

---

[27] Magazine Express's assertion of CDA immunity is completely without merit. Its website, if it even has one, is not at issue, and thus it does not meet the statutory definition of an ICS as that term is applied to this action. *See* 47 U.S.C. § 230(f)(2).

[28] Claims IV and V, which involve material misrepresentations and failure to state a material fact, are based upon the text of Amazon's policies and purchasing agreements. Am. Compl. ¶¶ 148, 152. Because the CDA only shields ICSs from liability for content provided by another information content provider, Amazon is not entitled to immunity for Claims IV and V, as *it* created the only text upon which these two claims are predicated. *See Dimeo v. Max*, 433 F. Supp. 2d 523, 530-31

    1)    *The CDA does not immunize criminal use of the mail, which is not speech or website content, but action.*

Amazon's CDA immunity argument fails at the outset because this is not a "cause of action [that] treat[s] [Amazon] as a publisher or speaker of information" provided by a third party. *Corbis Corp. v. Amazon.com, Inc.*, 351 F. Supp. 2d 1090, 1118 (W.D. Wash. 2004). At issue is not a tortuous, defamatory, or otherwise "injurious *message*[ ]," *Zeran*, 129 F.3d at 331 (emphasis added); rather, Claims I, II, III, VI, and VII all have as one of their independent bases the illegal *shipment* of or aiding and abetting in the shipment of contraband goods, which is an action, not internet speech. The CDA has *never* shielded an entity from liability predicated solely upon its own *actions*. Where, as here, an internet retailer has "actual, rather than constructive, knowledge of illegal sales," and is thus "actively involved in the sale of . . . contraband, the fact that sales were consummated over the computer service would not necessarily provide a shield from liability." *Stoner v. eBay, Inc.*, 56 U.S.P.Q.2d 1852, 1855, 2000 WL 1705637, *4 (Cal. Super. 2000).

As the statute makes clear, immunity is limited to a "cause of action that requires, to establish liability, a finding that an ICS published third-party content . . . . 'defamation law would be a good example of such liability.'" *Chicago Lawyers' Comm'n for Civil Rights Under the Law, Inc. v. Craigslist, Inc.,* 461 F. Supp. 2d 681, 696 (N.D. Ill. 2006) (citing *Doe v. GTE*, 347 F.3d at 660); *id*. at 697 (CDA limited to "claims that require 'publishing' as an essential element")). This lawsuit does not treat Amazon as the publisher of the Publications, but rather, involves Amazon in its role as a retailer like any other seller of tangible goods. Compare this action to *Schneider*, in which the plaintiff, an author of a book sold by Amazon, sued Amazon for tortuous interference based on "defamatory and/or scurrilous comments" about his book that were posted on Amazon's website bulletin board by third party website users. 31 P.3d at 38-39. Schneider's claim – which

---

(E.D. Pa. 2006) (only where defendant "did not create the anonymous posts" could he assert immunity under the CDA).

involves messages, not the sale and shipment of goods – clearly treated Amazon as the speaker or publisher of the third parties' allegedly defamatory remarks. Plaintiff's cause of action does not.[29]

Where defendants claim CDA immunity based on their own *actions*, as opposed to the mere passive internet hosting of third party *speech* like chat room messages, these attempts, unsurprisingly, fail. In *800-JR Cigar, Inc. v. GoTo.com, Inc.*, a cigar retailer brought an action against an internet search engine alleging trademark infringement, unfair competition, and dilution. 437 F. Supp. 2d 273, 277 (D.N.J. 2006). The court rejected GoTo.com's claim to CDA immunity because "the alleged fraud [was] the *use* of the trademark name in the bidding process, and not solely the information from third parties that [appeared] on the search results page." *Id.* at 295 (emphasis added). Likewise, when it unlawfully advertises or ships goods, Amazon is not acting as a "publisher or speaker of . . . information." 47 U.S.C. § 230(c)(1). The shipment of unlawful goods is not a speech act. *See Craigslist*, 461 F. Supp. 2d at 697 ("[l]imiting the immunity afforded under Section 230 to those claims that require 'publishing' as an essential element – as opposed to any cause of action"); *id.* at 696 ( "Congress did not intend to grant a vast, limitless immunity").[30]

Moreover, each claim in the Complaint is also based upon, in the alternative, Defendants' conspiratorial or aiding and abetting actions, namely, entering into agreements to market, sell, and distribute the materials. These allegations are not based upon the website *content* at issue, but upon the conspiratorial *act or acts* that resulted in the joint selling and marketing arrangement. The leading case on aiding and abetting liability and the CDA, *GTE Corp.*, is instructive on this point. In *GTE*, college athletes sued the defendant because a subscriber to GTE's internet access service used

---

[29] Thus, Defendants' reliance upon *Drudge*, 992 F. Supp. at 44, a defamation action, is unavailing. In *Drudge*, AOL received immunity from suit over defamatory remarks posted on its website by a gossip columnist, where AOL had no "role in creating or developing any of the information" at issue. *Id.* at 50 (emphasis added). As explained further below, since Amazon is responsible, at least "in part," for the content at issue here, *Drudge* is also distinguishable on that basis.

[30] *See also Fair Hous. Council v. Roommates.com, LLC*, 489 F.3d 921, 928 (9th Cir. 2007) ("We do not read [*Carafano*] as granting CDA immunity to those who actively encourage, solicit and profit from the tortious and unlawful communications of others"); *800-JR Cigar*, 437 F. Supp. 2d at 295 ("It is not the purpose of the Act to shield entities from claims of fraud and abuse arising from their own … advertising business, rather than from the actions of third parties").

the internet to display nude images of them. 347 F.3d at 656. The court held that GTE was immune under the CDA because the offensive material at issue was created by a third party, and GTE merely provided the electronic infrastructure. *Id.*

Central to the holding in *GTE* was the fact that GTE had not taken any actions to aid or abet the user of its service. The court likened GTE's role as a web host to a telephone company, and reasoned that a phone company would not be liable for aiding and abetting the sale of narcotics merely because they were sold by phone. *Id.* The secondary liability allegations in the instant case are easily distinguishable from those alleged in *GTE* because here Amazon is not merely a passive infrastructure like a phone line or an internet cable, but rather, knowingly and purposefully entered into an unlawful agreement to market, sell, and ship the materials, by which it would retain a portion of the proceeds from the unlawful sales. *See* Am. Compl. ¶¶ 85-90; *see also GTE*, 347 F.3d at 657 (stating that "GTE did not earn revenues from the sales of the tapes" in discussing why GTE was entitled to immunity under the CDA). Amazon also takes other overt acts in furtherance of the unlawful agreement, such as by advertising its sale of the magazines on several other websites. *See* Am. Compl. ¶ 101. As either a shipper, a retailer, or the executor of a conspiratorial agreement – Amazon is liable as an actor, not a speaker, and hence, the CDA fails as a defense.

On an even more fundamental level, the CDA's application here would be an unprecedented expansion of immunity that would place retailers beyond the reach of unlawful trade practice laws simply because they chose to sell those materials online rather than in a physical store. This is exactly the opposite of Congress's intent in enacting the CDA, which was to provide immunity for the *removal*, not the proliferation or continuing sale and shipment of, illegal materials. Indeed, the immunity provision is limited by its own terms to actions undertaken by the defendant "to *restrict* access to or availability of" offensive or illegal material. 47 U.S.C. § 230(c)(2)(A) (emphasis added); *see also GTE*, 347 F.3d at 659-60 (the title of § 230, "Protection for Good Samaritan blocking and screening of offensive material" is "hardly an apt description if its principal effect is to do nothing about the distribution of indecent and offensive materials"). Under the plain language of

the statute, therefore, the only way the CDA could be brought to bear here is if this action had been filed by *Marburger and Dowd*, not Plaintiff, against Amazon for "restrict[ing]" or removing, 47 U.S.C. § 230(c), at its discretion, the Publications from Amazon's website.

2)    *Even if Plaintiff's claims were premised solely on internet content as opposed to actions, the CDA defense still fails because Amazon is the "Provider," at least "in part," of the "content" at issue.*

Even if Plaintiff's claims were based only on the content of Amazon's website listings for the Publication – as opposed to the Defendants' actions – Amazon's CDA defense still fails. Amazon cannot meet its burden to show that a "different information content provider provided the information" at issue. *Corbis*, 351 F. Supp. 2d at 1118 (citing 47 U.S.C. § 230(c)). The CDA does not apply when the ICS is also the "information content provider" ("ICP"). *See Dimeo,* 433 F. Supp. 2d at 530-31 (only where defendant "did not create the anonymous posts" could he assert immunity under the CDA). Where, as here, the defendant "is responsible, in whole *or in part*, for the creation or development of [the] information" on the website, 47 U.S.C. ¶ 230(f)(3) (defining ICP) (emphasis added), it is both an ICS and ICP, and therefore gets no immunity.

To illustrate why Amazon is not entitled to immunity, it is necessary to explain the difference between the various sales "platforms" of Amazon and its respective degrees of "responsib[ility], in whole or in part," *id.*, for the content of the listings. Because no discovery has yet been undertaken, plaintiff's understanding of these facts is limited, and this is yet another reason why consideration of such a factually intensive affirmative defense would best be reserved until after discovery has been undertaken.

As plaintiff understands it, Amazon maintains at least three distinct internet sales platforms. The first is Amazon.com's primary website, where Amazon (as opposed to a third party, like on "eBay") elects what to sell, engages in its own marketing and advertising of those products, and maintains control over the product listing. This "primary" website is where Amazon sells the Publications. Amazon's truly passive sales platform is "zShops," which is more like eBay in that a third-party seller creates all of the web content for each item, including the picture and descriptors.

Indeed, zShops listings state "This page created by seller." None of the items at issue here was sold on zShops. *Compare Corbis*, 351 F. Supp. 2d at 1093-94 (conferring CDA immunity upon Amazon for unauthorized use of plaintiff's photograph on zShops listing).

The dog fighting Videos were sold on the "Amazon Marketplace," a third platform which is more passive than the primary sales website, but still not sufficiently passive to provide CDA immunity. In the "Marketplace," multiple third party sellers can register to sell the same item under a common listing, but do not have the ability to control anything but the description of the condition of their item (*e.g*., "fair," "good"), and the price. The sellers simply appear as links off of a primary page over which Amazon retains editorial control. Although there were between two and seven sellers of each of the Videos issue at any given time, all of these third party sellers were consolidated onto a single webpage with one common image, one description, one "product details" section, and an editorial review. There is no way for those third parties to edit the Videos' product description, unlike on zShops or eBay.

The primary obstacle to Amazon's bid for total immunity is the internal inconsistencies between its own statements and those of its co-Defendants as to which of them is responsible for the content of the website listing in question. Although the CDA may provide immunity where "a third party willingly provides the essential published content," *Carafano*, 339 F.3d at 1123, here, none of the putative third parties apparently "willingly provide[d]" the content. In fact, all expressly disclaim having provided the content at all. *See* Marburger at 8 (Marburger has "no input into, let alone any type of control over, the contents of anything on Amazon"); Mag. Expr. at 2 (the Amazon sales page reflects what "the publisher wants to include on the Amazon site").[31]

In other words, the publishers disclaim responsibility for the information, Magazine Express claims the publishers *do* provide the information, and Amazon claims Magazine Express provides

---

[31] *Compare* Griffiths Decl. ¶ 8 ("I was not aware that The Gamecock was being advertised on Amazon"), with *Batzel v. Smith*, 351 F.3d 904, 908 (9th Cir. 2003) (finding implausible "that Congress intended to immunize someone . . . who . . . places on the Internet" materials that the publisher "*had not even aimed for Internet publication*") (Gould, J., dissenting from denial of rehearing) (emphasis added).

the information. *See* Zapolsky Decl. ¶ 5. The fact that none of the Defendants wants to take responsibility for the content of these particular listings is telling. But the listing for the Publications did not come into being of its own free will. Since it is Amazon's burden to carry the defense, it should be denied based on these factual discrepancies alone.  At minimum, at least some discovery is necessary in order to sort out defendants' failure to get their story straight concerning who is responsible for the content in question.

Nonetheless, even if it were clear that one of the other Defendants was initially responsible for the *original* content that forms the basis of the listings, Amazon is nonetheless plainly "responsible, in whole *or in part*, for the creation or development of" the internet content at issue. 47 U.S.C. § 230(f)(3) (emphasis added). As Amazon's own voluminous submissions to the Court make clear, even on the Marketplace sales platform where the third-party seller submits information for the product listing, it is subject to several layers of "review," "editing," "updat[ing]," "consent," "submit[ing]," "delet[ing]," "reassign[ing]," "permission" and "overwrit[ing]" prior to listing, as spelled out in literally dozens of pages of Defendant's own policies. *See, e.g.,* Zapolsky Decl., Ex. I ("There is no guarantee that the details you supply will be visible on Amazon.com. . . . Sellers cannot delete product detail pages.  These pages are intended to be a permanent feature in our catalog"); *id.* ("Amazon.com may update a page and 'overwrite' it.  When we do this, editing permission will be reassigned to us and you will receive an error when trying to edit. . . . Corrections submitted through the Suggestion Box will come to Amazon.com for review"); *id.* ("if an item is prohibited, we will delete the page"); *id.* (seller may "not . . . modify [website], or any portion of it, except with express written consent of Amazon.com" "This site or any portion of this site may not be . . . visited or otherwise exploited for any commercial purpose without express written consent of Amazon"). This is wholly unlike the chat rooms and bulletin boards that form the basis for the overwhelming majority of CDA cases, where third party messages appear live as soon as they are submitted, with no review, input, editing, or "overwrit[ing]" on the part of the defendant.

Since Amazon is thus, *by operation and requirement of its own policies*, "responsible," at least "*in part*, for the creation or development of" the internet content regarding the Publications, it is not entitled to CDA immunity. 47 U.S.C. § 230(f)(3) (emphasis added). In May 2007, the Ninth Circuit held that a website was "responsible," at least "in part" for unlawful racially discriminatory content, and thus was not entitled to immunity, where it engaged in "categorizing, channeling and limiting" third-party content submitted, and thus "provide[d] an additional layer of information." *Fair Housing*, 489 F.3d at 928-29.[32] Similarly here, Amazon is not entitled to CDA immunity.

**B.    Defendants' First Amendment argument is meritless.**

As the Supreme Court has repeatedly admonished, "[a]ny First Amendment interest which might be served by advertising an ordinary commercial proposal . . . is altogether absent when the commercial activity itself is illegal." *Pittsburgh Press Co. v. Pittsburgh Comm'n on Human Relations*, 413 U.S. 376, 388-89 (1973). Apparently recognizing that this well-settled precedent is fatal to their defense, Defendants attempt instead to characterize this action as something it is not.

---

[32] Notably, Amazon filed an *amicus curiae* brief in support of the defendant in *Fair Housing Council*, and the Ninth Circuit rejected the same sweeping immunity arguments Amazon advances here. *See id.* at 927 n.7 ("Amazon.com . . . acknowledge[s] that 'if there were a circumstance in which the content . . . was itself unlawful,'" the website may not receive immunity); *id.* at 931 (Reinhardt, J., concurring in part) ("the information that we should examine for the purpose of § 230(c) immunity should be the entire . . . web page, including all of the statements therein"); *see also Hy Cite Corp. v. BadBusinessBureau.com,* 418 F. Supp. 2d 1142, 1149 (D. Ariz. 2005) (denying immunity at the motion to dismiss stage because the allegations "arguably could support a finding that Defendants are 'responsible . . . for the creation or development of [the] information'") (citation omitted). Likewise, the CDA does not shield Amazon here.

The CDA defense fails as to the Videos as well. The Videos were sold on "Marketplace," where the only variable the third party seller can alter is the price and the statement of the item's condition (*e.g.*, "fair," "good"). Each seller does not have a different product description and possibly a different product image, as on eBay. Third parties are constrained by Amazon's decisions about how best to market these materials. Therefore, Amazon cannot use the CDA to shield its sales of the videos. *See, e.g., Anthony v. Yahoo, Inc.*, 421 F. Supp. 2d 1257, 1262-63 (N.D. Cal. 2006) (holding that "[b]ecause Anthony posits that Yahoo!'s *manner* of presenting the profiles – *not the underlying profiles themselves* – constitute fraud, the CDA does not apply") (emphasis added); *Gentry v. eBay, Inc.*, 99 Cal. App. 4th 816, 832 (2002) (party's creation of the product description is "highly significant for the purposes of assessing the application of [the CDA]").

This action has nothing to do with "pure editorial, political speech." Amazon at 2. Nor is it an action "to gather together and destroy all past copies of the magazines." Dowd at 23. Nor does Plaintiff seek "a total ban on pure speech that is editorial," *id.*, nor has Plaintiff asked the Court "to ban the publication of the magazines, regardless of their content in any given issue." *Id.* The essential question is whether Congress can constitutionally restrict criminal solicitations – namely, the movement in interstate commerce of advertisements for fighting animals and weapons that are illegal to buy and sell under Federal law. The answer to that question is an unqualified yes.[33]

    1)    *The Publications and their advertisement and sale on Amazon.com are plainly commercial speech.*

Although traditionally the Constitution afforded no protection to commercial speech at all, the Supreme Court held in 1975 that commercial speech can be afforded some limited protection, but under a different legal standard than that applied to political speech and other forms of expression. *Bolger v. Youngs Drug Products Corp.*, 463 U.S. 60, 64-65 (1983) ("[T]he [federal] Constitution accords less protection to commercial speech than to other constitutionally safeguarded forms of expression"). One of the key reasons for this distinction is that commercial speech, unlike other varieties of speech, "occurs in an area traditionally subject to government regulation." *Ohralik v. Ohio State Bar Assn.*, 436 U.S. 447, 455-456 (1978); *Central Hudson Gas & Electric Corp. v. Pub. Serv. Comm'n of New York*, 447 U.S. 557 (1980). Recognizing that the commercial speech designation is completely fatal to their First Amendment defense, Defendants press the absurd assertion that the conduct challenged in the Amended Complaint is pure political speech. Amazon at 43; Marburger at 32.

However, as recognized by the U.S. Congress earlier this year, the Publications and their advertisement for sale online are both clearly "commercial speech." *See* 110 CONG. REC. E656

---

[33] Contrary to Defendants' assertion, there is no "heightened" pleading standard for Plaintiff's complaint just because Defendants subsequently elected to raise First Amendment concerns in their motions to dismiss. *See* Dowd at 12. In fact, by raising an affirmative defense on a 12(b) motion, the heightened burden falls on *Defendants*. *Gomez v. Toledo,* 446 U.S. 635, 640 (1980) (where defendant seeks dismissal on an affirmative defense, "the burden of pleading [the defense] rests with the defendant").

(Mar. 28, 2007). In *Bolger*, the Supreme Court held that speech is commercial if it is concededly an advertisement, if it refers to a specific product, or if the publisher had an economic motivation. *Bolger*, 463 U.S. at 67. Although not all three *Bolger* factors must be present to qualify speech as commercial, *see id.* at 67 n.14, all three factors are present here.

With regard to Amazon, there is no dispute that Amazon's website offering the Publications for sale does "no more than propose a commercial transaction." *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc*., 425 U.S. 748, 762 (1976). Amazon has not claimed any political purpose in advertising the Publications for sale, nor could it. The Publications are offered for sale for the commercial profit of Amazon.com and its shareholders. Such a solicitation is the purest form of commercial speech under the Supreme Court's precedents, *see Board of Trustees of the State University of New York v. Fox,* 492 U.S. 469 (1989), and thus, at least with regard to Amazon's conduct, there is no question that its First Amendment claim must be considered under the commercial speech framework.

With regard to the publishers of the Publications, Defendants do not dispute that both Publications are composed mostly of advertisements, and routinely feature in excess of one hundred advertisers and thousands of products per issue. Am. Compl. ¶¶ 62-63. Each Publication not only identifies specific products, but also "propose[s] a commercial transaction," *Virginia State Board of Pharmacy*, 425 U.S. at 762, by making an offer that lists the current price, quantity (*i.e.*, fighting "trios"), contact information, and instructions on how to accept the offer and order the fighting animals or weapons. *See id.* (examining whether the material contains price and quantity information). The economic motivation of both the advertisers and the Defendants is also clear – for instance, advertising in *The Gamecock* costs up to $2,200 for a single advertisement per year. Pendleton Decl. Ex. 4 (reproducing THE GAMECOCK 81 (Jun. 2007)). Fighting animals are advertised for $1,000 or more. *Id.* at 49 (advertising fighting birds that have "fought" successfully at "major competition in gaff, short knife, & long knife").

Nevertheless, Defendants claim that, notwithstanding these solicitations, the Publications at issue are "pure editorial, political speech" and fall outside the scope of the commercial speech doctrine. Amazon at 2. The problem, however, is that Defendants' argument that the commercial speech analysis does not apply where printed materials include both criminal solicitations and some non-commercial speech, Amazon at 43, has been repeatedly rejected by the Supreme Court, and for good reason. Parties proposing illegal commercial transactions cannot be permitted to immunize those solicitations from government regulation simply by mixing the occasional political statement with blatantly criminal solicitations.

For instance, in *Bolger*, the Supreme Court rejected a First Amendment challenge to restrictions on the publication of pamphlets that contained both commercial speech and statements of "public issues" relating to the politics of contraception. 463 U.S. at 68. Here, as in *Bolger*, "*[m]ost of*" the content of the magazines "fall[s] within the core notion of commercial speech – 'speech which does no more than propose a commercial transaction.'" *Id.* at 66 (emphasis added). Therefore, the Court applied the commercial speech standard to the entire publication, finding that:

> [t]he mailings constitute commercial speech notwithstanding the fact that they contain discussion of important public issues such as venereal disease and family planning. We have made clear that advertising which links a product to a current public debate is not thereby entitled to the constitutional protection afforded noncommercial speech. . . . Advertisers *should not be permitted to immunize [illegal] information from government regulation simply by including references to public issues.*

*Id.* at 67-68 (citations omitted; emphasis added); *see also Central Hudson*, 447 U.S. at 576 (Blackmun, J., concurring) (examining whether publication was "*entirely*" lawful) (emphasis added); *Pittsburgh Press*, 413 U.S. at 388 (assessing whether illegal content was "severable").

Likewise here, Defendants cannot immunize themselves entirely from regulation simply by appending some political speech with unprotected commercial speech proposing illegal transactions.[34] In *Valentine v. Chrestensen*, the Supreme Court characterized the position advanced

---

[34] Defendants' characterization of the non-commercial content of these Publications as being entirely political or protected speech is a disputed factual issue not suitable to resolution on a motion to dismiss. Its is Plaintiff's theory of the case that any political content in these magazines is

here by Defendants – that commercial speech can be cloaked with full First Amendment protection so long as some political speech is thrown in – as "evasion," and held that if such evasion "were successful, every merchant who desires to broadcast . . . need only append a civic appeal, or a moral platitude, to achieve immunity from the law's command." 316 U.S. 52, 55 (1942).

For this same reason, Defendants' suggestion that the unprotected commercial speech is somehow "inextricably intertwined" with the remaining protected content, thereby entitling the entire publication to consideration as political speech, Amazon at 44, is simply absurd. In *Board of Trustees of the State University of New York v. Fox*, the Supreme Court explained that a publication containing both commercial speech and political speech will be analyzed as commercial speech unless the two are "inextricably intertwined," in which case the speech will be analyzed as political speech. 492 U.S. 469, 474 (1989). However, what Defendants fail to point out is that the Supreme Court limited this narrow exception to commercial speech that a "state law required to be included" with political speech, such as a state law requirement that charitable solicitations (protected speech) must also include a statement setting forth the percentage of donations actually passed along to the charity (which the Court characterized as commercial speech). *Id.* (narrowing its prior holding in *Riley v. National Federation of the Blind of North Carolina, Inc.*, 487 U.S. 781, 796 (1988)).[35]

In so holding, the Court observed that where "no law of man or of nature makes it impossible" to publish political speech *separately* from the illegal commercial speech at issue, the commercial and non-commercial speech will *not* be considered "inextricably intertwined" simply because the publisher elects to mix the two in the same publication. *Id.* Here, as in *Fox*, "there is

---

a sham concocted for the express purpose of evading liability under federal and state law – a theory that Plaintiff is prepared to prove through discovery. Indeed, in some issues of the Publications, nearly one half of all non-advertising content is *recycled* – articles that are being repeatedly reprinted from prior issues. *See*, *e.g.*, Pendleton Decl., Ex. 3A (reproducing *The Feathered Warrior* 39-58 (Apr. 2004) (reprinting articles from prior issues of *The Feathered Warrior*)).

[35] Defendants' reliance upon *Riley* is utterly misplaced, as *Riley* concerned  solicitations for contributions for charitable purposes – a far cry from the solicitations for criminal commercial transactions at issue here.

nothing whatever 'inextricable' about the noncommercial aspects of these [materials]." *Id.* The publishers can print political articles about cockfighting without putting in the same publication advertisements for the sale of fighting animals and weapons in violation of federal law.

Indeed, Defendants routinely do so, as demonstrated by the fact that they collectively publish and/or sell approximately *sixty-five* other print titles pertaining to the nature, history, and politics of animal fighting.[36] It may be less *profitable* for Marburger and Dowd to publish speech that is not subsidized by advertisements for contraband that bring in $2,200 each (or more) annually, but that certainly does not in any way foreclose their right to engage in fully protected expression. *See Capital Broadcasting Co. v. Mitchell*, 333 F. Supp. 582, 584 (D.D.C. 1971), *aff'd sub nom Nat'l Ass'n of Broadcasters v. Kleindienst*, 405 U.S. 1000 (1972) (finding that broadcasters who challenged ban on cigarette advertising "have lost no right to speak – they have only lost an ability to collect revenue from others for broadcasting their commercial messages"). Defendants' mere business preference to pair their criminal solicitations with the occasional political commentary does not render them "inextricably intertwined."

> 2)    *There is no First Amendment protection for commercial speech that proposes illegal commercial transactions.*

Having failed to prove that either Amazon's advertising of subscriptions or the Publications themselves constitute non-commercial, pure political speech, Defendants can only prevail on their First Amendment challenge if they prove all four elements of the test for regulating commercial speech under *Central Hudson*, 447 U.S. at 564. The problem here, however, is that Defendants cannot even pass the first hurdle – *i.e.,* that the speech at issue is not "*related to* unlawful activity," or misleading or untruthful. *Id.* (emphasis added); *Thompson v. Western States Med. Ctr.*, 535 U.S. 357, 367 (2002) ("as a threshold matter," the court looks to "whether the commercial speech

---

[36] *See* THE GAMECOCK 63 (Jul. 2006) (advertising 11 cockfighting books sold by Marburger); Pendleton Decl., Ex. 5 (reproducing THE FEATHERED WARRIOR 0, 59, 60, 65, 66 (Jun. 2007) (advertising 28 cockfighting books and pamphlets sold by Dowd Publishers)). Similarly, a search on Amazon.com for "cockfighting" reveals 26 print titles about cockfighting in addition to the Publications. None of these items are at issue in this action.

*concerns* unlawful activity or is misleading") (emphasis added). In other words, if the speech even "concerns" or is "related to unlawful activity" – let alone directly proposes hundreds of criminal transactions, as here – the First Amendment challenge fails at the outset, because such speech is simply "not protected by the First Amendment." *Western States*, 535 U.S. at 367. This is a threshold requirement, not a multi-factor balancing test. *See Pittsburgh Press*, 413 U.S. at 388-89 (holding that "[a]ny First Amendment interest which might be served by advertising an ordinary commercial proposal . . . is altogether absent when the commercial activity itself is illegal," and postulating that "no doubt that a newspaper constitutionally could be forbidden to publish a want ad proposing a sale of narcotics or soliciting prostitutes").

Here, as alleged in the Amended Complaint, the commercial transactions for illegal fighting animals and weapons proposed by the hundreds in the Publications not only "concern" or "relate to" unlawful activity, but in and of themselves violate the AWA (and the laws of thirty-six states), which makes it a federal felony to "knowingly *sell, buy*, transport, deliver, or receive for purposes of transportation, in interstate or foreign commerce, any dog or other animal for purposes of having the dog or other animal participate in an animal fighting venture." 7 U.S.C. § 2156(b) (emphasis added); *see also id.* § 2156(e) (same prohibition with respect to cockfighting knives and gaffs).[37] Since the Publications are predominantly "advertise[ments] . . .[for] commercial activity [which] itself is illegal," they enjoy no First Amendment protection.[38] *Pittsburgh Press*, 413 U.S. at 388-89;

---

[37] Indeed, Dowd's and Marburger's apparent decision to run only a "*few* such ads" for knives and gaffs as of last month, *see* Amazon at 7, 39 n.16 (emphasis added), only proves Plaintiff's point. This is a small step in the right direction, but also effectively concedes that the advertisements are unlawful. So long as they continue to advertise *any* "such ads" for knives – not to mention hundreds of advertisements for fighting animals – these Publications will have no First Amendment protection, and their shipment and sale will be unlawful.

[38] Defendants' conclusory assertion that the advertisements in the Publications "do not directly solicit . . . illegal activity," Amazon at 46, is false, and also amounts to a impermissible factual attack when raised on a motion to dismiss. *See* Am. Compl. ¶ 63 (over 90 percent of the advertisements "are criminal solicitations" which "propose commercial transactions for fighting animals or fighting paraphernalia that are illegal," either under "state law in the seller's jurisdiction" or under federal law).

*see also The Casbah, Inc. v. Thone,* 651 F.2d 551, 564 (8th Cir. 1981) (upholding restraint on advertising promoting sale of drug paraphernalia, and noting that such speech "is analogous to advertisements promoting the sale of narcotics or soliciting prostitution, and may constitutionally be prohibited"). Defendants' challenge simply fails at the threshold of *Central Hudson.*[39]

       3)    *The remaining* Central Hudson *factors also refute Defendants' First Amendment defense.*

Since the advertisements at issue are overt criminal solicitations, this Court need not reach the remaining sequential steps of the *Central Hudson* test. Even if the commercial content of the Publications was somehow "entirely" lawful, *Central Hudson,* 447 U.S. at 576, however, Defendants' challenge would only succeed if the Court went on to find that: (1) the numerous government interests implicated are not "substantial"; (2) the restrictions as applied do not "directly advance the state interest involved"; and (3) the restrictions are more extensive than necessary to serve those interests. *Central Hudson,* 447 U.S. at 564. Here, Defendants argue that the relief sought "would not significantly, directly, and materially alleviate illegal cockfighting." Amazon at 47.

However, these fact-intensive propositions would require Plaintiff to prove its ultimate case on the merits at the pleading stage. While Defendants may demean Plaintiff's factual allegations as "rank speculation," Amazon at 47, Plaintiff is certainly not required to append to the allegations in its initial pleading the "evidence, circumstantial or otherwise," *id.*, Defendants apparently think is required. Notably, the cases cited by Defendants all applied the latter steps of *Central Hudson* after a full trial or other extensive factual development. *See*, *e.g.*, *44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 493 (1996) (noting that the trial court "heard conflicting expert testimony and reviewed a number of studies" and issued "findings of fact" regarding the impact of the restriction). Plaintiff need not *prove*, at this early stage, that the restriction is no more extensive than necessary to serve the substantial government interests at issue. *See Mosely v. Bd. of Educ. of City of*

---

[39] Likewise, Amazon's challenge to Claims IV and V, which are based on its material misrepresentations of fact regarding its sale of the Publications, is rejected at the outset. *Central Hudson*, 447 U.S. at 566 ("misleading" commercial speech not protected by First Amendment).

*Chicago*, 434 F.3d 527, 533 (7th Cir. 2006) (Plaintiff "ha[s] no obligation to allege facts negating an affirmative defense in [its] complaint"). Thus, even if Defendants could advance beyond the first prong of the *Central Hudson* test, proceeding any further at this juncture would be premature.

Even if Plaintiff *did* have such a burden on the remaining sequential steps of *Central Hudson*, it is easily satisfied here. First, the governmental interests implicated in the animal fighting provisions of the Animal Welfare Act are numerous and substantial. Congress acted to criminalize animal fighting and the "promoti[on]" or "furthering" of animal fighting in order to assist local law enforcement with the promotion of health, safety and welfare, to preserve public morals, and to prevent the suffering of animals. *See, e.g.*, S. REP. NO. 106-297 (2000) (resolving that the amendment ultimately enacted in 2002 "will also help law enforcement officers enforce cockfighting bans in the [48] states in which cockfighting has been banned"); *Prohibition of Interstate Movement of Live Birds for Animal Fighting: Hearing on H.R. 1275 Before the Committee on Agriculture of the House of Representatives*, 106th Congress, Serial 106-59 (2000) (urging passage of the amendment ultimately enacted in 2002 for "moral" reasons); H.R. Rep. No. 94-801 (1976) (adding cockfighting provision to federal animal fighting statute and stating the Committee's view that "animal fighting ventures" are "dehumanizing, abhorrent, and utterly without redeeming social value").

Each of these interests has been recognized as "substantial." *See*, respectively, *Posadas de Puerto Rico Assoc. v. Tourism Co.*, 478 U.S. 328, 341 (1986) (recognizing "health, safety, and welfare" as a "substantial interest" at the second part of the *Central Hudson* analysis); *Barnes v. Glen Theatres, Inc.*, 501 U.S. 560, 575 (1991) (Scalia, J.) (rejecting in plurality opinion a First Amendment challenge to public nudity law and observing that "[o]ur society prohibits, and all human societies have prohibited, certain activities not because they harm others but because they are considered, in the traditional phrase, 'contra bonos mores,' *i.e.*, immoral. In American society, such prohibitions have included, for example, sadomasochism, cockfighting, bestiality, suicide,

drug use, prostitution, and sodomy"). Accordingly, the regulations at issue satisfy the second step of *Central Hudson*.

Additionally, the animal fighting laws at issue advance the government's interests in reducing the demand and availability of animals and equipment necessary for animal fighting. As explained in the Amended Complaint, the publications are the primary commercial infrastructure of the illegal cockfighting industry, without which cockfighters and fight organizers, as well as buyers and sellers of material that is illegal to ship in interstate commerce, would not be able to maintian these criminal enterprises. *See* Am. Compl. ¶¶ 84, 114. Therefore, the laws at issue "directly advance" the government's interests, by impeding trafficking in the goods and equipment necessary to operate illegal ventures. To argue otherwise, as Defendants have done, is to level an impermissible factual attack on the Amended Complaint.

Lastly, as applied here, the animal fighting laws are no more extensive than necessary to serve those interests. Importantly, this action reaches only two of the more than *sixty-five* print titles published and/or sold by Defendants that are about cockfighting, *see supra* Section IV(B)(1). Although these materials also glorify the illegal bloodsport, this action focuses only on the two periodicals which actively further the unlawful criminal enterprise by advertising hundreds of illegal commercial transactions and by offering real-time information on upcoming cockfights. Since the Publications are the primary facilitator of illegal interstate trafficking in fighting birds and fighting implements, *see* Am. Compl. ¶¶ 84, 114, restricting their shipment and sale by Amazon – the sole online retailer and sole retail seller of subscriptions – is also narrowly tailored to accomplish the government's objective in stopping animal fighting. *See* THE FEATHERED WARRIOR 22, 24 (Jan. 2006) (extolling readers to "actively recruit new members to our sport and get them started off right by . . . . [e]ncourag[ing] them to take at least one, if not all, of our fine gamefowl publications"; "[Fighting] facility operators and each of us should make it our jobs to see that those that aren't subscribing to the publications are encouraged to do so at every opportunity").

4)    *Defendants' other arguments for avoiding* Central Hudson *are also unavailaing.*

Defendants, desperate to avoid the application of *Central Hudson*, wrongly cite *Carey v. Population Services International*, 431 U.S. 678, 701 (1977), for the proposition that regulation of commercial speech is analyzed instead with the same test that applies to political speech – namely, that speech is protected unless it incites imminent lawless action. Amazon at 45; Marburger at 31. But as the Supreme Court made clear in *Carey* – even prior to its ruling in *Central Hudson* – First Amendment protections do not attach if "the transactions proposed in the forbidden advertisements are themselves *illegal in any way*." *Carey*, 431 U.S. at 700 (citing *Pittsburgh Press*, 413 U.S. at 376) (emphasis added). *See also Casbah*, 651 F.2d at 564 (incitement standard applies only "outside of [the] commercial speech context"); *Lamar Outdoor Adver., Inc. v. Mississippi State Tax Comm'n*, 701 F.2d 314, 323 (5th Cir. 1983) (observing that "incitement has not been required" when analyzing restrictions on commercial speech) (citing *Vill. of Hoffman Estates v. The Flipside, Hoffman Estates, Inc.*, 455 U.S. 489 (1982)).[40] Even if the *Brandenburg* "incitement" test *did* apply here, Plaintiff would prevail anyway, since, as alleged in the Complaint, the advertisements *do* "incite" unlawful behavior – namely, the imminent consummation of the illegal transactions proposed. Am. Compl. ¶¶ 63, 114.

Defendants also try to evade the application of *Central Hudson* by arguing that the Publications cannot be constitutionally regulated because the "products advertised might [or might not] be used illegally." Amazon at 39. But this focuses entirely on the ultimate *use* of the products advertised, and conspicuously ignores the fact that the very purchase and sale of these products has been criminalized regardless of their eventual use. 7 U.S.C. § 2156(b), (e). Defendants' analogy to guns that can be lawfully advertised and sold but later criminally misused is thus inapt. Dowd at 19 n.13. Here, the sale of these items – unlike the guns in Defendants' analogy – is in and of itself a criminal act, irrespective of their ultimate use. 7 U.S.C. § 2156(b), (e). A more appropriate analogy

---

[40] *Edmonson v. Pearce*, 91 P.3d 605, 632-33 (Okla. 2004), relied upon by Defendants, *see* Amazon at 40 n.17, is inapposite for the same reasons, as neither the statute nor the constitutional challenge there had anything to do with commercial speech.

is the sale of narcotics, which, like the sale of fighting animals and weapons at issue here, is banned outright. Drug dealers could similarly argue that their buyers *might* use the contraband for historical, educational, or collection purposes, but there is still no constitutional right to advertise that contraband. *Pittsburgh Press*, 413 U.S. at 388-89. In any event, this argument seeks to attack the factual allegations in the Complaint, and thus should be disregarded at the pleading stage.

Defendants' argument that the dissemination of advertisements for illegal goods can never be restrained if they may be legally purchased *somewhere*, such as Guam, American Samoa, or Puerto Rico, *see* Amazon at 7, 45; Dowd at 24, is also flawed, as it ignores the critical fact that hundreds of the products advertised – over a third – are not legally purchased *anywhere on the planet*, because their local purchase is banned under state law, and their interstate and international sale are federal crimes. Am. Compl. ¶ 63. Since there is no reader in any jurisdiction for whom the Publications would be free of solicitations for illegal transactions, Defendants' argument fails.

Nor is Defendants' position salvaged by the self-serving and blatantly false "disclaimers" on a handful of the advertisements for fighting animals, claiming that the animals are not for fighting. *See* Amazon 38. Although the context makes unmistakably clear that the animals advertised are intended for fighting purposes, *see* Pendleton Decl., Ex. 2 (reproducing THE GAMECOCK 50 (Dec. 2006) (detailing results from animal fight at which one rooster "had driven the grey cocks beak down his throat and the grey cock was suffocating. . . . I pulled . . . his upper beak out of his throat")), one need look no further than the advertisements themselves. In one such ad, the seller asks for a premium price because the fighting rooster was a "solo winner" at "Piney Woods Club," an illegal cockfighting pit, but nonetheless includes the pretext "for show and breeding only!!!". THE GAMECOCK [section not paginated] (Apr. 2006). Another such ad with a purported "disclaimer" pictures the seller standing in a fighting pit strewn with feathers, and boasts that he was the "2004 Cocker of the Year" in the "Knife" division at an illegal cockfighting pit called the "Blackberry Game Club." *Id.* at 7 (Dec. 2005). Simply calling a criminal transaction "lawful" does not, *ipse dixit*, make it any less criminal. The First Amendment does not shield this illegal trafficking.

> 5)    *Plaintiff's requested relief does not amount to a prior restraint.*

The Court need not be detained by Defendants' hysterical pleas not to impose a prior restraint. *See* Amazon at 49-50; Marburger 27-28. Plaintiff has not asked for one. Am. Compl. at 43, ¶¶ A-F. Moreover, the prior restraint doctrine does not even appear to apply to commercial speech. *See Central Hudson*, 447 U.S. at 571 n.13 ("[w]e have observed that commercial speech is such a sturdy brand of expression that traditional prior restraint doctrine may not apply to it") (citing *Virginia Bd. of Pharmacy*, 425 U.S. at 771-72 n.24); *Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio*, 471 U.S. 626, 668 n.13 (1985) (Brennan, J., concurring) (recalling that "[t]he Court previously has noted that. . . *traditional prior restraint principles do not fully apply to commercial speech*") (citing *Central Hudson,* 447 U.S. at 571 n.13) (emphasis added); *Lowe v. S.E.C.*, 472 U.S. 181, 234 (1985) (White, J., dissenting) ("a flat prohibition or prior restraint on speech is, *as applied to fully protected speech*, presumptively invalid and may be sustained only under the most extraordinary circumstances") (emphasis added).

### C.    Defendants' overbreadth and vagueness challenges must also be rejected.

Amazon and Dowd also challenge the AWA and the D.C. Cruelty statute as unconstitutionally overbroad and vague, both facially and as applied to Defendants' conduct.[41] *See* Amazon at 41-43; Dowd at 10. As a threshold matter, any such "as applied" challenge is premature at this stage, as it is still unclear exactly what facts the law is to be "applied to" in this action.

Even if such merits issues were ripe for consideration, the AWA provision at issue, by its plain language, is limited to *commercial* speech. 7 U.S.C. § 2156(c). The Supreme Court has repeatedly held that "the overbreadth doctrine does not apply to commercial speech." *Flipside*, 455 U.S. at 497 (*citing Central Hudson*, 447 U.S. at 565 n. 8). In so holding, the Supreme Court reasoned that "[s]ince advertising is linked to commercial well-being, it seems unlikely that such

---

[41] While Amazon characterizes part of its overbreadth challenge as "as applied," it also presents a facial challenge, in that it is premised on hypothetical situations and future possibilities not before this Court. *See* Amazon at 41-42. The Supreme Court deems to be facial any challenge to a "statute on the ground that it may conceivably be applied unconstitutionally to others in situations not before the Court." *Los Angeles Police Dep't v. United Reporting Publ'g Corp.*, 528 U.S. 32, 38 (1999).

speech is particularly susceptible to being crushed by overbroad regulation." *Bates v. State Bar of Arizona*, 433 U.S. 350, 381 (1977); *id.* ("overbreadth has been described by this Court as 'strong medicine,' which 'has been employed . . . sparingly and only as a last resort'").

For the same reasons, the D.C. Cruelty to Animals statute is also not overbroad, since its application to Defendants here is premised upon commercial speech – namely, the Publications' advertisements for fighting dogs and birds, and cockfighting weapons. But even if this matter did not involve commercial speech, neither the AWA nor the D.C. Cruelty to Animals statute is overbroad. Defendants fail to make the necessary showing that there is *any* speech that the AWA or D.C. Cruelty to Animals statute could be unconstitutionally applied to, let alone a "substantial amount of constitutionally protected conduct." *City of Houston v. Hill*, 482 U.S. 451, 458 (1987). By making vague generalizations that it would be overbroad to apply the AWA and D.C. Cruelty to Animals statute to "other distributors or publishers," Amazon mischaracterizes the narrow circumstances at issue in this case. There simply *are no other* above-ground distributors or publishers of any self-described "trade publications" for animal fighting. Dowd at 5.

Nor is their any merit to Defendants' argument that the AWA and D.C. Cruelty to Animals statute are unconstitutionally vague, either facially or as applied.[42] A statute survives a vagueness challenge if it is worded with "sufficient definiteness that ordinary people can understand what conduct is prohibited." *Kolender v. Lawson*, 461 U.S. 352, 357 (1983). The provisions at issue, which, as applied to Defendants, prohibit commercial speech that "promot[es]" animal fighting ventures, are not vague. Defendants profess ignorance as to the scope of these prohibitions, but each, by its terms, "provide[s] people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits." *Hill v. Colorado*, 530 U.S. 703, 732 (2000).

For instance, Amazon asks the Court "What are 'instrumentalities of interstate commerce for commercial speech'?" Amazon at 42. But to answer its own question, Amazon need only finish

---

[42] Should the court determine that the statutes are not vague as applied to Defendant Amazon, it need not even consider a facial challenge for vagueness. The Supreme Court has held that "[a] plaintiff who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others." *Flipside*, 455 U.S. at 495.

reading the statute it has asked the Court to strike down. *See* 7 U.S.C. § 2156(g)(3) ("the term 'instrumentality of interstate commerce' means any written, wire, radio, television or other form of communication in, or using a facility of, interstate commerce"). Likewise, the phrase "commercial speech" has an established meaning within our legal system – one Amazon has apparently already found. *See* Amazon at 44 (citing *Bolger*, 463 U.S. at 64-65, for the futile argument that the Publications are not within the definition of commercial speech).

Nor is the term "promote" unconstitutionally vague. *See McConnell v. Fed. Election Comm'n*, 540 U.S. 93, 170 n.64 (2003) (rejecting argument that the term "promote" as used in the Bipartisan Campaign Reform Act of 2002 was vague). Indeed, another federal statute prohibiting using the mail for sending "obscene" materials, which is undoubtedly a broader category than commercial speech that promotes animal fighting ventures, has already been upheld against vagueness challenges. *See Smith v. United States*, 431 U.S. 291 (1977). Defendants' attempt to find vagueness where none exists merely proves the adage that "[i]t will always be true that the fertile legal imagination can conjure up hypothetical cases in which the meaning of (disputed) terms will be in nice question." *Grayned v. City of Rockford*, 408 U.S. 104, 111 n.15 (1972).

### D.    *Defendants' claim that distributors do not have to conform their conduct to the Animal Welfare Act is baseless and premature.*

Amazon and Magazine Express argue, untethered to any particular 12(b) theory for dismissal, that they simply "cannot be held to a standard of 'knowingly' . . . as the Animal Welfare Act requires, *see* 7 U.S.C. § 2156," by virtue of their role as distributors. Magazine Express Mot. to Dismiss (hereinafter "Mag. Expr.") at 5; *see also* Amazon at 36. However, the unilateral pronouncement that they simply "cannot be held" to a statutory standard that applies with equal force to them and every other person in the United States, flies in the face of not only the AWA, but also the standard, admitted by Defendants, that distributors can be held liable where they know or even "have reason to know." *Lewis v. Time, Inc.*, 83 F.R.D. 445, 463-64 (E.D. Cal. 1979).

Amazon's brief reads as though it learned of the illegal nature of the Publications for the first time with the filing of this action, but Amazon has had "actual knowledge" of the unlawful

nature of the Publications for more than two years. Am. Compl. ¶¶ 98-99. Indeed, Amazon makes scant mention of Plaintiff's detailed 2005 and 2006 notice letters to it, and instead offers the bizarre assertion that "mere notice" does not somehow equate to "knowledge" or even "having reason to know." *Lewis*, 83 F.R.D. at 463-64, cited in Amazon at 36. Although Amazon admits that it "would only be liable if [it] knew or had reason to know," Amazon at 36, it *at no time claims that it did not know or have reason to know*. For that reason, and consistent with the precedent cited by it, Amazon's defense on this point is unavailing.

Amazon attempts to avoid this result by arguing that nothing short of a final judgment in a court proceeding would suffice to provide it with "actual knowledge" of the unlawful nature of the materials. Amazon at 36. Not surprisingly, it offers not a single authority to support this illogical assertion.[43] If a party could never initiate a legal proceeding without first having initiated a legal proceeding, retailers could sell illegal materials in perpetuity. Amazon misrepresents the nature of the required notice. Obviously it is within the province of the judiciary to determine whether the shipment of these publications is unlawful, but that does not mean that a seller can never "hav[e] reason to know," *Lewis*, 83 F.R.D. at 463-64, cited in Amazon at 36, absent a specific court ruling to that effect. A finding of knowledge is based on *whether* a party knows or has reason to know, not *how* it came to know. *See Good Impressions, Inc. v. Britton*, 169 F. Supp. 866, 869 (D.D.C. 1958) ("actual knowledge" is actual knowledge "no matter how [the party] acquired it"). Indeed, Amazon's "Product Description" for *The Feathered Warrior* states that it "is a trade magazine devoted to [ ] the . . . fighting of gamefowl." Am. Compl. ¶ 96.

Since it does not dispute that it had actual knowledge, Amazon's reliance on case law addressing whether or not a distributor has a "duty to monitor" the items it chooses to sell is also inapposite. In fact, *Lerman* actually supports Plaintiff's position. Immediately following the quotation proffered by Amazon for the proposition that a "national distributor of hundreds of

---

[43] Indeed, Amazon's prior removal of the dog fighting videos, upon having "learned . . . from HSUS," Zapolsky Decl. ¶¶ 13-14 – *without* a "legal finding," Amazon at 37 – demonstrates that such a "finding" is not necessary to impart actual knowledge.

periodicals has no duty to monitor each issue of every periodical it distributes," *Amazon* at 37 (quoting *Lerman v. Flynt Distrib. Co, Inc.*, 745 F.2d 123, 139 (2d Cir. 1984)), *Lerman* continues:

> At the same time a distributor as an integral part of the movement of information from the creator to the reader – the distributor here was to receive 46% of the profit from the sale of the magazine – cannot be entirely immune from liability.   When a distributor acts with the requisite scienter in distributing materials . . . it must be subject to liability.

*Lerman*, 745 F.2d at 139. Here, the requisite scienter – knowledge – is met, and Amazon at no point denies that. Moreover Amazon is clearly "an integral part of the movement of information," *id.*; it also actively markets, takes the money for, and arranges for shipment of the magazines. *See* Am. Compl. ¶¶ 95, 101; *see also Auvil v. CBS 60 Minutes*, 800 F. Supp. 928, 931-32 (E.D. Wash. 1992) (confirming the "conduit liability" of an actor in "the print chain of distribution," including "book sellers," if it "knows or had reason to know of [the unlawful] character" of the material).

Contrary to Defendants' assertions, there *is* precedent holding *distributors* of publications liable for violations of animal fighting laws. Defendants are truly hard pressed to get around *Commonwealth v. Fricchione,* Crim. No. 0012396-2004 (Pa. Ct. Comm. Pleas, sentenced March 13, 2006), cited in Am. Compl. ¶¶ 80-81. In *Fricchione* the Pennsylvania Deputy Attorney General for Organized Crime charged the defendant with three felony counts of animal fighting and criminal conspiracy – all based solely on the fact that he "did create, publish, and distribute through the Commonwealth of Pennsylvania an underground publication that encouraged, aided, or assisted in the promotion of dogfighting." *Id.*, Indictment at 1-2.

Defendants' only rebuttal is that this Court should ignore that precedent because the defendant happened to also be prosecuted – in a different matter, in a different state, in a different year – for directly fighting animals. *See* Amazon at 53 n.23. But that fact does nothing to undermine the ultimate result, which is that Fricchione was adjudicated guilty of criminal offenses based solely on the publication and distribution of publications which are substantively identical to those at issue here. In fact, after the dog fighting magazine was disbanded due to Mr. Fricchione's incarceration, one of the dog fighters who had advertised his fighting dogs in Fricchione's publication began to

run an identical advertisement – right down to the font – in *The Feathered Warrior* instead. *See* Am. Compl. ¶¶ 65, 127; *see also United States v. Thompson*, 118 F. Supp. 2d 723, 725-26 (W.D. Tex. 1998) ("as a matter of law, [ ] the term 'animal fighting venture' [in the AWA] includes the entire commercial activity," including those who "publish *and distribute* magazines") (emphasis added).

Most importantly, the fact that Amazon *continues* to sell these publications after having actual knowledge and a reason to know that the publications contain facially unlawful advertisements for contraband, sets it completely apart from every case it cites. In *Eimann v. Soldier of Fortune Magazine, Inc.*, 880 F.2d 830 (5th Cir. 1989), for example, the distributor did not assert an ongoing right to run the ambiguously-phrased advertisement for a hit man after its nature had been made known to it. Rather, defendant in that matter was trying to avoid liability for having run the advertisement in the past, before its meaning was made known to it for the first time. Here, on the other hand, Defendants' unlawful acts are ongoing, and Plaintiff has filed this action to stop those unlawful trade practices from continuing.

Defendants' fall-back position that the advertisements for fighting animals and weapons are somehow "ambiguous" or "facially innocuous" is also impossible to accept, and contrary to the allegations in the Amended Complaint. Amazon at 38 n.16, Marburger at 27; Amended Complaint ¶¶ 63, 64, 66, 71, 72. The brazen full page criminal solicitations in the Publications are nothing like the advertisement found by the court – after the relevant facts had been tested at trial – to be "facially innocuous" in *Eimann*. There, the court found ambiguous a two-line classified advertisement that said simply "EX-MARINES -- 67-69 'Nam Vets, Ex-DI, weapons specialist -- jungle warfare, pilot, M.E., high risk assignments, U.S. or overseas." *Eimann*, 880 F.2d at 831. No reasonable person, the court held, would interpret that as an advertisement for a hit man.

Here, on the other hand, it is quite plain that an advertisement is for the sale or purchase of cockfighting roosters when it expressly markets those birds on the basis that they "want to hurt something," such as one in particular that was marketed for his fighting prowess on the basis that he had impaled an opposing bird "through [the] neck and kill[ed] [him] outright." Am. Compl. ¶ 64

(quoting THE FEATHERED WARRIOR 1 (Jul. 2006)).[44] Nor is it ambiguous where a Texas advertiser markets $1,000 fighting birds that have "fought" successfully at "major competition in gaff, short knife, & long knife." Pendleton Decl., Ex. 4 (reproducing THE GAMECOCK 49 (Jun. 2007)). As explained in the Publications themselves, "[o]bviously, some of the advertisers are clearly advocating cockfights. . . . you can tell that we're not talking about just the breeding and showing of the animals." THE FEATHERED WARRIOR 22 (July 2006).

The publisher Defendants' recent decision to stop running advertisements for cockfighting knives and gaffs, *see* Amazon at 39 n.16; Pendleton Decl., Ex. 4 (reprinting THE GAMECOCK 5 (Jul. 2007)), further undermines their position here. As stated by Defendant Marburger in its own publication, "The Animal Fighting Prohibition Enforcement Act of 2007 (S. 261) has became [*sic*] Federal Law. So there will be NO MORE gaff, knives [*sic*] advertising in the pages of GAMECOCK. The law reads: [setting forth statutory text]." *Id.* Although the Publications continue to advertise fighting animals, this half-step demonstrates that the publishers recognize these advertisements as being facially unlawful.

Defendants' claim that the advertisements are not unlawful simply because they "could lead to animal fighting activities," Amazon at 39, also reflects a misunderstanding of the unlawful activity at issue. The advertisements are unlawful on their face because the items advertised are illegal to sell – not because the animals and weapons are later used in illegal animal fights. The legal violation at issue here is not the "underlying activity," Amazon at 39, but rather, the *commercial transaction itself*. In the cases cited by Amazon, the court declined to impose liability

---

[44] Defendants' assertion that such animals are strictly for "showing," Amazon at 39 n.16, is also preposterous, and contrary to the allegations in the Complaint. At legitimate dog and poultry shows, the winners are not based on how many other animals they "kill outright." Likewise, the suggestion that the cockfighting pit advertised for sale in *The Gamecock* "could be used for . . . showing animals," *id.*, is entirely absurd. Legitimate animal shows do not require a "drag pit" – like the one found at the cockfighting pit advertised for sale in *The Gamecock* – a specially constructed chamber where gravely wounded animals are placed to bleed slowly to death for the purpose of gambling on which one lifts his head last.

because the speech may have resulted in an increased "risk" of criminal activity; here, the commercial transaction proposed is *in and of itself illegal* under Federal law.

Thus, there is nothing "stunning," Amazon at 37, about requiring a retailer to stop illegal shipments of monthly catalogs for illegal goods when it has actual knowledge of the facial illegality of those materials. The "practical implication," *id.*, of *Defendants'* position is much more "stunning" — Defendants would permit a retailer to continue to sell unlawful goods even after the illegal nature of those goods is made known to it, simply because it may not have previously been aware of the illegal nature of the goods. That defies the applicable standard – acknowledged by Defendants – that a distributor can be held liable if it knows or even "has reason to know" of the unlawful nature of the printed materials it sells. In light of that uncontested principle, it strains all credulity to suggest that Amazon enjoys blanket immunity even where it: (1) has actual knowledge of the unlawful materials; (2) receives a percentage of the profit; (3) actively engages in marketing and promoting the product; and (4) is in fact the sole retail seller of the product.

### E.    Plaintiff's claims concerning the dog fighting videos are not moot.

Claims I, II, and III allege unlawful trade practices based on Amazon's sales of two dog fighting DVDs (the "Videos") "in which approximately twenty live dogs are actually and intentionally maimed, mutilated, tortured, wounded, and killed" in dog fights "staged for the purpose of producing and selling [the DVDs] for commercial gain."[45] Am. Compl. ¶¶ 48, 55. When Plaintiff filed its Complaint, Amazon offered the Videos for sale.[46] Shortly thereafter, Amazon suspended its sales of the Videos. Amazon now attempts to evade liability for selling the Videos by arguing that "[s]ince Amazon has, upon notice, taken down and will take down the postings offering

---

[45] Amazon argues that only Count One is moot under this theory. However, Counts Two and Three also implicate Amazon's sales of the Videos. *See* Am. Compl. ¶¶ 138, 144. Amazon therefore waives any mootness argument as to those claims. *See Edmond*, 953 F.2d at 1400.

[46] Amazon sold one or both Videos for at least several months. *See* Am. Compl. ¶ 91. Because no discovery has yet been obtained, Plaintiff does not know how many illegal sales of the Videos Amazon has made.

the Videos for sale, there is no live case or controversy," and that therefore, Plaintiff is not entitled to either "injunctive or declaratory relief." Amazon at 29. Amazon is wrong on both counts.

"Voluntary cessation of allegedly illegal conduct … does not make [a] case moot." *United States v. W.T. Grant Co.*, 345 U.S. 629, 632 (1953). To moot a claim for injunctive relief, a defendant bears a "heavy burden" to demonstrate that "there is no reasonable expectation that the wrong will be repeated." *Id.* at 633. It must be "absolutely clear… that the allegedly wrongful behavior could not reasonably be expected to recur." *Vitek v. Jones,* 445 U.S. 480, 487 (1980); *see also Perfect 10, Inc. v. Amazon.com, Inc.*, 487 F.3d 701, 732 n.16 (9th Cir. 2007) (trademark infringement claim not moot because Amazon had "not established that [its] alleged[]" infringement could not "reasonably be expected to recur," even after Amazon had severed the business relationship that made possible the alleged infringement). Amazon does not even come close to satisfying this "heavy burden" of certainty, for several reasons.

First, Amazon's noncommittal statement that it will "*remove*" – *i.e.*, *after* the page goes back up in the first place – "any product detail page for *Hood Fights* and *Unleashed* if Amazon *learns* that these videos have been listed for sale again on Amazon.com," falls well short of this standard on its face. Zapolsky Decl. ¶¶ 13, 15 (emphasis added). Far from disproving a "a more-than-speculative chance" that the sales will resume, *Columbia Rope Co. v. West,* 142 F.3d 1313, 1316 (D.C. Cir. 1998), this statement practically guarantees that the unlawful sales *will* resume. Since Amazon will rely exclusively on *consumers* to "learn" of future sales, Zapolsky Decl. ¶ 13, it can "reasonably be expected" that time would elapse between the posting of the Videos for sale, and the point at which concerned consumers discovered the posting. This also assumes that consumers will take the time to bring it to Amazon's attention. During that interval, the unlawful trade practices alleged in the Amended Complaint would recur, and would continue unabated.

Second, "the court's power to grant injunctive relief survives discontinuance of . . . illegal conduct . . . [if] the defendant is free to return to his old ways." *Grant,* 345 U.S. at 632-33. Amazon's noncommittal statement not only leaves it "free to return to [its] old ways," *id.*, it evinces

73

a virtual certainty, on its face, that Amazon *will* return to its old ways, since Amazon has made clear that it will not act until there is something to "remove" from its website. Zapolsky Decl. ¶ 15. Amazon's statement that it "will *continue* to remove the product detail page for these videos upon notice," Amazon at 10, which implies that Amazon has previously removed both Videos upon notice, also lacks credibility. Consumers notified Amazon of the Videos in the past – including on October 17, 2007 – and Amazon failed to remove them at that time. *See* Am. Compl. ¶ 93 (Amazon scolding consumer for engaging in "censorship" by bringing the videos to its attention, after which time it continued to sell the dog fighting video for more than three months).

Third**,** by "reserv[ing]" for future briefing a statutory and constitutional right to sell the Videos, Amazon at 41 n.18, Amazon gives rise to a "reasonable expectation," *Grant*, 345 U.S. at 633, that sales of the Videos will resume. *See Blisscraft of Hollywood v. United Plastics Co.,* 294 F.2d 694, 701 (2d Cir. 1961) (injunction against future infringement although defendant discontinued use of offending labels, because defendant continued to dispute the trademark).[47]

---

[47] Even if Amazon's promise to discontinue the sale of the Videos – but only after their sale resumes for an indeterminate amount of time – achieved the certainty required in this Circuit to moot a claim for injunctive relief, Plaintiff is entitled to, at a minimum, pursue its claims for declaratory relief. In *Super Tire Engineering Co. v. McCorkle,* the Supreme Court held that despite the fact that a strike had ended, thereby mooting the employers' claims for injunctive relief, the mootness determination "is appropriate with respect to only one aspect of the lawsuit . . . the request for injunctive relief . . . the district court 'had the duty to decide the appropriateness and the merits of the declaratory request irrespective of its conclusion as to the propriety of the issuance of the injunction.'" 416 U.S. 115, 121-22 (1974) (citing *Roe v. Wade*, 410 U.S. 113, 166 (1973)).

Amazon's argument that suspending sales of the Videos precludes even "declaratory relief" for prior sales is without merit. Amazon at 29. This assertion presumes that an unlawful commercial transaction ceases to be a legal violation the moment it is consummated. Amazon cites no authority – nor could it – for this counterintuitive proposition. Rather, it is plain that each sale of the Videos made by Amazon comprises a violation of federal law, and that is no less true merely because Amazon has suspended its sales of those particular dog fighting DVDs. Amazon remains liable for prior unlawful trade practices based on the sale and advertising of the Videos on its website. *See Payne Enterprises, Inc. v. United States*, 837 F.2d 486, 492 (D.C. Cir. 1988) (remanding with instructions to afford plaintiff declaratory relief as to defendant's prior statutory violations).

## CONCLUSION

For the foregoing reasons, Defendants' motions to dismiss should be denied in their entirety. At a minimum, Plaintiff is entitled to discovery to resolve Defendants' incomplete and internally inconsistent jurisdictional assertions.

August 17, 2007

Respectfully submitted,

\_\_\_\_/s/_____
Ethan Carson Eddy (D.C. Bar No. 496406)
Jonathan R. Lovvorn (D.C. Bar No. 461163)
THE HUMANE SOCIETY OF THE UNITED STATES
2100 L Street, N.W.
Washington, D.C. 20037
(202) 676-2329
(202) 778-6132 (fax)
eeddy@hsus.org

*Of Counsel:*

Stuart Philip Ross (D.C. Bar No. 031658)
Sarhana Livingston (Va. Bar No. 70177)
ROSS, DIXON & BELL, LLP
2001 K Street, N.W.
Washington, D.C. 20006
(202) 662-2000