IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
Civil Division

```
------------------------------------------------x
                                                 )
THE HUMANE SOCIETY OF                            )
THE UNITED STATES,                               )
                                                 )
              Plaintiff,                         )     Case No. 07-0623 (CKK)
                                                 )
       v.                                        )
                                                 )     ORAL HEARING REQUESTED
AMAZON.COM, INC., ET AL.,                         )
                                                 )
              Defendants.                        )
                                                 )
------------------------------------------------x
```

**REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
AMAZON'S MOTION TO DISMISS HSUS'S AMENDED COMPLAINT**

Laura R. Handman (D.C. Bar No. 444386)
laurahandman@dwt.com
Constance M. Pendleton (D.C. Bar No. 456919)
conniependleton@dwt.com
Davis Wright Tremaine LLP
1919 Pennsylvania Avenue, N.W., Suite 200
Washington, DC 20006-3402
(202) 973-4200
(202) 973-4499 fax

David A. Zapolsky, Esq.
Amazon.com, Inc.
P.O. Box 81226
Seattle, WA 98108-1226
(206) 266-1323
(206) 266-7010 fax

Of Counsel

September 7, 2007

Jennifer Lenga Long (admitted *pro hac vice*)
jenniferlengalong@dwt.com
Davis Wright Tremaine LLP
1201 Third Avenue, Suite 2200
Seattle, WA 98101-3045
(206) 622-3150
(206) 757-7700 fax

Attorneys for Defendant Amazon.com, Inc.

### TABLE OF CONTENTS

TABLE OF CONTENTS.................................................................................................. i

TABLE OF AUTHORITIES ........................................................................................... ii

PRELIMINARY STATEMENT .....................................................................................1

ARGUMENT....................................................................................................................4

I.     HSUS HAS FAILED TO STATE A CLAIM UNDER DC'S CONSUMER
      PROTECTION LAW AND TO CARRY ITS BURDEN OF ESTABLISHING
      STANDING ...............................................................................................................4

          A.    HSUS Cannot State a Cause of Action Under the D.C. CPPA ...............5

               1.    The D.C. CPPA Cannot Be Reasonably Construed to Permit
                     a Private Right of Action to Enforce Criminal Animal Welfare
                     Statutes that Are Not Consumer-Oriented and Do Not Themselves
                     Provide a Private Right of Action ...................................................6

               2.    There is No Consumer-Merchant Relationship Between HSUS
                     and Amazon; and the Alleged Injuries Do Not Arise from a
                     Consumer-Merchant Transaction.....................................................11

               3.    HSUS Has Not Stated a Claim on the Substantive Provisions
                     of the CPPA…… ...............................................................................13

          B.    HSUS Lacks Prudential Standing  Because the Injuries
              Alleged Do Not Fall Within the Zone of Interests of the CPPA ...........14

          C.    HSUS Cannot Establish Article III Standing........................................15

                1.    HSUS Lacks Organizational Standing........................................15

                2.    HSUS Cannot Establish Associational Standing Based
                     on Speculation that Amazon's Actions Increase the
                     Chance that Its Members Will Contract Bird Flu or
                     Become Victims of Violent Crimes...............................................19

II.    HSUS'S CLAIMS WITH RESPECT TO THE VIDEOS ARE MOOT BECAUSE
      AMAZON REMOVES ANY THIRD-PARTY SALES OF THE VIDEOS....................21

III.   SECTION 230 OF THE COMMUNICATIONS DECENCY ACT BARS HSUS'S
      CLAIMS AGAINST AMAZON ................................................................................22

IV.   HSUS'S CLAIMS FAIL BECAUSE AS A "DISTRIBUTOR," AMAZON

HAS NO DUTY TO CENSOR THE MAGAZINES BECAUSE IT HAS NO ACTUAL KNOWLEDGE THAT THE MAGAZINES ARE ILLEGAL; INDEED, THE U.S. POSTAL SERVICE HAS RULED THAT THEY ARE "MAILABLE" ......................................................................................................28

V.  THE FIRST AMENDMENT BARS HSUS'S CLAIMS VERSUS AMAZON................33

   A.  HSUS Seeks to Penalize Core Editorial, Political Speech, Not Purely Commercial Speech..................................................................................33

   B.  HSUS's Requested Cease and Desist Order Against Amazon Constitutes an Unconstitutional Prior Restraint.......................................38

VI.  HSUS'S CONSPIRACY CLAIM FAILS AS A MATTER OF LAW.............................39

VII.  CONCLUSION...........................................................................................................40

## TABLE OF AUTHORITIES

### CASES

*44 Liquormart, Inc. v. Rhode Island,* 517 U.S. 484 (1996) ............................................37

*800-JR Cigar, Inc. v. GoTo.com, Inc.,* 437 F. Supp. 2d 273 (D.N.J. 2006) ...................27

*Abigail Alliance for Better Access to Developmental Drugs v. Eshenbach,*
   469 F.3d 129 (D.C. Cir. 2006) ........................................................16

*Adams v. A.B. & A., Inc.,* 613 A.2d 858 (D.C. 1992) ......................................6

\**Adler v. Vision Lab Telecommunications, Inc.,*
   393 F. Supp. 2d 35 (D.D.C. 2005)................................................5, 11, 12, 40

\**Allen v. Wright,* 468 U.S. 737 (1984) ........................................................17

\**Animal Legal Defense Fund Boston, Inc. v. Promivi Veal Corp.,* 626 F. Supp. 278
   (D. Mass. 1986), *aff'd,* 802 F.2d 440 (1st Cir. 1986) ......................................8

*Anthony v. Yahoo!, Inc.,* 421 F. Supp. 2d 1257 (N.D. Cal. 2006) .............................27

*Armstrong v. Accrediting Council for Continuing Education & Training, Inc.,*
   832 F. Supp. 419 (D.D.C. 1993), *vacated on other grounds,*
   84 F.3d 1452 (D.C. Cir. 1996).....................................................40

*Ashcroft v. Free Speech Coalition,* 535 U.S. 234 (2002) ...................................38

*Associated Bank-Corp. v. Earthlink, Inc.,* No. 05-C-0233, 2005 WL 2240952
   (W.D. Wis. Sept. 13, 2005).....................................................23-24

\**Atwater v. District of Columbia Department of Consumer & Regulatory Affairs,*
   566 A.2d 462 (D.C. 1989) ........................................................7, 8

*Auvil v. CBS "60 Minutes,"* 800 F. Supp. 928 (E.D. Wash. 1992) ...........................32, 33

*Barnes v. Yahoo!, Inc.,* No. 05-926, 2005 WL 3005602 (D. Or. Nov. 8, 2005)...................26

*Barrett v. Rosenthal,* 146 P.3d 510 (Cal. 2006) ........................................24, 26

*Bartnicki v. Vopper,* 532 U.S. 514 (2001) ..............................................38

*Batzel v. Smith,* 333 F.3d 1018 (9th Cir. 2003)..........................................24

*Ben Ezra, Weinstein & Co. v. AOL,* 206 F.3d 980 (10th Cir. 2000)..........................25

*Blumenthal v. Drudge, 992 F. Supp. 44 (D.D.C. 1998)...................................................24, 25, 26

Blisscraft of Hollywood v. United Plastics Co., 294 F.2d 694 (2d Cir. 1961)..............................21

Board of Trustees of State University of New York v. Fox,
    492 U.S. 469 (1989)................................................................................................35, 37, 38

Bolger v. Youngs Drug Products Corp., 463 U.S. 60 (1983) ................................................35, 37

Brandenburg v. Ohio, 395 U.S. 444 (1969)...............................................................................36

Broder v. Cablevision Systems Corp., 418 F.3d 187 (2d Cir. 1995) ............................................9

Browning v. Clinton, 292 F.3d 235 (D.C. Cir. 2002) .................................................................40

Carey v. Population Services International, 431 U.S. 678 (1977)................................................36

Cammarano v. United States, 358 U.S. 498 (1959)....................................................................35

*Carafano v. Metrosplash.com, Inc., 339 F.3d 1119 (9th Cir. 2003) .................................22, 23, 27

Carleton v. Winter, 901 A.2d 174 (D.C. App. 2006).................................................................11

Carter Products, Inc. v. FTC, 323 F.2d 523 (5th Cir. 1963) ......................................................31

*Central Hudson Gas & Elec. Corp. v. Public Service Commission,
    447 U.S. 557 (1980)................................................................................................... passim

Cheshire Mortgage Service, Inc. v. Montes,
    612 A.2d 1130 (Conn. 1992) .................................................................................................10

Chicago Lawyers' Committee for Civil Rights Under the Law, Inc. v. Craigslist, Inc.,
    461 F. Supp. 2d 681 (N.D. Ill. 2006) ....................................................................................24

City of Cincinnati v. Discovery Network, Inc., 507 U.S. 410 (1993) ...........................................38

City of Houston v. Hill, 482 U.S. 451 (1987) ...........................................................................38

Conboy v. AT&T Corp., 241 F.3d 242 (2d Cir. 2001) .................................................................9

Cooper v. First Government Mortgage & Investors Corp., 206 F. Supp. 2d 33
    (D.D.C. 2002) ........................................................................................................................7

Corbis Corp. v. Amazon.com, Inc., 351 F. Supp. 2d 1090 (W.D. Wash. 2004).....................22, 25

*Davis v. Costa-Gavras*, 595 F. Supp. 982 (S.D.N.Y. 1984) .........................................................32

*District Cablevision Ltd. Partnership v. Bassin*, 828 A.2d 714 (D.C. 2003) .................................7

*Doe v. AOL*, 718 So. 2d 385 (Fla. Dist. Ct. App. 1998) ...............................................................24

*Doe v. Bates*, No. 05-CV-91, 2006 WL 3813758 (E.D. Tex. Dec. 27, 2006) ..............................23

*Doherty, Clifford, Steers & Shenfield, Inc. v. FTC*, 392 F.2d 921 (6th Cir. 1968).......................31

*Downing v. Abercrombie & Fitch*, 265 F.3d 994 (9th Cir. 2001)...................................................34

*Dunagin v. City of Oxford*, 718 F.2d 738 (5th Cir. 1983)..............................................................36

*Edenfield v. Fane*, 507 U.S. 761 (1993) .......................................................................................37

*Eder Bros. v. Wine Merchants of Connecticut, Inc.*,
    880 A.2d 138 (Conn. 2005) ..................................................................................................10

*Eimann v. Soldier of Fortune Magazine, Inc.*, 880 F.2d 830 (5th Cir. 1989)................................29

*Ex Parte Jackson*, 96 U.S. (6 Otto) 727 (1877).............................................................................28

*Fair Housing Council v. Roommates.com, LLC*,
    489 F.3d 921 (9th Cir. 2007) ...............................................................................................27

*Finger v. Omni Publications International Ltd.*, 566 N.E.2d 141, 144 (N.Y. 1990) ....................34

*Friends of Tilden Park, Inc. v. District of Columbia*, 806 A.2d 1201 (D.C. 2002) ..................9, 20

*Gentry v. eBay, Inc.*, 99 Cal. App. 4th 816, 121 Cal. Rptr. 2d 703 (2002).......................23, 24, 27

*Green v. AOL*, 318 F.3d 465 (3d Cir. 2003) ..................................................................................26

*Hakki v. Zima Co.*, No. 03-9183, 2006 WL 852126
    (D.C. Super. Ct. Mar. 28, 2006) (appeal pending)....................................................*passim*

*Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982) ................................................................16

*Hoffman v. Capital Cities/ABC, Inc.*, 255 F.3d 1180 (9th Cir. 2001)...........................................34

*Howard v. Riggs National Bank*, 432 A.2d 701 (D.C. 1981) .........................................................5

*Hoyte v. Yum! Brands, Inc.*, 489 F. Supp. 2d 24 (D.D.C. 2007)............................................*passim*

*In re American Home Products Corp.*, 98 F.T.C. 136 (1981) .......................................................31

*International Labor Rights Education & Research Fund v. Bush,
    954 F.2d 745 (D.C. Cir. 1992) ................................................................................17

Iron Arrow Honor Society v. Heckler, 464 U.S. 67 (1983) ...........................................22

Joseph Burstyn, Inc. v. Wilson, 343 U.S. 495 (1952) ...................................................35

Kathleen R. v. City of Livermore, 87 Cal. App. 4th 684,
    104 Cal. Rptr. 2d 772 (2001) ..................................................................................23

Kopff v. Battaglia, 425 F. Supp. 2d 76 (D.D.C. 2006) ...........................................11, 12

Korea Supply Co. v. Lockheed Martin Corp., 29 Cal. 4th 1134 (2003) .......................10

*Lerman v. Flynt Distributing Co., 745 F.2d 123 (2d Cir. 1984).........................28, 29, 32

Lewis v. Time, Inc., 83 F.R.D. 455 (E.D. Cal. 1979), aff'd, 710 F.2d 549
    (9th Cir. 1983).....................................................................................................28, 30

*Lujan v. Defenders of Wildlife, 504 U.S. 555 (1992) ..................................................16

*M.A.I.N. v. Commissioner, Maine Department of Human Services,
    876 F.2d 1051 (1st Cir. 1989)..................................................................................20

Morrison v. AOL, 153 F. Supp. 2d 930 (N.D. Ind. 2001)...............................................23

Mountain States Legal Foundation v. Glickman, 92 F.3d 1228 (D.C. Cir. 1996) .................15, 19

*National Wrestling Coaches Association v. Department of Education,
    366 F.3d 930 (D.C. Cir. 2004)..................................................................................17

Natural Resources Defense Council v. Environmental Protection Agency,
    464 F.3d 1 (D.C. Cir. 2006) ................................................................................19, 20

Nebraska Press Ass'n v. Stuart, 427 U.S. 539 (1976) ...................................................39

Near v. Minnesota ex rel. Olson, 283 U.S. 697 (1931)...................................................39

Newdow v. Bush, 391 F. Supp. 2d 95 (D.D.C. 2005) ....................................................22

Noah v. AOL Time Warner, Inc., 261 F. Supp. 2d 532 (E.D. Va. 2003),
    aff'd, 2004 WL 602711 (4th Cir. 2004)....................................................................23

New York Times Co. v. United States, 403 U.S. 713 (1971)...........................................39

*Nutritional Health Alliance v. Shalala*, 144 F.3d 220 (2d Cir. 1998)..............................39

*Optivus Technology, Inc. v. Ion Beam Applications S.A.*,
    469 F.3d 978 (Fed. Cir. 2006)......................................................................10

*Osborne v. Capital City Mortgage Corp.*, 727 A.2d 322 (D.C. 1999). ............................7

*People v. Fricchione*, Nos. 2004-4112 & 4113,
    2004 WL 3800901 (N.Y. 2d Dep't 2004)......................................................29

*Perfect 10, Inc. v. Amazon.com, Inc.*, 487 F.3d 701 (9th Cir. 2007) ..............................21

*Petersan v. Chartone, Inc.*, No. 03-CA-8328 (D.C. Super. Ct. Aug. 4, 2004) ..............15

*Petersan v. Chartone, Inc.*, No. 03-CA-8328 (D.C. Super. Ct. Apr. 27, 2006)..............15

*Pico v. Board of Education*, 638 F.2d 404 (2d Cir. 1980), *aff'd*,
    457 U.S. 853 (1982)............................................................................... 36-37

*Pittsburgh Press Co. v. Pittsburgh Commission on Human Relations*,
    413 U.S. 376 (1973)......................................................................................38

*Rainbow/Push Coalition v. FCC*, 396 F.3d 1235 (D.C. Cir. 2005) .................................19

*Randolph v. ING Life Insurance & Annuity Co.*, 486 F. Supp. 2d 1 (D.D.C. 2007) ..............17, 20

*Renal Physicians Ass'n v. United States Dep't of Health &*
    *Human Services*, 489 F.3d 1267 (D.C. Cir. 2007) .............................................18

*Riley v. National Federation of the Blind*, 487 U.S. 781 (1988) .......................33, 34, 39

*Rockefeller v. United States Court of Appeals*, 248 F. Supp. 2d 17 (D.D.C. 2003) ............... 39-40

*Schlesinger v. Reservists Committee to Stop the War*, 418 U.S. 208 (1974)..................19

*Schneider v. Amazom.com, Inc.*, 31 P.3d 37 (Wash. Ct. App. 2001)..................22, 23, 26

*Scrivani v. Vallombroso*, 916 A.2d 827 (Conn. App. Ct. 2007)......................................10

*SEC v. Wall Street Publishing Institute*, 851 F.2d 365 (D.C. Cir. 1988)........................34

*Simon v. Eastern Kentucky Welfare Rights Org.*, 426 U.S. 26 (1976) ...........................18

*Smith v. California*, 361 U.S. 147 (1959) ......................................................................31

*Spence v. Flynt*, 647 F. Supp. 1266 (D. Wyo. 1986) .....................................................32

*Stevens v. Superior Court*, 75 Cal. App. 4th 594 (1992) .................................10

*\*Stoner v. eBay, Inc.*, No. 305666, 2000 WL 1705637 (Cal. Super. Nov. 1, 2000)............23, 24, 25

*Stop Youth Addiction, Inc. v. Lucky Stores, Inc.*, 950 P.2d 1086 (Cal. 1998)............................9, 10

*United States v. Eichman*, 496 U.S. 310 (1990) ........................................33

*\*United States v. W.T. Grant Co.*, 345 U.S. 629 (1953)....................................21

*United States v. United Foods, Inc.*, 533 U.S. 405 (2001) ...........................................34

*Universal Communications Systems, Inc. v. Lycos, Inc.*, 478 F.3d 413 (1st Cir. 2007) ...............23

*Valentine v. Chrestensen*, 316 U.S. 52 (1942) .................................................35

*Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council, Inc.*,
425 U.S. 748 (1976)...................................................................34

*Voicenet Communications, Inc. v. Corbett*, No. 04-1318, 2006 WL 2506318
(E.D. Pa. Aug. 30, 2006) ...........................................................23

*\*Warth v. Seldin*, 422 U.S. 490 (1975) .......................................................... 18-19

*Wells v. Allstate Insurance Co.*, No. 00-0760, 2006 WL 176100
(D.D.C. Jan. 24, 2006) ............................................................5

*\*Williams v. Purdue Pharma Co.*, 297 F. Supp. 2d 171 (D.D.C. 2003)................................ *passim*

*\*Zeran v. AOL*, 129 F.3d 327 (4th Cir. 1997).................................................23, 24, 26

## STATUTES

7 U.S.C. § 2156...............................................................................3, 29, 30

15 U.S.C. § 53(d)...........................................................................31

18 U.S.C. § 48(b)...........................................................................21

18 U.S.C. § 371.............................................................................40

18 U.S.C. § 2252...........................................................................23

47 U.S.C. § 223 ................................................................................................23

47 U.S.C. § 230 ..........................................................................................*passim*

D.C. Code § 22-1805a ......................................................................................40

D.C. Code § 28-3901 ....................................................................................5, 11

D.C. Code § 28-3904 ..................................................................................*passim*

D.C. Code § 28-3905 ..................................................................................*passim*

Cal. Bus. & Prof. Code § 17200, et seq. ............................................................9

Animal Fighting Prohibition Enforcement Act of 2007, Pub. L. No. 110-22,
    121 Stat. 88 ...................................................................................... 29-30, 36

## MISCELLANEOUS

Joshua D. Taylor, *Why the Increasing Role of Public Policy in California's
    Unfair Competition Law Is a Slippery Step in the Wrong Direction,*
    52 Hastings L.J. 1131 (July 2001) ..............................................................10

*Screening Advertisements: A Guide For the Media, available at*
    http://www.ftc.gov/bcp/online/pubs/buspubs/adscreen.shtm ...........................30

*Should Publications Be Liable for Running Fraudulent Ads,*
    Wall Street Journal Online, Oct. 18, 2006 ....................................................30

USPS Regulations, DMM 707 ..........................................................................35

Committee on Public Services and Consumer Affairs,
    Report on Bill No. 1-253, Mar. 24, 1976 ........................................................8

Consumer Protection in the District of Columbia Following the
    Suspension of the DCRA - Enforcement of the Consumer Protection
    Procedures Act, April 1999 ...........................................................................8

*Cases chiefly relied upon are marked with an asterisk

## PRELIMINARY STATEMENT

Defendant Amazon.com ("Amazon") obviously does not support, promote, advocate, or engage in any form of animal fighting, despite the Humane Society of the United States's ("HSUS") repeated and well publicized accusations to the contrary. Yet from the opening line – "Amazon.com and its business associates in the animal fighting industry" (Opp. at 1) – and throughout its Opposition, HSUS deliberately and misleadingly mischaracterizes Amazon's role in this suit by conflating Amazon with the publishers of *Gamecock* and *Feathered Warrior* magazines (the "Magazines"), who are in turn conflated with those conducting and advertising illegal animal fighting. Amazon is a bookseller, engaged in the business of distributing First Amendment-protected expressive material, not the business of animal fighting. Amazon provides a website where individuals can order magazine and newspaper subscriptions as well as an online marketplace for third parties to buy and sell their own goods and services ("Marketplace"). Amazon does not sell roosters, steroids, or fighting knives or otherwise engage in "actions" or "illegal conduct" that violate animal welfare laws (Opp. at 1, 2, 47-50). Amazon does not have "agreements" with the Magazine publishers (Opp. at 8, 48). And Amazon does not "ship" or even possess the Magazines or videos (the "Videos") at issue in this suit (Opp. at 8, 46-49, 69, 72).

Dismissing Amazon's First Amendment defenses as a "bogus Constitutional smokescreen for criminal conduct" (Opp. at 2), HSUS urges that Amazon be forced to censor editorial, political speech because of third-party ads contained in Magazines – Magazines that have been deemed legal. For such an extraordinary measure, HSUS cites not one single case, federal or state, where similar relief against a magazine, much less a distributor, has ever been granted.

Not to be stymied by the inconvenience of animal welfare and conspiracy statutes that, HSUS concedes, confer no private right of action, HSUS seeks to enforce criminal statutes against Amazon, a private defendant, under the rubric of the District of Columbia Consumer Protection Procedures Act, D.C. Code §§ 28-3904 and 3905(k)(1) ("D.C. CPPA"), a statute protecting consumers from merchants' fraudulent trade practices. There is zero support for this unprecedented expansion, which would make the entire federal criminal and civil code actionable

1

in D.C. Superior Court under this local law designed to protect consumers. Here, HSUS alleges no injury from any consumer-merchant relationship. No one, much less a D.C. HSUS member, is alleged to have been deceived by Amazon or victimized by an unfair trade practice. The Amended Complaint fails to state a claim under D.C.'s CPPA. (Point I.A.)

Because the "zone of interest" of D.C.'s CPPA is consumer protection and this suit is all about animal protection, HSUS lacks prudential standing. At such a far remove, HSUS's prediction of dire health risks to D.C. members and costs to HSUS – neither of which has anything to do with consumer injury – do not meet its Article III burden of showing that Amazon's actions likely caused these alleged harms or that the activities of the third parties not before the Court – those who conduct animal fighting – will likely be abated by the relief sought against Amazon. With Amazon only accounting for a small percentage of the Magazines' subscriptions, it is not "likely" that the Magazines' circulation will even be materially reduced, much less the crime rate in D.C. (Point I.B.) In addition, HSUS's claims with respect to the Videos should be dismissed as moot because the Videos have been removed from Amazon's website and will continue to be removed on notice. (Point II.)

As to the merits, HSUS's claims against Amazon are absolutely barred by section 230 of the Communications Decency Act of 1996, 47 U.S.C. § 230 ("CDA"), because HSUS seeks to punish an interactive computer service for third-party content. Courts specifically reject the argument HSUS advances (Opp. at 47) that, by providing a platform for third parties to sell expressive material, Amazon is engaging in "action," not speech protected by section 230 and the First Amendment (Opp. at 47, 50). (Point III.) And even if not barred by section 230, the First Amendment immunizes distributors of information from liability for the content they disseminate unless the distributor knows or has reason to know the information prepared by others is illegal. Here, the U.S. Postal Service ("USPS") has twice rejected HSUS's claims that the Magazines are "nonmailable," an inconvenient truth never addressed by HSUS. HSUS's gloss on the animal welfare statutes it invokes ignores that the sale of gamecocks and implements is not *per se* illegal, but illegal only if "use[d]" "in an animal fighting venture,"

7 U.S.C. §§ 2156(b), (e), another limitation ignored by HSUS. Amazon has neither the legal duty to censor the Magazines nor the physical ability to review each issue of the more than 90,000 newspapers and periodicals for which it offers subscriptions, let alone investigate the legality of each ad contained within them. (Point IV.)

HSUS effectively concedes that it must lose if the Magazines are viewed as editorial speech, and makes no attempt to meet the applicable strict scrutiny standard. Instead, HSUS recharacterizes the Magazines, which have all the standard editorial features such as news stories, columns, editorials and letters to the editor, as nothing but "catalogues" (Opp. at 7). But the Magazines, speak for themselves, and – regardless of what one may think of the editorial content – they unquestionably are not mere catalogues. The USPS apparently does not share HSUS's view, according the Magazines "periodical" status. Neither the Court nor Amazon nor HSUS can, consistent with the First Amendment, sit as an über editorial board evaluating whether editorial content – such as a letter to the editor criticizing HSUS's recent legislative success – is a "sham" (Opp. at 56 n.34). Even if the Magazines were nothing but commercial speech, HSUS's claims would fail to satisfy intermediate scrutiny. HSUS's contention that Amazon's "commercial speech" solicits illegal transactions again distorts Amazon's role – Amazon promotes its online subscription service for the 90,000 magazines and newspapers it offers, including these two, which have never been declared unlawful, and does not sell or advertise gamecocks, cockfighting equipment or "game" fighting events, which, even after recent legislative changes, remain legal for certain purposes or in certain jurisdictions. Indeed, Amazon does not even reproduce or display on its website the allegedly objectionable advertisements contained in the Magazines. (Point V.A.)

Recognizing that it cannot possibly show the "exceptional" interests necessary to justify a prior restraint, HSUS instead simply declares that the relief it seeks – an order to "cease and desist . . . distributing" the Magazines and Videos, Am. Compl. at 43 – is not a prior restraint! The injunction HSUS is seeking is not limited to the ads, but even if it were, Amazon cannot excise the ads from the editorial and political content of the Magazines once published.

Amazon would have no choice but to cease offering the Magazines altogether – a classic prior restraint. (Point V.B.)

HSUS's dark charges of conspiracy and aiding and abetting based on nothing more than Amazon's offer of an online subscription service and an online marketplace fail to state a claim under either the federal or D.C. criminal conspiracy statutes. As a threshold matter, neither statute confers a private right of action, and HSUS has not stated a claim under the CPPA or for any independent, underlying unlawful act for which Amazon can be held liable. (Point VI.)

Shooting the messenger will not put an end to animal fighting. If HSUS can silence Amazon under these theories, it could likewise ban offers for publications such as *USA Today* for publishing football and baseball odds in states where bookmaking is illegal, *High Times* for advocating legalization of marijuana, or *Casino Player* in states that prohibit gambling. In its zeal, HSUS ignores here the obvious narrowly tailored solution HSUS has advocated so effectively elsewhere – enforcement of laws against individuals actually involved in illegal animal fighting, football star Michael Vick being the most recent and prominent example.

## ARGUMENT

I.  **HSUS HAS FAILED TO STATE A CLAIM UNDER DC'S CONSUMER PROTECTION LAW AND TO CARRY ITS BURDEN OF ESTABLISHING STANDING**

HSUS makes two key concessions in its opposition to Amazon's Motion to Dismiss which, considered together, make it impossible for HSUS to pursue this lawsuit against Amazon:

1.  HSUS concedes that it does *not* have a private right of action under the AWA, the D.C. Cruelty to Animals Statute, or the Federal Depiction of Animal Cruelty Statute, so it must rely entirely on the District of Columbia's Consumer Protection and Procedures Act ("D.C. CPPA" or the "Act") to bring this suit.

2.  HSUS makes clear that it alleges only two types of injuries allegedly caused by Amazon:

    • HSUS as an organization is injured because its time and programmatic resources are diverted to aid law enforcement actions against animal fighting ventures; and

4

- HSUS members, individually, are subject to a "substantially" heightened risk of serious bodily injury and illness that they, as members of the public, are exposed to as a result of animal fighting.

There is a fundamental disconnect, however, between a consumer protection action and the types of injuries HSUS alleges. That disconnect causes HSUS to run afoul of several legal principles that formalize the common sense conclusion that a litigant should not be able to bring a lawsuit designed to protect animals through the rubric of a statute designed to protect consumers where there is no alleged harm to consumers as such. The absence of any consumer injury both undercuts any claim of standing and fails to state a claim under the D.C. CPPA. Because the two are so intertwined, we begin the discussion with a detailed look at the statute.

### A.    HSUS Cannot State a Cause of Action Under the D.C. CPPA

While the language of the CPPA is undeniably broad, if HSUS's interpretation is accepted, it would be, as HSUS concedes, "uniquely expansive" (Opp. at 38) – likely the broadest consumer protection act currently in the country. But the CPPA was enacted, as its title suggests, "to protect *local consumers* from improper and fraudulent *trade* practices," *Williams v. Purdue Pharma Co.*, 297 F. Supp. 2d 171, 174 (D.D.C. 2003), and to "deter potentially fraudulent conduct," *Wells v. Allstate Ins. Co.*, No. 00-0760, 2006 WL 176100, at *7 (D.D.C. Jan. 24, 2006) by "assur[ing] that a just mechanism exists to remedy all improper trade practices [and to] promote, through effective enforcement, fair business practices throughout the community . . . ." D.C. Code § 28-3901(b).

The D.C. and federal courts that have interpreted the CPPA have placed limits on its reach despite its broad language. Despite the Act's provision that "a person, whether acting for the interests of itself, its members, or the general public, may bring an action under this chapter . . . ," D.C. Code § 28-3905(k)(1), courts have interpreted the CPPA to apply only to actions in which plaintiffs and defendants are on opposite sides of a consumer-merchant transaction. *See Adler v. Vision Lab Telecomms., Inc.*, 393 F. Supp. 2d 35, 39-40 (D.D.C. 2005); *Howard v. Riggs Nat'l Bank*, 432 A.2d 701, 709 (D.C. 1981). Despite language that the Act may be violated "whether or not any consumer is in fact misled, deceived or damaged thereby," D.C. Code § 28-3904, courts

have interpreted the CPPA to require plaintiffs to allege "harm" in the form of a particularized and specific Article III injury-in-fact "to the consumer" and to meet prudential standing requirements. *See Williams*, 297 F. Supp. 2d at 177-78; *Hoyte v. Yum! Brands, Inc.*, 489 F. Supp. 2d 24, 28-29 (D.D.C. 2007); *Hakki v. Zima Co.*, No. 03-9183, 2006 WL 852126, at *2 (D.C. Super. Ct. Mar. 28, 2006) (appeal pending).

      1.      **The D.C. CPPA Cannot Be Reasonably Construed to Permit a Private Right of Action to Enforce Criminal Animal Welfare Statutes that Are Not Consumer-Oriented and Do Not Themselves Provide a Private Right of Action**

      Reading over the CPPA as a whole, starting with the title "D.C. Consumer Protection Procedures Act," and considering the list of 32 violations in sections 28-3904(a) – (ee) (HSUS cites only four, Opp. at 5), <u>all</u> involving garden-variety situations in which consumers are injured by fraudulent or unfair trade practices, it is evident that alleged violations of federal and D.C. law upon which HSUS bases its CPPA claims are not the type of consumer fraud or unfair trade practice covered by the Act.

      **D.C. Authority:**  HSUS cites a handful of D.C. cases with general language describing CPPA's broad reach (Opp. at 37-38), but *none* of them actually predicate a claim under the CPPA on, as here, (1) a criminal law that (2) does not itself give rise to a private cause of action, and (3) is not a trade, consumer-protection, or product-safety related law.  *Adams v. A.B. & A., Inc.*, 613 A.2d 858 (D.C. 1992), the case HSUS cites throughout its brief (Opp. at 3, 5, 40, 41, 43, 44) for the proposition that it can base its CPPA claim on "any federal statute," contains no analysis of the types of laws on which a CPPA claim may be based.  Instead, *Adams*, which involved a claim by a homeowner against a contractor for failure to complete installation of a heating and air conditioning system, simply upholds the trial court's determination that plaintiffs' CPPA claims were not sufficiently litigated to be presented to the jury.  613 A.2d at 861-62.  The reference to "or of any federal law" is, at most, a passing reference to the statutory language.

      *Atwater v. District of Columbia Dep't of Consumer & Regulatory Affairs*, 566 A.2d 462, 465-66 (D.C. 1989), which involved a complaint by an insured motorist of insufficient notice of

policy termination, discusses the CPPA's broad language allowing a plaintiff to predicate a trade practice violation on the violation of "any other law." *Id.* at 464-65. However, *Atwater* clearly contemplates CPPA actions based on other *consumer protection* laws. *See id.* at 465 ("The Act contemplates that its procedures will be invoked, not simply to enforce its own substantive provisions, but also those of *other consumer protection laws*.") (emphasis added); and at 466 ("The legislative history of the Act reinforces the straightforward reading of the statute itself as a measure designed to provide procedures and sanctions for violations of *consumer protection statutes* generally") (emphasis added).

In *District Cablevision Ltd. P'ship v. Bassin*, 828 A.2d 714, 722-25 (D.C. 2003), the Court held that plaintiffs could predicate their CPPA claim on the common law rule against punitive liquidated damages under section 28-3905(k)(1)'s provision that "any consumer who suffers any damage as a result of a trade practice in violation of a law of the District of Columbia" may bring a CPPA suit. The Court reasoned that "when there is a disparity of bargaining power and one party unilaterally imposes a liquidated damages provision in an adhesive contract, the skepticism . . . shown by the common law to liquidated damages is at its height. And *when this set of circumstances occurs in a consumer context, it is a natural subject for consumer protection legislation such as the CPPA.*" *Bassin*, 828 A.2d at 724 (emphasis added).[1]

The legislative history of the Act is also consistent with requiring that predicate violations be consumer-related. In reviewing that history, *Atwater* notes that the relevant Committee Report states that the violations listed in section 28-3904 of the Act were to be "in addition to *other consumer-related laws* already on the books in the District." 566 A.2d at 467

---

[1] The other D.C. cases cited by HSUS all are focused on consumer protection and do not involve CPPA claims predicated on other laws, let alone criminal laws that are not consumer-oriented. *See Osborne v. Capital City Mortgage Corp.*, 727 A.2d 322 (D.C. 1999) (claim by borrower against lender for misrepresentation about amount owed to discharge debt under section 28-3904(e)); *Cooper v. First Gov't Mortgage & Investors Corp.*, 206 F. Supp. 2d 33 (D.D.C. 2002) (action brought by mortgage borrower versus mortgage brokers, for making or enforcing provisions of contracts for sales or leases which would "mislead, deceive or damage consumers").

(citing Committee on Public Services and Consumer Affairs, Report on Bill No. 1-253, Mar. 24, 1976, at 17). In a report of the Antitrust, Trade Regulation and Consumer Affairs Section of the D.C. Bar recommending the 2000 amendments to the CPPA, the Committee discusses the reduced enforcement of consumer law since the consumer protection authority of the Department of Consumer and Regulatory Affairs was suspended in 1994 as a cost-saving measure. *See* "Consumer Protection in the District of Columbia Following the Suspension of the DCRA - Enforcement of the Consumer Protection Procedures Act," April 1999, at 1-2, 4. The report recommends giving statutory authority to **consumers** and **consumer organizations** acting on their behalf to obtain injunctive relief to stop fraudulent practices.

**Other Authority:** Looking beyond D.C. for guidance, there appears to be only *one* published case from *any* jurisdiction (and HSUS has cited no other) involving the same litigation strategy attempted here – an animal rights organization premising a consumer protection lawsuit on violations of criminal animal welfare laws. That case, *Animal Legal Defense Fund Boston, Inc. v. Promivi Veal Corp.*, 626 F. Supp. 278, 281 (D. Mass.), *aff'd*, 802 F.2d 440 (1st Cir. 1986), soundly rejects the strategy. HSUS argues that *Promivi* should be disregarded because the Massachusetts unfair trade practices act and regulations were narrower than those of the CPPA (Opp. at 41). Even assuming, *arguendo*, that the Massachusetts consumer protection act was as narrowly drawn as HSUS represents – and it is not – the *Promivi* court does not base its opinion on the scope of the act, nor does it emphasize – or even mention – the statutory and regulatory language HSUS cites. Instead, the court reasons in broad terms that a private action could not lie because a victory by the plaintiff animal rights group would have "the unmistakable effect of enforcing by means of an injunction in a civil lawsuit, a criminal statute. . . ." 626 F. Supp. at 281. As the *Promivi* court advises, "However well-intentioned it is, [HSUS] is pursuing its goals along an improper avenue in this litigation. . . . [HSUS] should concentrate its estimable advocacy urging public officials and the designated private animal protection organizations to proper action." *Id.*[2]

---

[2] HSUS also attempts to distinguish *Broder v. Cablevision Sys. Corp.,* 418 F.3d 187, 199 (2d Cir. 1995) and *Conboy v. AT&T Corp.*, 241 F.3d 242, 258 (2d Cir. 2001) as involving laws that

HSUS relies heavily on California authority, especially *Stop Youth Addiction, Inc. v. Lucky Stores, Inc.*, 950 P.2d 1086 (Cal. 1998), to argue that its D.C. CPPA claims may be predicated on a non-consumer-oriented criminal statutes that do not provide a private right of action. Reliance on cases applying the California Unfair Competition Law, Bus. & Prof. Code § 17200, *et seq.* ("UCL") only underscores what an outlier California's law has been and what an outlier D.C. law would become if HSUS's expansive interpretation is not rejected. The situation in California, even before the UCL was reined in by California voter initiative (Proposition 64) in 2004, differed from the D.C. CPPA in significant respects. <u>One</u>, unlike the D.C. courts, California State courts do not require that plaintiffs satisfy Article III standing requirements. *Compare Friends of Tilden Park, Inc. v. District of Columbia*, 806 A.2d 1201, 1206 (D.C. 2002), *with Stop Youth Addiction*, 950 P.2d at 1110, 1095 (J. Brown, dissenting) (Before Proposition 64 added an injury-in-fact requirement, "courts [] repeatedly permitted persons not personally aggrieved to bring suit for injunctive relief under the unfair competition statute on behalf of the general public, in order to enforce other statutes under which parties would otherwise lack standing.") This position has been squarely rejected by D.C. federal and local courts. (*See* discussion at sections I.A.3 and I.C., *supra*.) <u>Two</u>, California's unfair competition law has had, since its inception, the express purpose of granting private competitors the ability to enforce penal laws against unfair competition. *Id.* The CPPA has no comparable legislative history permitting private enforcement of penal law. <u>Three</u>, both before and after the 2004 amendments, the California UCL authorizes only restitution and injunctive relief; it does not permit a plaintiff to recover monetary damages – a limitation that could arguably justify its broad scope. *See Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1148-49 (2003). The CPPA allows not only for injunctive relief and restitution, but also

---

are narrower in scope that the D.C. CPPA (Opp. at 40-41). But again, the courts' reasoning is broad and focused on whether the predicate statute itself conveys a private right of action. As the *Broder* court explains, "Were we to hold that [the New York General Business Law] may be used to assert a private right of action for violation of a federal law otherwise lacking one, we would essentially be attributing to the New York legislature an intent to thwart Congress's intentions on a significant scale." 418 F.3d at 187.

treble or statutory damages and punitive damages.  *See* D.C. Code § 28-3905.  <u>Four</u>, *Stop Youth Addiction* is predicated on a statute designed to protect consumers from a product that is dangerous to the consumers who buy it – in that case, the sale of cigarettes to minors.  The animal welfare statutes on which HSUS seeks to predicate its CPPA claims were not enacted to protect consumers from products, but to curb animal cruelty.[3]

Most importantly, criticism of *Stop Youth Addiction* and California's approach has been robust and well-reasoned, beginning with then Justice Brown's dissenting opinion:

> Allowing a private party standing to use a criminal law violation as a cause of action undermines the separation of powers in multiple ways: by granting private actors the right to vindicate the public interest, by extinguishing the historical limits on the rights of private litigants to invoke the remedial powers of the courts, and by depriving the executive of its constitutionally assigned discretion to enforce the Law. . . .  For one arm of government to exercise an 'essential power' of another threatens the constitutional integrity of the coordinate branch.

*Stop Youth Addiction*, at 1109-10.  Indeed, here, HSUS invited the King County, Washington Prosecuting Attorney to exercise his "assigned discretion to enforce the Law" against Amazon, and he declined.  *See* Pendleton Decl. Ex. 11.[4]

---

[3] The other California and Connecticut cases relied on all also involved garden-variety consumer protection and unfair trade practices claims, *Optivus Tech., Inc. v. Ion Beam Applications S.A.*, 469 F.3d 978, 985 (Fed. Cir. 2006) (marketing a medical device without FDA approval in violation of the Federal Food, Drug, and Cosmetics Act); *Stevens v. Superior Court*, 75 Cal. App. 4th 594 (1992) (the unlicensed sales of insurance to buyers of vehicles); *Eder Bros. v. Wine Merchants of Connecticut, Inc.*, 880 A.2d 138, 140 (Conn. 2005) (claim alleging an illegal offering of quantity discounts in violation of the Liquor Control Act); *Cheshire Mortgage Serv., Inc. v. Montes*, 612 A.2d 1130 (Conn. 1992) (claims alleging violation of Truth in Lending Act provision and a provision limiting the prepaid finance charge); *Scrivani v. Vallombroso*, 916 A.2d 827 (Conn. App. Ct. 2007) (claim predicated on Connecticut's Home Improvement Act).

[4] "In the public sector, prosecutors have a duty to use their discretion in charging a defendant with a criminal violation. . . .  The defendant in a UCL suit based upon a criminal law violation does not enjoy the safeguards of detachment, neutrality, and evenhandedness."  Joshua D. Taylor, *Why the Increasing Role of Public Policy in California's Unfair Competition Law Is a Slippery Step in the Wrong Direction*, 52 Hastings L.J. 1131, 1140 (July 2001).

2.    **There is No Consumer-Merchant Relationship between HSUS and Amazon; and the Alleged Injuries Do Not Arise from a Consumer-Merchant Transaction**

HSUS dismisses in a single footnote Amazon's argument that this action fails because it does not meet the D.C. courts' longstanding requirement that a CPPA action must be brought to benefit the consumer (or at least potential consumers) in consumer-merchant transactions. That footnote states: "To the extent that . . . *Riggs* . . . stood for the proposition . . . that a CPPA plaintiff must be a consumer in a 'consumer-merchant' relationship – that has been overruled by the 2000 CPPA amendments." *See* Opp. at 37 n.20. To the contrary, the consumer-merchant relationship requirement has been consistently applied by D.C. and federal courts since the CPPA was amended in 2000.[5]

A "consumer" is defined by the Act as "a person who does or would purchase, lease (from), or receive consumer goods or services . . . or a person who does or would provide the economic demand for a trade practice." D.C. Code § 28-3901(a)(2). HSUS is not a consumer of the gamecock Magazines or the alleged dogfighting Videos, the products on which the CPPA claims are based, as defined by the statute. In footnote 20 of its Opposition, HSUS admits as much. Thus, HSUS's argument suffers from the same deficiency as the plaintiffs in *Adler,* 393 F. Supp. 2d at 39-40 – it is not a consumer as defined by the statute. In *Adler*, the plaintiffs were individuals who received unwanted advertising faxes from the defendant, a communications company that sent fax solicitations on behalf of its clients. *Id.* at 36. The plaintiffs brought suit under "blast fax" provisions of the Telephone Consumer Protection Act as well as the CPPA. *Id.* The plaintiffs were injured by conduct of the defendant – they received unsolicited faxes from defendants in violation of the TCPA that tied up their fax machines, but they never purchased, leased, or received any goods from defendant. *Id.* at 40. Instead, it was "defendants own clients,"

---

[5] *See, e.g., Carleton v. Winter*, 901 A.2d 174, 178 (D.C. App. 2006) (applying consumer-merchant relationship test to amended CPPA); *Kopff v. Battaglia*, 425 F. Supp. 2d 76, 93 (D.D.C. 2006) (same); *Adler*, 393 F. Supp. 2d at 39-40 (same); *Williams*, 297 F. Supp. 2d at 174 (discussing requirement); *Hakki,* 2006 WL 852126, at *3, n.3 (declining to reach consumer-merchant relationship determination, but noting doubt that requisite relationship existed).

on whose behalf the unsolicited faxes were sent – "not plaintiffs – [who were] consumers of Defendants' fax transmission services." *Id.* The plaintiffs who received the unsolicited faxes were neither the merchants nor the consumers in the transaction. Thus, even though the plaintiffs suffered injuries caused by the defendant fax advertising company, the court held that the consumer-merchant rule barred the claim. *See also Kopff*, 425 F. Supp. 2d at 93 (dismissing CPPA claim premised on a violation of the TCPA following reasoning articulated in *Adler*).

Here, no injury is alleged to have arisen from a consumer-merchant relationship between HSUS and Amazon. There is no allegation that any D.C. HSUS member was deceived when she ordered the magazine from Amazon or was cheated out of the purchase price of a Magazine or Video. There is, naturally, no allegation that any HSUS member who purchased a Magazine from Amazon in any way engaged in or furthered the animal fighting that led to the injuries HSUS alleges. Even assuming the HSUS plaintiff need not *itself* be a consumer, a CPPA suit must be brought *on behalf of* consumers to protect them in their role *as consumers*. The Act was not designed to protect residents of the District, who just happen to be consumers of goods and services in D.C., from ills wholly unrelated to their role as consumers or potential consumers of the good or service in question. Here, as in *Adler*, the consumers in the consumer-merchant transaction – those who buy the Magazines and Videos – are not the victims.

The damages provisions of the CPPA also underscores the principle that the Act is intended to protect consumers of goods and services in unfair consumer transactions. HSUS seeks damages under sections 28-3905(k)(1)(a) and (e), among others. Section (a) provides "treble damages or $1500 per violation payable to the ***consumer.***" Section (e) provides for additional relief in representative actions "to restore to the ***consumer*** money or property, real or personal, which may have been acquired by means of the unlawful trade practice" (emphasis added). Thus, if HSUS prevails in this suit and obtains all of the relief it seeks, Amazon would, according to the statute, have to pay damages to the consumers of the Magazines and Videos and reimburse them for Amazon's percentage of the sale – Amazon would be paying damages to the very people who have allegedly caused HSUS's injuries – those who buy the Magazines and

Videos, according to HSUS, in order to engage in animal fighting, underscoring the absurdity of using the CPPA as a vehicle for this lawsuit.

    **3.**    **HSUS Has Not Stated a Claim on the Substantive Provisions of the CPPA**

HSUS all but abandons claims under sections 28-3904(a) and (e) of the D.C. CPPA (Count IV) that Amazon has violated the CPPA "by representing . . . that the content of the Publications and the Videos and their sale is legal," Am. Compl. ¶ 148, and its claim under section 28-3904(f) (Count V) that Amazon violated the CPPA "by . . . failing to state that the content of the Publications and the Videos and their sale is illegal," Am. Compl. ¶ 152. HSUS fails to address Amazon's argument that these provisions are inapplicable because Amazon never represents that items offered by third parties for sale on its website are legal, specifically disclaims any warranty as to the legality of the publications, and expressly places that obligation on the publishers of the Magazines and the third-party sellers of the Videos to assure their legality. Amazon Mem. at 53 and Zapolsky Decl. Ex. K ("Amazon . . . make[s] no representations or warranties of any kind, express or implied, as to the . . . information, content, materials, products . . . or services included in or otherwise made available to you through this site . . ."). Nor does HSUS explain how Amazon can be held liable for failing to affirmatively disclose that the Magazines and Videos are illegal or nonmailable when no court of law has declared them so and, in fact, the USPS has twice expressly declared the Magazines "mailable." Amazon Mem. at 52-53; Pendleton Decl. Exs. 8, 9. This is the sum total of the alleged misrepresentations and nondisclosures by Amazon – there is *no* allegation that the product description falsely describes the Magazines or the Videos.

While the CPPA's broad language, including "the statute's introduction – '[i]t shall be a violation of this chapter, whether or not any consumer is in fact misled, deceived, or damaged thereby,' . . . might suggest that a plaintiff could pursue a claim under the D.C. CPPA without an actual or threatened injury, the cases hold otherwise." *Hoyte*, 489 F. Supp. 2d at 28 (Robertson, J.) (requiring allegation of injury to consumer as a result of consuming trans fats where plaintiff alleged that defendant failed to disclose the presence of trans fats in its products under section

28-3904(f) and violated the warranty provisions of section 28-3904(x)); *Williams*, 297 F. Supp. 2d 177 (Collyer, J.) (requiring allegation that plaintiffs actually saw allegedly misleading advertising and were somehow deceived by it); *Hakki*, 2006 WL 852126, at *2 (requiring allegation that plaintiff had an underage child who was influenced to purchase or consume one of defendant's alcoholic products by one of defendant's advertisements). None of HSUS's injury-in-fact arguments refers to <u>any</u> consumer who purchased the Magazines or Videos because of Amazon's alleged misrepresentations or nondisclosures, and there is no allegation that HSUS as an organization or any HSUS member was misled by any statement of Amazon into purchasing the product. Nor does it claim that any consumer was hurt by purchasing the products, or using the products after buying them.

As to the balance of the Counts, HSUS relies most heavily on the catchall provisions, sections 28-3904(x) and 28-3905(k)(1) of the D.C. CPPA,[6] as the vehicle for alleged violations of the Federal Depiction of Animal Cruelty Statute (Count I), the Animal Welfare Act (Count II) and the D.C. Cruelty to Animals Statute (Count III). But these provisions cannot be divorced from the overriding consumer context of the CPPA as discussed *supra*. Where, as here, there is no unfair business practice that has caused injury to a consumer qua consumer, no claim can be brought under the CPPA.

**B.      HSUS Lacks Prudential Standing Because the Injuries Alleged Do Not Fall Within the Zone of Interests of the CPPA**

HSUS alleges no injury to itself as an organization or any of its members as *consumers* of the Magazines or Videos. Nor does it allege standing as a consumer advocacy organization alleging injury on behalf of D.C. consumers of the products, as is the contemplated role of public interest organizations under the D.C. CPPA. *See* Section I.A.1, *supra*. The alleged injuries fall

---

[6] Section 28-3905(k)(1) provides that a "trade practice *in violation of a law of the District of Columbia*" violates the D.C. CPPA. Section 28-3904(x) provides that it is a violation of the CPPA to "sell consumer goods in a condition or manner not consistent with that warranted by operation of sections 28:2-312 through 318 of the District Columbia Official Code, *or by operation or requirement of federal law.*"

outside the zone of interests of the CPPA and prudential standing is therefore lacking.  *See Mountain States Legal Found. v. Glickman*, 92 F.3d 1228, 1232 (D.C. Cir. 1996) ("the injury that supplies constitutional standing must be within the requisite 'zone of interests'" protected by the statute at issue).

## C.    HSUS Cannot Establish Article III Standing

HSUS does not and cannot seriously challenge Amazon's argument that a CPPA plaintiff must demonstrate injury-in-fact under *Williams*, *Hakki*, and *Hoyte*.  (*See* discussion at Section I.A.3, *supra*.)[7]  Even if standing in this case could be premised on an injury to HSUS that is not related to a role as a consumer or an advocate on behalf of consumers, and the statute, case law and legislative history vigorously suggest otherwise, the injuries HSUS alleges are not caused by and will not be redressed by a decision against Amazon.

### 1.    HSUS Lacks Organizational Standing

Even accepting, without conceding, HSUS's allegations that it experiences a significant drain on its organizational resources from its efforts to help law enforcement authorities prosecute animal fighting, HSUS cannot show the causation and redressability elements of Article III standing sufficient to withstand a motion to dismiss.  As it does throughout its opposition brief, HSUS conflates the role of Amazon with that of the Magazine publishers, the advertisers, and at times even the spectators and animal fighting participants themselves.[8]  This

---

[7] Plaintiff cites only one case to challenge an Article III Standing requirement (Opp. at 31), *Petersan v. Chartone, Inc.*, No. 03-CA-8328 (D.C. Super. Ct., Aug. 4, 2004 (Order Denying Def.'s Mot. for J. on the Pleadings), a two-page unpublished order denying defendant's motion to dismiss, which both precedes *Hakki* and *Hoyte* and fails to discuss *Williams*.  Moreover, in *Petersan*, the court ultimately granted partial summary judgment for defendants, holding that plaintiffs, attorneys who purchased medical records for use in personal injury lawsuits, were not purchasing the records for use in a consumer transaction.  Thus, the court held that the claims did not come within the CPPA and defendant was entitled to judgment on that claim as a matter of law.  *See Petersan v. Chartone, Inc.*, No. 03-CA-8328 (D.C. Super. Ct., Apr. 27, 2006) (Order Granting Def.'s Mot. for Partial Summ. J. and Denying Pl.'s Mot. for Partial Summ. J.) (appeal pending).  (Copies of these and other unpublished opinions are attached as Appendix A.)

[8] *E.g.*, "Amazon.com and its business associates in the animal fighting industry" (Opp. at 1); "if the **Defendants** would simply agree not to include such illegal solicitations in **their** publications" (*id.* at 1 n.1); "**defendants** Amazon, Dowd Publishers and Marburger Publishing, and their

shorthand may be convenient when addressing the arguments of several defendants, but it deliberately obscures the distinctions between the various defendants and between the defendants and the parties not before this Court, distinctions critical to this case.

HSUS has not alleged facts from which this Court can find that it is "likely, as opposed to merely speculative," that the alleged drain on HSUS's resources and time would be alleviated by a favorable decision against *Amazon*. The organizational injury HSUS alleges is caused directly by either the people who engage in animal fighting or inadequate law enforcement (Opp. at 26) (complaining that HSUS must step in because of inadequate law enforcement capacity). When a plaintiff's asserted injury arises from the actions of a third party not before the court, it becomes "substantially more difficult" to establish standing. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 562 (1992). Even accepting all of HSUS's allegations as true, Amazon is four or five steps removed from the organizational injury alleged, and each step in the chain of causation requires actions by independent actors over whom Amazon has no control.[9]

Based on the facts alleged, it must be likely, as opposed to speculative, that if the Videos and subscriptions to the Magazines are no longer available via Amazon: (1) the distributors and publishers would not sell a substantially similar number of copies of the Magazines and Videos through a combination of the existing alternate outlets (*i.e.*, through the publishers, other websites, feed stores and trade shows); (2) the publishers and advertisers would not be able to

---

employees and agents, knowingly publish . . . the Publications" (*id.* at 8); "**Defendants'** unlawful acts cause illegal animal fighting by *advertising illegal animal fights*." (*id.* at 29); "Nor can **Defendants** explain how it does not promote or further illegal animal fights to publish the results and winners from those fights" (*id.* at 30).

[9] *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982) and *Abigail Alliance for Better Access to Developmental Drugs v. Eshenbach*, 469 F.3d 129 (D.C. Cir. 1992) (Opp. at 23-24) are not analogous, since, unlike the attenuated allegations against Amazon, those defendants engaged in conduct that directly conflicted with the organization's mission, making causation and redressability clear. *See Abigail Alliance*, 469 F.3d at 132-33 (organization devoted to assisting members in accessing potentially life-saving drugs sued FDA, challenging the "unduly burdensome requirements" that it "imposes on experimental treatments"); *Havens Realty*, 455 U.S. at 366-68 (organization whose purpose was "to make equal opportunity housing a reality" sued owner of apartment complex allegedly engaged in "racial steering" in violation of the Fair Housing Act).

convey the products and information about animal fighting allegedly included in the Magazines through some other medium, such as on one of the myriad websites devoted to cockfighting or a new website; (3) the consumers of the Magazines would not be able to obtain information about the products and cockfights allegedly contained in the Magazines from some other source; (4) as a result of the information gap, a significant number of the people who engage in animal fighting are likely to disengage from the practice. In addition, with respect to health and safety risks to HSUS members, discussed in Section I.B.2, *infra*, it must be likely as opposed to speculative that a fifth set of actors, people who commit crimes associated with animal fighting, would stop committing such acts if the Magazines were no longer available on Amazon.

Courts routinely reject standing at the pleading stage when causation and redressability would depend on the actions of an independent third party not before the court.[10] HSUS quotes *National Wrestling Coaches Ass'n v. Dep't of Educ.*, 366 F.3d 930, 938 (D.C. Cir. 2004) for the proposition that standing is proper where the "plaintiff adduces facts showing that those choices have been made or will be made in such a manner as to produce causation and permit redressability of injury." Yet HSUS cites no case – including *National Wrestling* – in which a plaintiff has actually sufficiently alleged or adduced such facts with respect to a third party.

To satisfy its "burden to prove subject matter jurisdiction by a preponderance of the evidence," *Randolph v. ING Life Ins. & Annuity Co.*, 486 F. Supp. 2d 1, 5 (D.D.C. 2007),[11] HSUS relies on unsupported assertions in the Amended Complaint to the effect that the circulation and readership of

---

[10] *See, e.g., Allen v. Wright*, 468 U.S. 737, 758-59 (1984) ("speculative whether change in tax exemption for private schools would have a significant impact on racial composition of public schools"); *International Labor Rights Educ. & Res. Fund v. Bush*, 954 F.2d 745, 751 (D.C. Cir. 1992) ("there is generally no standing where the plaintiff seeks to change the defendant's behavior only as a means to alter the conduct of a third party, not before the court, who is the direct cause of the plaintiff's injury") (internal citations and quotation marks omitted).

[11] While factual disputes are not to be resolved at the pleadings stage, "a court may appropriately dispose of a case under Fed. R. Civ. P. 12(b)(1) for standing, and may consider the complaint supplemented by undisputed facts evidenced in the record, or the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." *Id.* at 5 (internal citation and quotation marks omitted).

the Magazines would be significantly reduced if they were not available on Amazon's website. (Opp. at 29.) Contrary to HSUS's assertion that Amazon is the only online source (*id.*), a quick Google search reveals at least one other website on which consumers can purchase the magazines, as well as directly through Magazine Express's website. *See* http://www.hilltopfeed.net/Qstore/Qstore.cgi? CMD=009&DEPT=1058694290&BACK=A0004A1. Only a small percentage of subscriptions are obtained through Amazon,[12] with subscriptions available through the publishers directly, at feed stores and at trade shows. HSUS's contention that, if subscriptions were no longer offered on Amazon, the "Publications' circulation would therefore be substantially reduced," is thus purely speculative. (Opp. at 29.)[13] *See* Marburger Reply at I.B.; Griffiths Decl. ¶ 7. Even more remote is the contention that this would in turn lead to a significant reduction in animal fighting, given the multiple websites devoted to cockfighting that contain similar information – an alternative source of information cited by Amazon, *see* Amazon Mem. at 24 n.12, that HSUS does not even mention or address. Courts have been appropriately reluctant to premise redressability on assumptions about how third parties will respond to a change in economic or market conditions. *Renal Physicians Ass'n v. United States Dep't of Health & Human Servs.*, 489 F.3d 1267 (D.C. Cir. 2007) (no standing where plaintiff organization failed to allege facts showing that an order invalidating safe harbor provision would likely cause hospitals to pay medical directors more, or forego a planned pay cut); *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 42-43 (1976) (speculative whether change in tax rules governing nonprofit hospitals would lead hospitals to improve services for indigents); *cf. Warth v. Seldin*, 422 U.S. 490, 504 (1975) (plaintiffs claiming a

---

[12] *See* Declaration of J.C. Griffiths ("Griffiths Decl.") ¶ 7 in support of Marburger's Motion to Dismiss (noting that the vast majority of subscriptions to the Magazines are sold directly through the publisher).

[13] The allegation (Opp. at 29), that "[T]he Publications consistently rank in the top one percent and top five percent, respectively, of all magazine subscriptions sold on Amazon.com," is a patent misreading, given that Amazon offers such popular titles as *People* and *Sports Illustrated*, to name but two of the 90,000 titles. Moreover, at best, only a maximum of 300 *Gamecock* Magazines could have been sold via Amazon, through Amazon's relationship with EBSCO/Magazine Express, with the total likely fewer because Amazon does not account for all of EBSCO's sales of the Magazines. *See* Marburger Reply at I.B. and Griffiths Decl. ¶ 7.

local zoning ordinance excluded low income residents failed to show they would be able to buy or rent homes in the town if the court granted their requested remedy).

> **2.    HSUS Cannot Establish Associational Standing Based on Speculation that Amazon's Actions Increase the Chance that Its Members Will Contract Bird Flu or Become Victims of Violent Crimes**

HSUS's argument that it can establish standing based on its D.C. members' "substantially heightened risk of serious bodily injury and illness" (Opp. at 33) based on Amazon's acts borders on the frivolous. HSUS can only sue Amazon if at least one of its members has standing to sue in her own right. *Rainbow/Push Coal. v. FCC*, 396 F.3d 1235, 1239-40 (D.C. Cir. 2005). Any potential injury to D.C. members of the HSUS would be to the members as *residents* of D.C., not as *consumers*, and not as consumers of any online subscription service offered by Amazon. HSUS has alleged no reason why its members, as apart from the general population of D.C. residents, are at heightened risk for these ills. A plaintiff may not assert a "generalized grievance" that is suffered by all or a large class of citizens. *Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208, 227 (1974).

Even assuming HSUS may base standing on injuries to third parties outside the consumer transactions in question, its vague "increase in risk" allegations are insufficient to establish injury-in-fact. HSUS's reliance (Opp. at 33, 34) on *Natural Res. Def. Council v. EPA*, 464 F.3d 1 (D.C. Cir. 2006) and *Mountain States*, 92 F.3d at 1235, both actions against federal agencies, only serves to highlight the contrast here. The *Mountain States* plaintiffs could, at the pleadings stage, allege an increased risk of wildfire based on calculations by the Forest Service, which "pointed to non-trivial variations in risk." 92 F.3d at 1234-35. In *NRDC*, the plaintiffs presented statistics from which the court could infer that two to four NRDC members would contract skin cancer as a result of the EPA rule at issue. 464 F.3d at 7. The court specifically declined to reach the question whether "*any* scientifically demonstrable increase in the threat of death or serious illness" was sufficient for standing. *Id.* at 6 (emphasis added). HSUS has not alleged (let alone alleged facts to support) any scientifically demonstrable increase in the risk of the avian bird flu, dog attack,

violent crime, or other physical harm to its members resulting from Amazon's online offer of the Magazines or Videos. *See* Am. Compl. ¶¶ 62-65, 112, 114, and 121-123.

Even if there is a *correlation* between animal fighting and crimes such as rape, assault, and murder, and even a causal link between cockfighting and avian bird flu, any causal link to *Amazon* is wholly attenuated. That Amazon has the power to influence the market behavior of the publishers of the Magazines, those who advertise in the Magazines, the consumers who buy them, those who engage illegally in animal fighting, and those who commit crimes associated with animal fighting is purely speculative. This type of third-party behavior is completely outside of Amazon's control, in contrast to actions by the Federal Government which can, by force of law, effect change on behavior on a broad scale.[14] The risks to HSUS's members of personal injury from violent crime and bird flu associated with animal fighting cannot be attributed to Amazon or redressed by enjoining Amazon from allowing the Magazines or Videos to be sold through its website.[15]

---

[14] *Compare with NRDC*, 464 F.3d at 7 ("As to causation, NRDC's asserted injuries are linked to EPA's action through a fairly straightforward chain: EPA has permitted too much new production and consumption of methyl bromide, which will result in more emissions, which will increase ozone depletion, which will adversely affect the health of NRDC's members. This injury can be redressed if EPA does not permit such excessive production and consumption of methyl bromide").

[15] If this Court finds that HSUS has no Article III or prudential standing to bring suit, dismissing the claim in lieu of remanding the case to the D.C. Superior Court would be appropriate here since D.C. courts would also be compelled to dismiss the CPPA claims for lack of standing. *See Friends of Tilden Park*, 806 A.2d at 1206 (D.C. courts equally require Article III standing); *Hakki*, 2006 WL 852126 (requires injury in fact for claim under CPPA). While this Court remanded the *Randolph* case, 486 F. Supp. 2d at 10-11, and the Circuits remain divided (*see* cases cited in *Randolph*), remand in this case appears particularly unwarranted given the "absolute certainty that remand would be futile." *M.A.I.N. v. Comm'r, Maine Dep't of Human Servs.*, 876 F.2d 1051, 1054 (1st Cir. 1989). This case was properly removed, federal law is the predicate for the claims under the local statute, and serious constitutional and federal statutory challenges have been raised. Removal of this case was thus not, as HSUS suggests, a "shell game" or a "transparent ploy" (Opp. at 22). Indeed, two judges of this Court have dismissed rather than remanded CPPA cases that were initially dismissed for lack of standing. *See, e.g,. Williams*, 297 F. Supp. 2d at 178; *Hoyte*, 489 F. Supp. 2d at 26. This case clearly presents federal questions; HSUS did not contest removal. Any award of attorney fees to HSUS if the case is remanded would be unwarranted.

**II.    HSUS'S CLAIMS WITH RESPECT TO THE VIDEOS ARE MOOT BECAUSE AMAZON REMOVES ANY THIRD-PARTY SALES OF THE VIDEOS**

HSUS's claims (Counts I, II and III) against Amazon with respect to the Videos should be dismissed as moot. *United States v. W.T. Grant Co.*, 345 U.S. 629 (1953), relied on by HSUS (Opp. at 73-74), explains that the court has "broad discretion" in considering whether to dismiss a claim as moot "based on all the circumstances." *Id.* at 633. "To be considered are the bona fides of the expressed intent to comply, the effectiveness of the discontinuance and, in some cases, the character of the past violations." *Id.* All these factors argue in favor of dismissal of the claims as against Amazon as moot. Here, assuming without conceding (having never seen the Videos) that the Videos depict animal cruelty under the federal act and "lack any serious religious, political, educational, journalistic, historic or artistic value," 18 U.S.C. § 48(b), the past violations alleged in the Amended Complaint were carried out by the third parties who posted the Videos for sale on Amazon's website. Amazon has stated in a sworn affidavit that is anything but "noncommittal" (Opp. at 73), from its Vice President and Associate General Counsel, that it will remove the Videos if it is notified that a third party is attempting to sell them on its website. *See Grant*, 345 U.S. at 899.[16] As in *Grant*, there is no significant threat of future violation by Amazon. Finally, Amazon's reservation of merits arguments with respect to the Videos, in the event the claims are not dismissed, does not give rise to a "reasonable expectation" that Amazon would abandon its stated policy.[17] *Id.* at 633. Injunctive relief would not accomplish anything beyond what is already in effect. Since any money damages and restitution recovered would go to the purchasers of the Videos and not HSUS, *see* D.C. Code

---

[16] In *Perfect 10, Inc. v. Amazon.com, Inc.*, 487 F.3d 701, 732 n.16 (9th Cir. 2007), the court noted that plaintiff's suit against Amazon was not moot, because neither Google nor Amazon indicated that they would not engage in similar activity in the future. Here, in contrast, Amazon has stated in a sworn affidavit that it will remove the Videos from its website upon notice.

[17] In *Blisscraft of Hollywood v. United Plastics Co.*, 294 F.2d 694, 701 (2d Cir. 1961), relied on by HSUS (Opp. at 74), though the defendant stopped using the trademark on its product before suit was filed, it continued to challenge the validity of the plaintiff's trademark. There was no pledge by defendant not to use the mark, unlike here, and no argument that defendant's voluntary cessation mooted the claim.

§ 28-3905(k)(1), and since HSUS has not alleged that any of its members purchased one of the Videos from Amazon, there can be no money judgment against Amazon. HSUS can continue to seek declaratory relief with respect to its claims against the producers of the Videos but, as against Amazon, in the absence of a live case or controversy, HSUS is, in effect, inviting an advisory opinion, an invitation that should be declined. *See Newdow v. Bush*, 391 F. Supp. 2d 95, 107-08 (D.D.C. 2005); *Iron Arrow Honor Soc'y v. Heckler*, 464 U.S. 67, 70-71 (1983).

## III.    SECTION 230 OF THE COMMUNICATIONS DECENCY ACT BARS HSUS'S CLAIMS AGAINST AMAZON

HSUS fundamentally misapprehends the nature of CDA section 230 immunity, which prohibits HSUS's suit against Amazon both as to the Videos – content created and offered on Amazon's Marketplace service by third parties – and the Magazines – content created by third parties, subscriptions to which may be ordered via Amazon's site. Under the CDA, "no provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." 47 U.S.C. § 230(c)(1). Section 230 reflects Congress' decision to treat Internet publishers "differently from corresponding publishers in print, television and radio," *Carafano v. Metrosplash.com, Inc.*, 339 F.3d 1119, 1122 (9th Cir. 2003), because the Internet flourishes "with a minimum of government regulation," and has become a "forum for a true diversity of political discourse, unique opportunities for cultural development, and myriad avenues for intellectual activity." 47 U.S.C. §§ 230(a)(3) & (4).

Each of the three statutory elements required for immunity under the CDA is satisfied in this case. One, HSUS does not dispute that, as an operator of an interactive website, Amazon is a provider of "interactive computer services" within the meaning of the CDA. *Schneider v. Amazon.com, Inc.*, 31 P.3d 37, 39-41 (Wash. Ct. App. 2001); *Corbis Corp. v. Amazon.com, Inc.*, 351 F. Supp. 2d 1090, 1118 (W.D. Wash. 2004); 47 U.S.C. § 230(f)(2).

Two, beginning with the flawed premise that Amazon "ships" the Videos and Magazines (Opp. at 8, 46-49, 69, 72), which it does not (Zapolsky Decl. ¶¶ 4, 7), HSUS seeks to hold Amazon liable for Videos, Magazines and ads that Amazon does not create, and birds and

22

implements that Amazon does not sell. No matter what label HSUS chooses to attach to its claims, HSUS's claims "treat [Amazon] as [a] publisher or speaker of . . . information" provided by a third party and seek to punish Amazon for that content. 47 U.S.C. § 230(c)(1). Section 230 "precludes courts from entertaining claims that would place a computer service provider in a publisher's role. Thus, lawsuits seeking to hold a service provider liable for its exercise of a publisher's traditional editorial functions – such as deciding whether to publish, withdraw, postpone or alter content – are barred." *Zeran v. AOL,* 129 F.3d 327, 330 (4th Cir. 1997); *Schneider,* 31 P.3d at 41. HSUS's suit necessarily purports to treat Amazon as if it were the original "publisher or speaker," not only of the Videos and Magazines, but also of the third-party ads contained within the Magazines.

This core principle of section 230 – not to treat interactive computer services as "publishers or speakers" – is not limited only to defamation or tort-based lawsuits, as HSUS incorrectly contends (Opp. at 46, 47). The "plain language" of "§ 230 creates a federal immunity to <u>any cause of action</u> that would make service providers liable for information originating with a third-party user of the service." *Zeran,* 129 F.3d at 330 (emphasis added). Courts throughout the country treat section 230 immunity as "quite robust," extending the immunity to all types of content and claims. *See Carafano,* 339 F.3d at 1123.[18] Application here to bar HSUS's animal

---

[18] For example, section 230 immunity has been expanded to bar the following: a state statutory claim against eBay for negligently misrepresenting sports items as authentically autographed (*Gentry v. eBay, Inc.,* 99 Cal. App. 4th 816, 121 Cal. Rptr. 2d 703, 717, 833 n.10 & 11 (2002)); claims eBay violated state unfair competition laws for auctioning bootleg and other "infringing" sound recordings (*Stoner v. eBay, Inc.,* No. 305666, 2000 WL 1705637 (Cal. Super. Nov. 1, 2000)); a state law claim for nuisance, misuse of funds, and premises liability against a library for providing computers allowing access to pornography (*Kathleen R. v. City of Livermore,* 87 Cal. App. 4th 684, 697-98, 104 Cal. Rptr. 2d 772 (2001)); contract claims (*Morrison v. AOL,* 153 F. Supp. 2d 930, 934 (N.D. Ind. 2001)); state criminal law claims (*Voicenet Commc'ns, Inc. v. Corbett,* No. 04-1318, 2006 WL 2506318 (E.D. Pa. Aug. 30, 2006); a civil claim predicated on federal statute 18 U.S.C. § 2252, which criminalizes knowing distribution of child pornography (*Doe v. Bates,* No. 05-CV-91, 2006 WL 3813758 (E.D. Tex. Dec. 27, 2006)); a federal cyberstalking claim under 47 U.S.C. § 223 (*Universal Commc'ns Systems, Inc. v. Lycos, Inc.,* 478 F.3d 413 (1st Cir. 2007)); a federal civil rights claim (*Noah v. AOL Time Warner, Inc.,* 261 F. Supp. 2d 532 (E.D. Va. 2003), *aff'd,* 2004 WL 602711 (4th Cir. 2004); a Lanham Act claim (*Associated Bank-Corp. v. Earthlink, Inc.,* No. 05-C-0233, 2005 WL 2240952 (W.D. Wis. Sept.

welfare, D.C. CPPA and conspiracy claims against Amazon based on Amazon's online platform for third parties to sell goods and an online subscription mechanism is entirely consistent with the CDA's broad coverage.

HSUS's attempts to impose liability on Amazon on the basis that it is allegedly "actively involved in the sale of contraband" and the "shipment of unlawful goods" (Opp. at 47, 48) is factually and legally wrong. Amazon does not sell implements or gamecocks or the Videos in issue. It offers an online platform (Marketplace) for third parties to buy and sell their own products (the Videos) that Amazon does not possess or "ship," and a mechanism to subscribe to Magazines (never declared illegal) that it likewise does not possess, distribute or "ship" and that have never been declared illegal. Zapolsky Decl. ¶¶ 3-4, 7; Pendleton Decl. Exs. 8, 9. That role is protected. *Stoner*, 2000 WL 1705637, at *1, *3 (rejecting plaintiff's attempts to characterize eBay as an active participant in selling "bootleg" or "infringing" products auctioned on its website; "Immunity extends beyond the publication of harmful material over the Internet, and encompasses the distribution of such material in transactions effected over the Internet."); *Gentry*, 99 Cal. App. 4th at 832 (same for sales of fraudulent memorabilia); *Doe v. AOL*, 718 So. 2d 385 (Fla. Dist. Ct. App. 1998) (immunity extends to action by a mother against AOL for selling and distributing pornographic images of her son in violation of Florida law).

Amazon does not need to be a wholly passive conduit, like a phone line or Internet cable, to be entitled to CDA protection, as HSUS incorrectly argues (Opp. at 46, 48-49, 52). The CDA applies whether or not Amazon acts as more than a passive chat room host, or conduit for Internet service (Opp. at 46, 52). *See Zeran*, 129 F.3d at 330-31. Indeed, in numerous cases, courts have immunized interactive computer services from suit despite their active editing, altering, selection and posting (*Batzel v. Smith*, 333 F.3d 1018, 1021, 1031 (9th Cir. 2003), *Barrett v. Rosenthal*, 146 P.3d 510, 528 (Cal. 2006). In *Blumenthal v. Drudge,* 992 F. Supp. 44 (D.D.C. 1998), Judge

---

13, 2005); and a Fair Housing Act claim (*Chicago Lawyers' Comm. for Civil Rights Under the Law, Inc. v. Craigslist, Inc.*, 461 F. Supp. 2d 681, 698-99 (N.D. Ill. 2006)), all of which purported to treat the defendant as the "publisher or speaker" of content provided by third parties.

Friedman held that AOL was not liable under section 230 for allegedly defamatory statements made in the Drudge Report carried on AOL's service despite AOL's payment for the column, its specification in a contract about the nature of the column, its editing rights, and its active advertising of the column, including a press release that made "clear the kind of material Drudge would provide to AOL subscribers – gossip and rumor – and urged potential subscribers to sign onto AOL in order to get the benefits of the Drudge Report." *Id.* at 51-52.[19]

Amazon does not create the product descriptions[20] or actively market the Videos or Magazines, but even if it did, "neither aggressive advertising nor the imposition of a fee – including a fee based in part on the price at which an item is sold – transforms an interactive service provider into a seller responsible for items sold." *Stoner*, at *2, citing *Drudge*, 992 F. Supp. at 51-52. Amazon has no "agreements" with the publishers of the Magazines, as HSUS incorrectly assumes, period. (Opp. at 17-18, 48.) But even if it did, that would be insufficient to transform Amazon's offer of subscriptions to that of an "actor" unprotected by section 230. *Drudge*, 992 F. Supp. at 51-53. To the extent, if any, that Amazon may "select" the Magazines – two among 90,000 periodicals it offers – and "market" them, as it does every other periodical it makes available, that is insufficient to exclude Amazon's offer of the Magazines from the ambit of section 230. As HSUS concedes (Opp. at 51), the Videos fall even more squarely within section 230's coverage. Amazon plays zero role in their creation, selection, possession, or shipment, and indeed, has never even seen the contents of the Videos which belong to the third-party sellers. *See* Zapolsky Decl. ¶¶ 7, 9, 14.

---

[19] *See also Corbis*, 351 F. Supp. 2d at 1117-18 (holding that section 230 barred consumer protection and tortious interference claims based on third party content although Amazon provided tools that helped shape that content); *Ben Ezra, Weinstein & Co. v. AOL,* 206 F.3d 980, 983 (10th Cir. 2000) (section 230 applied to erroneous stock quotes provided by independent contractor for display on AOL service, though AOL dictated nature and format of quote information).

[20] As Amazon's website itself states, the Magazines' product descriptions (the magazine descriptions, cost, frequency of publication, cover image and ISBN numbers), are provided to Amazon by Magazine Express, which in turn obtains the information from the Magazines. *See* Reply of Magazine Express, at 2-3; Zapolsky Decl. ¶ 5, Ex. E; Am. Compl. ¶¶ 86-87, 95-97.

In addition, in contending that the CDA was designed to immunize only the "removal" of content, and that the CDA's application here "would be an unprecedented expansion of immunity" (Opp. at 49), HSUS misunderstands a threshold principle of the CDA.  Section 230's protection applies whether or not an ISP "restricts access to or availability of material" or takes down a posting.  (Opp. 45-46, 49-50.)  *Green v. AOL,* 318 F.3d 465, 472 (3d Cir. 2003) (section 230 "does not require [an information content provider] to restrict speech; rather, it allows [it] to establish standards of decency without risking liability for doing so.").[21]  In fact, countless suits involving plaintiffs seeking exactly what HSUS seeks here – the removal of content – have been defeated under the CDA.[22]  Thus, HSUS's contention that the CDA would apply here only under a scenario where Dowd or Marburger sued Amazon for "restricting" or "removing" the Magazine subscription listings from Amazon's website (Opp. at 49), misses the mark completely.

<u>Three</u>, the allegedly unlawful material here is "information provided by another information content provider."  47 U.S.C. § 230(c)(1).  Amazon did not create any part of the content with which HSUS takes issue.  An "information content provider" is "any person or entity that is responsible, in whole or in part, for the creation or development of information provided through the Internet or any other interactive computer service."  47 U.S.C. § 230(f)(3).  A service provider may be an "information content provider" with respect to some content and still enjoy immunity with respect to third-party content; the operative inquiry, is whether Amazon originated "the portion of the statement or publication at issue."  339 F.3d at 1123.

---

[21] *See Drudge,* 992 F. Supp. at 52 ("Congress has conferred immunity from tort liability as an incentive to Internet service providers to self-police the Internet for obscenity and other offensive material, even where the self-policing is unsuccessful or not even attempted."); *Barrett,* 146 P.3d at 523 (Section 230's immunity "applies even when self-regulation is unsuccessful, or completely unattempted").

[22] *See, e.g., Schneider,* 31 P.3d at 39-41 (affirming dismissal under Section 230 of a claim arising from Amazon's failure to remove a customer comment from its site); *Barnes v. Yahoo!, Inc.*, No. 05-926, 2005 WL 3005602 (D. Or. Nov. 8, 2005) (Yahoo! immune from liability despite alleged failure to fulfill its duty to remove, block, screen, or edit unauthorized tortious content); *Zeran,* 129 F.3d at 329 (AOL immune from liability for failure to remove Internet hoax quickly enough despite AOL's assurances that the posting would be removed).

There is no dispute that third parties – not Amazon – created the Videos, the Magazines and the ads in the Magazines – the allegedly illegal content at issue here. HSUS's focus on some purported "factual dispute" concerning which defendant created the product descriptions for the Magazines and Videos on Amazon's website (Opp. at 46, 50, 51-52) is nothing more than a red herring. HSUS's claims arise <u>not</u> from the description of the Videos and Magazines on Amazon's website or any alleged warranty of lawfulness, but from the content offered and described – namely, the Videos and Magazines, or, more specifically, the ads in the Magazines – and, indeed, have nothing to do with the descriptions of the Videos or Magazines on Amazon's website. And, in any event, HSUS does not allege that the product descriptions are illegal. Thus, whether or not Amazon created the descriptions of the publications, which it did not, is immaterial to its CDA defense: Amazon is immune because it did not create the "essential published content" – the Videos and Magazines. *Carafano*, 339 F.3d at 1124-25 (section 230 barred claims where Matchmaker "did not play a significant role in creating, developing or 'transforming' the relevant information"); *see Gentry,* 99 Cal. App. 4th at 832-33 ([h]olding eBay responsible for providing a warranty . . . when it merely . . . provided the web site on which the individual defendants designated their collectibles as autographed, puts eBay in the shoes of the individual defendants, making it responsible for their publications or statements . . . [and] is inconsistent with section 230.")[23]

---

[23] Cases relied on by HSUS (Opp. at 53 n.32) where the manner of sale, rather than the third-party content, was at issue have no application here. *E.g. Anthony v. Yahoo!, Inc.*, 421 F. Supp. 2d 1257, 1262-63 (N.D. Cal. 2006) (Yahoo! sent false profiles (content created by Yahoo!) as well as real profiles created by third parties to potential new members to entice them to join and to current members to "lure" them into renewing their subscriptions); *800-JR Cigar, Inc. v. GoTo.com, Inc.*, 437 F. Supp. 2d 273, 277 (D.N.J. 2006) (court imposed liability notwithstanding section 230 because the search engine defendant <u>itself</u> violated another's trademark rights). Similarly, in *Fair Housing Council v. Roommates.com, LLC*, 489 F.3d 921 (9th Cir. 2007), Roommates.com did not qualify for CDA immunity because of its active role in creating the content. HSUS misstates Amazon's position in its *amicus curiae* brief filed in support of defendant in *Fair Housing* (Opp. at 53 n.32), which was entirely consistent with its position here – section 230 immunity would not apply if content created by Amazon were deemed unlawful but would apply here where the content HSUS claims is unlawful, here the Magazines and Videos, was created by third parties.

Because the question whether HSUS's claim against Amazon is barred by section 230 is one of law, this Court can decide its application on a motion to dismiss, as courts routinely do, based on a review of the website, without the need for any discovery, *see* cases cited in Amazon Mem. at n.14, and dismiss all Counts (I – VII) as against Amazon on this basis.

## IV.    HSUS'S CLAIMS FAIL BECAUSE AS A "DISTRIBUTOR," AMAZON HAS NO DUTY TO CENSOR THE MAGAZINES BECAUSE IT HAS NO ACTUAL KNOWLEDGE THAT THE MAGAZINES ARE ILLEGAL; INDEED THE U.S. POSTAL SERVICE HAS RULED THAT THEY ARE "MAILABLE"

Amazon provides an online subscription mechanism and marketplace and, like any bookseller, library, newsstand, video store or other conduit, Amazon maintains First Amendment rights as a distributor of expressive content – rights that are paramount, not "paradoxical" (Opp. at 5), even though Amazon does not create the content it makes available.  While HSUS denigrates a distributor's First Amendment interests, at least as far back as 1877, the United States Supreme Court recognized the importance of protecting distributors, stating that "[l]iberty of circulating is as essential to the freedom of liberty of publishing; indeed, without circulation, the publication would be of little value." *Ex Parte Jackson*, 96 U.S. (6 Otto) 727, 733 (1877).  *See Lerman v. Flynt Distrib. Co.*, 745 F.2d 123, 139 (2d Cir. 1984) ("First Amendment guarantees have long been recognized as protecting distributors of publications"); *Lewis v. Time, Inc.*, 83 F.R.D. 455, 464 (E.D. Cal. 1979) ("The right to distribute newspapers and other periodicals lies 'at the heart' of First Amendment guarantees.  Under federal constitutional standards, the right to distribute is carefully protected.") (citations omitted), *aff'd*, 710 F.2d 549 (9th Cir. 1983).[24]

---

[24]  Unlike a bookstore, video store, library or newsstand, however, Amazon does not stock the Magazines or Videos in issue, and, importantly, Amazon does not "ship," or "arrange[ ] for shipment of" the Magazines or Videos, as HSUS repeatedly incorrectly asserts in its Opposition, though fails to allege in its Complaint.  (Opp. at 8, 46-49, 69, 72.)  *See* Zapolsky Decl. ¶ 4, Exs. C, D, ¶ 7, Ex. G; Am. Compl. ¶¶ 9, 86-87.  Once a customer orders a subscription via Amazon's website, Amazon refers the order request to Magazine Express, the subscription service provider for the Magazines, which conveys the request to the publishers.  Zapolsky Decl. ¶ 4, Exs. C, D, Marburger and Dowd then mail the Magazines directly to the respective customers.  *Id.*  Amazon never has physical possession of the Magazines.  *Id.*; Am. Compl. ¶¶ 9, 86-87.  Similarly, the third-party seller who sells the Videos on Marketplace has possession of the material and arranges for shipment directly to the customer.  Zapolsky Decl. ¶ 7.

HSUS does not dispute that, absent knowledge of or sufficient reason to doubt, a distributor has no duty to investigate or censor. *Lerman*, 745 F.2d at 139 ("Obviously the national distributor of hundreds of periodicals has no duty to monitor each issue of every periodical it distributes. Such a rule would be an impossible burden on the First Amendment"). But HSUS contends that its claims of illegality alone are sufficient to establish knowledge – not so. The fact that the Magazines contain ads for gamecocks and knives does not, on its face, put Amazon on notice that the ads – in magazines Amazon does not even publish, possess, stock or ship – are for illegal purposes. *Eimann v. Soldier of Fortune Magazine, Inc.*, 880 F.2d 830, 834 (5th Cir. 1989). HSUS assumes – erroneously – that the sale of gamecocks and knives and gaffs is itself illegal. (Opp. at 70-71.) [25] In fact, the AWA, as amended this past May, provides only that the sale is illegal if the birds or implements are used for fighting purposes.[26] HSUS attempts to write out of the legislation (Opp. at 2, 6) this statutory limitation that makes clear the sale of birds and implements is not *per se* illegal.

---

[25] Even if the items advertised – birds and implements – were illegal to sell, Amazon does not sell these items and is not a party to that commercial transaction. (Opp. at 71-72.) The prosecutions of James Fricchione for animal cruelty-related charges in New York and in Pennsylvania are not "precedent" for holding Amazon – as a distributor – liable for violations of animal fighting laws. (Opp. at 69.) First, Fricchione was involved in dog fighting, for which he was convicted in New York. Amazon is not. Second, there was no judicial finding that the publisher could be held liable under animal cruelty laws in Pennsylvania. Fricchione pled guilty to the Pennsylvania charges arising out of his publication of the magazine. Third, Fricchione actually published the magazine at issue. Amazon does not publish the Magazines or produce the Videos. Fourth, and most importantly, in the New York prosecution, the New York Supreme Court admonished the People for relying on the defendant's "Sporting Dog Journal" magazine as a basis for probable cause of criminal activity. The court concluded: "This raises a very serious issue of the subversion of Defendant's First Amendment right to freedom of expression . . . . Whether or not the publication is characterized as 'underground' is . . . immaterial, as it is not a criminal activity to publish the magazine in question, even if it does offend the sensibilities of certain people." *See People v. Fricchione*, Nos. 2004-4112 & 4113, 2004 WL 3800901 (N.Y. 2d Dep't 2004).

[26] *See* Animal Fighting Prohibition Enforcement Act of 2007, Pub. L. No. 110-22, § 3, 121 Stat. 88, amending the AWA, 7 U.S.C. § 2156(b), to provide: "It shall be unlawful for any person to knowingly sell, buy, transport, or deliver, or receive for purposes of transportation, in interstate or foreign commerce, any dog or other animal *for purposes of having the dog or other animal participate in an animal fighting venture*, and AWA § 2156(e), making it unlawful for "any

Investigation into what HSUS itself describes as "hotly contested factual issues" (Opp. at 4) is exactly the kind of inquiry an online subscription service like Amazon cannot be expected to undertake. Even if Amazon had the duty to investigate the ads in these magazines – which it plainly does not – Amazon certainly would not have the <u>ability</u> to investigate ads in each issue of the 90,000 magazine and newspaper subscriptions it offers via its website. In the case of these Magazines, to determine whether, despite disclaimers which expressly reject unlawful uses, the birds or the implements are being offered for sale interstate for use for fighting purposes is a factual inquiry obviously beyond Amazon's capacity – particularly since it never even possesses copies of the Magazines. Because a distributor has "no direct involvement in the preparation or production" of the work, lacks "control or responsibility for the content," and "is less able than the publisher to investigate," the "danger in self-censorship is more threatening than it is with the original publisher, since without such resources or control the distributor is more likely to be cautious." *Lewis v. Time, Inc.*, 83 F.R.D. at 465. In addition, "since the distributor normally carries a multitude of magazines and newspapers, self-censorship carries potentially more pervasive consequences." *Id.*[27] If liability were imposed on a distributor without a requirement of knowledge:

---

person to knowingly sell, buy, transport, or deliver in interstate commerce a knife, a gaff, or any other sharp instrument attached, or designed or intended to be attached, to the leg of a bird *for use in an animal fighting venture*." *Id.* (emphasis added)); *see* Am. Compl. ¶¶ 16-28.

[27] The extraordinary relief HSUS seeks does not comport with standards applied historically by federal agency or regulatory authorities that exercise jurisdiction over advertising. The Federal Trade Commission, for example, while encouraging publishers and broadcasters to reject third-party ads containing blatantly misleading claims (*see Screening Advertisements: A Guide For the Media*, http://www.ftc.gov/bcp/online/pubs/buspubs/adscreen.shtm, and Feb. 11, 2003 speech of then-FTC Commissioner Timothy Muris to Cable Television Advertising Bureau) has not pursued a claim against a pure publisher, let alone a distributor, of a publication containing an unlawful, deceptive or misleading third-party ad, because publishers and distributors do not actively participate in the creation of the ad and cannot be expected to know whether the ad is unlawful. *See Should Publications Be Liable for Running Fraudulent Ads*, Wall Street Journal Online, Oct. 18, 2006 ("Paul Davis, an FTC attorney, . . . tells the WSJ that the FTC has long debated whether action <u>should</u> be taken against publications that run deceptive or misleading ads. 'And the answer was simply, no,' he says, because the ads are protected as free speech")

> Every bookseller would be placed under an obligation to make himself aware of the contents of every book in his shop. It would be altogether unreasonable to demand so near an approach to omniscience. And the bookseller's burden would become the public's burden, for by restricting him the public's access to reading matter would be restricted. If the contents of bookshops and periodical stands were restricted to material of which their proprietors had made an inspection, they might be depleted indeed.

*Smith v. California*, 361 U.S. 147, 153 (1959) (citation and footnote omitted).

HSUS does not – and cannot – rebut, but instead wholly ignores that, not only have the Magazines <u>never</u> been <u>declared</u> illegal, but the USPS specifically <u>rejected</u> such a finding – not once, but twice. In denying HSUS's first petition, the USPS found that "bird fighting magazines are generally mailable" and that the Magazines contained no "non-mailable advertisements" for upcoming bird fights in jurisdictions where bird fighting is unlawful. *See* USPS's June 5, 2006 denial, Pendleton Decl. Ex. 8. When denying HSUS's second petition, the USPS expressly stated that the enactment of the Federal Animal Fighting Prohibition Enforcement Act of 2007 "did not alter" the USPS's previous conclusions, noting that the new law contained no direct ban on advertising of bird fighting accessories. *See* USPS's June 26, 2007 denial, Pendleton Decl. Ex. 9.[28] Similarly, HSUS ignores the King County, Washington Prosecuting Attorney's

---

(emphasis in original). The appropriate recourse here, as in the case of an FTC action, is against the advertiser and the ad agency, the parties responsible for the content. *Compare In re Am. Home Prods. Corp.*, 98 F.T.C. 136, 396 (1981) (advertising agency may be held liable under the FTC Act if agency was an active participant in preparing the deceptive advertisement and it knew or should have known that the advertisement was false or lacked substantiation); *Carter Prods., Inc. v. FTC*, 323 F.2d 523, 534 (5th Cir. 1963) (upholding liability of advertising agency because agency developed marketing concept); *Doherty, Clifford, Steers & Shenfield, Inc. v. FTC*, 392 F.2d 921, 928 (6th Cir. 1968) (upholding ad agency's liability where agency offered general marketing consultation, formulated advertising plans and originated, *see infra* at V.B, the advertising ideas). Notably, consistent with the constitutional barrier to prior restraint, the FTC Act expressly limits injunctive relief if the ad is contained in a newspaper, magazine, periodical or other regularly published publication, as the ads are here. *See* 15 U.S.C. § 53(d). The FTC typically allows the advertiser to continue advertising but subjects the advertiser – not the publisher or distributor – to post-publication penalties if the ad lacks substantiation.

[28] The HSUS administrative challenge to the USPS decision, filed in this Court on July 10, 2007, *see* Pendleton Decl. Ex. 7, has not yet been resolved. Even if it were resolved in HSUS's favor, the issues raised here as to whether HSUS has standing and can maintain a claim under CPPA and whether liability and injunctive relief can be imposed on Amazon consistent with the CDA, common law and the First Amendment would remain. Accordingly, the pendency of the appeal from the USPS denial should not delay resolution of this motion to dismiss.

31

rejection in February 2007 of HSUS's request to initiate *Quo Warranto* proceedings against Amazon finding no violation of federal and state criminal statutes. Thus, HSUS has in fact "initiated a legal proceeding" (Opp. at 68), and thus far the Magazines have been deemed lawful.

Given the absence of any formal finding that the ads, let alone the Magazines, are illegal and, indeed, given the multiple determinations to the contrary, Amazon has no "knowledge" that the Magazines are illegal. (Opp. at 68-69.) "Knowledge" necessary to impose on a distributor such as Amazon the duty to investigate or cease distributing periodicals cannot be imparted – as HSUS contends (Opp. at 68-69) – by mere notice of a claim of illegality, even if filed in a court of law. In *Lerman,* 745 F.2d at 140-41, for example, the Second Circuit held that a national distributor of magazines did not act with the requisite actual malice (*i.e.*, knowledge or serious doubts) in continuing to distribute a magazine containing a nude photograph misidentified as the plaintiff, even though the distributor knew that the plaintiff had filed a libel suit against the publisher based upon the publication of an earlier issue with the same misidentification, one which had been enjoined and removed from circulation.[29]

As for the practical implication of a rule where liability is imposed on the distributor on mere notice, the bookseller, fearful of liability, would have to empty its shelves of any literature accused of wrong <u>before</u> any legal finding of illegality. "More than unrealistic in economic terms, it is difficult to imagine a scenario more chilling on the media's right of expression and the publisher's right to know." *Auvil,* 800 F. Supp. at 932. Amazon's decision to remove the Videos does not "demonstrate" that a "legal finding" is "not necessary to impart actual knowledge" (Opp. at 68 n.43) or satisfy the requirements under the First Amendment that videos, ads or magazines must be deemed illegal before Amazon can be liable for making them available

---

[29] *See also Spence v. Flynt,* 647 F. Supp. 1266, 1273 (D. Wyo. 1986) ("[k]nowledge of the 'type' of publication, that the publication had previously printed libelous material or that it had been sued for libel falls short of the actual malice standard"); *Davis v. Costa-Gavras,* 595 F. Supp. 982, 988 (S.D.N.Y. 1984) ("[t]he mere threat of litigation is insufficient to put a defendant on notice of 'probable falsity'"); *Auvil v. CBS "60 Minutes,"* 800 F. Supp. 928, 932 (E.D. Wash. 1992) ("Persons injured by defamatory material are not impaired by limiting conduit liability to those situations where culpability is established.").

through its website. *Auvil*, 800 F. Supp. at 931 ("plaintiff's construction would force the creation of full time editorial boards . . . which possess sufficient knowledge, legal acumen and access to experts to continually monitor incoming transmissions and exercise on-the-spot discretionary calls or face $75 million dollar lawsuits at every turn. That is not realistic."). Amazon's decision not to carry the Videos was a voluntary one, driven not by legal concerns but by business considerations arising from customer preferences.

## V.    THE FIRST AMENDMENT BARS HSUS'S CLAIMS VERSUS AMAZON

### A.    HSUS Seeks to Penalize Core Editorial, Political Speech, Not Purely Commercial Speech

Labeling "absurd" defendants' description of the Magazines as editorial political speech (Opp. at 54, 57), HSUS proclaims that this action "has nothing to do with 'pure, editorial, political speech' " (Opp. at 54). Yet, HSUS targets exactly that – magazines expressing editorial and political ideas – not mere "catalogues" (Opp. at 7) or purely commercial speech. HSUS seeks nothing less than a wholesale, content-based ban on the Magazines – truthful, non-misleading editorial and commercial speech – as well as treble damages – remedies that cannot withstand strict scrutiny. *Riley v. Nat'l Fed'n of the Blind*, 487 U.S. 781, 788-89 (1988). The remedy HSUS seeks singles out and burdens pure speech on one subject because HSUS finds that speech abhorrent – not coincidentally, speech that is often critical of HSUS. *United States v. Eichman*, 496 U.S. 310, 319 (1990) ("If there is a bedrock principle underlying the First Amendment, it is that the Government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable").

Tacitly recognizing that it cannot possibly meet the strict scrutiny requirements applicable to editorial speech, HSUS makes no effort and instead puts all its eggs in the commercial speech basket. Defendants' characterization of the content of the Publications as "political or protected speech" is not a "disputed factual issue," as HSUS contends (Opp. at 56 n.34), but one undergirded by well-established precedent, as well as patently evident from the face of the Magazines which are properly before the Court on this Motion to Dismiss (*see* Mem. in Support of Amazon Mot. to

Dismiss p. 4, n.1 ).[30] Courts are reluctant to accept the invitation HSUS extends to sit as an editorial board judging whether content, on its face editorial, is a "sham." *See, e.g., Finger v. Omni Publ'ns Int'l Ltd.*, 566 N.E.2d 141, 144 (N.Y. 1990) ("questions of 'newsworthiness' are better left to reasonable editorial judgment and discretion," rather than judicial intervention).

"Commercial speech" is not how courts treat magazines – such as these – containing editorial and political commentary as well as ads, which together do "more than propose a commercial transaction." *Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 762, 771 n.24 (1976) ("[T]here are commonsense differences between speech that does no more than propose a commercial transaction and other varieties"); *United States v. United Foods, Inc.*, 533 U.S. 405, 409 (2001).[31] First, ads cannot be physically excised from the Magazines, once published, because editorial and ad content are "inextricably intertwined." *See Riley*, 487 U.S. at 796. Second, even if defendants could physically excise the ads from the Magazines, practically speaking, Amazon is not the party in the position to do so because it does not stock or distribute the Magazines. Zapolsky Decl. ¶¶ 4, 7. Third, Amazon is not the party who can decide whether to accept or decline the ads – the publishers are. Fourth, the fact that magazine publishers accept ads and hope to make a profit does not turn their

---

[30] *See* Pendleton Decl. Ex. 1 (*The Feathered Warrior* (Jan. 2004) at 21-24) (opinion piece expressing views on animal rights debate and lobbying of elected officials and exhorting readers to support the United Gamefowl Breeders Association and "any program that fights for the rights of the gamefowl breeder"); Ex. 2 (*The Gamecock* (Dec. 2006) at 99-100) (opinion piece titled "March on Washington" proclaiming "We are Americans! . . . . Does anybody out there know any Capitol Hill lobbyists or senators we could get to help organize a march on Washington? . . . . Do we have enough people who would take part and make our voices heard once and for all?").

[31] *Compare SEC v. Wall Street Publ'g Inst.*, 851 F.2d 365, 372 (D.C. Cir. 1988) (articles published by securities trade journal featuring particular firms' securities in return for consideration from firms were not commercial speech, in part because they were "not 'conceded' to be advertisements" and were "indistinguishable from run-of-the mill newspaper or magazine stories"); *Hoffman v. Capital Cities/ABC, Inc.*, 255 F.3d 1180, 1185-86 (9th Cir. 2001) (magazine's use in article of altered photo of Dustin Hoffman from movie "Tootsie" to display Michael Kors' dress was non-commercial speech entitled to full protection under the First Amendment) *with Downing v. Abercrombie & Fitch*, 265 F.3d 994, 1002 (9th Cir. 2001) (Abercrombie & Fitch catalogue using without permission photograph of appellants in a surf competition to promote the sale of its surfing-themed clothing was commercial speech).

magazines into commercial speech. *Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 67

(1983) ("economic motivation . . . would clearly be insufficient by itself to turn the materials [in

question] into commercial speech").[32]  Fifth, HSUS's claim that the magazines are "catalogues,"

"with some political speech . . . thrown in – as evasion" (Opp. at 7, 57) is not how the USPS

treats them.  The USPS designates *Gamecock* and *Feathered Warrior* as it does *National

Geographic, Glamour, Cigar Aficionado* or any other magazine, according them "Periodical"

postage rate privileges, based, *inter alia*, on their content, because their "primary purpose" is the

"transmission of information," not advertising.[33]  Not so for catalogues, such as those for Pottery

Barn, or other commercial items, which receive "Standard" rate postage status because they are

designed only for advertising purposes.  As is evident from the face of the Magazines, they are a

far cry from the drug company pamphlets in *Bolger, supra* or the "Tupperware parties" in *Board

of Trustees of State Univ. of New York v. Fox*, 492 U.S. 469, 473-75 (1989).[34]

   While an editorial speech or mixed editorial/commercial speech designation would be

"completely fatal" to HSUS's claims, a commercial speech designation would not be

"completely fatal to [Amazon's] First Amendment defenses" as HSUS argues (Opp. at 54).  The

product descriptions for the Magazines on Amazon's website or Amazon's "advertising of

subscriptions, (Opp. at 55, 58) may well be commercial speech, but that speech is not in issue.

Only by conflating the third-party ads which HSUS contends solicit unlawful activity with the

lawful editorial content of the Magazines and then unilaterally declaring both illegal, does HSUS

---

[32] *See also Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495, 501-02 (1952) ("That books, newspapers, and magazines are published and sold for profit does not prevent them from being a form of expression whose liberty is safeguarded by the First Amendment.").

[33] *See* USPS Regulations, DMM 707 at 4.4.1(b) ("Basic Eligibility Standards" for Periodical Publications) and at 17.4.4-5 ("Advertising Percentages") ("At least once a year, the USPS verifies the advertising percentage reported on the corresponding postage statement by measuring the advertising and nonadvertising portions of one issue"); *see also* Pendleton Decl. Exs. 1 and 2 (*Feathered Warrior* (Jan. 2004) at 2; *Gamecock* (Dec. 2006) at 4).

[34] Subsequent decisions have eroded the now 65-year old rule in *Valentine v. Chrestensen*, 316 U.S. 52 (1942), relied on by HSUS (Opp. 56-57).  *See Cammarano v. United States*, 358 U.S. 498 (1959) (Douglas J. dissenting) ("The [*Valentine*] ruling was casual, almost offhand.  And it has not survived reflection").

argue that Amazon's promotion of subscriptions to the Magazines constitutes "commercial speech" that concerns unlawful activity. This logical jujitsu cannot turn editorial speech subject to strict scrutiny into commercial speech subject to intermediate scrutiny.

Even if only commercial speech were at issue, HSUS cannot satisfy even the first prong of the *Central Hudson* test for commercial speech – that is, that the speech concern unlawful activity and is misleading. *Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n*, 447 U.S. 557, 564 (1980). The USPS already has rejected HSUS's calls to declare the Magazines "nonmailable." *See* Pendleton Decl. Exs. 8, 9. Under AWA, the sale of implements and birds is not *per se* unlawful but only if used for fighting purposes and only for ads after the effective date of May 3, 2007. *See* Animal Fighting Prohibition Enforcement Act of 2007, Pub. L. No. 110-22, § 3, 121 Stat. 88, amending 7 U.S.C. §§ 2156(b) and (c). Therefore, the speech does not "concern or relate to" unlawful activity, let alone "directly propose[] hundreds of criminal transactions" (Opp. at 58-59). Even if it did, the First Amendment protects ads for products and services that could be, but are not necessarily, used for an unlawful purpose. *See, e.g., Carey v. Population Servs. Int'l,* 431 U.S. 678, 701 (1977) (rejecting the argument that a total ban on contraceptive advertisements is needed because such advertisements "directly incite[] illicit sexual activity among the young") (citing *Brandenburg v. Ohio*, 395 U.S. 444, 447 (1969)); *Dunagin v. City of Oxford*, 718 F.2d 738, 743 (5th Cir. 1983) ("The commercial speech doctrine would disappear if its protection ceased whenever the advertised product might be used illegally"). In any event, Amazon is not a party to the "commercial transaction" involving the sales of items listed in the ads (Opp. at 59). Thus, Amazon's commercial speech does not "concern unlawful activity and is not misleading." *Central Hudson*, 447 U.S. at 564. Accordingly, HSUS cannot satisfy even the first prong of the *Central Hudson* test.

As to the remaining *Central Hudson* factors, HSUS makes no headway even at this initial stage.[35] While the government may well have an interest in combating illegal animal fighting

---

[35] The burden here is on HSUS, not Amazon, Opp. at 54, n.33, and is a heightened one given the First Amendment interests at stake. *Pico v. Bd. of Educ.*, 638 F.2d 404, 415 (2d Cir. 1980), *aff'd,*

(the second prong of the *Central Hudson* test), nothing in the Amended Complaint suggests that barring Amazon – many times removed from the perpetrators of animal fighting – from offering on-line subscriptions would directly and materially advance that interest (the third prong of the *Central Hudson* test). A restriction "may not be sustained if it provides only ineffective or remote support for the government's purpose"; it must "directly advance[] the governmental interest asserted." *Central Hudson*, 447 U.S. at 566; *Edenfield v. Fane*, 507 U.S. 761, 770-71 (1993) (restriction on commercial speech must alleviate harms to a material degree); *44 Liquormart, Inc. v. Rhode Island,* 517 U.S. 484 (1996) (ban on price advertising must significantly reduce alcohol consumption).

As discussed at I.C.1 (Article III Standing), HSUS posits incorrectly that Amazon is the exclusive retailer of subscriptions to the Magazines (Am. Compl. ¶ 85; Opp. 8, 29, 62, 72), ignoring other sellers of the Magazines and nowhere addressing the widespread availability of the same information on dozens of websites. *See* Amazon Mem. at 23 n.10. Particularly given that Amazon does not "ship," is not the "sole online retailer," and is not the "sole retail seller" of the Magazines (Opp. at 8, 29, 62), nothing in the Amended Complaint or Opposition indicates that those who engage in animal fighting will cease the behavior simply if Amazon is prohibited from offering online subscriptions to the Magazines. *See* I.C., *supra* (Article III Standing). Therefore, HSUS cannot satisfy the third prong of the *Central Hudson* test.

Finally, HSUS cannot satisfy *Central Hudson's* fourth prong. The remedy HSUS seeks is far "more extensive than necessary to serve the asserted interests," *Central Hudson*, 447 U.S. at 569-72, and ignores reasonable and obvious alternatives to restrictions on speech. *Fox*, 492 U.S. at 479 (regulation is invalid if it is substantially excessive and disregards less restrictive and more

---

457 U.S. 853 (1982) (burden of demonstrating defenses to charges of First Amendment violations rests with the school officials charged with infringing constitutionally protected speech and the "burden is one of persuasion, not of pleading," "nor is the burden a light one"; "courts will not rest with officials' bare allegation that such a basis existed."); *Bolger*, 463 U.S. at 71 n.20 (in First Amendment jurisprudence, "[t]he party seeking to uphold a restriction on commercial speech carries the burden of justifying it"); *Edenfield v. Fane*, 507 U.S. 761, 770-71 (1993) ("This burden is not satisfied by mere speculation or conjecture").

37

precise means). HSUS's proposed ban casts within its net not only legitimate commercial speech (*e.g.,* ads for the United Gamefowl Breeders Association and an ad for a documentary on the history of cockfighting), but also core editorial and political speech (*e.g.,* commentary on legislation, breeding and disease). Among more reasonable non-speech-burdening alternatives for battling illegal cockfighting than suing Amazon are: stricter enforcement and prosecution of laws against those conducting illegal fights, *see* Am. Compl. ¶¶ 75-79, counter-speech and the requirement that the Magazines not accept illegal advertisements in the future. *Pittsburgh Press Co. v. Pittsburgh Comm'n on Human Rel's*, 413 U.S. 376, 391 (1973) (affirming injunction prohibiting newspaper from accepting ads, but not enjoining publication of newspaper itself); *City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 418 n.13 (1993). *See Bartnicki v. Vopper*, 532 U.S. 514, 529-30 (2001) ("[I]t would be quite remarkable to hold that speech by a law-abiding possessor of information can be suppressed in order to deter conduct by a non-law-abiding third party."). Thus, not only does HSUS's claim fail the strict scrutiny test for core speech, it also fails the four-part *Central Hudson* test for commercial speech. The more narrowly tailored solution – one effectively pursued with recent successes like the prosecution of Michael Vick – is to enforce laws against those actually engaged in animal fighting, not Amazon, a disseminator of First Amendment protected speech. HSUS's remedy is unconstitutionally overbroad because "a substantial amount of protected speech" – editorial and political speech – "is prohibited or chilled in the process." *Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 234 (2002); *City of Houston v. Hill*, 482 U.S. 451, 455 (1987).

### B. HSUS'S Requested Cease and Desist Order Against Amazon Constitutes an Unconstitutional Prior Restraint

Dismissing Amazon's concerns as "hysterical" (Opp. at 65), HSUS simply declares without further explanation that it is not seeking a prior restraint and then makes no attempt at justification. But a prior restraint is exactly the relief HSUS is seeking, requesting that Amazon be prohibited from offering magazine subscriptions on the basis that the Magazines themselves are illegal. *See* Am. Comp. at 43 (seeking "all appropriate injunctive relief, including an Order

38

that Defendants permanently cease and desist from unlawful trade practices in violation of D.C. Code § 28-3905(k)(1)(D), namely, possessing, distributing by mail, marketing, and/or selling the Videos and the Publications that promote and further the illegal criminal enterprises of dog fighting and cockfighting").

Having unilaterally declared the editorial content in the Magazines is commercial speech and the relief sought not a prior restraint,[36] HSUS makes no attempt to overcome the "virtually insurmountable" presumption of unconstitutionality, *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 558 (1976) (White, J., concurring). Just as well since the effort would be fruitless. HSUS cannot articulate interests here that are "exceptional" – that is, on the order of jeopardizing troops in wartime – necessary to justify such a draconian measure. *See, e.g., Near v. Minnesota ex rel. Olson*, 283 U.S. 697, 719 (1931); *New York Times Co. v. United States*, 403 U.S. 713, 730 (1971) (Stewart, J., concurring) (the Pentagon Papers case) (holding that newspapers could not be enjoined even during wartime from publishing top secret documents obtained without authorization; must show that publication would "surely result in direct, immediate, and irreparable damage to our Nation or its people"). Amazon cannot physically review and excise, or refuse to run, ads within magazines it does not control or possess. Amazon's only practical recourse would be to censor the Magazines as a whole – the result HSUS seeks but a result which is anathema to the First Amendment. *See Riley*, 487 U.S. at 796.

## VI.    HSUS'S CONSPIRACY CLAIM FAILS AS A MATTER OF LAW

HSUS's federal conspiracy claim – based on nothing more than Amazon's online subscription service and Marketplace – fails as a matter of law because 18 U.S.C. § 371, a criminal statute, does not contain a private civil right of action. *Rockefeller v. United States*

---

[36] Even if HSUS were seeking only to enjoin the Magazines from accepting ads for gamecocks and implements in the future, which it plainly does not, some courts have expressly rejected the notion – advanced by HSUS (Opp. at 65) – that prior restraint doctrine does not apply to commercial speech. *See, e.g., Nutritional Health Alliance v. Shalala*, 144 F.3d 220, 228 (2d Cir. 1998) (rejecting as overbroad government's contention that prior restraint doctrine does not apply to commercial speech; "We see no reason why the requirement of procedural safeguards [in prior restraint cases] should be relaxed whether speech is commercial or not.").

*Court of Appeals*, 248 F. Supp. 2d 17, 23 (D.D.C. 2003). Nor does HSUS state a claim for conspiracy under the CPPA. "[N]o provision of the CPPA creates a cause of action for aider-and-abettor liability." *Armstrong v. Accrediting Council for Continuing Educ. & Training, Inc.*, 832 F. Supp. 419, 425 (D.D.C. 1993), *vacated on other grounds*, 84 F.3d 1452 (D.C. Cir. 1996) (holding that "the CPPA creates only those causes of action specifically enumerated within its provisions; a cause of action creating liability for aiders and abettors of those who allegedly violate the CPPA is not included"). *Accord Adler*, 393 F. Supp. 2d at 42 n.8 ("While defendants may have provided the means for advertisers to get their messages to plaintiffs, 'aiding and abetting' a D.C. CPPA violation is not a violation in itself.") The conspiracy claims also fail because HSUS does not state a claim against Amazon or any other defendant for any independent, underlying, unlawful act that, if done alone, would give rise to a cause of action. D.C. Code § 22-1805a (b); *Browning v. Clinton*, 292 F.3d 235, 245 (D.C. Cir. 2002).

Despite HSUS's deliberate efforts to conflate defendants and mischaracterize their relationships, defendants are not "business associates in the animal fighting industry" (Opp. at 1) any more than Amazon is a "business associate" in any other "industry" covered in any of the 90,000 periodicals for which it offers subscriptions. Amazon has no "agreements" with the Magazine publishers (Opp. at 8, 17, 48-49). Zapolsky Decl. ¶ 4. Its relationship is with Magazine Express. *Id. See* Griffiths Decl. ¶ 8. Thus, Counts VI and VII fail as a matter of law.

## VII.    CONCLUSION

For the foregoing reasons, defendant Amazon respectfully urges that the motion to dismiss be granted and that the Amended Complaint be dismissed in its entirety with prejudice.

Dated this 7th day of September, 2007.

Respectfully submitted,

DAVIS WRIGHT TREMAINE LLP

_____Laura R. Handman_____/s/_____
Laura R. Handman (D.C. Bar No. 444386)
laurahandman@dwt.com

Constance M. Pendleton (D.C. Bar No. 456919)
conniependleton@dwt.com
1919 Pennsylvania Avenue, N.W., Suite 200
Washington, DC 20006-3402
(202) 973-4200; fax: (202) 973-4499

Of Counsel:

David A. Zapolsky, Esq.
Vice President & Assoc. Gen. Counsel
Litigation & Regulatory
Amazon.com, Inc.
P.O. Box 81226
Seattle, WA 98108-1226
(206) 266-1323, fax: (206) 266-7010

Jennifer Lenga Long (admitted *pro hac vice*)
jenniferlengalong@dwt.com
Davis Wright Tremaine LLP
1201 Third Avenue, Suite 2200
Seattle, WA 98101-3045
(206) 622-3150; fax: (206) 757-7700

Attorneys for Defendant Amazon.com, Inc.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
Civil Division

-------------------------------------------------x
                                   )

**THE HUMANE SOCIETY OF**      )
**THE UNITED STATES,**        )
                                   )

           Plaintiff,      )   Case No. 07-0623 (CKK)
                                   )

   v.                       )
                                   )   **ORAL HEARING REQUESTED**

**AMAZON.COM, INC., ET AL.,**  )
                                   )

          Defendants.    )
                                   )
-------------------------------------------------x

**REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
AMAZON'S MOTION TO DISMISS HSUS'S AMENDED COMPLAINT**

# APPENDIX A

Westlaw.

Not Reported in F.Supp.2d                                                      Page 1
Not Reported in F.Supp.2d, 2005 WL 2240952 (W.D.Wis.)
(Cite as: Not Reported in F.Supp.2d)

▷
Associated Bank-Corp. v. Earthlink, Inc.
W.D.Wis.,2005.
Only the Westlaw citation is currently available.
United States District Court,W.D. Wisconsin.
ASSOCIATED BANK-CORP., Plaintiff,
v.
EARTHLINK, INC., Defendant.
No. 05-C-0233-S.

Sept. 13, 2005.

Lynn M. Stathas, for Plaintiff.
Kim Grimmer, Solheim, Billing & Grimmer, S.C.,
Madison, WI, C. Celeste Creswell, Joseph W.
Ozmer, II, Wargo & French, LLP, Atlanta, GA, for
Defendant.

MEMORANDUM AND ORDER
SHABAZ, J.
*1 Plaintiff Associated Bank-Corp. commenced this
action against Defendant EarthLink, Inc. seeking
monetary and injunctive relief. Plaintiff seeks
damages pursuant to three theories of liability:
Tortious Interference with Business Relations,
Negligence and Fraudulent Representations in
violation of Wis. Stat. § 100.18(1). Plaintiff also
seeks injunctive relief alleging a violation of 15
U.S.C. § 1125(a), Injury to Business Reputation.
Jurisdiction is based on 28 U.S.C. § 1331 and
diversity of citizenship, 28 U.S.C. § 1332(a)(1).
The matter is presently before the Court on
Defendant's motion for summary judgment. Also
before the Court is Plaintiff's Rule 56(e) motion.
The following facts are those most favorable to
Plaintiff.

BACKGROUND

Plaintiff Associated Bank-Corp. is a diversified
multibank holding company headquartered in Green
Bay Wisconsin. Associated Bank is the company's
largest member bank with over 300 locations in
Wisconsin, Illinois and Minnesota. Defendant
EarthLink, Inc. is an internet service provider with
its principal place of business in Atlanta Georgia.

However, Defendant has over five million
subscribers throughout the United States including
customers in Wisconsin, Illinois and Minnesota.

Defendant provides its customers with access to the
internet. It also provides additional software and
services designed to block spam electronic mail,
alert customers of fraudulent websites and block
pop-up windows. One of the services Defendant
provides to its customers and other users of the
internet is the use of its ScamBlocker0 tool.
ScamBlocker0 is a free service that in part protects
users from phisher scams.

Generally, a phisher site is a fraudulent web site
that mimics the site of a legitimate business. The
phisher site attempts to have internet users click on
the link provided in the phisher's email. If the user
clicks on the link he or she is taken to the phisher
site. The phisher site then directs the user to enter
personal or financial information. This information
is then used for criminal purposes.

ScamBlocker0 works by redirecting users to a
Scam Alert page. The page states the following
pertinent information:
POTENTIALLY FRAUDULENT WEB SITE
ALERT generated by ScamBlocker from EarthLink
You have been redirected to this page by
ScamBlocker from EarthLink.
The Web address you requested is on our list of
potentially Dangerous and Fraudulent Web Sites.
Those who visit the site may be at high risk for
identity theft or other financial losses.
Please do not continue to this potentially risky site.
Simply click your browser's back button.
Internet Scams and ScamBlocker There has been a
recent increase in Internet scams that use fraudulent
emails. These emails often include links to fake
Web sites, which look like real sites but are set up
[to] steal personal information.
With ScamBlocker, any time you attempt to visit
one of these addresses on the growing list of
potentially fraudulent Web sites gathered by
EarthLink and our partners, your browser will

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 2
Not Reported in F.Supp.2d, 2005 WL 2240952 (W.D.Wis.)
(Cite as: Not Reported in F.Supp.2d)

automatically redirect to a Scam Alert page (like this one). It's that simple!

**\*2** Users can continue to the site they requested by disabling the ScamBlocker0 tool and clicking on a button labeled "[c]ontinue to this potentially dangerous or fraudulent site."

Plaintiff owns and operates an online banking web site located at www.associatedbank.com. Plaintiff's customers can use the web site to access checking and savings accounts, apply for personal and business loans, access retirement and investment accounts and transact other bank related business. Plaintiff's web site has been the target of phishing attacks.

On approximately April 12, 2005 ScamBlocker0 identified Plaintiff's web site as a potentially dangerous and fraudulent web site. However, this was an error because Plaintiff's web site was (and is) a legitimate web site. On April 13, 2005 Plaintiff contacted Defendant to report the error and at 11:49 p.m. that same day a customer (and employee) of Plaintiff reported he was able to visit the web site again without being redirected by ScamBlocker0. However, while Plaintiff's site was on the list of potentially fraudulent websites any internet user that had installed ScamBlocker0 would have been redirected to the Scam Alert page when he or she tried to visit the site.

Plaintiff commenced this action on April 15, 2005 and Defendant filed its answer on May 16, 2005. Defendant's motion for summary judgment and Plaintiff's Rule 56(e) motion are presently before the court.

### MEMORANDUM

Defendant argues it is entitled to summary judgment because it is immune from liability pursuant to 47 U.S.C. § 230(c)(1) which provides immunity for interactive computer services that publish information received from third party information content providers. Plaintiff argues summary judgment is not appropriate because Defendant acted as an information content provider

when it created and developed the substance of the erroneous warning about Plaintiff's website. Accordingly, Plaintiff argues Defendant's conduct is not protected by the immunity granted in 47 U.S.C. § 230.

As a preliminary matter the Court has before it Plaintiff's motion to strike paragraphs 12, 14, 20, 21 and 24 of Scott Mecredy's declaration. Having reviewed the challenged portions the Court finds no merit in Plaintiff's motion. The Court considers these paragraphs in so far as they are made on personal knowledge, set forth such facts as would be admissible in evidence, and show affirmatively that the declarant is competent to testify to the matters stated therein. Fed.R.Civ.P. 56(e).

Summary judgment is appropriate where the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 55(c).

A fact is material only if it might affect the outcome of the suit under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Disputes over unnecessary or irrelevant facts will not preclude summary judgment. *Id.* Further, a factual issue is genuine only if the evidence is such that a reasonable fact finder could return a verdict for the nonmoving party. *Id.*

**\*3** To determine whether there is a genuine issue of material fact courts construe all facts in the light most favorable to the non-moving party. *Heft v. Moore*, 351 F.3d 278, 282 (7th Cir.2003) (citations omitted). Additionally, a court draws all reasonable inferences in favor of that party. *Id.* However, the non-movant must set forth "specific facts showing that there is a genuine issue for trial" which requires more than "just speculation or conclusory statements." *Id.* at 283 (citations omitted).

Section 230(c) of the Communications Decency Act of 1996 provides in relevant part: "[n]o provider ... of an interactive computer service shall

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 3
Not Reported in F.Supp.2d, 2005 WL 2240952 (W.D.Wis.)
(Cite as: Not Reported in F.Supp.2d)

be treated as the publisher or speaker of any information provided by another information content provider." 47 U .S.C. § 230(c)(1).

Section 230(f)(2) defines the term "Interactive computer service" as "any information service, system, or access software provider that provides or enables computer access by multiple users to a computer server, including specifically a service or system that provides access to the Internet and such systems operated or services offered by libraries or educational institutions." 47 U.S.C. § 230(f)(2). Accordingly, § 230 creates immunity for any cause of action that would make Interactive computer services liable for information originating from a third-party. *Zeran v. Am. Online, Inc.,* 129 F.3d 327, 330 (4th Cir.1997).

The statute goes on to define the term "Information content provider" as "any person or entity that is responsible, in whole or in part, for the creation or development of information provided through the Internet or any other interactive computer service." 47 U.S.C. § 230(f)(3). The actions of Information content providers are not immune from liability under § 230. *Optinrealbig.com, LLC v. Ironport Sys., Inc.,* 323 F.Supp.2d 1037, 1045 (N.D.Cal.2004) (citations omitted).

Courts have treated § 230 immunity as "quite robust, adopting a relatively expansive definition of "interactive computer service" and a relatively restrictive definition of "information content provider"." *Carafano v. Metrosplash.com, Inc.,* 339 F.3d 1119, 1123 (9th Cir.2003).

Accordingly, Section 230 effectively immunizes providers of interactive computer services from "civil liability in tort with respect to material disseminated by them but created by others." *Blumenthal v. Drudge,* 992 F.Supp. 44, 49 (D.D.C.1998).

The Court concludes that a reasonable trier of fact could not infer that Defendant acted as an information content provider. In support of its motion for summary judgment Defendant submitted the declaration of Scott Mecredy. Mr. Mecredy is

the Project Manager for the ScamBlocker0 tool and accordingly knows how the tool operates. He indicated one of Defendant's third-party vendors identified Plaintiff's web site as a potentially fraudulent site. He also indicated this list of phisher sites was directly input into Defendant's database without any alteration of content on Defendant's part. Further, Exhibit 1 to the Mecredy declaration demonstrates the information was imported from another party. Because the evidence indicates the information came from another provider Defendant cannot be held liable for the republication of the statements under § 230. *Optinrealbig.com,* at 1044.

*4 Plaintiff argues because Defendant did not disclose the identity of the third-party provider (the name was redacted on Exhibit 1 to the Mecredy declaration) Defendant itself authored the erroneous warning or in the alternative controls the entity. However, there is no evidence supporting that assertion in the record. Further, had Defendant edited the list of phisher sites it received from the third-party vendor Congress enacted § 230 "to forbid the imposition of publisher liability on a service provider for the exercise of its editorial and self-regulatory functions. *Ben Ezra, Weinstein & Co. v. Am. Online, Inc.,* 206 F.3d 980, 986 (10th Cir.2000) (citations omitted).

Imposing liability on Defendant for the inaccurate information provided by a third-party content provider would treat Defendant as the publisher, a result § 230 specifically proscribes. Accordingly, Defendant is immune from suit pursuant to § 230.

Defendant asserts it is entitled to attorneys' fees because Plaintiff did not have standing to bring an action under the Lanham Act, 15 U.S.C. § 1125. Under the Lanham Act a court may award reasonable attorney's fees to the prevailing party in exceptional cases. 15 U.S.C. § 1117(a). The party needs to prove an exceptional case exists by clear and convincing evidence. *Finance Inv. Co. (Bermuda) Ltd. v. Geberit,* 165 F.3d 526, 533 (7th Cir.1998) (citations omitted). Further, when a defendant is the prevailing party in an action the standard is not whether plaintiff filed the action in

Not Reported in F.Supp.2d                                                              Page 4
Not Reported in F.Supp.2d, 2005 WL 2240952 (W.D.Wis.)
**(Cite as: Not Reported in F.Supp.2d)**

good faith but rather whether the action was oppressive. *S Industries, Inc. v. Centra 2000, Inc.,* 249 F.3d 625, 627 (7th Cir.2001) *citing (Door Sys., Inc. v. Pro-Line Door Sys., Inc.,* 126 F.3d 1028, 1031 (7th Cir.1997)). An action is oppressive if it lacked merit, had elements of an abuse of process claim and plaintiff's conduct unreasonably increased the cost of defending against the suit. *Id.*

Defendant cannot meet its burden of proving Plaintiff's action was oppressive. The Court has not reached the merits of Plaintiff's Lanham Act claim. Accordingly, Defendant did not have to defend against the merits of that action and it cannot prove that the Lanham Act claim unreasonably increased the cost of defending against the suit as a whole.

## ORDER

IT IS ORDERED that Defendant's motion for summary judgment is GRANTED.

IT IS FURTHER ORDERED that Plaintiff's Rule 56(e) motion is DENIED.

IT IS FURTHER ORDERED that Defendant's motion for attorneys' fees under the Lanham Act is DENIED.

IT IS FURTHER ORDERED that judgment is entered in favor of defendant against plaintiff dismissing the action and all claims contained therein with prejudice and costs.

W.D.Wis.,2005.
Associated Bank-Corp. v. Earthlink, Inc.
Not Reported in F.Supp.2d, 2005 WL 2240952 (W.D.Wis.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d                                              Page 1
Not Reported in F.Supp.2d, 2005 WL 3005602 (D.Or.)
(Cite as: Not Reported in F.Supp.2d)

▷
Barnes v. Yahoo!, Inc.
D.Or.,2005.
Only the Westlaw citation is currently available.
United States District Court,D. Oregon.
Cecilia L. BARNES, Plaintiff,
v.
YAHOO!, INC., a Delaware corporation,
Defendant.
No. Civ. 05-926-AA.

Nov. 8, 2005.

Thomas R. Rask, Kell, Alterman & Runstein,
Portland, Oregon, for plaintiff.
Jeffrey A. Johnson, Cosgrave Vergeer Kester LLP,
Portland, Oregon, Patrick Carome, Samir Jain,
Wilmer Cutler Pickering Hale & Dorr LLP,
Washington, D.C., for defendant.

OPINION AND ORDER
AIKEN, J.
*1 Defendant filed a motion to dismiss pursuant to
Fed.R.Civ.P. 12(b)(6) alleging that defendant is
immune from liability pursuant to 47 U.S.C. §
230(c)(1). Defendant's motion is granted and this
case is dismissed.

BACKGROUND

Plaintiff filed this case alleging personal injury
against defendant Yahoo! Inc. ("Yahoo!").
Plaintiff's complaint alleges that plaintiff's former
boyfriend engaged in a campaign to harass the
plaintiff using the Internet by setting up a series of
online "profiles." Profiles are publicly available
web pages on which a person typically displays
personal information about herself such as name,
address, age, hobbies, pictures, or other content.
The profiles at issue contained information about
the plaintiff and appeared to have been posted by
her. These profiles included nude pictures of the
plaintiff and information about how to contact her
at her workplace. Plaintiff also alleges that her
former boyfriend impersonated plaintiff in
discussions in online chat rooms, "soliciting" other

men by directing them to the unauthorized profiles,
which resulted in plaintiff being visited and
harassed at her workplace by various men.

Plaintiff brought suit against Yahoo! alleging that
her former boyfriend used Yahoo!'s Internet-based
services to post the profiles and engage in the chat
room conversations. Plaintiff concedes that
although Yahoo! had no "initial responsibility to
act," she alleges that Yahoo! assumed a legal duty
to act when one of its employees allegedly told
plaintiff that Yahoo! would "stop" the unauthorized
profiles, and that Yahoo! then failed to fulfill that
"duty."

Yahoo! is an interactive computer service provider
with "over 165 million registered users" and "345
million unique visitors ... each month. Complaint, ¶
10. Any person with access to the Internet may, at
no charge, register as a Yahoo! user, obtain an
online Yahoo! identifier and account, and then
engage in various online activities, such as sending
and receiving email, participating in Yahoo! chat
room discussions, and posting a self-authorized
online "profile."

Plaintiff alleges that she tried for several months to
get Yahoo! to remove the allegedly unauthorized
profiles. Specifically, beginning in January 2005,
on several occasions, plaintiff "mailed ... a signed
statement" to Yahoo! "denying any involvement
with the unauthorized profiles" and asking Yahoo!
to "remove" them. Complaint, ¶¶ 4-6. Each time,
Yahoo! allegedly "did not respond ." Id. Nearly
three months later, at the end of March, plaintiff's
former boyfriend's actions were continuing so
plaintiff contacted a local Portland news program,
who decided to publicize a report about plaintiff's
situation. Complaint, ¶ 7. Plaintiff alleges that the
upcoming news report "precipitated" a telephone
call from Mary Osako, a Yahoo! employee, to the
plaintiff. Id. Plaintiff alleges that Ms. Osako asked
plaintiff to fax her the statements about this
problem including any statements that plaintiff had
previously sent to Yahoo!. Plaintiff alleges that

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 3005602 (D.Or.)
(Cite as: Not Reported in F.Supp.2d)

Page 2

Osako pledged that she would "walk the statements over to the division responsible for stopping unauthorized profiles" and that "Yahoo! would put a stop to the unauthorized profiles." *Id.*

**\*2** Plaintiff alleges that once Osako undertook to assist her, Yahoo! "assumed an affirmative duty to do so with care." *Id.* at ¶ 7. Plaintiff alleges that Yahoo! breached that duty when it "negligently and carelessly failed to remove the unauthorized profiles and prohibit them from being posted again." *Id.* at ¶ 9. Plaintiff further alleges that because she relied on Yahoo! to provide assistance, she "made no other arrangements for assistance." *Id.* at ¶ 8.

### STANDARDS

Under Fed.R.Civ.P. 12(b)(6), dismissal for failure to state a claim is proper only when it appears to a certainty that the plaintiffs can prove no set of facts in support of their claim that would entitle them to relief. *Litchfield v. Spielberg,* 736 F.2d 1352, 1357 (9th Cir.1984), *cert. denied,* 470 U.S. 1052 (1985). For the purpose of the motion to dismiss, the complaint is liberally construed in favor of the plaintiffs, and its allegations are taken as true. *Rosen v. Walters,* 719 F.2d 1422, 1424 (9th Cir.1983).

### DISCUSSION

Defendant alleges that plaintiff's complaint must be dismissed due to defendant's immunity from suit pursuant to 47 U.S.C. §§ 230(c)(1), (2).[FN1] Section 230 generally immunizes interactive service providers such as Yahoo! from liability for harm caused by the dissemination of third-party information. The legislative history surrounding Congress's creation of § 230 represented the desire to protect online intermediaries from liability for unlawful third-party content. Congress reasoned that any liability would threaten development of the online industry as a medium for new forms of mass communication and simultaneously create disincentives to self regulate such content by service providers. Congress therefore determined that liability should rest with the actual

wrongdoers-the originators of the illegal and harmful content-and not intermediary servers whose systems are sometimes abused by wrongdoers.

> FN1. Section 230 states: "No provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider."

There can be no dispute that in the nine years since Section 230 was enacted that courts across the country have held that Section 230 generally bars claims that seek to hold the provider of an interactive computer service liable for tortuous or unlawful information that someone else disseminates using that service. In *Batzel v. Smith,* 333 F.3d 1018 (9th Cir.2003), the court noted that "Congress ... has chosen for policy reasons to immunize from liability for defamatory or obscene speech 'providers and users of interactive computer services' when the ... material is provided by someone else." *Id.* at 1020. *Batzel* noted that it was "join[ing] the consensus developing across other courts of appeal that § 230(c) provides broad immunity for publishing content provided primarily by third parties." *Id.* Similarly, in *Carafano v. Metrosplash.com, Inc.,* 339 F.3d 1119 (9th Cir.2003), the court noted that "under the statutory scheme, an 'interactive computer service' qualifies for immunity so long as it does not also function as an 'information content provider' for the portion of the statement or publication at issue." *Id.* at 1123. *See also, Zeran v. America Online, Inc.,* 129 F.3d 327, 328 (4th Cir.1997), *cert. denied,* 524 U.S. 937 (1998)("Section 230 ... plainly immunizes computer service providers like AOL from liability for information that originates with third parties"); and *Roskowski v. Corvallis Police Officers' Ass'n.,* Civ. No. 03-474-AS, 2005 WL 555398 (D.Or.2005)(Section 230 immunizes website operators from claims based on information that users posted directly to the operators' sites).

**\*3** Plaintiff here attempts to distinguish her claim from one falling under § 230 by asserting that she is

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                        Page 3
Not Reported in F.Supp.2d, 2005 WL 3005602 (D.Or.)
**(Cite as: Not Reported in F.Supp.2d)**

not seeking to hold defendant liable as a publisher of third-party information; instead plaintiff argues that her claim falls under the Restatement (Second) of Torts § 323 as an Oregon torts claim. Section 323 provides:

One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if:

(a) his failure to exercise such care increases the risk of such harm, or

(b) the harm is suffered because of the other's reliance upon the undertaking.

*Id.*

Plaintiff argues that she relied upon defendant's "assumption of its affirmative duty" to remove the unauthorized profiles from its website. Plaintiff's Response, p. 5. Specifically, plaintiff alleges that defendant failed to exercise reasonable care in performing this undertaking, as the unauthorized profiles remained on the website for three months "after [defendant] undertook this duty." *Id.* Plaintiff alleges that it was not until she brought this lawsuit that the profiles were finally removed. In essence, plaintiff is seeking to hold defendant liable for the injuries she allegedly sustained as the result of defendant's "failure to fulfil its promise to remove the unauthorized profiles." *Id.* at p. 9.

Plaintiff relies on several Oregon tort cases where an actor undertook a duty, the actor was then negligent in performing that duty, resulting in negligence which ultimately caused plaintiff injury. *See Arney v. Baird,* 62 Or.App. 643, 645-47, 651, 661 P.2d 1364, *rev. denied,* 295 Or. 446, 668 P.2d 382 (1983) (tow truck driver instructed plaintiff to move a cone that was set up to secure the accident scene, plaintiff was hit by a car. Court held tow truck driver and service station were initially under no obligation to help plaintiff, however, once they undertook that obligation "they assumed the duty of performing the task with reasonable care. Court

held trial court did not err in submitting these allegations to the jury.).

Plaintiff's case is distinguishable from the Oregon tort cases relied on by plaintiff due to the protection afforded defendant by § 230. Specifically, this case is controlled by Ninth Circuit law holding that § 230 provides service providers such as defendant with "broad immunity for publishing content provided primarily by third parties." *Carafano,* 339 F.3d at 1123. The facts here are similar to the facts in *Zeran* where the plaintiff also alleged that when he contacted America Online (AOL) to demand that the internet postings be removed, he was allegedly "assured" by a "company representative ... that the posting would be removed." 129 F.3d at 329. When the harassment continued, plaintiff brought suit alleging that AOL was negligent in failing to act quickly enough and in preventing any further similar postings. The Fourth Circuit rejected Zeran's claim holding that because he was seeking to hold the service provider liable based on injuries allegedly resulting from the dissemination of third-party content, his claim necessarily and impermissible sought to treat the service provider as "publisher" of that content, regardless of the particular label attached to the claim. *Id.* at 327. The court therefore found AOL immune from suit.

*4 Plaintiff's allegations similarly fall under the broad immunity provided internet servers by § 230. Plaintiff alleges she was harmed by third-party content, and that the service provider [defendant] allegedly breached a common law or statutory duty to block, screen, remove, or otherwise edit that content. Any such claim by plaintiff necessarily treats the service provider as "publisher" of the content and is therefore barred by § 230. Plaintiff's argument that she seeks to hold defendant liable only for its alleged "failure to fulfil its promise to remove the unauthorized profiles," does not remove this case from the immunity provided by § 230. Plaintiff's claim remains an effort to hold the service provider liable for failing to perform the duties of a publisher, such as screening or removing third-party content. *See also, Schneider v. Amazon.com, Inc.,* 108 Wash.App. 454, 31 P.3d 37,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                      Page 4
Not Reported in F.Supp.2d, 2005 WL 3005602 (D.Or.)
**(Cite as: Not Reported in F.Supp.2d)**

41-43 (2001)(court rejected plaintiff's claim that defendant "promised to remove" allegedly tortuous reviews, but then "failed to do so, and reposted the reviews rather than deleting them." Court held that § 230 barred plaintiff's claim because the "broken promise" claims were based on an alleged "failure to remove the posting," and therefore based on defendant's "exercise of editorial discretion" subject to § 230's prohibition on publisher liability).

*CONCLUSION*

Defendant's motion to dismiss (doc. 9) is granted. Further, defendant's request for oral argument is denied as unnecessary. This case is dismissed and all pending motions are denied as moot.

IT IS SO ORDERED.

D.Or.,2005.
Barnes v. Yahoo!, Inc.
Not Reported in F.Supp.2d, 2005 WL 3005602 (D.Or.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Slip Copy                                                                                   Page 1
Slip Copy, 2006 WL 3813758 (E.D.Tex.), 35 Media L. Rep. 1435
(Cite as: Slip Copy)

C

Doe v. Bates
E.D.Tex.,2006.

United States District Court,E.D. Texas,Texarkana
Division.
Johnny DOE, a minor son of John and Jane Doe,
Plaintiff,
v.
Mark BATES and Yahoo! Inc., Defendants.
No. 5:05-CV-91-DF-CMC.

Dec. 27, 2006.

Adam Quentin Voyles, Heard Robins Cloud Lubel
& Greenwood, Houston, TX, Geoffrey Patton
Culbertson, Kelly B. Tidwell, Patton, Tidwell &
Schroeder, LLP, Texarkana, TX, for Plaintiff.
John David Crisp, Crisp Boyd Poff, Texarkana, TX,
Patrick J. Carome, Samir Jain, Wilmer Cutler
Pickering Hale & Dorr, Washington, DC, for
Defendants.

### ORDER

DAVID FOLSOM, United States District Judge.
*1 Before the Court are Plaintiffs' Objections to
Report and Recommendation by Magistrate Judge
Craven. Dkt. No. 57. In this Report and
Recommendation, the Magistrate Judge
recommends granting defendant Yahoo! Inc.'s
Motion to Dismiss All Claims Against Yahoo! Dkt.
Nos. 56 & 17, respectively. Also before the Court is
Yahoo!'s response to the objections, as well as
Plaintiffs' reply and Yahoo!'s sur-reply. Dkt. Nos.
60, 61 & 62.

On matters referred to the magistrate under 28
U.S.C. § 636(b), the district court makes a *de novo*
determination of those parts of the magistrate's
report, findings, or recommendations to which
timely objection is made. 28 U.S.C. § 636(b)(1);
*Garcia v. Boldin,* 691 F.2d 1172, 1179 (5th
Cir.1982). The district court may accept, reject, or
modify in whole or in part, the magistrate's findings
or recommendation. *Garcia,* 691 F.2d at 1179.
Upon a *de novo* review, and after reviewing all

relevant pleadings, the Court finds that Yahoo!'s
motion to dismiss (Dkt. No. 17) should be
**GRANTED.**

### I. BACKGROUND

An "e-group" is an internet-based forum where
users can "engage in discussions; share photos and
files; plan events; exchange ideas and information;
and nurture interests and activities ." Amended
Complaint, Dkt. No. 11 at ¶ 7. At the hearing
before the Magistrate Judge, Yahoo! represented
that it maintains nearly one million registered e-
groups. Hr'g Tr. at 8 (Nov. 7, 2005). Plaintiffs
allege that Yahoo! knowingly hosted illegal child
pornography on the "Candyman" e-group. Dkt. No.
11 at ¶¶ 18-23. The individual defendant, Mark
Bates, has been imprisoned for his involvement as
moderator of the "Candyman" e-group. Dkt. Nos.
57 at 4 & 60 at 3. Plaintiffs bring claims against
Yahoo! for violation of 18 U.S.C. § 2252A,
negligence, negligence per se, intentional infliction
of emotional distress, invasion of privacy, and civil
conspiracy.

The Communications Decency Act ("CDA"), 47
U.S.C. § 230, provides as follows:
(a) Findings
The Congress finds the following:
(1) The rapidly developing array of Internet and
other interactive computer services available to
individual Americans represent an extraordinary
advance in the availability of educational and
informational resources to our citizens.
(2) These services offer users a great degree of
control over the information that they receive, as
well as the potential for even greater control in the
future as technology develops.
(3) The Internet and other interactive computer
services offer a forum for a true diversity of
political discourse, unique opportunities for cultural
development, and myriad avenues for intellectual
activity.
(4) The Internet and other interactive computer
services have flourished, to the benefit of all

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                      Page 2
Slip Copy, 2006 WL 3813758 (E.D.Tex.), 35 Media L. Rep. 1435
**(Cite as: Slip Copy)**

Americans, with a minimum of government regulation.
(5) Increasingly Americans are relying on interactive media for a variety of political, educational, cultural, and entertainment services.
**\*2** ...
(c) Protection for "good samaritan" blocking and screening of offensive material
(1) Treatment of publisher or speaker
No provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider.
(2) Civil liability
No provider or user of an interactive computer service shall be held liable on account of-
(A) any action voluntarily taken in good faith to restrict access to or availability of material that the provider or user considers to be obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable, whether or not such material is constitutionally protected; or
(B) any action taken to enable or make available to information content providers or others the technical means to restrict access to material described in paragraph ( [A] ).
...
(e) Effect on other laws
(1) No effect on criminal law
Nothing in this section shall be construed to impair the enforcement of section 223 or 231 of this title, chapter 71 (relating to obscenity) or 110 (relating to sexual exploitation of children) of Title 18, or any other Federal criminal statute.
...
(f) Definitions
As used in this section:
...
(2) Interactive computer service
The term "interactive computer service" means any information service, system, or access software provider that provides or enables computer access by multiple users to a computer server, including specifically a service or system that provides access to the Internet and such systems operated or services offered by libraries or educational

institutions.
(3) Information content provider
The term "information content provider" means any person or entity that is responsible, in whole or in part, for the creation or development of information provided through the Internet or any other interactive computer service.
....

## II. REPORT AND RECOMMENDATION

The Magistrate Judge found Yahoo!'s motion procedurally proper and turned to the merits. Dkt. No. 56 at 7-10. The Magistrate Judge also found that § 230(c)(1) is not merely "definitional," as Plaintiffs argued, but rather is an immunity provision. *Id.* at 15-17. Next, the Magistrate Judge found that Yahoo! met the elements of § 230(c)(1) immunity: (1) Yahoo! is a provider of an "interactive computer service;" (2) the pornographic photographs at issue are "information provided by another information content provider;" and (3) Plaintiffs' claims treat Yahoo! as the "publisher or speaker" of the third party content. *Id.* at 18-27. Finally, the Magistrate Judge found that Plaintiffs' federal claim pursuant to 18 U.S.C. § 2252A did not fit within any exception to § 230. *Id.* at 29-31.

## III. PLAINTIFFS' OBJECTIONS

Plaintiffs first object that Magistrate Judge Craven improperly used defamation case law to immunize Yahoo! from violations of federal child pornography laws. Dkt. No. 57 at 6-9. Plaintiffs also argue that the civil remedy at issue (available under 18 U.S.C. § 2255) is exempt from immunity because it relates to 18 U.S.C § 2252A, which is a criminal statute. *Id.* at 13-17. Yahoo! responds that "enforcement" in the context of criminal laws refers to government prosecutions. Dkt. No. 60 at 16-20.

**\*3** Plaintiffs also argue that Yahoo! should be liable because it knowingly profited from the trafficking of illegal child pornography. Dkt. No. 57 at 10-11. Plaintiffs argue that *Zeran v. AOL, Inc.,* 129 F.3d 327 (4th Cir.1997), and other cases applying § 230,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

did not involve intentional conduct. *Id.* at 11-13. Plaintiffs allege that Yahoo! knowingly received and displayed the pornographic photographs at issue. Dkt. No. 11 at ¶¶ 18-23. Yahoo! responds that knowledge is irrelevant to § 230 immunity. Dkt. No. 60 at 13-14. Plaintiffs reply that "there is no case that has granted a service provider civil immunity for knowingly possessing child pornography." Dkt. No. 61 at 6. In sur-reply, Yahoo! also relies on *Zeran,* where the Fourth Circuit applied § 230 immunity even where Plaintiff alleged giving the internet service provider actual knowledge of the tortious content at issue. Dkt. No. 62 at 4.

Yahoo! also argued at the hearing before the Magistrate Judge that e-groups are "exactly the type of innovative platform for third party communications that Congress wanted to foster and encourage development [of]." Hr'g Tr. at 57.

## IV. DISCUSSION

Section 230(e)(1) provides, in relevant part: "Nothing in this section shall be construed to impair the enforcement of ... chapter ... 110 (relating to sexual exploitation of children) of Title 18, or any other Federal criminal statute." Plaintiffs allege violation of 18 U.S.C. § 2252A, which is under chapter 110 of Title 18 and therefore covered by the § 230(e)(1) exemption. While the ability of the government to prosecute internet service providers for alleged violations of 18 U.S.C. § 2252 is not disputed, the parties agree that the applicability of § 230(e)(1) to a private civil suit based on alleged criminal acts is an issue of first impression.

The Court finds that immunity from all private civil liability comports with the clear Congressional policies to avoid disincentives to innovation and to encourage self-regulation. Congress made these policies explicit in the language of the statute:
(b) Policy
It is the policy of the United States-
(1) to promote the continued development of the Internet and other interactive computer services and

other interactive media;
(2) to preserve the vibrant and competitive free market that presently exists for the Internet and other interactive computer services, unfettered by Federal or State regulation;
(3) to encourage the development of technologies which maximize user control over what information is received by individuals, families, and schools who use the Internet and other interactive computer services;
(4) to remove disincentives for the development and utilization of blocking and filtering technologies that empower parents to restrict their children's access to objectionable or inappropriate online material; and
(5) to ensure vigorous enforcement of Federal criminal laws to deter and punish trafficking in obscenity, stalking, and harassment by means of computer.

**\*4** Section 230 does not, as Plaintiffs propose, provide that an intentional violation of criminal law should be an exception to the immunity from civil liability given to internet service providers. Such a finding would effectively abrogate the immunity where a plaintiff simply alleged intentional conduct. Instead, "lawsuits seeking to hold a service provider liable for its exercise of a publisher's traditional editorial functions-such as deciding whether to publish, withdraw, postpone or alter content-are barred." *Zeran,* 129 F.3d at 330.

Plaintiffs make much of the allegation that Yahoo! profited from advertising on the "Candyman" e-group. However, Plaintiffs have not shown that Congress intended the question of immunity to turn on how the internet service provider earns its revenue, whether by subscription fees or by advertising. Yahoo!'s e-groups provide services substantially similar to those at issue in *Zeran. Id.* at 329. The threat of litigation in this context would have an "obvious chilling effect." *Id.* at 331. Internet service providers like Yahoo! have millions of users, and "[t]he amount of information communicated via interactive computer services is therefore staggering." *Id.* In light of the restriction of services that might result from a "specter of ...

Slip Copy                                                                                                        Page 4
Slip Copy, 2006 WL 3813758 (E.D.Tex.), 35 Media L. Rep. 1435
**(Cite as: Slip Copy)**

liability," Congress "chose to immunize service providers to avoid any such restrictive effect." *Id.* While *Zeran* considered § 230 in the context of defamation, these principles are equally applicable in the context of illegal pornography. *Doe v. AOL, Inc.,* 783 So.2d 1010, 1017 (Fl.2001).

The *Zeran* court also noted the Congressional purpose of removing disincentives to self-regulation by internet service providers. If internet service providers such as Yahoo! could be liable for reviewing materials but ultimately deciding to allow them, they would likely chose not to regulate at all. *Id.* Further, even simply responding to notices of potentially obscene materials would not be feasible because "the sheer number of postings on interactive computer services would create an impossible burden in the Internet context." *Id.* at 333. To the extent an internet service provider actually makes choices about its content, without immunity they "would be faced with ceaseless choices of suppressing controversial speech or sustaining prohibitive liability ." *Id.* While the facts of a child pornography case such as this one may be highly offensive, Congress has decided that the parties to be punished and deterred are not the internet service providers but rather are those who created and posted the illegal material, such as defendant Mark Bates, the moderator of the "Candyman" e-group.

The legislative history further buttresses the Congressional policy against civil liability for internet service providers. One key proponent of an amendment containing the language of § 230 at issue explained that "the existing legal system provides a massive disincentive for the people who might best help us control the Internet to do so." 141 Cong. Rec. H8469. Several legislators identified "obscenity" in particular as material that could be more freely regulated as a result of the immunity provided by the statute. Another proponent noted that "[t]here is no way that any of [the internet service providers], like Prodigy, can take the responsibility to edit out information that is going to be coming in to them from all manner of sources onto their bulletin board.... We are talking

about ... thousands of pages of information every day, and to have that imposition imposed on them is wrong." *Id.* at H8471. The House approved the amendment by a vote of 410 to 4. *Id.* at H8478.

**\*5** The Magistrate Judge correctly found that "Congress decided not to allow private litigants to bring civil claims based on their own beliefs that a service provider's actions violated the criminal laws ." Dkt. No. 56 at 31.

### V. CONCLUSION

For all of these reasons, the Court is of the opinion that the findings and conclusions of the Magistrate Judge are correct. Therefore, the Court hereby adopts the Report of the United States Magistrate Judge as the findings and conclusions of this Court. Accordingly, Yahoo!'s Motion to Dismiss (Dkt. No. 17) is hereby **GRANTED.**

This cause of action is therefore **DISMISSED WITH PREJUDICE.**

JOHN AND JANE DOE, as Next Friend of JOHNNY DOE, a Minor

V.

MARK BATES and YAHOO!, INC.
CAROLINE M. CRAVEN, United States Magistrate Judge.

### *REPORT AND RECOMMENDATION OF THE UNITED STATES MAGISTRATE JUDGE*

Pursuant to the provisions of 28 U.S.C. § 636(b)(1) and (3) and the Amended Order for the Adoption of Local Rules for Assignment of Duties to United States Magistrate Judges, Defendant Yahoo! Inc.'s Motion to Dismiss All Claims Against Yahoo! (Docket Entry # 17) was referred to the Honorable Caroline M. Craven for the purpose of preparing a report and recommendation. The Court, having reviewed the relevant briefing and hearing arguments of counsel,[FN1] recommends the motion be **GRANTED.** The Court further recommends Plaintiffs' above-entitled and numbered cause of action be **DISMISSED WITH PREJUDICE.**

Slip Copy                                                                    Page 5
Slip Copy, 2006 WL 3813758 (E.D.Tex.), 35 Media L. Rep. 1435
**(Cite as: Slip Copy)**

FN1. The Court conducted a hearing on Defendant's motion on November 7, 2005.

## I.

## BACKGROUND

John and Jane Doe, as Next Friend of Johnny Doe, a Minor ("Plaintiffs") filed this lawsuit against Mark Bates, proceeding *pro se,* and Yahoo!, Inc. ("Defendant"). Plaintiffs allege violations of 18 U.S.C. § 2252A, negligence, negligence per se, intentional infliction of emotional distress, invasion of privacy, and civil conspiracy. The First Amended Complaint ("FAC") alleges as follows:

Defendant is a global internet communications, commerce, media, and web content provider/ operator, providing online services to millions of worldwide users daily. FAC at 2, ¶ 6. One of the services offered by Defendant is known as E-groups, a web-based forum for like-minded computer users to connect via a topic-based web page. *Id.* at 3, ¶ 7. E-groups are topic-specific, which allow, encourage, and facilitate E-group members to engage in discussions, share photographs and files, plan events, exchange ideas and information, and nurture interests and activities. *Id.* E-groups have moderators, and the E-group web sites are hosted and operated by Defendant on its computers. *Id.* at 3, ¶ 9.

One of Defendant's E-groups was called Candyman. *Id.* Candyman, like Defendant's other E-groups, was hosted and operated by Defendant on its computers. *Id.* Defendant Bates was the Candyman web site moderator. *Id.* The purpose of the Candyman E-group was to provide a forum for sharing, posting, emailing, and transmitting hard-core, illegal child pornography. *Id.*

**\*6** Defendant knew about Candyman because Defendant Bates had to obtain Defendant's consent and authorization to moderate the group. *Id.* at 3, ¶ 11. Moreover, Defendant knew or had reason to know about the illegal nature of Candyman's content because (1) the site was in an adult entertainment subcategory, (2) its introductory web

page expressly stated that the group was for people who "love kids," and (3) any type of message, picture, or video could be posted on the site. *Id.* at 3, ¶ 10.

Soon after Candyman was established, it attracted thousands of members who, via Defendant's servers, posted, stored, viewed, and exchanged thousands of illegal, hard-core child pornographic photographs and video clips of illegal sex acts with children. *Id.* at 4, ¶ 11. Candyman members participated in live chat discussions and were even polled by Bates as to (1) whether they preferred hard-core child pornography or so-called "soft-pics," and (2) the preferred age of the children featured on the site. *Id.* at 4, ¶¶ 11-12. It is undisputed that Candyman's content included illegal child pornography.

Defendant Bates and others were arrested and prosecuted as a result of a nationwide child pornography sting operation in 2000 and 2001. Bates pled guilty to violating 18 U.S.C. § 2252A, which makes interstate distribution of child pornography a federal felony. Bates is currently serving a thirty year sentence in a federal prison in California. *See* Defendant's mot. at 3.

Despite knowledge of the E-group's content, Defendant did nothing to prevent, remove, or block the illegal child pornographic material from being stored on its web site or its servers, or to remove it once it was stored there. FAC at 5, ¶ 16. Defendant generated substantial advertising revenue from the site's high traffic volume. *Id.* Until Defendant shut down the E-group on February 6, 2001, *see* Defendant's mot. at 5, Defendant profited by hosting Candyman's illegal child pornography. FAC at 5, ¶ 16.

Among the pornographic images uploaded onto Candyman were sexually explicit photographs of the Does' minor son, Johnny Doe. The photographs were illegal child pornography and were taken by a neighbor of the Does who was a member of the Candyman E-group. FAC at 4, ¶ 15. According to Defendant's motion, the neighbor was also caught

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2006 WL 3813758 (E.D.Tex.), 35 Media L. Rep. 1435
(Cite as: Slip Copy)

Page 6

in the government's "Operation Candyman" sting operation, pled guilty to violating 18 U.S.C. § 2252A, and is currently serving a twelve year sentence in federal prison. *See* Defendant's mot. at 4.

After the photographs were uploaded by the neighbor, Defendant stored them on its computers, knowingly permitted and allowed them to be available for accessing by Candyman members and others, and distributed them to pedophiles all over the world who subscribed to Defendant's service and opted to take advantage of Defendant's automatic email service. FAC at 4-5, ¶ 15. Defendant not only created, hosted, and maintained the portal through which thousands of pedophiles prospered and hundreds of children, including Johnny Doe, were victimized, but Defendant also profited from its actions. *Id.* at 5, ¶ 16.

## II.

### DEFENDANT'S MOTION

#### A. Defendant's arguments, generally

*7 Defendant moves, pursuant to Federal Rule of Civil Procedure 12(b)(6), for dismissal with prejudice all claims asserted against it in Plaintiffs' FAC. According to Defendant, the Communications Decency Act, 47 U.S.C. § 230 ("Section 230"), immunizes interactive service providers such as Defendant from this type of litigation. Defendant refers to numerous cases, asserting courts around the country have held that "Section 230 broadly prohibits the imposition of civil liability on interactive service providers for harms caused by the dissemination of content created and developed by third parties." [FN2] Defendant asserts Section 230 immunity from liability applies with full force here because Plaintiffs have not, and could not, allege that Defendant participated in the creation or development of the allegedly unlawful photographs of Johnny Doe.

FN2. Defendant's mot. at 2.

### B. Plaintiffs' response, generally

In response, Plaintiffs first assert the motion should be denied as procedurally improper and premature. In this regard, Plaintiffs contend Defendant's claim is an affirmative defense to Plaintiffs' allegations, and affirmative defenses may not be used to dismiss a plaintiff's complaint under Rule 12(b)(6). Plaintiffs request Defendant's immunity from civil liability be determined only after discovery is completed and after Plaintiffs have had an opportunity to further amend the FAC.

In addition, Plaintiffs' Opposition makes three basic arguments against application of Section 230. First, Plaintiffs assert Section 230(c)(1) does not apply because it is not an immunity provision, but instead is merely "definitional" in nature. Second, Plaintiffs claim the elements of Section 230(c)(1) immunity are not met here because Defendant may have had some input into the Candyman group, and one or more of their claims do not treat Defendant as the "publisher or speaker" of the harmful content. Third, even if Section 230 applies, Plaintiffs argue that their federal claim falls within Section 230's exception for "enforcement" of a "federal criminal statute."

### III.

### APPLICABLE STANDARD

Fed.R.Civ.P. 12(b)(6) authorizes a dismissal of a complaint for "failure to state a claim upon which relief can be granted." A 12(b)(6) motion should be granted only if it appears beyond doubt that the plaintiff could prove no set of facts in support of his claim that would entitle him to relief. *See Conley v. Gibson,* 355 U.S. 41, 45-46 (1957). Before dismissal is granted, the court must accept all well-pleaded facts as true and view them in the light most favorable to the nonmovant. *Capital Parks, Inc. v. Southeastern Advertising and Sales Sys., Inc.,* 30 F.3d 627, 629 (5th Cir.1994). A court need not, however, accept as true allegations that are conclusory in nature. *Kaiser Aluminum & Chem. Sales, Inc. v. Avondale Shipyards, Inc.,* 677 F.2d 1045, 1050 (5th Cir.1982).

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                      Page 7
Slip Copy, 2006 WL 3813758 (E.D.Tex.), 35 Media L. Rep. 1435
**(Cite as: Slip Copy)**

## IV.

### WHETHER DEFENDANT'S MOTION IS PROCEDURALLY IMPROPER OR PREMATURE

#### A. Plaintiffs' arguments

*8 As an initial matter, Plaintiffs assert Defendant's motion is procedurally improper and premature. Specifically, Plaintiffs rely on *Doe v. GTE Corp.,* 347 F.3d 655, 657 (7th Cir.2003) and *Novak v. Overture Services, Inc.,* 309 F.Supp.2d 446,452 (E.D.N.Y .2004), wherein the courts stated affirmative defenses generally do not justify dismissal under Federal Rule of Civil Procedure 12(b)(6). In both cases, the plaintiffs did not oppose resolution of the defendants' Section 230 immunity defenses on motions to dismiss under Rule 12(b)(6). Because the plaintiffs (1) did not insist upon the proper procedure, raising the defense in a Rule 12(c) motion to dismiss as opposed to a Rule 12(b)(6) motion to dismiss, (2) did not seek better notice of the defense, and (3) did not seek discovery, both courts declined to "fuss[ ] over procedural niceties to which the parties are indifferent." *Doe v. GTE Corp.,* 347 F.3d at 657; *Novak,* 309 F.Supp.2d at 452. The courts then considered the merits of the defendants' Section 230 immunity defense arguments.

Here, Plaintiffs insist they are not indifferent to the proper procedure and do not consent to resolution of Defendant's Section 230 immunity defense on a motion to dismiss under Rule 12(b)(6). Plaintiffs also request that the immunity issue be determined only after discovery is completed and they have had an opportunity to further amend the FAC. Plaintiffs agree with Defendant that the FAC does not allege that Defendant had a specific role in the "creation and development" of Candyman's child pornography. However, Plaintiffs state this is so because they do not know exactly what Defendant did, or did not do, with respect to the site. Plaintiffs contend they have alleged that Defendant placed advertising on the site, and there is reason to believe that Defendant may have done something

more.

#### B. Defendant's response

On the other hand, Defendant asserts its Section 230 immunity defense relies entirely on the allegations on the face of the FAC, and therefore the defense is properly asserted in a Rule 12(b)(6) motion to dismiss. Defendant maintains Plaintiffs ignore the Fifth Circuit precedent and point to a few cases from other jurisdictions in which courts suggested, in dicta, that an affirmative defense could not be brought on a Rule 12(b)(6) motion to dismiss. Defendant asserts it is clear that in the Fifth Circuit (as elsewhere) dismissal is appropriate "if [the] affirmative defense ... appears on the face of the complaint." *Garrett v. Commonwealth Mortgage Corp. of Am.,* 938 F.2d 591, 594 (5th Cir.1991); *see also Neel v. Rehberg,* 577 F.2d 262, 264 (5th Cir.1978) ("[A]n affirmative defense ... may be raised by a motion to dismiss for failure to state a claim upon which relief can be granted pursuant to Fed.R.Civ.P. 12(b)(6).").

Moreover, according to Defendant, Plaintiffs overlook the fact that courts routinely have granted motions to dismiss based on Section 230 immunity in situations such as this-where the defendant's entitlement to immunity was apparent on the face of the complaint. Defendant argues that permitting it to assert Section 230 immunity only after discovery is completed would defeat one of the fundamental purposes of the immunity, namely to insulate service providers not only from liability, but also from the burdens of litigation, including those associated with discovery. Defendant points to the language of the statute which specifically states both that "no liability may be imposed" and that "[n]o cause of action may be brought" based on state law that is inconsistent with Section 230. 47 U.S.C. § 230(e)(3)(emphasis added). In sum, Defendant contends Section 230 immunity clearly may be asserted on a Rule 12(b)(6) motion to dismiss where its elements are apparent from the face of the complaint.

#### C. Discussion

Slip Copy                                                                                          Page 8
Slip Copy, 2006 WL 3813758 (E.D.Tex.), 35 Media L. Rep. 1435
(Cite as: Slip Copy)

**\*9** Plaintiffs present the Court with cases indicating a Rule 12(b)(6) motion to dismiss is a procedurally improper method for determining the applicability of an affirmative defense provided by Section 230. Not only are the cases from other jurisdictions, but the *Doe* decision, relied upon by the court in *Novak,* also indicates the Court may recast its decision as a judgment on the pleadings under Rule 12(c). *Doe v. GTE Corp.,* 347 F.3d at 657.

In addition, Fifth Circuit cases indicate a Rule 12(b)(6) motion, properly raised before the service of a responsive pleading (as was done in this case), may be used to raise an affirmative defense. *See Puckett v. United States,* 82 F.Supp.2d 660 (S.D.Tex.1999). In *Puckett,* the defendant files its Rule 12(b)(6) motion after filing its answer to the plaintiffs' complaint. *Id.* at 663. The *Puckett* court initially noted that (1) courts do not mechanically deny any motion made after a responsive pleading as untimely; (2) if the defendant has previously included in the answer the defense raised in the Rule 12(b)(6) motion, thereby giving notice, then courts generally allow Rule 12(b)(6) motions filed after the answer; and (3) the courts consider Rule 12(b)(6) motions to dismiss filed after a responsive pleading, not as a Rule 12(b)(6) motion, but as a Rule 12(c) motion for judgment on the pleadings. *Id.*

Because the defendant had previously raised *res judicata* as an affirmative defense in its answer to the plaintiffs' original complaint, the *Puckett* court treated the defendant's Rule 12(b)(6) motion as a Rule 12(c) motion for judgment on the pleadings. *Id.* The court then noted that the standard applicable to a Rule 12(c) motion is the same as that applicable to a Rule 12(b)(6) motion to dismiss for failure to state a claim. *Id. See also Johnson v. Johnson,* 385 F.3d 503, 529 (5th Cir.2004).

Another district court in the Fifth Circuit has considered the same affirmative defense asserted in this case-that all of the plaintiff's claims are barred by Section 230 immunity. *See MCW, Inc. v. Badbusinessbureau.com LLC,* 2004 WL 833595, \*2 (N.D.Tex.2004)(unpub.). The defendants in *MCW*

raised the Section 230 immunity defense in the context of a Rule 12(b)(6) motion. *Id.* The court stated that the Communications Decency Act ("CDA"), "if applicable, is an appropriate ground for dismissal of the complaint under Rule 12(b)(6) because the Act would preclude [the plaintiff] from establishing a set of facts that would entitle it to relief." *Id.* at \* 7, *citing Schneider v. Amazon.com, Inc.,* 108 Wash.App. 454, 31 P.3d 37 (Wash.Ct.App.2001)(affirming the trial court's decision to dismiss a cause of action, pursuant to a Rule 12(b)(6) motion, where immunity was extended to Amazon. com through the CDA).

Here, Defendant raised the Section 230 immunity defense in a Rule 12(b)(6) motion, which was filed properly, prior to the service of a responsive pleading. The Court in its research located only one case within the Fifth Circuit having addressed the Section 230 immunity defense, and it specifically endorsed the use of a Rule 12(b)(6) motion to raise the defense. *MCW, Inc. v. Badbusinessbureau. com LLC,* 2004 WL 833595 (N.D.Tex.2004)(unpub.). The case is unpublished, but the Court still finds the decision persuasive in this context. Moreover, even if the Court were to determine Defendant had not utilized the proper motion, the Court could properly treat it as a Rule 12(c) motion for judgment on the pleadings. For these reasons, the Court finds Defendant's motion is procedurally proper.

**\*10** Turning to the issue of whether Defendant's motion is premature, Plaintiffs indicate they want more discovery before the Court rules on the Section 230 immunity defense. As discussed in detail in Section VII(D)(2) below, based on Plaintiffs' current allegations and the applicable case law, no amount of discovery would establish a set of facts that would entitle Plaintiffs to relief. Additionally, Plaintiffs filed this cause of action in early May of 2005 and were able to conduct discovery until the Court's October 19, 2005 Order staying discovery pending the ruling on Defendant's current motion. Plaintiffs have also had the opportunity to file an amended complaint in this case.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                              Page 9
Slip Copy, 2006 WL 3813758 (E.D.Tex.), 35 Media L. Rep. 1435
(Cite as: Slip Copy)

Moreover, Defendant properly raised the immunity defense in its motion to dismiss filed July 22, 2005. Not only has the immunity issue been fully briefed by the parties, but the Court has also conducted a hearing on Defendant's motion. The motion is ripe for consideration, and the Court agrees with Defendant that further delay in ruling on its motion will defeat one of the fundamental purposes of the immunity, namely to insulate service providers not only from liability, but also from the burdens of litigation, including those associated with discovery. In sum, the Court finds Defendant's motion is not premature.

After delineating the applicable law on the Section 230 immunity defense, the Court will consider Plaintiff's additional arguments that (1) Section 230(c)(1) does not apply because it is not an immunity provision, but instead is merely "definitional" in nature; (2) the elements of Section 230(c)(1) immunity are not met here because Defendant may have had some input into the Candyman group, and one or more of their claims do not treat Defendant as the "publisher or speaker" of the harmful content; and (3) even if Section 230 applies, Defendant's federal claim falls within Section 230's exception for "enforcement" of a "federal criminal statute."

## V.

## APPLICABLE LAW

### A. The Communications Decency Act, 47 U.S.C. § 230

The Communications Decency Act, 47 U.S.C. § 230, provides that:
(c) Protection for 'Good Samaritan' blocking and screening of offensive material.
(1) Treatment of publisher or speaker. No provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider.
(2) No provider or user of an interactive computer service shall be held liable on account of-(A) any

action voluntarily taken in good faith to restrict access to or availability of material that the provider or user considers to be obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable, whether or not such material is constitutionally protected; or (B) any action taken to enable or make available to information content providers or others the technical means to restrict access to material described in paragraph (1).

**\*11** 47 U.S.C. § 230(c). Defendant is relying solely on the Section 230(c)(1) immunity.

The term "interactive computer service" is defined as "an information service, system, or access software provider that provides or enables computer access by multiple users to a computer server, including specifically a service or system that provides access to the Internet and such systems operated or services offered by libraries or educational institutions." *Id.* § 230(f)(2). The term "information content provider" is defined as "any person or entity that is responsible, in whole or in part, for the creation or development of information provided through the Internet or any other interactive computer service." *Id.* § 230(f)(3).

### B. Case Law

Section 230 generally immunizes interactive service providers from liability for harm caused by the dissemination of third-party information. *Barnes v. Yahoo! Inc.,* 2005 WL 3005602, *2 (D.Or. Nov. 8, 2005). The *Barnes* court provides the following legislative history for Section 230:
The legislative history surrounding Congress's creation of § 230 represented the desire to protect online intermediaries from liability for unlawful third-party content. Congress reasoned that any liability would threaten development of the online industry as a medium for new forms of mass communication and simultaneously create disincentives to self regulate such content by service providers. Congress therefore determined that liability should rest with the actual wrongdoers-the originators of the illegal and

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                   Page 10
Slip Copy, 2006 WL 3813758 (E.D.Tex.), 35 Media L. Rep. 1435
**(Cite as: Slip Copy)**

harmful content-and not intermediary servers whose systems are sometimes abused by wrongdoers.

*Id.*

Section 230 does not immunize an interactive computer service if it also functions as an information content provider for the portion of the statement or publication at issue. *Carafano v. Metrosplash .com,* 339 F.3d 1119, 1125 (9th Cir.2003); *see also Blumenthal v. Drudge,* 992 F.Supp. 44, 50 (D.D.C.1998)(acknowledging that Section 230(c)(1) would not immunize AOL with respect to any information developed or created entirely by itself and that joint liability would be possible if AOL "had any role in creating or developing any of the information" in the posted material). "The distinction between merely publishing information provided by a third-party as an interactive computer service and actually creating or developing any of the information posted as an information content provider is critical." *MCW, Inc. v. Badbusinessbureau.com LLC,* 2004 WL 833595, *8 (N.D.Tex.2004)(unpub.), *citing Carafano v. Metrosplash.com, Inc.,* 207 F.Supp.2d 1055, 1067 (C.D.Cal 2002), *aff'd on other grounds,* 339 F.3d 1119 (9th Cir.2003)(rejecting the trial court's conclusion that Matchmaker.com was an information content provider).

In the seminal case *Zeran v. America Online, Inc.,* 129 F.3d 327 (4th Cir.1997), *cert. denied,* 524 U.S. 937 (1998), the plaintiff argued that AOL unreasonably delayed in removing defamatory messages posted by an unidentified third party, refused to post retractions of those messages, and failed to screen for similar postings thereafter. *Id.* at 328. Specifically, the plaintiff alleged that when he contacted AOL to demand the internet postings be removed, he was allegedly assured that the postings would be removed. *Id.* at 329. When the internet postings were not removed, the plaintiff filed suit against AOL for negligently failing to act quickly enough and in preventing further similar postings.

*12 The Fourth Circuit rejected the plaintiff's claims, holding that because he was seeking to hold the service provider liable based on injuries allegedly resulting from the dissemination of third-party content, his claims necessarily sought to treat the service provider as "publisher" of that content, regardless of the particular label attached to the plaintiff's claims. *Id.* at 332-33. The court found AOL was immune from suit. *Id.*

Three other federal courts of appeals have also held that Section 230 immunizes computer service providers from liability for information that originates with third parties. *See Carafano,* 339 F.3d at 1123 (9th Cir.2003)(noting that the Ninth Circuit in *Batzel v. Smith,* 333 F.3d 1018 (9th Cir.2003) had "joined the consensus developing across other courts of appeals that § 230(c) provides broad immunity for publishing content provided primarily by third parties"); *see also Green v. America Online,* 318 F.3d 465, 471 (3d Cir.2003)(upholding immunity for the transmission of defamatory messages and a program designed to disrupt the recipient's computer); *Ben Ezra, Weinstein, & Co. v. America Online, Inc.,* 206 F.3d 980, 985-86 (10th Cir.2000)(upholding immunity for the on-line provision of stock information even though AOL communicated frequently with the stock quote providers and had occasionally deleted stock symbols and other information from its database in an effort to correct errors).

## VI.

## WHETHER SECTION 230(c)(1) IS MERELY A "DEFINITIONAL" PROVISION

### A. Plaintiffs' arguments

According to Plaintiffs, Section 230(c)(2) provides the substantive "protection for blocking and screening of offensive material" by immunizing Internet service providers from civil liability for either taking steps to restrict access to or availability of material that is considered objectionable, or enabling others to do so. *See* 42 U.S.C. § 230(c)(2). Absent these activities,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                    Page 11
Slip Copy, 2006 WL 3813758 (E.D.Tex.), 35 Media L. Rep. 1435
(Cite as: Slip Copy)

Plaintiffs assert it is not inconsistent to hold the internet providers liable under state causes of action. In other words, Plaintiffs contend that if an Internet service provider such as Defendant takes affirmative steps to block or screen objectionable material, such as child pornography, then it has no liability to the censored customer. Using their interpretation, Plaintiffs state that under Section 230(c)(2), Defendant's steps to shut down Candyman after it became aware of the investigation by the F.B.I. protects Defendant from liability to the censored customers for that action.FN3

> FN3. The Court notes that Defendant is not seeking immunity pursuant to Section 230(c)(2) but rather pursuant to Section 230(c)(1).

However, Plaintiffs disagree with Defendant's claim pursuant to Section 230(c)(1) that it is protected from liability to the victims of Candyman's child pornography for failing to censor the site. Plaintiffs rely on *Doe v. GTE Corp.*, 347 F.3d 655 (7th Cir.2003), asserting Section 230(c)(1) does not apply because it is not an immunity provision, but instead is merely "definitional" in nature.

### B. *Doe v. GTE Corp.*

*13 In *GTE,* after the district court had dismissed the plaintiffs' claims based on Section 230, a panel of the Seventh Circuit affirmed on state law grounds and therefore did not decide whether Section 230 applied. *Id.* at 660-61. The appellate court nevertheless mused about potential interpretations of Section 230 that differed from the interpretation that all other courts had adopted. In particular, it hypothesized, and Plaintiffs here assert, that Section 230(c)(1) may not be a prohibition on liability at all, but instead may be merely a "definitional" provision that delineates the scope of persons who are entitled to the protection of the separate immunity set forth in Section 230(c)(2). *Id.* at 660.

Section 230(c)(2), as the *GTE* court noted, protects a "provider or user" of an interactive computer service from liability for efforts to *remove or restrict* content that the defendant in good faith determines to be harmful or objectionable. *Id.* at 659. Under the "definitional" reading of Section 230(c)(1) offered in *GTE,* "an entity would remain 'a provider or user'-and thus be eligible for the immunity under § 230(c)(2)-as long as the information came from someone else; but it would become a 'publisher or speaker' and lose the benefit of § 230(c)(2) if it created the objectionable information." *Id.* at 660.

### C. Discussion

This "definitional" reading of the statute is untenable for at least four reasons offered by Defendant in this case. First, Section 230 has its own, separately designated "definitions" section that explicitly defines terms used elsewhere in the statute, including terms used in Section 230(c). *See* 47 U.S.C. § 230(f). As a structural matter, therefore, it makes little sense to suggest that Section 230(c)(1) is also intended to be nothing more than definitional.

Second, on its face, Section 230(c)(1) does not purport to be a "definition" of anything; it states that "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." 47 U.S.C. § 230(c)(1). While the *GTE* dictum hypothesizes that Section 230(c)(1) might define the term "provider or user," that section functions not to attribute a particular meaning to that term, but rather as a substantive prohibition on how "provider[s] and user[s]" may be "treated." *Id.*

Third, according to the *GTE* definitional dictum, a provider or user may become a "publisher or speaker" if it creates the objectionable information and thereby "lose the benefit of § 230(c)(2)." *Doe v. GTE Corp.,* 347 F.3d at 660. But nothing in Section 230(c)(2) suggests that its applicability depends on whether the defendant is or is not a "publisher or speaker." Indeed, Section 230(c)(2)

Slip Copy
Slip Copy, 2006 WL 3813758 (E.D.Tex.), 35 Media L. Rep. 1435
(Cite as: Slip Copy)

Page 12

does not even use those terms. The plain meaning of Section 230(c)(2) is that a provider or user is immune for removing or restricting content as long as it believes in "good faith" that the content is unlawful or objectionable-nothing in Section 230(c)(2) implies that being the publisher or speaker of the content in question makes any difference.

**\*14** Fourth, the meaning that the *GTE* dictum would attribute to Section 230(c)(1) would serve no purpose. According to Plaintiffs, the immunity under Section 230(c)(2) is intended to ensure that, if a provider or user removes particular content, "it has no liability to the censored customer" whose content has been removed. The *GTE* court's hypothesis presumes that the purpose of Section 230(c)(1) is to make clear that Section 230(c)(2) immunity does not apply where the provider itself created the content in question-that is, where the provider itself would be the "censored" party. But a provider is not going to sue *itself* for removing its own content, and thus the elimination of the immunity in that context would be meaningless. As a result, the interpretation of Section 230(c)(1) advocated by Plaintiffs would render that provision a practical nullity.

The only rationale the *GTE* court and Plaintiffs offer for their "definitional" reading of Section 230(c)(1) is the claim that it is the only way to square the meaning of the statute with its title-"Protection for 'Good Samaritan' blocking and screening of offensive material." *Doe v. GTE Corp.,* 347 F.3d at 660. As an initial matter, where the heading or title of a statute conflicts with its actual text, the text must prevail. *See, e.g., Trainmen v. Baltimore & Ohio R.R.,* 331 U.S. 519, 528-29 (1947). In any event, the conflict that Plaintiffs posit between the statute's title and the interpretation of Section 230(c)(1) adopted by the courts is illusory. Section 230(c)(1) immunity serves an important policy goal that corresponds with the meaning of the statute's title: By eliminating the risk of liability for third-party content, Section 230(c)(1) frees service providers to monitor and screen their services and take actions to block harmful content without risk that such monitoring would provide the notice or knowledge that could be the basis for liability. It promotes self-regulation.

Finally, the Court notes that every court that has made a ruling under Section 230(c)(1), including four federal courts of appeals, has agreed that Section 230(c)(1) is an independent source of immunity for harm caused by third-party content. No court has embraced the *GTE* dicta cited by Plaintiffs. This Court rejects it as well.

## VII.

## WHETHER THE ELEMENTS OF SECTION 230(c)(1) IMMUNITY ARE MET

### A. The elements of Section 230(c)(1) immunity

Three elements are required for Section 230 immunity. *Schneider v. Amazon.com, Inc.,* 108 Wash.App. 454, 31 P.3d 37 (Wash.Ct.App.2001). The defendant must be a provider or user of an "interactive computer service." The asserted claims must treat the defendant as a publisher or speaker of information. The information must be provided by another "information content provider." *Id.* at 39; *see also* 47 U.S.C. § 230(c)(1).

### B. Plaintiffs' arguments

Plaintiffs argue the elements of Section 230(c)(1) immunity are not met here because Defendant may have had some input into the Candyman group, and one or more of their claims do not treat Defendant as the "publisher or speaker" of the harmful content. Plaintiffs assert Defendant may have put advertisements on the E-group pages or provided format or organization for the pages. Plaintiffs do not know what Defendant did with the website when the information was stored; Defendant possibly modified or enlarged the pictures. In any event, Plaintiffs contend this is different from the traditional case, and their pleadings allege what they need to hold Defendant liable.

### C. Defendants' response

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy

Slip Copy, 2006 WL 3813758 (E.D.Tex.), 35 Media L. Rep. 1435

**(Cite as: Slip Copy)**

**\*15** Defendant contends each of the three necessary elements for application of Section 230(c)(1) immunity is apparent from the face of the FAC. As for Plaintiffs' point that Defendant may have put advertisements on the E-group pages or provided format or organization for the pages, Defendant contends this position has been rejected by numerous courts. *See Carafano v. Metrosplash.com, Inc.,* 339 F.3d 1119 (9th Cir.2003); *Ben Ezra, Weinstein, and Co., Inc. v. America Online Inc.,* 206 F.3d 980 (10th Cir.2000); *Blumenthal v. Drudge,* 992 F.Supp. 44 (D.D.C.1998). According to Defendant, the only issue is whether Defendant somehow helped in creating the photographs. Again, Defendant maintains Plaintiffs have not, and could not, allege that Defendant participated in the creation or development of the allegedly unlawful photographs of Johnny Doe.

### D. Discussion

### 1. The first element-whether Defendant is a provider of an "interactive computer service"

The FAC describes Defendant as a "global internet communications, commerce, media, and web content provider/operator" and the service at issue as a "web-based forum" allowing "like-minded computer users to interact via a topic-based web page." FAC at ¶¶ 6-7. The term "interactive computer service" is defined as "an information service, system, or access software provider that provides or enables computer access by multiple users to a computer server, including specifically a service or system that provides access to the Internet and such systems operated or services offered by libraries or educational institutions." *Id.* § 230(f)(2). Based on the allegations contained in the FAC, the Court finds Defendant is a provider of an "interactive computer service" and therefore falls within the class of entities entitled to the protections of Section 230.

### 2. The second element-whether the pornographic photographs are "information provided by another information content provider"

The term "information content provider" is defined as "any person or entity that is responsible, in whole or in part, for the creation or development of information provided through the Internet or any other interactive computer service." *Id.* § 230(f)(3). Plaintiffs allege Defendant "not only created, hosted and maintained the *portal through which* thousands of pedophiles prospered and hundreds of children, including Johnny Doe, were victimized, but [Defendant] profited from it." FAC at 5, ¶ 16 (emphasis added). Plaintiffs further allege Defendant was an active participant in that it had the child pornography stored on its servers and placed advertisements on its E-group web pages. *Id.* at 12, ¶ 67. Finally, in this regard, Plaintiffs allege Defendant "created and maintained the *facility* for posting and distributing pornographic images of Johnny Doe being sexually violated." *Id.* at 13, ¶ 80 (emphasis added).

Plaintiffs' allegations, taken as true, establish that Defendant created, hosted, and maintained the Candyman E-group and placed advertisements on the E-group web pages. The allegations do not establish, as they must to survive Section 230(c)(1) immunity, that Defendant is responsible, in whole or in part, for the creation or development of the information provided through the Candyman E-group.

**\*16** As pointed out by Defendant, Plaintiffs allege the photographs were taken and uploaded by the Does' neighbor. FAC at 4, ¶ 15. Plaintiffs further allege Defendant "breached its duty of reasonable care to Johnny Doe by permitting the Candyman web site to serve as a platform for the uploading, downloading and large-scale distribution of hardcore child pornography through its *servers without oversight or intervention* because it was profitable to do so." *Id.* at 7, ¶ 32 (emphasis added). Plaintiffs' claims are necessarily based on "information provided by *another* information content provider." 47 U.S.C. § 230(c)(1)(emphasis added).

In particular, Plaintiffs' case revolves around the harm that allegedly has arisen from the dissemination of "child pornographic pictures of

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                    Page 14
Slip Copy, 2006 WL 3813758 (E.D.Tex.), 35 Media L. Rep. 1435
**(Cite as: Slip Copy)**

Johnny Doe." (FAC ¶¶ 15, 20-23). Because it has not been alleged Defendant played any role in the "creation or development" of those images, it follows the images were provided by "another information content provider." *See* 47 U.S.C. § 230(f)(3). This critical fact is readily apparent on the face of the FAC, which affirmatively alleges the pornographic images of Johnny Doe were created and uploaded by the Does' neighbor rather than Defendant. The FAC explicitly asserts it was the Does' neighbor who "took illegal child-pornographic photographs of [Johnny Doe] and uploaded them onto the Yahoo Candyman E-group site." (FAC at 4 ¶ 15; *see also id.* ¶ 21 ("Yahoo *received* these child pornographic photographs of Johnny Doe when they were uploaded onto Yahoo's Candyman website and stored on Yahoo's computers.")(emphasis added).

The allegations contained in the FAC do not warrant additional discovery. No amount of discovery into the issues of whether Defendant placed advertising onto the website or even modified or enlarged the photographs could change the allegations contained in Plaintiffs' FAC that specifically acknowledge the images were provided by "another information content provider." In addition, no amount of discovery into whether Defendant enlarged or even modified the photographs would establish a set of facts that would entitle Plaintiffs to relief. This is so because, based on the allegations contained in the live pleading before the Court and based on the case law detailed below, additional discovery would not provided a set of facts for Plaintiffs to allege Defendant played a significant role in the "creation or development" of the specific content alleged to have injured Plaintiffs. The Court elaborates as follows.

Contrary to Plaintiffs' suggestion, the plain language of Section 230 dictates an analysis that focuses on whether the particular injurious "information" giving rise to the claims was provided by the service provider or by "another information content provider." And that in turn depends on whether the service provider was

"responsible, in whole or in part, for the *creation or development*" of that particular information. 47 U.S.C. § 230(f)(3)(emphasis added). In this case, the content for which Plaintiffs seek to hold Defendant liable are the pornographic pictures of Johnny Doe. Thus, the question is whether Defendant was responsible for the creation or development of those images. According to the allegations contained in the FAC, the "information" at issue was not provided by Defendant but was "provided by another information content provider."

**\*17** The case law confirms that the immunity analysis turns on who was responsible for the specific harmful material at issue, not on whether the service provider was responsible for the general features and mechanisms of the service or other content (such as advertisements) that might also have appeared on the service. For example, in *Carafano v. Metrosplash. com,* 339 F.3d 1119 (9th Cir.2003), the plaintiff asserted that the defendant Matchmaker.com ("Matchmaker"), the operator of an online dating service, was liable for a false, unauthorized, and sexually explicit profile of the plaintiff that an unidentified user had posted to the service. The plaintiff argued that Matchmaker was an "information content provider" with respect to all the profiles on the service, and therefore was not entitled to the protection of Section 230, because Matchmaker had provided the basic forms that were used to generate the profiles and had shaped the content of the profiles through the use of multiple choice questions whose answers were sometimes sexually suggestive. *Id.* at 1123-24.

The Ninth Circuit Court of Appeals rejected the plaintiff's argument, stating that even though Matchmaker had contributed both "structure and content" to its online profile service, it could not be held liable for profiles generated through that service except to the extent it "created or developed *the particular information at issue"* in the case. *Id.* at 1125 (emphasis added). Because it was undisputed that the unidentified user, not Matchmaker, had supplied the answers to the multiple choice questions and the identifying

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                           Page 15
Slip Copy, 2006 WL 3813758 (E.D.Tex.), 35 Media L. Rep. 1435
**(Cite as: Slip Copy)**

information that in combination made the profile a false and defamatory depiction of the plaintiff, the "particular information at issue" was "provided by another content provider." The court held "Matchmaker did not play a significant role in creating, developing or 'transforming' the relevant information" and found it immune from suit. *Id.* at 1125.

Many other courts have similarly confirmed the critical question is not whether the service provider played a role in shaping the forum or service through which the allegedly harmful information was conveyed, but rather whether the service provider contributed to the creation or development of the specific content that is alleged to have injured the plaintiff. In *Ben Ezra, Weinstein & Co. v. America Online, Inc.,* 206 F.3d 980, 985-86 (10th Cir.2000), the Tenth Circuit held that AOL was immune from liability for injuries resulting from faulty stock quotes that had appeared on its service after it was shown that the vendor who supplied the stock quote data was the source of the particular erroneous data at issue. It mattered not that AOL had designed and promoted the "personal finance channel" on which the stock quote data appeared or even that AOL had "deleted some stock symbols or other information ... in an effort to correct the errors." *Id.*

Similarly, in *Blumenthal v. Drudge,* 992 F.Supp. 44, 51-52 (D .D.C.1998), the court held AOL immune from defamation claims based on a particular false assertion that the gossip columnist Matt Drudge had authored for his Drudge Report. The court so held notwithstanding (1) AOL's otherwise active role in making the Drudge Report available to its subscribers, including its hiring of Drudge as an independent contractor; (2) its "affirmative[ ] promot[ion]" of him as a "runaway gossip success;" (3) its express retention of "certain editorial rights with respect to the content" of the Drudge Report; and (4) its payment to Drudge of a royalty that was his sole source of income at the time. *See also Gentry v. eBay, Inc.,* 99 Cal.App. 4th at 833 n. 11 (service provider's involvement with content of website "*is* irrelevant if [the service

provider] did not itself create or develop the content for which [the plaintiffs] seek to hold it liable"). In sum, because the FAC affirmatively asserts that someone other than Defendant created and developed the particular unlawful and injurious photographs at issue in this case, those photographs as a matter of law constitute "information provided by another information content provider."

### 3. The third element-whether Plaintiffs' claims seek to treat Defendant as the "publisher or speaker" of the third-party content .

**\*18** Defendant asserts the third element for immunity is satisfied because imposing liability on Defendant would, in at least three different respects, "treat" Defendant as the "publisher or speaker" of the unlawful content that the Does' neighbor allegedly uploaded onto the Candyman E-group. First, according to Defendant, this lawsuit seeks to impose on Defendant the very same liability that could be visited on the original publisher of the content at issue, the neighbor. Second, Defendant asserts this lawsuit seeks to impose on Defendant the "quintessential" duties of a publisher, such as screening, monitoring, and editing out inappropriate content. Third, Defendant contends the essence of each of the claims is that Defendant "published" unlawful information pertaining to Johnny Doe and thereby caused him harm.

In response, Plaintiffs make two arguments. First, Plaintiffs rely on a dissenting opinion from the Florida Supreme Court, asserting Section 230 does not prohibit claims that would treat an interactive computer service as a so-called "distributor" rather than a publisher. *See Doe v. America Online, Inc.,* 783 So.2d 1010, 1018-28 ("*Florida Doe*")(Lewis, J., dissenting). Second, Plaintiffs assert their federal statutory claim does not treat Defendant simply as a "publisher or speaker" of the photographs but also as a receiver and possessor of those photographs. In other words, Plaintiffs contend Defendant violated Section 2252A not only by distributing child pornography but also by receiving and possessing it. The Court will consider the two arguments in

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2006 WL 3813758 (E.D.Tex.), 35 Media L. Rep. 1435
**(Cite as: Slip Copy)**

turn below.

### a. Distributor Liability

According to dissent in the *Florida Doe* case, a claim of "distributor" liability is one in which liability is based on an allegation that a mere distributor of third-party information (such as a bookstore or newsstand), who could not otherwise be liable for unlawful content that it distributes, can be liable if it "knew or should have known" of the particular content at issue and its unlawful nature. *See Florida Doe,* 783 So.2d at 1021-23. Because such "distributors" may be subject to liability only if this heightened level of "scienter" is established, the argument goes, imposing such liability on them treats them as "distributors" rather than "publishers" and therefore falls outside the ambit of Section 230. *Id.* at 1023-24.

While Plaintiffs assert that "the courts have gone round and round about this distinction,"FN4 courts considering Section 230, including the Florida Supreme Court in the *Florida Doe* case, have consistently rejected this argument. *Florida Doe,* 783 So.2d 1010, 1016-17. The courts have reasoned that "distributor liability" is "merely a subset, or a species, of publisher liability, and is therefore also foreclosed by § 230." *See Zeran,* 129 F.3d at 332; *see also Perfect 10, Inc. v. CCBill, LLC,* 340 F.Supp.2d 1077, 1111 (C.D.Cal.2004)("[E]ven if the Defendants are considered distributors rather than publishers, the CDA immunities would still apply...."); *Blumenthal,* 992 F.Supp. at 52 (in enacting Section 230, "Congress made no distinction between publishers and distributors in providing immunity from liability").

FN4. Plaintiffs' response at 22.

### b. Receipt and Possession

**\*19** Plaintiffs also assert that their federal statutory claim does not "treat" Defendant as a publisher in all respects. Specifically, they assert that their "claim under section 2252A charges [Defendant] with violating the child pornography laws not simply as a 'publisher or speaker' of the illegal

photographs of Johnny Doe, but *also* as a receiver and possessor of those photographs. In other words, [Defendant] violated section 2252A not only by distributing child pornography, but also by receiving and possessing" it.FN5

FN5. *Id.* at 10-11, 18.

The FAC explicitly defines the damages sought in terms of the publication of the images: "As a proximate cause of the conduct alleged herein [Johnny Doe's] private harm has been *published* to the world causing Doe to suffer sever[e] mental anguish and/or pain and suffering in the past and future. Doe seeks damages for his mental anguish and/or pain and suffering." (FAC at 16, ¶ 100 (emphasis added). Similarly, the injunctive relief Plaintiffs seek is prevention of further publication-that is, "the viewing and distribution of Johnny Doe's photographs from [Defendant's] websites or servers." (*Id.* at 16, ¶ 102).

Courts have clearly stated that Section 230 generally "creates a federal immunity to any cause of action that would make service providers liable for information originating with a third-party user of the service" and have applied the immunity to a wide variety of claims regardless of the terms in which they were described. *Zeran,* 129 F.3d at 330. The plaintiff in *Noah v. AOL Time Warner, Inc.,* 261 F.Supp.2d 532, 534 (E.D. Virginia 2003), made an argument similar to that Plaintiffs make here. The plaintiff in *Noah,* a Muslim who used AOL's service, sued AOL under Title II of the Civil Rights Act, which prohibits discrimination in places of public accommodation, based on AOL's alleged failure "to prevent participants in an online chat room from posting or submitting harassing comments that blasphemed and defamed the plaintiff's Islamic religion and his co-religionists." *Id.* at 534. According to the plaintiff, his claim fell outside the scope of Section 230 because it did not "treat" AOL as a publisher or speaker but rather "as the owner of a place of public accommodation" who was subject to Title II and who had engaged in discrimination. *Id.* at 538.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                Page 17
Slip Copy, 2006 WL 3813758 (E.D.Tex.), 35 Media L. Rep. 1435
**(Cite as: Slip Copy)**

The court granted AOL's motion to dismiss based on Section 230, noting that "[a]n examination of the injury claimed by plaintiff and the remedy he seeks clearly indicates that his Title II claim seeks to 'place' AOL 'in a publisher's role,' in violation of § 230." *Id.* Specifically, because the plaintiff had alleged that AOL was liable "for its refusal to intervene and stop the allegedly" harmful content and had also "request[ed] an injunction requiring AOL to adopt 'affirmative measures' to stop such harassment," the "allegations [made] clear that plaintiff [sought] to hold AOL liable for its failure to exercise 'a publisher's traditional editorial functions.' " *Id.* at 538-39.

**\*20** The same is true here. The injury claimed by Plaintiffs is grounded in the pornographic photographs having been "published to the world" and the injunction Plaintiffs seek is to prevent such publication. (FAC at 16 ¶¶ 100, 102). Plaintiffs are seeking to hold Defendant liable for its alleged failure to exercise a "publisher's traditional editorial functions," *Zeran,* 129 F.3d at 330, such as blocking, screening, or otherwise preventing the dissemination of the images. (*See* FAC at 6, ¶ 23 (Defendant allegedly "took no action to block or remove" the images in question). Plaintiffs' allegations impermissibly seek to "treat" Defendant as the publisher of those images.

### E. Conclusion

Taking Plaintiffs' allegations as true and viewing them in the light most favorable to Plaintiffs, each of the three necessary elements for application of Section 230(c)(1) immunity is apparent from the face of the FAC: (1) Defendant is an "interactive computer service"; (2) the pornographic pictures of Johnny Doe are "information provided by another information content provider," namely the neighbor who took the pictures; and (3) Plaintiffs' claims seek to treat Defendant as the "publisher or speaker" of that third-party content. Therefore, unless Plaintiffs' claims fall within Section 230' s exception for "enforcement" of a "federal criminal statute" as advocated by Plaintiffs, Defendant is entitled to Section 230(c)(1) immunity.

### VIII.

### WHETHER PLAINTIFFS' CLAIM FALLS WITHIN SECTION 230'S EXCEPTION

#### A. Arguments

Finally, even if Section 230 applies, Plaintiffs argue that their federal claim falls within Section 230's exception for "enforcement" of a "federal criminal statute." In their FAC, Plaintiffs added a new claim against Defendant and Bates based on an alleged violation of 18 U.S.C. § 2252A, a federal statute that makes it a crime to knowingly distribute child pornography and that also contains a provision for a private "civil remedy" for anyone aggrieved by a violation of the statute. 28 U.S.C. § 2252A(f).

Plaintiffs contend that applying Section 230(c)(1) to bar their civil claim under 18 U.S.C. § 2252A would be contrary to 47 U.S.C. § 230(e)(1), which states that Section 230 is not to be construed to "impair the enforcement of ... chapter ... 110 (relating to sexual exploitation of children) of Title 18, [18 USCS §§ 1460 et seq. or §§ 2251 et seq.] or any other Federal criminal statute." 47 U.S.C. § 230(e)(1). Plaintiffs maintain neither Section 230 nor any of its subsections, including Section 230(c), has any effect on Section 2252A. Specifically, Plaintiffs argue the civil remedies provisions of Section 2252A are exempted from the reach of Section 230(c).

Finally, Plaintiffs argue while Section 230(e)(1) provides a textual basis for saying that some classes of federal statutes are excluded from the reach of Section 230(c) and others are not, there is no basis for saying that parts of a specified federal statute are subject to exception and other parts are not. In this regard, Plaintiffs state there is no textual support for such internal bifurcation.

**\*21** In response, Defendant asserts the plain text of the statute limits this exception to criminal prosecutions for violations of federal criminal statutes, not private civil suits based on alleged violations of such statutes. Defendant focuses on

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                        Page 18
Slip Copy, 2006 WL 3813758 (E.D.Tex.), 35 Media L. Rep. 1435
(Cite as: Slip Copy)

the definition of the term "criminal" as well as its use in the context of Section 230(e)(1), asserting the use of the term excludes and is distinguished from civil claims. Defendant also contends Congress' use of the word "enforcement" in Section 230(e)(1) again confirms that the exception applies only to criminal prosecutions.

Both parties agree there has not been a previous Section 230(c) immunity case involving Section 2252A. The Court in its research has not located a case considering the applicability of Section 230(e)(1) in a factual scenario such as the one asserted in this case. Therefore, Plaintiffs' argument is one of first impression.

## B. Applicable Law

Supreme Court precedent makes clear that the statutory text is the requisite starting point for statutory interpretation. *See, e .g., Harris Trust and Sav. Bank v. Solomon Smith Barney, Inc.,* 530 U.S. 238, 254 (2000) ("[I]n any case of statutory construction, ... analysis begins with the language of the statute."). Courts routinely rely on dictionary definitions as a means of determining the meanings of words used in statutes. *See, e.g., United States v. Vargas-Duran,* 356 F.3d 598, 603 (5th Cir.2004) (relying on dictionary definitions to ascertain meaning of statutory term).

## C. Discussion

Again, Section 230(e)(1) provides as follows:
(e) Effect on other laws
(1) No effect on criminal law
Nothing in this section shall be construed to impair the enforcement of section 223 or 231 of this title, chapter 71 (relating to obscenity) or 110 (relating to sexual exploitation of children) of Title 18, or any other Federal criminal statute.

47 U.S.C. § 230(e)(1).

The plain text of the statute establishes that the 230(e)(1) exception does not encompass private civil claims. As argued by Defendant, the common definition of the term "criminal," as well as its use

in the context of Section 230(e)(1), specifically excludes and is distinguished from civil claims. The term "criminal" is defined as "[c]onnected with the administration of penal justice." Black's Law Dictionary 302; *see also* American Heritage Dictionary of the English Language 430 (4th ed.2000)(defining "criminal" as "[r]elating to the administration of penal law"). The term "civil" is defined as follows: "[o]f or relating to private rights and remedies that are sought by action or suit, *as distinct from criminal proceedings."* Black's Law Dictionary 262 (emphasis added). In addition, Congress' use of the word "enforcement" in Section 230(e)(1) again confirms that the exception refers to governmental action, not civil actions by a private litigant.

Congress did not bifurcate any statutes as asserted by Plaintiffs. Rather, as noted by Defendant, it preserved the ability of law enforcement officials to enforce the federal criminal laws to their fullest extent while at the same time eliminating the ability of private plaintiffs to pursue service-provider defendants. Given the complexity of Title 18 and the availability of civil remedies in statutes throughout the criminal code, Congress achieved its intended result using simple language making it clear that Section 230's limits on civil liability would not affect governmental enforcement of federal criminal laws.

**\*22** As noted by Defendant, Plaintiffs' invocation of Section 230(e)(1) rests on their generalized policy arguments rather than the text of the statute. Plaintiffs' core argument appears to be that Section 230(e)(1) must exempt civil claims under the child pornography statutes because child pornography is "not to be tolerated" and "[i]f the prospect of civil liability provides a disincentive for engaging in child pornography over and above that provided by the prospect of fines and jail time, then that is a good thing." [FN6]

FN6. *Id.* at 13-15.

Child pornography obviously is intolerable, but civil immunity for interactive service providers

Slip Copy                                                                                     Page 19
Slip Copy, 2006 WL 3813758 (E.D.Tex.), 35 Media L. Rep. 1435
**(Cite as: Slip Copy)**

does not constitute "tolerance" of child pornography any more than civil immunity from the numerous other forms of harmful content that third parties may create constitutes approval of that content. Section 230 does not limit anyone's ability to bring criminal or civil actions against the actual wrongdoers, the individuals who actually create and consume the child pornography. Here, both the neighbor and the moderator of the Candyman web site have been prosecuted and are serving sentences in federal prison. Further, the section 230(e)(1) exemption permits law enforcement authorities to bring criminal charges against even interactive service providers in the event that they themselves actually violate federal criminal laws.

Regarding civil liability, however, Congress decided not to allow private litigants to bring civil claims based on their own beliefs that a service provider's actions violated the criminal laws. As Defendant explained in its briefing, the reason is evident. If civil liability were possible, the incentive to bring a civil claim for the settlement value could be immense, even if a plaintiff's claim was without merit. Even if it ultimately prevailed, the service provider would face intense public scrutiny and substantial expense. Given the millions of communications that a service provider such as Defendant enables, the service provider could find itself a defendant in numerous such cases. Congress determined that it wanted to eliminate the resulting disincentives to the development of vibrant and diverse services involving third-party communication, while maintaining the ability of criminal prosecutions by the government for violations of federal criminal law. In sum, Congress did intend to treat civil and criminal claims differently and carefully crafted Section 230(e)(1) to achieve exactly that result. Plaintiffs' claim, although novel, is untenable and without merit. Based on the foregoing, it is

**RECOMMENDED** that Defendant Yahoo! Inc.'s Motion to Dismiss All Claims Against Yahoo! (Docket Entry # 17) be **GRANTED**. It is further

**RECOMMENDED** that Plaintiffs' above-entitled

and numbered cause of action be **DISMISSED WITH PREJUDICE.**

Within ten (10) days after receipt of the magistrate judge's report, any party may serve and file written objections to the findings and recommendations of the magistrate judge. 28 U.S.C.A. 636(b)(1)(C).

**\*23** Failure to file written objections to the proposed findings and recommendations contained in this report within ten days after service shall bar an aggrieved party from *de novo* review by the district court of the proposed findings and recommendations and from appellate review of factual findings accepted or adopted by the district court except on grounds of plain error or manifest injustice. *Thomas v. Arn,* 474 U.S. 140, 148 (1985); *Rodriguez v. Bowen,* 857 F.2d 275, 276-77 (5th Cir.1988).

E.D.Tex.,2006.
Doe v. Bates
Slip Copy, 2006 WL 3813758 (E.D.Tex.), 35 Media L. Rep. 1435

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in A.2d                                              Page 1
Not Reported in A.2d, 2006 WL 852126 (D.C.Super.)
(Cite as: Not Reported in A.2d)

C

hakki v. Zima Co.
D.C. Super.,2006.
Only the Westlaw citation is currently available.
 Superior Court of the District of Columbia, Civil Di-
vision.
   Ayman R. HAKKI, on behalf of himself, all others
   similarly situated and the general public, Plaintiff,
                            v.
      ZIMA COMPANY, et al., Defendants.
                    No. 03-9183.

                   March 28, 2006.

                       ORDER
WEISBERG, J.

                     Calendar 4

*1 This matter is before the court on the Motion to
Dismiss of the "Domestic Manufacturer and Import-
er" Defendants and the separate Motion to Dismiss of
the Defendant the Beer Institute. Both motions seek
dismissal pursuant to Super. Ct. Civ. R. 12(b)(1) and
12(b)(6) based on Plaintiff's lack of standing and his
failure to state a claim on which relief can be granted.
The motions have been fully briefed by all parties.

Plaintiff brings this suit on behalf of himself and two
proposed classes of others similarly situated, alleging
a violation of the District of Columbia Consumer
Protection Procedures Act ("CPPA"), D.C.Code §
28-3901 et seq., unjust enrichment, negligence and
"rescission." The Defendants are nineteen alcoholic
beverage manufacturers and importers and the Beer
Institute, a trade association. Plaintiff alleges, in es-
sence, that Defendants intentionally create and dis-
seminate their product advertisements in such a way
as to appeal to underage consumers of alcohol,
thereby creating a demand and causing a myriad of
harms associated with underage drinking, for the pur-
pose of reaping millions of dollars of revenue and
profit flowing from the illegal consumption of alco-
hol by underage drinkers. Plaintiff proposes to rep-
resent two classes: (1) parents and guardians of chil-
dren whose family resources were used by children

under age 21 to purchase Defendants' products
between 1982 to the present, and (2) parents and
guardians of children who are currently under age 21
and who may be induced to make such purchases be-
cause of Defendants' advertising methods.

                 STANDARD OF REVIEW

A trial court considering a motion to dismiss for fail-
ure to state a claim under Rule 12(b)(6) of the Superi-
or Court Rules of Civil Procedure must construe the
complaint "in the light most favorable to the
plaintiff" and must accept as true all allegations of
fact set forth in the complaint. Larijani v. Geor-
getown University, 791 A.2d 41, 43 (D.C.2002)
(quoting McBryde v. Amoco Oil Co., 404 A.2d 200,
202 (D.C.1979)). Only where it appears "beyond
doubt" that the plaintiff can prove no set of facts in
support of his claims that would entitle him to relief
may a complaint be dismissed under Rule 12(b)(6).
Id.; Owens v. Tiber Island Condo. Ass'n., 373 A.2d
890, 893 (D.C.1977) (quoting Conley v. Gibson, 355
U.S. 41, 45-46 (1957)). A Rule 12(b)(1) motion ad-
dressed solely to the allegations of the complaint and
challenging subject matter jurisdiction based on lack
of standing is judged by essentially the same stand-
ard. See Heard v. Johnson, 810 A.2d 871, 877-78
(D.C.2002).

Defendants contend that Plaintiff has failed to estab-
lish that he has standing to bring this action either in
his own right or as the representative of his putative
classes and that, standing aside, he has failed to state
any claim on which relief can be granted. After care-
fully considering the arguments of the parties and
scrutinizing the complaint under the rigorous stand-
ard applicable to preemptive motions such as these,
the court concludes that Defendants are correct on
both points and that the complaint must be dismissed.

                      STANDING

*2 The local courts of the District of Columbia are
not established under Article III of the Constitution.
Nonetheless they, like their Article III counterparts,
exercise jurisdiction only over actual cases and con-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                          Page 2
Not Reported in A.2d, 2006 WL 852126 (D.C.Super.)
**(Cite as: Not Reported in A.2d)**

troversies and insist on the prudential prerequisites of standing. *Friends of Tilden Park, Inc. v. District of Columbia,* 806 A.2d 1201, 1206 (D.C.2002). To have standing, the Plaintiff "must have suffered an injury in fact-an invasion of a legally protected interest which is (a) concrete and particularized, ... and (b) actual or imminent, not conjectural or hypothetical." *Id.* at 1207 (quoting *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560 (1992)); *see also Community Credit Union Services, Inc. v. Federal Express Services Corp.,* 534 A.2d 331, 333 (D.C.1987). Moreover, "before one may sue for damages on behalf of others-whether the 'others' are members of an organization or a class of consumers-he must show injury to himself." *Consumer Federation of America v. UpJohn Co.,* 346 A.2d 725, 729 n. 11 (D.C.1975).

Although the complaint alleges that Defendants' advertising causes underage drinking to the detriment of Plaintiff and the classes he purports to represent, it does not allege (1) that Plaintiff has, or has had, a child, (2) that any such child, when underage, purchased or consumed the product of any Defendant, or (3) that any such child ever saw one of Defendants' advertisements, much less that he or she was influenced by Defendants' marketing techniques to purchase or consume the product of any Defendant. In opposition to the motions to dismiss, Plaintiff argues that a parent is injured when family funds are used by a child to purchase alcohol, but his complaint does not allege that any child of his ever spent any funds (the child's or the family's) on Defendants' products or that he or she did so in response to Defendants' advertisements. Hypothetical injuries cannot confer standing where an actual injury is not alleged in the complaint.

Nor can Plaintiff claim standing as the representative of a class of parents seeking to protect their children. Even assuming Plaintiff still has a minor child, which the complaint does not allege, and that his child could allege a legally cognizable injury, any such claim belongs to the child and must be brought as parent or next friend on behalf of the child. Cases cited by Plaintiff, which have allowed parents to sue governmental entities to vindicate their own parental rights, are simply inapposite to a claim against private companies for doing nothing more than creating a tempta-

tion to which children may have illegally succumbed, making it more difficult for parents to prevent them from doing what they should not do. No case upholds such a broad concept of parental standing.

Three courts have now rejected complaints virtually identical to this one. *See Kreft v. Zima Beverage Co.,* No. 04CV1827 (Colo.Dist.Ct., Sept. 16, 2005); *Eisenberg v. Anheuser-Busch, Inc.,* No. 1:04CV1081, 2006 WL 290308 (N.D.Ohio, February 2, 2006); *Tomberlin v. Adolph Coors Company,* No. 05CV545 (Wisc.Cir.Ct., February 16, 2006). Although the standing jurisprudence of each jurisdiction is not identical, the reasoning of those courts applies equally to Plaintiff's complaint here. However much Plaintiff may abhor teenage drinking and the profits Defendants may knowingly and intentionally reap from it, he does not have a private right of action unless he can plead an injury in fact to a legally protected interest that is particular to him, which Plaintiff's complaint does not allege.<sup>FN1</sup>

> FN1. Plaintiff attempts to get around his lack of standing by invoking the 2000 amendments to the CPPA, which rewrote and appear to have broadened the right to sue for relief from certain unlawful trade practices. The CPPA is undoubtedly an ambitious piece of remedial legislation, and the 2000 amendments may well have broadened its reach. D.C.Code § 28-3905(k)(1) was amended in 2000 as part of Bill 13-679, the "Fiscal Year Budget Support Act of 2000." The Committee Report states that the purpose of the amendment was "to allow representative organizations as well as individuals to maintain actions to redress unfair trade practices." Report of the Committee of the Whole, May 10, 2000, p. 10. So-called organizational or associational standing rests on its own footing and has its own unique jurisprudential considerations, which have no applicability to Plaintiff's putative class action. *See, e.g., Sierra Club v. Morton,* 405 U.S. 727, 739 (1972); *Friends of Tilden Park,* 806 A.2d at 1207. There is no indication that the Council intended to legislate away the time-honored principles of stand-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                      Page 3
Not Reported in A.2d, 2006 WL 852126 (D.C.Super.)
**(Cite as: Not Reported in A.2d)**

ing as they apply to claims of individuals, whether alone or as representatives of a proposed class. At least one federal court interpreting the CPPA has so held. _Williams v. The Purdue Pharma Company, 297 F.Supp.2d 171, 177 (D.D.C.2003)._ Moreover, even if the 2000 amendments to the CPPA purported to overrule District of Columbia jurisprudence on standing, the amendment to section 3905(k)(1) is not retroactive (_Childs v. Prull, 882 A.2d 227, 238 (D.C.2005)_), and it would have no bearing on Plaintiff's class claims dating back to 1982. For that matter, it is not clear why Plaintiff's attempt to reach back is not also barred by the three-year statute of limitations applicable to CPPA claims. _See District Cablevision Limited Partnership v Bassin, 828 A.2d 714, 729 (D.C.2003)._

### FAILURE TO STATE A CLAIM

**\*3** Plaintiff's complaint purports to state four claims: (1) violation of the CPPA, (2) negligence, (3) unjust enrichment, and (4) rescission.[FN2] As a matter of law, however, the complaint fails to state any claim on which relief can be granted.

> FN2. Technically, of course, rescission is not a claim but a remedy. In any event, for the reasons that follow in text, neither Plaintiff nor his putative classes are entitled to it.

Plaintiff's CPPA claim is his most promising. To state a claim under the CPPA, a plaintiff must allege one of the unlawful trade practices enumerated in D.C.Code § 28-3904 or one that is prohibited by another District of Columbia law. _See District Cablevision, 828 A.2d at 722-23._ While there are undoubtedly numerous laws prohibiting consumption of alcohol by minors and sale of alcohol to minors, Plaintiff has not alleged any advertisement or other conduct by any Defendant that violates the CPPA. Plaintiff has not alleged, and cannot prove, any advertisement that was materially misleading under an objective standard or any that claimed consumption of alcohol by minors was legal or acceptable conduct.

Instead, the Complaint faults Defendants for using advertisements and marketing campaigns that are likely to appeal to minors, because they employ attractive models, video games and animation, social situations with which minors might identify, certain types of humor, and the like. It cannot be disputed that these same techniques also appeal to older audiences who can, of course, purchase and consume alcoholic beverages legally. Neither the CPPA nor any other District of Columbia law makes it an unlawful trade practice to place advertisements that are intended to appeal to persons over 21 because the same advertisements may also appeal to persons under 21, who are prohibited from purchasing the product. The legislature may wish to consider such a law if it could be shown that a particular form of advertising appeals, disproportionately or exclusively, to underage drinkers, but the statute under which Plaintiff brings suit does not permit the court to make such a law (or to declare policy in the area) where none exists.

Claims very similar to Plaintiff's CPPA claim were rejected by the United States District Court in Ohio in _Eisenberg,_ the California Superior Court in _Goodwin v. Anheuser-Busch Cos., 2005 WL 280330 (Cal.Super.Ct.2005),_ and the Colorado District Court in _Kreft_ (lack of standing without injury to legally protected interest). Of course, the consumer protection statute of each jurisdiction is different. Nonetheless, the reasons that led those courts to reject the consumer protection claims apply with equal force to the CPPA. Because the complaint does not allege that Defendants' advertising was false, misleading, claimed a benefit the product does not have or suggested in any way that it was not unlawful for minors to purchase or consume alcohol, Plaintiff has failed to state a claim under the CPPA on which relief can be granted, and that claim must be dismissed.[FN3]

> FN3. Given other grounds for dismissal, the court need not reach the question of whether an actionable consumer-merchant relationship exists between Plaintiff and Defendants, but it is at least arguable that such a relationship does not exist for purposes of CPPA liability. _See Howard v. Riggs Nat'l. Bank, 432 A.2d 701, 709-10 (D.C.1981); but see Williams, 297 F.Supp.2d at 175._

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                 Page 4
Not Reported in A.2d, 2006 WL 852126 (D.C.Super.)
**(Cite as: Not Reported in A.2d)**

Plaintiff's remaining claims are even farther from the mark. His claim for unjust enrichment fails as a matter of law because the complaint doe not allege that he has conferred a benefit on any Defendant. *See News World Communications, Inc. v. Thompsen*, 878 A.2d 1218, 1222 (D.C.2005); *Jordan Keys & Jessamy, LLP v. St. Paul Fire and Marine Ins. Co.*, 870 A.2d 58, 62-64 (D.C.2005). He and his lawyers apparently believe that Defendants have been "unjustly enriched" by profits attributable to illegal consumption of alcohol by underage drinkers. But the complaint does not allege that *any* Defendant has been unjustly enriched at Plaintiff's expense or that he or any child of his is the source of even one dime of Defendants' allegedly ill-gotten gains.[FN4] The United States District Court rejected a virtually identical unjust enrichment claim in *Eisenberg*, and again its reasoning applies with equal force to Plaintiff's unjust enrichment claim in this action.

> FN4. Whether or not this jurisdiction recognizes so-called indirect purchaser claims in antitrust litigation or other contexts, Plaintiff does not allege that any minor child of his was an indirect purchaser of any product manufactured by any Defendant, and certainly he cannot allege that his child purchased anything *from* a Defendant.

*4 For similar reasons, Plaintiff's claim for the remedy of "rescission" also fails as a matter of law. Rescission is a contract remedy enabling a party to repudiate his contract and be restored to his pre-contract position if the other party made a material misrepresentation in the execution of the contract. *See Dean v. Garland*, 779 A.2d 911, 915 (D.C.2001). Plaintiff does not, and cannot, allege any contract or transaction of any kind between himself and any Defendant. Even if Plaintiff's minor child obtained an alcoholic beverage purchased from a retailer, which he does not allege, the contract would be between the purchaser and the retailer, and the Defendant's only contract would have been between itself, or its wholesale distributor, and the retailer, which presumably received the full benefit of its bargain, whether or not the alcoholic beverage ended up in the hands of an underage consumer. Rescission in favor of Plaintiff is simply not an available remedy against the manufac-

turer in these circumstances.

The complaint's final claim of negligence is on no firmer footing than Plaintiff's other three claims. It is axiomatic that a claim of negligence requires proof of a duty owed to the plaintiff, a breach of that duty, and an injury to the plaintiff proximately caused by the breach.[FN5] *See, e.g., District of Columbia v. Harris*, 770 A.2d 82, 87 (D.C.2001). The primary defect in Plaintiff's negligence claim is that he does not allege any injury. Specifically, Plaintiff fails to allege that he has or had an underage child who purchased any Defendant's product, and he certainly does not allege that any such purchase was proximately caused by the allegedly negligent conduct-the Defendants' targeted advertising-or that Plaintiff's money was used to pay for it. In essence, Plaintiff's negligence claim, like his others, boils down to a complaint that underage drinking is harmful to underage drinkers, their families, and the society at large, it is caused at least in part by Defendants' deliberate or negligent advertising and marketing strategies, and therefore Plaintiff should be compensated even without proof that he suffered any injury as a result of Defendants' conduct.

> FN5. Although the complaint pleads negligence, Plaintiff's argument in opposition to the motions seems to sound in some sort of unidentified intentional tort. *See* Plaintiff's opposition at pp. 4, 28, 31.

Even if Plaintiff had pled and could prove an injury and causation-in-fact, his negligence claim fails as a matter of law because he cannot prove either a legal duty owed by Defendants to him (or to his putative classes of parents and guardians) or proximate cause. In general, tort law recognizes no duty to protect a plaintiff from illegal conduct by a third party absent a "special relationship" or other circumstance not present here. *District of Columbia v. Beretta*, 872 A.2d 633, 640 (D.C.2005) (*en banc*). The reason for this limiting doctrine is that absent special circumstances, the intervening criminal act of a third person is generally not foreseeable, either as a matter of fact or as a matter of policy, and the allegedly negligent party is not in a position to protect against it. *Id. at 641.* Here, taking Plaintiff's factual allegations as true, it is foreseeable that advertising and marketing

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 852126 (D.C.Super.)
**(Cite as: Not Reported in A.2d)**

Page 5

strategies designed to create demand for Defendants' products might appeal to minors and underage young adults and cause them to purchase or otherwise consume alcoholic beverages. For this to occur, however, the underage drinker would have committed a crime, as would the retailer who sold the beverage to him or her or the adult who purchased it from the retailer and made it available to the underage drinker (unless the underage drinker stole it, which would constitute a separate crime). While these criminal acts may be "foreseeable," Defendants are virtually powerless to prevent them and legally owe no duty to the parents of the underage drinker to protect against harm to the parent or the child caused by the criminal acts of both the child and at least one other adult.

**\*5** Whether analyzed under the rubric of duty or proximate cause, the result is the same. _Id. at 641 n. 4._ Proximate cause encompasses both foreseeability and the policy that liability will not attach unless the breach of duty has a direct causal link to the injury. _District of Columbia v. Freeman,_ 477 A.2d 713, 716 (D.C.1984); _Lacy v. District of Columbia,_ 424 A.2d 317, 319 (D.C.1980). It embraces a liability-limiting policy, which will relieve an actor of liability for harm he caused in fact, where the chain of events appears highly extraordinary in retrospect. _Lacy,_ 424 A.2d at 320-21. Ordinarily the issue of proximate cause would be one for the jury, not appropriate for resolution as a matter of law on a Rule 12(b)(6) motion, but it becomes a question of law when the allegations, accepted as true and taken in the light most favorable to the plaintiff, will not support a reasonable finding of proximate cause as to both the cause-in-fact requirement and the liability-limiting principle. _Freeman,_ 477 A.2d at 716; cf. _Service Employees Int. Union Health and Welfare Fund v. Philip Morris Inc.,_ 346 U.S.App. D.C. 74, 249 F.3d 1068 (2001).

The problems associated with teenage drinking are well known. The court can appreciate the wisdom of a governmental policy to regulate advertising and marketing by alcoholic beverage manufacturers in an effort to minimize, to the extent possible, the risk that such advertising and marketing might influence teenagers to drink.[FN6] In our system, however, the choice of that policy, and between competing policies, belongs to the other branches of government. The blunt instrument of a private civil action for damages or injunctive relief, where there is no direct injury alleged, is not the device our constitution and democratic institutions have chosen to impose standards of conduct on purveyors of alcohol at the manufacturing level. _See Beretta,_ 872 A.2d at 645. It appears that every state and federal court that has considered the claims Plaintiff purports to bring here has rejected them on a variety of grounds, all rooted in jurisprudential policy. This court now adds its dictum to that list.[FN7]

FN6. Any attempt to regulate commercial speech associated with the marketing of a lawful product to those who are legally entitled to use it based on the premise that such speech may also make the product attractive to those who are not legally entitled to use it, might well run afoul of the First Amendment; and if a state attempted to do so in a way that interfered with interstate commerce, it would likely raise additional issues under the Commerce Clause. Because the court can resolve the motions to dismiss on non-constitutional grounds, it is unnecessary and unwise to reach Defendants' arguments that granting relief to the Plaintiff on this complaint, particularly injunctive relief, would be unconstitutional. _See, e.g., Lewis v. Hotel and Rest. Empl. Union,_ 727 A.2d 297, 301 (D.C.1999).

FN7. The Beer Institute, in addition to joining the other Defendants' arguments, makes a number of arguments in support of its own motion to dismiss. The Beer Institute is a trade association, which is not a manufacturer, importer, seller or advertiser of alcoholic beverages. Plaintiff's only claims against it appear to be based on a common law conspiracy theory. In the District of Columbia, however, conspiracy is not an independent tort; in order to establish liability of an alleged conspirator, a plaintiff must plead and prove an underlying tort in which the conspirator participated. _See Executive Sandwich Shoppe, Inc. v. Carr Realty_

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 852126 (D.C.Super.)
(Cite as: Not Reported in A.2d)

*Corp.*, 749 A.2d 724, 738 (D.C.2000); *Halberstam v. Welch*, 227 U.S.App. D.C. 167, 174, 705 F.2d 472, 479. Because Plaintiff has no viable claim against any Defendant, his claims against the Beer Institute must also be dismissed.

For the foregoing reasons, it is this 28th day of March, 2006,

ORDERED that the Motion to Dismiss of the "Domestic Manufacturer and Importer" Defendants and the Motion to Dismiss of the Defendant the Beer Institute be, and they hereby are, granted, and the complaint is hereby dismissed with prejudice.FN8

> FN8. The following named Defendants have not responded to the complaint: Bacardi Limited, Bacardi & Company Limited, Diageo plc, Heineken N.V., Mark Anthony Brands Ltd., Zima Company, Bacardi Group, Paddington, Ltd., Mark Anthony Group, Mark Anthony International, Mike's Hard Lemonade Company, and Brown-Forman Beverages Worldwide. The court has granted successive motions for extensions of time, and another such motion is currently pending. The stated reason for the requested relief is that these Defendants are negotiating with Plaintiff to be voluntarily dismissed, either because they are not entities capable of being sued or for lack of personal jurisdiction. The pending motion for still another extension is moot. The complaint against these Defendants is dismissed for the reasons stated herein. If it is ever reinstated, these Defendants' other objections to the court's exercise of jurisdiction over them are preserved.
>
> It is not disputed that Plaintiff's lawyers have litigated or attempted to litigate these same claims all over the country against these same Defendants. Surely they anticipated the Defendants' arguments urging the court to dismiss the complaint for lack of standing and failure to state a claim. Presumably Plaintiff drafted his complaint as strongly as possible to support his standing

and to state his claims. Plaintiff filed his complaint nearly three years ago and has not sought to amend it in the interim. The court is therefore dismissing the complaint with prejudice, without leave to amend. If the arguments for and against the legal sufficiency of the allegations in the complaint are to be addressed again in this jurisdiction, it should be by the Court of Appeals.

D.C. Super.,2006.
Hakki v. Zima Co.
Not Reported in A.2d, 2006 WL 852126 (D.C.Super.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

2004 WL 3800901 (N.Y.A.D. 2 Dept.)                              Page 1
(Cite as: 2004 WL 3800901)

Supreme Court, Appellate Division, Second
Department, New York.
THE PEOPLE OF THE STATE OF NEW YORK,
Respondent,
v.
James J. FRICCHIONE, Defendant-Appellant.
Nos. 2004-4112, 2004-4113.
September 17, 2004.

Orange County Clerk's Indictment Nos. 2003-403
& 2003-740

Brief of Defendant-Appellant

James J. Herkenham, Attorney for Defendant-
Appellant, Slate Hill Commons, 2904 U.S. Route 6,
P.O. Box 430, Slate Hill, New York 10973, (845)
355-7830.

*i 1. The index number of the case in the court
below is 2003-403 & 2003-740.

2. The full names of the original parties are as set
forth above. There have been no changes.

3. The proceeding was commenced in the County
Court of the State of New York, County of Orange.

4. The proceeding was commenced by the service
of an indictment on May 19, 2003 and subsequent
indictment on October 2, 2003.

5. This is a criminal matter.

6. The appeal is from an order of conviction and
sentencing of the Hon. Nicholas De Rosa dated
April 22, 2004.

7. The appendix method is being used. The appeal
is the original record.

**\*1 TABLE OF CONTENTS**

TABLE OF CONTENTS ... 1

TABLE OF AUTHORITIES ... 3

PRELIMINARY STATEMENT ... 8

STATEMENT OF FACTS ... 9

POINT ONE : THE APPLICATION FOR A
SEARCH WARRANT WAS DEFECTIVE IN
THAT IT DID NOT ALLEGE SUFFICIENT
PROBABLE CAUSE TO SEARCH
DEFENDANT'S PREMISES ... 20

POINT TWO : THE PROSECUTION'S FAILURE
TO REQUEST A *VENTIMIGLIA* HEARING, AND
SUBSEQUENT EVIDENCE OF UNCHARGED
CRIMES ON ITS DIRECT CASE WAS
REVERSIBLE ERROR ... 27

POINT THREE : THE WEIGHT OF THE
EVIDENCE ADDUCED IS INSUFFICIENT TO
CONVICT THE DEFENDANT OF THE CRIME
OF TAMPERING WITH PHYSICAL EVIDENCE
... 32

*2 POINT FOUR : THE FAILURE OF THE
PROSECUTION TO TURN OVER *BRADY*
MATERIAL CONSTITUTES REVERSIBLE
ERROR ... 37

CONCLUSION ... 43

**\*3 TABLE OF AUTHORITIES**

*NEW YORK STATE CASES*

*City of New York v. Black Garter,* 179 Misc.2d 597,
Richmond Co., Sup. Ct., 1997 ... 25

*People v. Acevedo,* 175 A.D.2d 323, 3rd Dept. 1991
... 21

*People v. Alfinito,* 16 N.Y.2d 181, 1965 ... 23

*People v. Baxley,* 89 N.Y.2d 208, 1994 ... 38

*People v. Belton,* 55 N.Y.2d 49, 1982 ... 23

*People v. Benzinger,* 36 N.Y.2d 29, 1974 ... 35

*People v. Bigelow,* 66 N.Y.2d 417, 1985 ... 21

*People v. Bleakely,* 69 N.Y.2d 490, 1987 ... 36

*People v. Candella,* 171 A.D.2d 329, 4th Dept.
1991 ... 22

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*People v. Cleague,* 22 N.Y.2d 363, 1968 ... 35

*People v. Crum,* 272 N.Y. 348, 1936 ... 36

*People v. Davis,* 81 N.Y.2d 281, 1993 ... 40

*People v. Elwell,* 50 N.Y.2d 231, 1980 ... 23

*People v. Fein,* 18 N.Y.2d 162, 1966 ... 39

*People v. Fitzgerald,* 156 N.Y. 253, 1898 ... 36

*People v. Foley,* 307 N.Y. 490, 1954 ... 36

*People v. Ford,* 66 N.Y.2d 428, 1985 ... 35

*People v. Fraser,* 96 N.Y.2d 318, 2001 ... 25

*People v. Galbo,* 218 N.Y. 283, 1916 ... 36

*People v. Gokey,* 60 N.Y.2d 309, 1983 ... 23

*4 *People v. Hanlon,* 36 N.Y.2d 549, 1975 ... 22

*People v. Hansen,* 38 N.Y.2d 17, 1975 ... 21

*People v. Harper,* 236 A.D.2d 822, 4th Dept. 1997 ... 21

*People v. Heath,* 175 A.D.2d 562, 4th Dept. 1991 ... 27

*People v. Hendricks,* 25 N.Y.2d 129, 1969 ... 22

*People v. Iovine,* 193 Misc.2d 668, App. Term, 2nd Dept. 2002 ... 31

*People v. Johnson,* 66 N.Y.2d 398, 1985 ... 23

*People v. Jones,* 44 N.Y.2d 76, 1978 ................. 39

*People v. Kennedy,* 47 N.Y.2d 196, 1979 ... 35

*People v. Lewis,* 275 N.Y. 33, 1937 ... 35

*People v. Lumpkins,* 141 Misc.2d 581, Kings Co., Sup. Ct. 1988 ... 42

*People v. Mangi,* 10 N.Y.2d 86, 1961 ... 39

*People v. Mateo,* 2 N.Y.3rd 383, 2004 ... 30

*People ex rel. McCracken v. Miller,* 291 N.Y. 55, 1943 ... 36

*People v. McCray,* 51 N.Y.2d 594, 1980 ... 21

*People v. Molineux,* 168 N.Y. 264, 1901 ... 29

*People v. Montague,* 19 N.Y.2d 121, 1967, cert. den. 389 U.S. 862,1967 ... 22

*People v. Morla,* 182 Misc.2d 540, Monroe Co.,Sup. Ct. 1999 ... 21

*People v. Mott,* 94 A.D.2d 415, 4th Dept. 1983 ... 33

*People v. Novoa,* 70 N.Y.2d 490, 1987 ... 38

*People v. P.J. Video,* 68 N.Y.2d 296, 1986, cert. den. 479 U.S. 1091, 1986 ... 21

*5 *People v. Pena,* 50 N.Y.2d 400, 1980 ... 35

*People v. Peterson,* 98 Misc.2d 637, Bronx Co., Crim. Ct. 1978 ... 40

*People v. Ponder,* 54 N.Y.2d 160, 1981 ... 21

*People v. Portelli,* 15 N.Y.2d 235, 1965 ... 39

*People v. Price,* 160 Misc.2d 372, Bronx Co., Sup. Ct. 1979 ... 42

*People v. Ramos,* 201 A.D.2d 78, 1st Dept. 1994 ... 42

*People v. Razezicz,* 206 N.Y. 249, 1912 ... 36

*People v. Rowland,* 157 Misc.2d 114, Kings Co., Crim. Ct. 1992 ... 42

*People v. Savvides,* 1 N.Y.2d 554, 1956 ... 39

*People v. Schrader,* 251 A.D.2d 1032, 4th Dept. 1998 ... 31

*People v. Simmons,* 36 N.Y.2d 126, 1975 ... 41

*People v. Spotford,* 85 N.Y.2d 593, 1995 ... 30

*People v. Steadman,* 82 N.Y.2d 1, 1993 ... 42

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2004 WL 3800901 (N.Y.A.D. 2 Dept.)
(Cite as: 2004 WL 3800901)

Page 3

*People v. Testa,* 48 A.D.2d 691, 2nd Dept. 1975, aff'd. 40 N.Y.2d 1018, 1976, cert. den. 431 U.S. 925, 1977 ... 41

*People v. Vega,* 3 A.D.3rd 239, 1st Dept. 2004 ... 31

*People v. Ventimiglia,* 52 N.Y.2d 362, 1981 ... 27

*People v. Vilardi,* 76 N.Y.2d 67, 1980 ... 38

*People v. Villani,* 59 N.Y.2d 781, 1983 ... 39

*People v. Vitalis,* 67 A.D.2d 498, 2d Dept. 1979 ... 35

*People v. W.,* 49 N.Y.2d 179, 1978 ... 39

*People v. Washington,* 32 N.Y.2d 401, 1973 ... 39

*6 *People v. Way,* 59 N.Y.2d 361, 1983 ... 35

*People v. Weiss,* 290 N.Y. 160, 1943 ... 36

*People v. Wright,* 86 N.Y.2d 591, 1995 ... 39

*Rochester Police Dept. v. Bergio,* 68 A.D.2d 340, 4th Dept. 1979 ... 41

FEDERAL CASES

*Aguilar v. Texas,* 378 U.S. 108, 1964 ... 23

*Brady v. Maryland,* 373 U.S. 83, 1963 ... 37

*California v. Trombetta,* 467 U.S. 479, 1984 ... 39

*Franks v. Delaware,* 438 U.S. 154, 1978 ... 23

*Griswold v. Connecticut,* 381 U.S. 479, 1965 ... 24

*Illinois v. Gates,* 462 U.S. 213, 1983 ... 23

*Jacobellis v. Ohio,* 378 U.S. 184, 1964 ... 25

*Kyles v. Whitley,* 514 U.S. 419, 1995 ... 39

*Marron v. United States,* 275 U.S. 192, 1927 ... 24

*Michelson v. United States,* 335 U.S. 469, 1948 ... 30

*Miller v. California,* 413 U.S. 15, 1973 ... 25

*Mishkin v. State of New York,* 383 U.S. 502, 1966 ... 25

*Osborn v. United States,* 385 U.S. 323, 1966 ... 24

*Sgro v. United States,* 287 U.S. 206, 1932 ... 21

*Spinelli v. United States,* 393 U.S. 410, 1969 ... 23

*United States v. Agurs,* 427 U.S. 97, 1976 ... 38

*United States v. Bagley,* 473 U.S. 667, 1985 ... 42

*United States v. Capra,* 501 F.2d 267, 2nd Cir. 1974 ... 24

*7 NEW YORK STATUTES

Crim. Proc. Law Section 240.20(1)(h) ... 37

Crim. Proc. Law Section 470.15(3)(c)(6) ... 30

Crim. Proc. Law Section 690.35(3)(c) ... 21

Penal Law Section 140.10(a) ... 29

Penal Law Section 140.20 ... 29

Penal Law Section 215.40 ... 32

Penal Law Section 220.03 ... 28

Penal Law Section 220.45 ... 28

Penal Law Section 220.50 ... 28

Penal Law Section 221.05 ... 29

Penal Law Section 265.01 ... 28

CONSTITUTIONAL REFERENCES

U.S. Constitution, First Amendment ... 25

U.S. Constitution, Fourth Amendment ... 20

U.S. Constitution, Fourteenth Amendment ... 20

N.Y. State Constitution, Art. 1, Sect. 8 ... 25

2004 WL 3800901 (N.Y.A.D. 2 Dept.)
(Cite as: 2004 WL 3800901)

Page 4

N.Y. State Constitution, Art. 1, Sect 12 ... 20

PRELIMINARY STATEMENT

Defendant-Appellant James J. Fricchione respectfully files this Brief in support of his Appeal from two Judgments of Conviction, both rendered on or about April 21 2004, for Prohibition of Animal Fighting, Cruelty to Animals and Tampering with Physical Evidence, under consolidated Indictments, in Orange County Court, Hon. Nicholas DeRosa, J., presiding, predicated upon verdicts rendered, at a bench trial, on or about March 1 2004. Execution of Judgment was stayed by the Appellate Division, Second De-Partment, by Order dated on or about June 1 2004. See Notice of Appeal (App. p.2); Decision and Order (App. p.168).

### *9 STATEMENT OF FACTS

On April 22, 2003, Investigator Michael DeWitt of the New York State Police applied for a Search Warrant (App. pp. 9-24) to search the premises of Defendant James J. ("Jay") Fricchione, and to seize various items of evidence suspected to be on or about the premises, located at 1929 County Route 1, Westtown, New York, in the County of Orange. The Defendant was suspected of involvement in dog, specifically pit bull, fighting, in contravention of various sections of the Agricultural and Markets Law of the State of New York. The Defendant published a bi-monthly magazine, the "Sporting Dog Journal", which, according to Prosecution experts, amongst other topics, reported the results of pit bull fights, or matches. On that same day, the Hon. Jeffrey Berry, Judge of the Orange County Court, issued the requested Search Warrant (App. pp. 29-33).

The next day, April 23, 2003, the Search Warrant was executed, various items of evidence were seized, and the Defendant was arrested. (Apparently, the execution of the Search Warrant was videotaped by a representative of the United States Department of Agriculture.)

*10 On May 19, 2003, the Defendant was indicted on thirty (30) counts of violating various sections of the Agricultural and Markets Law (App. pp. 47-58), including Prohibition of Animal Fighting (14 counts); Aggravated Cruelty to Animals (3 counts); and Overdriving, Torturing and Injuring Animals : Failure to Provide Proper Sustenance (13 counts). Seventeen (17) pit bulls were confiscated, and subsequently housed at the Warwick Humane Society Shelter, in Warwick, New York, also in the County of Orange.

Discovery proceeded in the course of the first Indictment (2003-403). During Memorial Day Weekend, May 25-26, 2003, the Warwick Humane Society was conducting a garage sale, open to the public. The Defendant was found in the approximate location twice, one time giving a false name to the police, and two (2) of the pit bulls were discovered to be missing from the shelter. They were later recovered in the immediate vicinity.

As a result of this incident, the Defendant was again indicted on October 2, 2003 (App. p. 117) and charged with one (1) count of Tampering with Physical Evidence (2003-740).

On November 14, 2003, the two (2) Indictments *11 were consolidated for trial (App. pp. 142-143).

The Defendant elected to waive a jury, and a bench trial, presided over by the Hon. Nicholas DeRosa, Judge of the Orange County Court, commenced on February 20, 2004.

New York State Police Investigator Theresa Andryshak (R. pp. 14-69) was the first witness to testify for the Prosecution. In essence, she testified to the seizure of the evidence, the cataloging and vouchering of it, and the measures taken to safeguard it.

The next witness, Beverly Blinn-Knapp D.V.M., testified in a dual capacity: both as a participant in the execution of the Search Warrant, and as an expert witness regarding the nature and severity of the alleged injuries to the dogs on the Defendant's premises (R. pp. 70-159). She also testified as to the nature and possible uses of various veterinary

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2004 WL 3800901 (N.Y.A.D. 2 Dept.)                                    Page 5
(Cite as: 2004 WL 3800901)

drugs and medicines found at the location, and that in her expert opinion, the various wounds exhibited by the dogs in question were the result of dog fights.

Investigator Ted LaRuffa (R. pp. 162-171) of the New York State Police testified next. He testified that, only two (2) days prior to trial, using a Hemident field test kit, he detected blood on a rug seized from *12 premises during the execution of the Search Warrant. He could only identify the blood as mammal, and could not characterize it as either human or animal.

The next witness for the Prosecution was Trooper Timothy C. Knapp, of the Pennsylvania State Police. (R. pp. 172-199) He was authorized to participate, by the terms of the Search Warrant, in the raid. In essence, he testified to the nature and content of the "Sporting Dog Journal", to which he subscribed in an undercover capacity, using an alias.

Investigator DeWitt, who originally applied for the Search Warrant, was the next Prosecution witness (R. pp. 200-272). He testified to a "stake-out" of February 8, 2003, of Defendant's premises, and the events surrounding the execution of the Search Warrant. (Interestingly, the first thing the police did, even before executing the Search Warrant, was to arrest the Defendant, R. p. 211.) Investigator DeWitt identified numerous items of vouchered evidence, including subscription records of the "sporting Dog Journal".

The next witness, Dena Mangiamele D.V.M., from San Diego, California, testified in an expert capacity (R. pp. 275-329). She testified as to her review of photographs and veterinary records of the dogs in question. *13 In essence, she testified that it was her expert opinion that the injuries allegedly sustained by the pit bulls were as a result, due to their nature and location, of dog fighting. She also testified as to the possible uses of the veterinary medicines and supplies found on Defendant's premises, and that various items were "consistent" with dog fighting.

Another expert on animal cruelty and dog fighting, one Andrew Christiansen (R. pp. 300-395), from the State of Florida, was the next witness. He testified as to the history of dog fighting, and the training techniques used to condition the dogs for the contests. He also offered his interpretation of the result of "matches" reported in the "Sporting Dog Journal".

This concluded the Prosecution evidence in regard to the first Indictment. The Prosecution was unable to produce any direct evidence (e.g., eyewitnesses) that dog fights were ever conducted on the Defendant's premises.

In regard to the second Indictment, the Prosecution first offered Jeffrey Feagles, the Commissioner of Public Works of the Town of Warwick (R. pp. 396-407). This witness testified that he had encountered the Defendant the *14 morning of May 26, 2003, in the vicinity of the Warwick Humane Society Shelter. Mr. Feagles testified that the Defendant explained to him that he was looking for a garage sale. The witness then called the police, who "checked him out", and apparently let the defendant go on his way.

The next witness was Police Officer Fred W. Bramich, of the Town of Warwick Police Department (R. pp. 408-420). This witness testified that he had encountered the Defendant the night before, May 25, 2003, a little before midnight, approximately two hundred (200) yards from the Warwick Humane Society Shelter. The Defendant explained to him that he had to defecate in the adjoining woods. The Defendant gave him a false name; the witness arrested him, and he was apparently given a Desk Appearance Ticket after posting Sixty ($60.00) Dollars bail. (The Record is devoid of the disposition of this arrest.) This witness also testified that he recovered two (2) pit bulls that morning in the vicinity, and returned them to the Warwick Humane Society Shelter.

The next witness was Police Officer Alexander Csorba of the Town of Warwick Police Department (R. pp. 421-432). This witness was the Police

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2004 WL 3800901 (N.Y.A.D. 2 Dept.)
Page 6
(Cite as: 2004 WL 3800901)

Officer who responded to Mr. Feagle's call the morning of May 26, 2003. He questioned *15 the Defendant, and, apparently satisfied that nothing was amiss, let him go after determining that his license and registration were valid. He also assisted in the recovery of the pit bulls and their return to the animal shelter. Most importantly (R. p. 152), he testified that there were two - not one - incidents in the vicinity of the animal shelter the night before.

The last witness produced by the Prosecution was Susan Barron, the President of the Warwick Humane Society (R. pp. 432-447). In essence, she testified that locks at the shelter had been apparently tampered with, two (2) pit bulls were found to be missing, and subsequently returned to the shelter by the police.

The Defendant's wife, Daniela Fricchione, was the first to testify on behalf of the Defendant (R. pp. 463-493). Basically, she testified as to conditions in the Fricchione home, some details as to the publication of the magazine were also explained. She also testified that the carpet in question, with the blood on it, was used to "whelp" (give birth) to puppies, and that pit bull enthusiasts would gather on the Fricchione property, usually on Saturdays. Finally, she testified that she had received a telephone call, and returned home in the middle of the execution of the Search Warrant.

*16 Erick Lingueno, an employee of Defendant, testified next (R. pp. 494-527). He worked for the Defendant's excavation business for almost three (3) years. He also did help the defendant care for the dogs, by feeding and exercising them, using a treadmill. He did witness what he referred to as a "kennel accident", involving a fight between two (2) of the dogs, who were both injured. He arrived at the Fricchione property the morning of the execution of the Search warrant, and immediately called Daniela Fricchione. That was the last day he worked for the Defendant. He testified that he had never seen any organized dog fighting on the Fricchione property.

The Defendant was the next to testify (R. pp.

528-642; 727-856). In essence, he acknowledged publishing the "Sporting Dog Journal", but emphatically denied being involved in organized dog fighting. He did offer an alternative explanation of the reports of "matches" in the magazine, stating that, for all he knew, they were records of weight pulling contests or "hog rodeos". He explained that a battery charger found on the premises was used in his excavation business, not for electrocuting dogs, as had been suggested by one of the Prosecution experts.

*17 Another witness, Richard Freemont Stratton, was taken out of order (R. pp. 642-721), and testified in the middle of Defendant's direct testimony. The author of several books on pit bull terriers, he was offered as an expert. He admitted witnessing "hundreds" of dog fights, and explained the rules and methods of conducting such fights. He also offered alternative explanations for Defendant's alleged methods of training the dogs, referring also to weight pulling matches and "hog rodeos". The bulk of his testimony dealt with in generalities of the world of pit bull fighting.

Upon the resumption of his testimony, the Defendant testified that the dogs in question were well-cared for, and again denied any connection with organized dog fighting. As to reports of dog fights in his magazine, he testified that he "tried to avoid them" (R. p. 777), but that he would give voice to peoples' opinions (R. id.) He testified also that he administered to the dogs injured in the aforementioned "kennel accident" on the carpet where the blood was found. (R. p. 812). He testified that he had never been to a dog fight (R. p. 813), and did not condone them (R. p. 817).

One Joseph Hlavenka (R. pp. 857-870) was the next *18 witness to testify. In essence, he testified that he knew the defendant for approximately five (5) years, and the defendant offered to teach him how to operate the heavy equipment used in excavation, after he was laid off from his job with Verizon. He also owned a pit bull, and would visit the Fricchione residence. He tsetified that he witnessed the defendant treating the dogs involved in the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:07-cv-00623-CKK     Document 50-2     Filed 09/07/2007     Page 41 of 48

2004 WL 3800901 (N.Y.A.D. 2 Dept.)                                                    Page 7
(Cite as: 2004 WL 3800901)

"kennel accident" on the rug where the blood was found.

James Charles Cutler testified next (R. pp. 871-881). He testified that he was a heavy equipment mechanic, who worked on Defendant's machines on an average of once or twice a month. He identified pictures of buckets as being filled with drained anti-freeze fluid. He also identified the battery charger as a twelve (12) volt apparatus, which just "tingles" (R. p. 877), and would be insufficient to electrocute either a human or an animal.

The last witness to testify was James Leshinski, an electrician (R. pp. 882-891). He testified that he did electrical work for the Defendant, and put heat in the kennel building. On cross-examination, he stated that twelve (12) volts of direct current would not affect a human or an animal; it would take, for example, fifteen hundred (1,500) volts to kill a human.

**\*19** In an interesting, but insightful, sidelight, it must be noted that the Defendant once went to the aid of a New York State Trooper, who was being attacked on the roadside (R. p. 798).

On March 1, 2004, the Defendant was convicted of two (2) counts of Prohibition of Animal Fighting, for which he was sentenced on April 22, 2004, to a term of One and One Third (1 and 1/3) Years to Four (4) Years, and three (3) counts of Aggravated Cruelty to Animals, for which he was sentenced to three (3) One (1) year terms, to be all served concurrently. On the second Indictment, he was convicted of Tampering with Physical Evidence, and was sentenced to a consecutive term of One (1) to Three (3) years. He was also fined Five Thousand ($5,000.00) Dollars, and ordered to pay restitution, to be dtermined, to the Warwick Humane Society for the care of the dogs.

The Defendant now Appeals.

**\*20** POINT ONE : THE APPLICATION FOR A
SEARCH WARRANT WAS DEFECTIVE IN
THAT IT DID NOT ALLEGE SUFFICIENT

PROBABLE CAUSE TO SEARCH
DEFENDANT'S PREMISES.

The Application for the Search Warrant (App. pp. 9-28) in this case is a most unusual document. Authored by Michael DeWitt, the lead New York State Police Investigator, it is somewhat lengthy, containing some fifty three (53) separate paragraphs. Amazingly, over one half (twenty nine (29) paragraphs) have absolutely nothing to do with the Defendant or his alleged activities, but is rather a recitation of the general historical and cultural background, along with the methods and practices of dog fighting in this country.

The issuance of a search warrant is not - nor should it be - a routine matter. The Federal Constitution (Fourth and Fourteenth Amendments) and the New York State Constitution (Article 1, Section 12), mandate that no magistrate shall issue a warrant but upon the showing of probable cause. In this case, it was incumbent upon Investigator DeWitt to sufficiently link his wealth of general information to the Defendant, and it is respectfully submitted that he did not, failing to meet the standard for probable cause. Probable cause has been defined to mean information sufficient to **\*21** support a reasonable belief that an offense has been committed or that evidence of a crime may be found at a certain place. (*People v. Bigelow,* 66 N.Y.2d 417, 1985; *People v. McCray,* 51 N.Y.2d 594, 1980; *People v. Harper,* 236 A.D.2d 822, 4th Dept. 1997.)

When submitting a warrant application to the Court, the People must make allegations of fact (not speculation or surmise) supporting their contention that probable cause exists to issue the warrant. (see, Section 690.35(3)(c) of the Criminal Procedure Law; *People v. P.J. Video,* 68 N.Y.2d 296, 1986, cert. den. 479 U.S. 104, 1986.)

In order to support the issuance of a search warrant, the Affidavit in support of it must provide the Court with a substantial basis for determining the existence of probable cause. (*People v. Morla,* 182 Misc. 2d 540, Monroe Co., Sup. Ct. 1999.) The

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2004 WL 3800901 (N.Y.A.D. 2 Dept.)                                              Page 8
(Cite as: 2004 WL 3800901)

Affidavit in support must recite probable cause that the property described in the application may be found in or upon the place, premises, vehicle or person described. (*People v. Hansen*, 38 N.Y.2d 17, 1975, overruled on other grounds, *People v. Ponder*, 54 N.Y.2d 160, 1981; see also, *Sgro v. United States*, 287 U.S. 206, 1932; *People v. Acevedo*, 175 A.D.2d 323, 3rd Dept. 1991; *22 People v. Candella*, 171 A.D.2d 329, 4th Dept. 1991.)

The Affidavit must provide sufficient detail of circumstances from which a determination may be independently made. (*People v. Montague*, 19 N.Y.2d 121, 1967, cert. den. 389 U.S. 862, 1967.) The Affidavit must contain more than an ultimate conclusion of probable cause or the Affiant's assertion that the information received was reliable. (*People v. Hendricks*, 25 N.Y.2d 129, 1969.) The Affidavit is to be tested in a common sense manner, based upon an objective and fair reading of the entire instrument. (*People v. Hanlon*, 32 N.Y.2d 549, 1975.)

In the instant case, the Application for the Search Warrant (which has been extensively redacted by the Prosecution) makes early reference (App. p. 9) to the existence of a "confidential informant", whose identity remained secret, allegedly out of fear of reprisal.

This alleged confidential informant seemingly lacks, at times, the veracity required by law (e.g., App. p. 11, the confidential informant, from an unkown distance, is allegedly able to peer into animal carriers, and discern not only dogs, but actual pit bulls, inside these portable containers.) This, on a fair reading, should be interpreted as a statement made with reckless disregard for *23 the truth. (see, *Franks v. Delaware*, 438 U.S. 154, 1978; *People v. Alfinito*, 16 N.Y.2d 181, 1965.), there-by placing the validity of the entire Application in serious question.

New York has never abandoned (despite *Illinois v. Gates*, 462 U.S. 213, 1983) the two-pronged test to measure an informant's reliability, originally

formulated in *Aguilar v. Texas*, 378 U.S. 108, 1964, and *Spinelli v. United States*, 393 U.S. 410, 1969. This two-pronged test focuses on two issues : the informant's reliability, and the basis of his knowledge. In this case, the extreme redaction of the Application, it is submitted, makes it impossible, as a matter of law, to satisfy the latter requirement.

The Court of Appeals, interpreting the New York State Constitution, has reiterated the requirement for satisfying the *Aguilar-Spinelli* two-pronged mandate in cases involving alleged confidential informants. (see, e.g., *People v. Bigelow*, supra; *People v. Johnson*, 66 N.Y.2d 398, 1985; *People v. Gokey*, 60 N.Y.2d 309, 1983; *People v. Belton*, 55 N.Y.2d 49, 1982; *People v. Elwell*, 50 N.Y.2d 231, 1980.)

Yet another issue is the reliance of the People, to *24 some extent, upon alleged telephone conversations concerning the magazine in question ("Sporting Dog Journal"), which the Defendant concededly publishes, that somehow (never explained in the Search Warrant Application), came to the knowledge of the alleged confidential informant. It is respectfully submitted that this use - or, rather, misuse - of such alleged conversations, which were not indicative of any criminality, was an unwarranted invasion of Defendant's constitutional guarantee of privacy. (*Griswold v. Connecticut*, 381 U.S. 479, 1965.)

The utilization of misdirected calls, albeit in a warrant situation has been condemned. (*Osborn v. United States*, 385 U.S. 323, 1966; *Marron v. United States*, 275 U.S. 192, 1927; *United States v. Capra*, 501 F.2d 267, 2nd Cir. 1974.)

Even more troubling is the reliance in the Search Warrant Application (App. pp. 13-14, 18) of the nature of the content of the "Sporting Dog Journal" as somehow lending credence to the claims of probable cause and criminal activity. This raises a very serious issue of the subversion of Defendant's First Amendment right to freedom of expression as a basis for probable cause to search his premises.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:07-cv-00623-CKK    Document 50-2    Filed 09/07/2007    Page 43 of 48

2004 WL 3800901 (N.Y.A.D. 2 Dept.)                                                                Page 9
(Cite as: 2004 WL 3800901)

Whether or not the publication is characterized as "underground" is, it is respectfully submitted, *25 immaterial, as it is not a criminal activity to publish the magazine in question, even if it does offend the sensibilties of certain people.

The Supreme Court has wrestled with the issue of protected content in the context of obscenity and pornography, and has still not (with the exception of child pornography) reached a viable definition of what is, and what is not, defined as constitutionally protected under the First Amendment. (*Miller v. California,* 413 U.S. 15, 1973; *Mish-kin v. State of New York,* 383 U.S. 502, 1966; *Jacobellis v. Ohio,* 378 U.S. 184, 1964.)

Perhaps the best New York analogy would be *People v. Fraser,* 96 N.Y.2d 318, 2001, which held that the First Amendment protects non-obscene material. In addition, non-obscene (even erotic) expression or "speech" is protected from governmental interference (e.g., search warrants), by the free speech provisions of both the Federal and State Constitutions. (U.S. Constitution, Fourth and Fourteenth Amendments; New York Constitution, Article 1, Section 8; see also, *City of New York v. Black Garter,* 179 Misc.2d 597, Richmond Co., Sup. Ct. 1999.)

It is respectfully submitted that, under the totality of circumstances, the Application for the Search Warrant was defective, as it did not establish probable *26 cause to search Defendant's premises. The incredible alleged observation of the confidential informant, as well as the constitutionally protected status of the publication in question, so heavily relied upon by the Prosecution, both mitigate against meeting the established standard of what constitutes probable cause. Consequently, all of the evidence seized at the execution of the Search Warrant should have been suppressed.

**\*27 POINT TWO : THE PROSECUTION'S FAILURE TO REQUEST A *VENTIMIGLIA* HEARING, AND SUBSEQUENT OF EVIDENCE OF UNCHARGED CRIMES ON ITS DIRECT**

CASE WAS REVERSIBLE ERROR.

It is well-settled that the Prosecution is obliged to request a Hearing, and obtain a Ruling, on the admissibility of uncharged crime evidence in advance of trial, and the admissibility of such evidence, absent a Hearing, constitutes reversible error. (*People v. Ventimiglia,* 52 N.Y.2d 362, 1981; *People v. Heath,* 175 A.D.2d 562, 4th Dept., 1991.)

In the instant case, the Record is replete with references to uncharged crimes on the People's direct case, running the gamut from a Class D Felony (Burglary in the Third Degree) to a Violation (Unlawful Possession of Marijuana).

It is respectfully submitted that, had the Defendant been alerted to the Prosecution's plan to introduce such evidence, he could have availed himself of the requisite Hearing, relying upon the Trial Judge to filter such proof, and would not, consequently, have waived a jury.

In regard to the first Indictment (403-2003), as the record stands, the Prosecution made numerous references to allegeldy Criminally Possessing a Hypodermic *28 Instrument, a Class A Misdemeanor, in violation of Section 220.45 of the Penal Law. (Andryshak, R. pp. 21, 22, 23, 45, 48, and 49.)

The Prosecution made specific reference to allegedly Criminally Possessing a Weapon in the Fourth Degree ( a loaded Taurus Millenium 9mm allegedly found in the Defendant's home ), another Class A Misdemeanor, in violation of Section 265.01 of the Penal Law (Andryshak, R. p. 22).

The Prosecution made repeated specific references to Defendant's alleged possession of testosterone, labelled a controlled substance under the Public Health Law, in violation of Criminal Possession of a Controlled Substance in the Seventh Degree, another Class A Misdemeanor, under Section 220.03 of the Penal Law (Blinn-Knapp, R. pp. 132, 153; Mangiamele, R. p. 294).

The Prosecution made specific reference to the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:07-cv-00623-CKK    Document 50-2    Filed 09/07/2007    Page 44 of 48

2004 WL 3800901 (N.Y.A.D. 2 Dept.)                                                      Page 10
(Cite as: 2004 WL 3800901)

alleged Criminal Use of Drug Paraphenalia in the Second Degre (Dextrose), another Class A Misdemeanor, under Section 220.50 of the Penal Law (Mangiamele, R. p. 296).

Defendant was not charged with any of these crimes; all of this evidence was introduced on the People's direct case.

**\*29** In addition, although technically not a crime, specific reference was made by the Prosecution to the alleged-Unlawful Possession of Marijuana, a Violation, in contravention of Section 221.05 of the Penal Law (Andryshak, R. p. 23).

As it was, the strategy and conduct of the Prosecution resulted in surprise, prejudice and unfairness to the Defendant of the kind specifically anticipated and proscribed by *Ventimiglia,* supra.

In regard to the second consolidated Indictment (740-2003), although never offered or explained under the exceptions and guidelines of *People v. Molineux,* 168 N.Y. 264, 1901, the Prosecution, by the evidence adduced, bolstered its purely circumstantial case by making undeniable inference (Barron, R. p. 438) to the crimes of Criminal Trespass in the Third Degree, a Class B Misdemeanor (Penal Law Section 140.10(a)), and Burglary in the Third Degree, a Class D Felony (Penal Law Section 140.20).

Defendant was not charged with either of these crimes. This evidentiary lack of connection to *Molineux,* supra, was also specifically prohibited in *Ventimiglia,* supra,:

"... [W]hen a prosecutor, knowing that such evidence is to be presented, waits until objection is made when it is offered during trial before informing the court of the basis upon which he considers it to be admissible, there **\*30** is unfairness to the defendant..." (Ventimiglia, supra, at 361).

Although it is conceded that not all of these improper references were specifically objected to, this Court nevertheless has the jurisdiction to review these inherently unfair matters in the interest of justice (Section 470.15(3)(c)(6) of the Criminal Procedure Law).

Nor should the fact that this case was a bench, and not a jury, trial, nullify the holdings of *Ventimiglia,* supra.

In a recent case, *People v. Mateo,* 2 N.Y.3rd 383, 2004, Judge Smith, in a well-reasoned dissent, among other matters, observed, it is submitted quite correctly, that a bench trial should not vitiate the mandate of *Ventimiglia,* supra :

"[T]he evidence of a defendant's prior bad acts is 'objectionable not because it has no appreciable probative value but because it has too much. The natural and inevitable tendency of the tribunal - whether judge or jury - is to give excessive weight to the vicious record of crime thus exhibited and either allow it to bear too strongly on the present charge or take the proof of it as justifying a condemnation, irrespective of the accused's guilt of the present charge'." (*Mateo,* supra, at 438, quoting Wigmore, *Evidence,* Section 58.2 at 1212; see also, *Michelson v. United States,* 335 U.S. 469, 475476, 1948).

It is clear that the obligation to conduct a *Ventimiglia* Hearing attaches to a bench, as well as a jury, trial. (see, *People v. Spotford,* 85 N.Y.2d 593, 1995; **\*31** *People v. Schrader,* 251 A.D.2d 1032, 4th Dept.,1998; *People v. Iovine,* 193 Misc.2d 668, App. term, 2nd Dept., 2002).

If the proposed evidence, even if similar to the crime charged, and even if probative, is not relevant to a fact in issue, then its prejudicial effect outweighs its probative value, and is inadmissable. (*People v. Vega,* 3 A.D.3rd 239, 1st Dept. 2004).

The Prosecution obviously intended to paint the Defendant with a broad brush of illegality. In so doing, it overstepped it bounds, ignoring the safeguards crafted by *Ventimiglia,* supra, and its progeny, and committed numerous reversible errors.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2004 WL 3800901 (N.Y.A.D. 2 Dept.)                                              Page 11
(Cite as: 2004 WL 3800901)

Of greatest importance, of course, was that the People were ordered to conduct such a Hearing (App. p.82). The Court reiterated this (App. p. 161), so there can be no doubt that the People were aware, and put on notice, twice, of their obligation in this regard.

**\*32 POINT THREE : THE WEIGHT OF THE EVIDENCE ADDUCED IS INSUFFICIENT TO CONVICT THE DEFENDANT OF THE CRIME OF TAMPERING WITH PHYSICAL EVIDENCE.**

Consolidated Indictment (740-2003) charged the Defendant with the crime of Tampering with Physical Evidence, a Class E Felony, in violation of Section 215.40 of the Penal Law, which reads, in pertinent part, as follows:

"[A] person is guilty of Tampering with Physical Evidence when:

(2) Believing that certain physical evidence is about to be produced or used in an official proceeding or a prospective official proceeding, and intending to prevent such production or use, he suppresses it by any act of concealment, alteration or destruction, or by employing force, intimidation or deception against any person."

It is particularly noteworthy that no evidence was lost, altered or destroyed in this case, and that the crime charged contained the element of intent, which means that the People, beyond a reasonable doubt, must prove that it was the conscious objective of the Defendant to violate the provisions of this statute.

At the outset, the fact that only two dogs out of the eight housed at the Warwick Humane Society Shelter were found outside of the premises begs the question as to what any alleged perpetrator was intending to accomplish, as the six remaining dogs constitutes more than **\*33** enough evidence for the trial to move forward.

More importantly, the dogs in question could not even be construed as actual evidence, as they were never physically produced at trial, nor were they intended to be, as the Prosecution relied upon numerous photographs.

The inescapable conclusion is that, at the time of the alleged incident, the dogs themselves had ceased to have any evidentiary value, and could not, in any way, be construed as items of evidence.

Of note is the Prosecution, in the Opening Statement, (Hoovler, R.p.10) describing and promising to prove a motive ("...he tampered with the evidence in this case by trying to steal the pit bulls back because of their value ..."). No such motive was ever proven, and this failure thereby constituted reversible error. (*People v. Mott*, 94 A.D.2d 415, 4th Dept. 1985).

It is undisputed that the Warwick Humane Society held a garage sale, inviting the public, the weekend of May 24-25 2003, which happened to be Memorial Day Weekend. (Feagles, R.p.402; Bramick, R.p.419; Barron,R.pp. 434,439).

It is also undisputed that there were reports to the Warwick Police Department of two - not one - incidents in the immediate vicinity the night of May 25 2003. (Csorba, R.p. 425).

**\*34** The Prosecution presented absolutely no direct evidence that the Defendant, in any way, tampered with physical evidence, and relied solely upon circumstantial evidence that was, at best, tenuous.

In fact, no witness for the Prosecution could place the defendant closer than over one hundred yards to the Warwick Humane Society Shelter (Feagles, R.p. 399; Bramick, R.p. 414). When the defendant was arrested on the night of May 25 2003 (the Record is devoid of what charge or disposition), he was approximately three hundred yards - the length of three football fields - from the Warwick Humane Society Shelter (Bramick, R.p. 414).

It is also noteworthy that the Warwick Humane Society Shelter hosted approximately two to three hundred members of the public that weekend (Barron, R.p. 446).

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:07-cv-00623-CKK     Document 50-2     Filed 09/07/2007     Page 46 of 48

2004 WL 3800901 (N.Y.A.D. 2 Dept.)                                      Page 12

**(Cite as: 2004 WL 3800901)**

It is respectfully submitted that, given the above circumstances, reasonable doubt that the defendant was the perpetrator of this incident, for it is doubtful that a crime was even committed, abounds.

The reliance upon circumstantial evidence is misplaced. Such evidence, defined as evidence of a fact which does not directly prove a fact in dispute, but which permits a reasonable inference or conclusion that the fact exists, is in this case, of poor quality.

**\*35** It is respectfully submitted that those facts which form the basis of the inference must be proved, beyond a reasonable doubt, and the inference to be drawn must be one that may reasonably be drawn. (see, *People v. Ford,* 66 N.Y.2d 428, 1985; *People v. Way,* 59 N.Y.2d 361, 1983; *People v. Pena,* 50 N.Y.2d 400, 1980; *People v. Kennedy,* 47 N.Y.2d 196, 1979; *People v. Cleague,* 22 N.Y.2d 363, 1968; *People v. Vitalis,* 67 A.D.2d 498, 2nd Dept., 1979.)

It has been held that, in order for an inference to be drawn from circumstantial facts, the inference must be logically compelling. (*People v. Benzinger,* 36 N.Y.2d 29, 1974; *People v. Cleague,* supra.) The evidence in this case is anything but compelling.

In the instant case, this requisite logical compulsion is absent, as the dogs themselves had, arguably no evidentiary value, and the bulk of them remained on the shelter premises.

The evidence in this case is equivocal, and the finder of fact, whether judge or jury, cannot draw unwarranted inferences or make unsupported assumptions (e.g., that the dogs themselves were evidence when not produced at trial) See, *People v. Way,* supra; *People v. Pena,* supra.

An inference may not be based upon an inference. (*People v. Lewis,* 275 N.Y. 33, 1937; and may not be drawn **\*36** from remote evidence. (*People v. Galbo,* 218 N.Y. 283, 1916; *People v. Razezicz,* 206 N.Y. 249, 1912.)

It has been held that circumstantial evidence must exclude, to a moral certainty, every other hypothesis except the guilt of the accused. (*People v. Weiss,* 290 N.Y. 160, 1943.), and the evidence in this case simply does not meet this standard. It must be inconsistent with innocence. (*People v. Fitzgerald,* 156 N.Y. 253, 1898.) The final conclusion, it is respectfully submitted, was pure conjecture, and this is not allowed. (*People v. Foley,* 307 N.Y. 490, 1954.)

If it appears that the trier of fact has failed to give the evidence the weight it should be accorded, then the Appellate Court must set aside the verdict. (*People v. Bleakely,* 69 N.Y.2d 490, 1987; *People ex rel McCracken v. Miller,* 291 N.Y. 55, 1943.)

Most importantly, the evidence must be of such weight and credibility as to justify finding the Defendant guilty beyond a reasonable doubt. (*People v. Crum,* 272 N.Y. 348, 1936.)

The logical gap (see *People v. Ford,* supra) in this case is that a person intent upon tampering with evidence, would not leave the bulk of the evidence - if the dogs were indeed evidence at all - intact.

**\*37** POINT FOUR : THE FAILURE OF THE PROSECUTION TO TURN OVER *BRADY* MATERIAL CONSTITUTES REVERSIBLE ERROR.

In New York, the mandate of *Brady v. Maryland,* 373 U.S. 83, 1963, to turn over evidence or material favorable to the Defendant, has also been codified by statute. Section 240.20(1)(h) of the Criminal Procedure Law reads, in part, as to disclosure of such material:

"... [A]nything required to be disclosed prior to trial, to the Defendant by the prosecutor, pursuant to the constitution of this state or the United States..."

An examination of the record of this trial reveals that there were two distinct, discrete issues of the violation of the *Brady* and statutory mandate : one involves the first Indictment (403-2003) dealing

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:07-cv-00623-CKK    Document 50-2    Filed 09/07/2007    Page 47 of 48

2004 WL 3800901 (N.Y.A.D. 2 Dept.)                                    Page 13
(Cite as: 2004 WL 3800901)

with animal cruelty, etc; the second involves the second Indictment (740-2003), regarding evidence tampering.

Testimony by New York State Police Investigator Michael DeWitt confirmed that the execution of the Search Warrant in question was actually videotaped by an agent from the United States Department of Agriculture (R.p.239; People's Ex No. 70.) This videotaping was authorized by the terms of the Search Warrant issued (App. p. 29).

**\*38** Upon cross-examination by trial counsel, Investigator DeWitt admitted that a copy of this veideotape was given to the Prosecutor (R.P. 257), and never turned over to the Defendant (R.p. 258). This videotape is significant for several reasons, as the Defendant had always maintained that the dogs in question were well-cared for, under humane conditions. (Fricchione, R.pp. 559-582; pp. 731-734).

The discussion on the Record was specific as to this piece of evidence, and the Supreme Court has developed the rule that the suppression by the Prosecution of evidence favorable to an accused upon request violates due process when the material is relevant to either guilt or punishment, irrespective of the good faith or the bad faith of the Prosecution. (*Brady,* supra,at 87; see also, *People v. Baxley,* 89 N.Y.2d 208, 1994; *People v. Novoa,* 70 N.Y. 2d 490, 1987.)

Trial counsel made a request for *Brady* material (Omnibus Motion, App. P. 69), and the specific identification of the videotape in question was clear and unambiguous.

As to the good or bad prosecutorial faith, constitutional error depends upon the character of the evidence suppressed, not the character of the Prosecutor. (*United States v. Agurs,* 427 U.S. 97, 1976; **\*39***People v. Vilardi,* 76 N.Y.2d 67, 1990.) Defendant, without its disclosure, had no access to this evidence, and no reasonably available means to obtain it. (*California v. Trombetta,* 467 U.S. 479, 1984.)

This videotape was particularly relevant, as the *Brady* issue does not concern itself only with guilt, but with punishment as well. Had the Court been able to view this videotape, it is respectfully submitted that the resultant sentence would not have been so harsh.

By definition and inescapable inference, constitutional error of this type and magnitude cannot be harmless. The Supreme Court has held that, regardless of request, favorable evidence is always material, and constitutional error results from its suppression. (*Kyles v. Whitley,* 514 U.S. 419, 1995.)

*Brady* type cases result in consistent pro-Defendant holdings from the New York Court of Appeals. (see, *People v. Wright,* 86 N.Y.2d 591, 1995; *People v. Novoa,* supra; *People v. Villani,* 59 N.Y.2d 781, 1983; *People v. Jones,* 44 N.Y.2d 76, 1978; *People v. W.,* 44 N.Y.2d 179, 1978; *People v. Washington,* 32 N.Y.2d 401,1973; *People v. Fein,* 18 N.Y.2d 162, 1966; *People v. Portelli,* 15 N.Y.2d 235, 1965; *People v. Mangi,* 10 N.Y.2d 86, 1961; *People v. Savvides,* 1 N.Y.2d 554, 1956.)

In fact, the New York standard calls only for a **\*40** "reasonable possibility" of a different result. (*People v. Davis,* 81 N.Y.2d 281, 1993; *People v. Villardi,* supra; *People v. Wright,* supra.)

More significantly, it is arguable that the failure of the Prosecution to turn over *Brady* material in regard to the second Indictment, concerning evidence tampering, is even more egregious, as the evidence in that case was particularly flimsy, at best.

On direct examination, Police Officer Alexander Csorba, of the Warwick Police Department, testified that there had been not one, but two, other incidents in the immediate area the night before. (Csorba,R.p. 425).

The Prosecution failed to turn over any information, which, under the circumstances, was arguably favorable to the Defendant, and only discussed this one incident, concededly involving

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:07-cv-00623-CKK     Document 50-2     Filed 09/07/2007     Page 48 of 48

2004 WL 3800901 (N.Y.A.D. 2 Dept.)                                                    Page 14
(Cite as: 2004 WL 3800901)

the Defendant.

Had there been another person skulking about? It is respectfully submitted that any police notes or memoranda was absolutely vital to the defense case, as it could have disclosed the identity and/or motive of another alleged perpetrator.

In this context, it is noteworthy that *Brady* material has been held to include exculpatory, and most importantly, potentially exculpatory material in the possession of the Prosecution. (*People v. Peterson,* 98 Misc.2d 637, *41 Bronx Co., Crim. Ct., 1978.)

As to this issue, the existence of a reported second incident can only be, in the language of *Brady,* "favorable" to the Defendant, and any police notes and/or memoranda regarding this second incident should have been disclosed to the Defendant. Although the reported second incident, the night before, in the immediate vicinity, may, concededly, not have been apparent at the beginning of the trial, the *Brady* obligation is a continuing one, and such material, by its very nature, should have been turned over once the police officer testified as to the existence of a second incident. (*Rochester Police Dept. v. Bergin,* 68 A.D.2d 340, 4th Dept., 1979; *People v. Testa,* 48 A.D.2d 691, 2nd Dept. 1975, aff'd. 40 N.Y.2d 1018, 1976, cert. den. 431 U.S. 925, 1977.)

It has been determined that the Prosecutor has a duty to learn of any favorable evidence known to others acting in the government's behalf, including the police. (*Kyles v. Whitley,* supra; *People v. Simmons,* 36 N.Y.2d 126, 1975.) Possession by the Prosecution has been construed to include constructive possession as well, and evidence in the possession or control of investigative arms of the Prosecution, in any way involved in the *42 offense charged or a related transaction, is deemed to be readily accessible, and therefore, within the control of the Prosecution. (*People v. Price,* 100 Misc.2d 372, Bronx Co., Sup. Ct. 1979; see also, *People v. Steadman,* 82 N.Y.2d 1, 1983; *People v. Lumpkins,* 141 Misc.2d 581, Kings Co., Sup. Ct. 1988.)

In plain language, if there was another person

involved in suspicious activity - and the police knew about it - the Defendant was absolutely entitled to whatever information the police, and hence the Prosecution, possessed in this regard.

The failure of the Prosecution to disclose these matters, even after testimony in open Court, amounts to a Constitutional violation, entitling the Defendant to, at the very least, a new trial. (*United States v. Bagley,* 473 U.S. 667, 1985; *People v. Vilardi,* supra; *People v. Ramos,* 201 A.D.2d 78, 1st Dept., 1994; *People v. Rowland,* 157 Misc.2d 114, Kings Co., Crim. Ct., 1992.)

### *43 CONCLUSION

For the reasons articulated in this Brief, the convictions of Defendant James J. Fricchione should be reversed.

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v. James J. FRICCHIONE, Defendant-Appellant.
2004 WL 3800901 (N.Y.A.D. 2 Dept.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
CIVIL DIVISION

FILED
CIVIL ACTIONS BRANCH
AUG   4 2004

| | |
|---|---|
| Peter Petersan, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| Chartone, Inc., | ) |
| | ) |
| Defendant. | ) |

03-CA-8328

Calendar 5

Judge Mary A. G. Terrell

## ORDER DENYING DEFENDANT'S MOTION FOR JUDGMENT ON THE PLEADINGS

The present matter comes before the Court upon Defendant's Motion for Judgment on the Pleadings (hereinafter "Defendant's Motion").

### I.    Summary of Facts

Peter Petersan (hereinafter "Plaintiff") alleges that Chartone, Inc. (hereinafter "Defendant") unconscionably overcharged consumers for the copying and mailing of their own medical records.  Plaintiff does not claim that he suffered any personal and direct injury as a result of Defendant's alleged conduct.  Plaintiff brings the instant action on behalf of the general public.

### II.    Legal Standard for Judgment on the Pleadings

Super. Ct. Civ. R. 12 (c) provides that "after the pleadings are closed but within such time as not to delay the trial, any party may move for judgment on the pleadings."  The standard for deciding a motion for judgment on the pleadings is essentially the same as the standard for deciding a motion for summary judgment; the moving party must demonstrate that no issues of material fact exist and that the party is entitled to judgment as a matter of law.



Moorehead v. District of Columbia, 747 A.2d 138, 143 (D.C. 2000).   A court must view the
pleadings in a light most favorable to the nonmoving party.   Graff v. Malawer, 592 A.2d 1038,
1040 (D.C. 1991).  After the moving party has met its initial burden, the non-moving party
must present more than mere conclusory allegations or denials of the adverse party's pleadings
in order to survive a motion for judgment on the pleadings.  Id.

**III.   Conclusions of Law**

Defendant argues that Plaintiff lacks standing to bring the instant suit under D.C. Code
§ 28-3905 (k) (1) (2000).  Prior to October 19, 2000, §28-3905 (k) (1) permitted, "any
consumer that suffers damages" to sue under this section.  Plaintiff does not allege that he is a
consumer that suffered damages as a result of Defendant's alleged wrongdoing.

However, Congress amended D.C. Code § 28-3905 (k) (1) on October 19, 2000.  The
Code now provides that "any person [may] act . . . in the interest of the general public."  Id.
Plaintiff is a person taking legal action to stop the alleged unconscionable activites of
Defendant.  Plaintiff clearly falls within the broad domain of "any person [acting] in the interest
of the general public."

**WHEREFORE**, it is this 2nd day of August, 2004, it is hereby

**ORDERED** that Defendant's Motion for Judgment on the Pleadings be and hereby is
**DENIED**.

Judge Mary A. Goeden Terrell

DOCKETED AUG 5 - 2004

MAILED AUG 5 - 2004

2

Copies To:

Jennifer B. Furey, Esquire
Cooley Manion Jones, L.L.P.
21 Custom House Street
Boston, MA 02110

Jonathan Abram
Hogan & Hartson, L.L.P.
555 Thirteenth Street, N.W.
Washington, D.C. 20004

William Claiborne, Esquire
717 D Street N.W.
Suite 210
Washington, D.C. 20004

Sean R. Day, Esquire
8505 Baltimore Avenue
Suite B
College Park, MD 20740

## SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
### Civil Division

PETER PETERSAN et al.          )
                               )          Civil No.: 03ca8328
         Plaintiffs,           )          Calendar 5
                               )          Judge Mary Terrell
         v.                    )
                               )
CHARTONE, INC                  )
                               )
                               )
         Defendant.            )

> **FILED**
> CIVIL ACTIONS BRANCH
> **APR 27 2006**
> SUPERIOR COURT
> OF THE DISTRICT OF COLUMBIA
> WASHINGTON, DC

## ORDER GRANTING DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND DENYING PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

This matter is before the Court on plaintiffs and defendant's cross motions for partial summary judgment on the claims of some of the individuals who Plaintiffs seeks to represent pursuant to the District of Columbia Consumer Protection Procedures Act. Upon consideration of the parties' Memorandums of Points and Authorities, opposition thereto, and the entire record herein, it is the Court's opinion that Plaintiffs' motion for partial summary judgment be denied and Defendant's motion for partial summary judgment be granted.

### Background

Defendant Chartone, Inc. provides retrieval and copying services of patient medical records to healthcare businesses. Plaintiffs Deborah Longus and Peter Petersan requested copies of their medical records through their attorneys for use in separate personal injury lawsuits. The request was processed by Chartone Inc. Chartone provided Plaintiffs' attorneys with their medical records and charged a $25.00 clerical fee, copies at $1.10 per page and a 15% shipping surcharge, plus tax. On October 14, 2003, Plaintiff Peter Petersan filed his



complaint in a representative capacity against Chartone Inc. alleging violations of the District of Columbia Consumer Protection Procedures. The initial complaint was amended to add Plaintiff Longus to the lawsuit. The amended complaint was filed on May 8, 2004.

## Summary Judgment Standard

Rule 56 of the District of Columbia Superior Court Rules of Civil Procedure states that summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact." D.C. Super. Ct. Civ. R. 56(c). Likewise, "summary judgment is proper if, accepting the allegations of the complaint as true, and construing all the facts and inferences in a light most favorable to the non-moving party, the record shows that there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law." Urban Masonry Corp. v. N&N contractors, 676 A.2d 26, 30 (D.C. 1996); Partnership Placements, Inc. v. Landmark Ins. Co., 722 A.2d 837, 841 (D.C. 1998). "The moving party also carries the burden of proving no genuine issue of fact in the dispute." Urban Masonry, 676 A.2d at 30. Additionally, "parties opposing summary judgment must set forth by affidavit or in a similar sworn fashion, facts that there is a genuine issue for a trial." Potts v. District of Columbia, 697 A.2d 1249, 1251 (D.C. 1997).

## Conclusions of Law

Defendant Chartone argues that it is entitled to judgment as a matter of law because Plaintiffs purchased the medical records for a non-consumer purpose as defined by the District



of Columbia Consumer Protection Procedures Act. Section 28-3901(a)(2) of the Act defines a

consumer as the following:

> …a person who does or would purchase, lease (from), or receive consumer goods and services, including a co-obligor or surety, or a person who does or would provide the economic demand for a trade practice; as an adjective, "consumer" describes anything, without exception, which is primarily for personal, household, or family use.

Furthermore, the Court of Appeals in Weschler & Son, Inc. v. Klank, 561 A.2d 1003, 1005

(D.C 1989) established that:

> it is not the use to which the purchaser ultimately puts the goods or services ,
> but rather the nature of the purchaser that determines the nature of the transaction.
> If the purchaser is regularly engaged in the business of buying the goods or service[s]
> in question for later resale to another in the distribution chain, or at retail to the general
> public, then a transaction in the course of that business is not within the Act. If,
> on the other hand, the purchaser is not engaged in the regular business of purchasing
> this type of goods or service and reselling it, then the transaction will usually fall
> within the Act.

As such, under the analysis in Weschler, Plaintiffs suggest that since neither they nor their

attorneys is engaged in the 'regular business" of purchasing medical records and re-selling

them, it follows that the transaction is one within the Act and its protections. However, the

Weschler case states that if "the purchaser is not engaged in the regular business of purchasing

this type of goods or services and reselling them, then the transaction will *usually* fall within

the Act." *Id*. (emphasis added). Moreover, the term consumer as defined under the Act squarely

states that as an adjective, the word "consumer" describes anything without exception, which is

primarily for personal, household, or family use. On these facts, Plaintiffs' attorneys requested

their medical records for use in separate personal injury lawsuits. Plaintiffs' attorneys were not

just acting as intermediaries to procure the records to pass them along to Plaintiffs for their

personal use. But rather, Plaintiffs' attorneys sought the medical records for use in litigating

3

their personal injury lawsuits. Judge Blackburne-Rigsby reached a similar conclusion in *Ford v. Chartone*, 02 CA 7111 when she granted summary judgment in favor of the defendant. She determined that an attorney's purchase of medical records for the purpose of litigation was not a consumer transaction.

Nevertheless, Plaintiffs argue that their attorneys' request for medical records on their behalf does not affect their status as consumers. Additionally, in Plaintiffs' cross motion for summary judgment they maintains that (1) the District of Columbia's Consumer Procedures Protection Act ("CPPT") applies to individuals who requested copies of their medical records through their attorneys, (2) that the CPPT applies to individuals who, at anytime during the period covered by the complaint in this case requested copies of their medical records, (3) that the CPPT supplies a cause of action to enforce the Health Insurance Portability and Accountability Act (HIPAA) rights of individuals who ordered copies of their medical records and (4) that the HIPAA rate for Chartone in the District is 48 cents per page.

There is no legal authority in the District of Columbia that directly addresses whether an attorney's request for medical records on behalf of his client is analogous to the patient's own request for medical records.  However, recently, the Court in *Bugarin v. Chartone Inc.*, 135 Cal App.4th 1558 (2006) narrowly dealt with this issue. Under the circumstances of *Bugarin*, the trial court sustained a healthcare clearing house's demurrer to a class action complaint filed by a patient and law firm alleging that fees charged by the clearinghouse for copying the patient's medical records were excessive. *Id.* The Court of Appeals relied on the legislative intent of HIPPA and statutory interpretation of 45 C.F.R. § 164.524(a) (2005) in affirming the trial court's order sustaining respondent's demurrer without leave to amend.

4

In enacting HIPAA, Congress expressed concern for protecting the integrity and confidentiality of personal medical records, and for preventing the unauthorized use or disclosure of such records. 42 USC 1562 § 1320d-2(d)(2). As such, the United States Department of Health and Human Services (DHHS) promulgated regulations to protect the privacy of medical records. *Bugarin*, at 1562. 45 Code of Federal Regulations Part 164 (2005) governs the management and disclosure of medical records by "covered entities," which are defined as health plans or healthcare clearinghouses. Part 164 addresses the rights of individuals to access their own medical records. The Court in *Bugarin* noted that Part 164 grants an individual rights and protections that are personal, and that are to be exercised personally. *Bugarin*, at 1563. Furthermore, the Court reasoned that the word "individual" in part 164 is used with the intent to describe a natural person who is the subject of medical records or who is the subject of the protected health information. *Id*. Additionally, the Court opined that privacy concerns arise when someone other than the individual or personal representative as defined under the regulations makes the request for medical records. *Bugarin*, at 1564. Thus, in the interest of protecting the privacy of individuals, the Court declined to conflate individuals with agents, or for that matter with lawyers who purport to represent an individual. *Id*. Thus, in the interest of protecting the privacy of medical records in the instant matter, this Court agrees that a lawyer's request for medical records is not akin to a patient's request.

The *Ford and Bugarin* cases involved similar facts, similar causes of action and the same defendant as in the instant matter. Although neither case is binding on this Court, the reasoning of Judge Blackburne-Rigsby and the California Court of Appeals is particularly persuasive given their commonalities to the present case. Therefore, since this Court is not

5

convinced that Plaintiffs' claim falls within the District of Columbia Consumer Protection Procedures Act, Chartone is entitled to judgment as a matter of law. Accordingly, this Court cannot rule as a matter of law on Plaintiffs' claim that the District of Columbia's Consumer Procedures Protection Act applies to individuals who requested copies of their medical records through their attorneys. Furthermore, this Court cannot find as a matter of law that the CPPT applies to individuals who, at anytime during the period covered by the complaint in this case requested copies of their medical records because such a determination requires a case by case evaluation. Moreover, this Court is not empowered to determine whether the CPPT supplies a cause of action to enforce the Health Insurance Portability and Accountability Act (HIPAA) rights of individuals who ordered copies of their medical records or mandate that the HIPAA rate for Chartone in the District is 48 cents per page because these are legislative functions. As such, Plaintiffs' motion for partial summary judgment is denied.

It is this 26th day of Aril 2006 **ORDERED** that Defendant's motion for partial summary judgment is **GRANTED**. Plaintiffs' motion for partial summary judgment is **DENIED**.

_Mary C Terrell_
Judge Mary A. Gooden Terrell

Copies to:

Jennifer B. Furey, Esq.
Cooley Manion Jones LLP
21 Custom House Street
Boston, MA 02210

William Claiburne, Esq.
717 D Street, NW
Suite 210
Washington, DC 20004

MAILED From Chambers    APR 2 7 2006

DOCKETED In Chambers    APR 2 6 2006

6

Sean R. Day, Esq.
8505 Baltimore Ave.
Suite B
College Park, MD 20740

Westlaw.

Not Reported in Cal.Rptr.2d
Not Reported in Cal.Rptr.2d, 2000 WL 1705637 (Cal.Superior), 56 U.S.P.Q.2d 1852
**(Cite as: Not Reported in Cal.Rptr.2d)**

Page 1

▷
Stoner v. eBay, Inc.
Cal.Super.,2000.

Superior Court San Francisco County, California.
Randall STONER Plaintiff,
v.
EBAY INC., a Delaware Corporation; et al.,
Defendants.
**No. 305666.**

Nov. 1, 2000.

ORDER GRANTING DEFENDANT'S MOTION
FOR SUMMARY JUDGMENT
POLLAK, J.
*1 Defendants' Motion for Summary Judgment came on regularly for hearing on October 10, 2000. The question to be decided is whether eBay enjoys immunity under the Communications Decency Act ("CDA"), 47 U.S.C. § 230, for the conduct underlying plaintiff's claims. Having reviewed the evidence, law and argument, the Court concludes that eBay is immune from any liability arising from plaintiff's claims, and therefore grants defendant's motion.

eBay is an online auction company. Plaintiff claims that eBay "has developed a method of operation that allows it to knowingly reap massive profits from the sale of bootleg and other unauthorized 'infringing' sound recordings in violation of Business and Professions Code § 17200." (Plaintiff's Memorandum of Points and Authorities ("Plaintiff's P & A") p. 1.) Specifically, plaintiff claims that eBay violates section 17200 in that "(1) eBay actually sells, or at minimum, advertises and offers for sale, and causes the sale of, various bootleg and other infringing sound recordings, in direct violation of several applicable Penal Code Provisions (Pen.Code, §§ 653i, 653s, 653w); (2) eBay, independent of its users, engages in unfair business practices in that, knowing full well that infringing sound recording auctions are prevalent on its site, eBay actively promotes and enables

those auctions and takes a commission on each sale, even though it could eliminate said infringing auction if it wanted to; and (3) eBay itself engages in conduct likely to deceive the public in that it knows about and actively facilitates infringing sound recording auctions even though, as it also knows, many of the ultimate purchasers of the recordings truly do not realize they are buying illegal items with no resale value. (Plaintiff's P & A, p. 11-12, citing Second Amended Complaint ¶¶ 8-25.)

Defendant's immunity claim is based on 47 U.S.C. § 230(c)(1), which states that "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider," and section 230(e)(3) which provides in part that "[n]o cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section." Section 230 "creates a federal immunity to any state law cause of action that would hold computer service providers liable for information originating with a third party. Specifically, § 230 precludes courts from entertaining claims that would place a computer service provider in a publisher's role. Thus, lawsuits seeking to hold a service provider liable for its exercise of a publisher's traditional editorial functions--- such as deciding whether to publish, withdraw, postpone or alter content ---are barred." (*Zeran v. America Online* (4th Cir.1997) 129 F.3d 327, 330.)

Immunity under the CDA requires proof of three elements. Defendant must establish (1) that eBay is an interactive computer services provider; (2) that eBay is not an information content provider with respect to the disputed activity; and (3) that plaintiff seeks to hold eBay liable for information originating with a third-party user of its service. (*Ibid.*) For purposes of this motion it is undisputed that eBay is an interactive computer service provider as defined in section 230(f)(2). (Plaintiff's Separate Statement of Undisputed Material Facts

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in Cal.Rptr.2d                                                                                                            Page 2
Not Reported in Cal.Rptr.2d, 2000 WL 1705637 (Cal.Superior), 56 U.S.P.Q.2d 1852
(Cite as: Not Reported in Cal.Rptr.2d)

("Plaintiff's Material Facts"), ¶ 10, pg. 6.) Additionally, eBay has satisfied its burden of establishing that it is not an information content provider as defined in section 230(f)(3). The undisputed facts establish that the descriptions of the goods and services auctioned over the eBay service are created entirely by the sellers. (Plaintiff's Material Facts, ¶ 2, pg. 2.) eBay is not responsible for the creation or development of information relating to any of the products for which it provides auction services. While eBay may add additional information to its web pages, such as logos, category headings and seller ratings, this information is not unlike the information added to many web pages, the purpose of which is to facilitate ease of use and access to the content provided by the third-party. eBay, therefore, is not an information content provider or joint information content provider with respect to the description of auctioned goods.

*2 The more difficult question is whether plaintiff is seeking to hold eBay responsible for content provided by third parties. Plaintiff does not claim that there is anything improper about the manner in which eBay conducts its auction business, other than that it auctions sound recordings that may not lawfully be sold. However, plaintiff contends that eBay's services constitute more than mere publication of product descriptions prepared by others, and are instead independent acts of eBay in furtherance of illegal sales. Therefore, plaintiff claims, this suit does not seek to hold eBay responsible for the publication of information provided by others, but for eBay's own participation in selling contraband musical recordings.

Despite plaintiff's attempt to characterize eBay as an active participant in the sale of products auctioned over its service, plaintiff is seeking to hold eBay responsible for informing prospective purchasers that illegal recordings may be purchased-information that originates with the third party sellers who use the computer service. The uncontroverted facts establish that eBay's role does not extend beyond the scope of the federal immunity. eBay provides an interactive computer

service by which sellers of goods and services describe over the Internet the products they wish to sell, and sell them to the person who agrees, by submitting a bid through eBay's web site in accordance with the rules of the service, to pay the highest price for the product. eBay provides interactive computer services for which it charges a fee, just as America Online provides interactive services for which it charges a fee. eBay does not select items to be auctioned, does not inspect or come into possession of those items at any time, does not describe the items to prospective bidders, and does not determine the minimum price which the seller will accept for the item. eBay does advertise and promote its auction service, and charges a fee for the use of its service. However, neither aggressive advertising nor the imposition of a fee-including a fee based in part on the price at which an item is sold-transforms an interactive service provider into a seller responsible for items sold. (*Cf. Blumenthal v. Drudge* (D.D.C.1998) 992 F.Supp. 44, 51-52 (America Online immune from liability for libelous statements contained in the Drudge Report even though America Online paid Drudge to include the Report on its service and actively advertised the Report by, among other things, issuing a press release which made "clear the kind of material Drudge would provide to AOL subscribers-gossip and rumor-and urged potential subscribers to sign onto AOL in order to get the benefit of the Drudge Report").)

Plaintiff points to several other features of eBay's service which he contends transform defendant from a mere computer services provider to an active participant in the sale of the auctioned goods and services. eBay provides insurance for all auctioned items up to $200, less a $25 deductible. (Perkins' declaration, Ex. I.) Coverage is available where a buyer pays for an item but does not receive it or where the buyer receives "an item that is less than what is described" (*Ibid.*) Providing insurance, however, is not selling, or offering to sell, the insured merchandise. Providing limited insurance for all items auctioned over its service may encourage buyers to use the service, but does not make eBay the seller. If a seller misrepresents an

Not Reported in Cal.Rptr.2d                                                                                       Page 3
Not Reported in Cal.Rptr.2d, 2000 WL 1705637 (Cal.Superior), 56 U.S.P.Q.2d 1852
(Cite as: Not Reported in Cal.Rptr.2d)

auctioned item, giving rise to coverage, the insurer will have a subrogation claim against the seller, but not against eBay. (See, e.g., *Fireman's Fund Ins. Co. v. Wilshire Film Ventures, Inc.* (1997) 52 Cal.App.4th 553, 555-556 .) eBay also provides escrow and payment services, for which additional fees are charged. eBay refers users to i-Escrow, which accepts payment from the buyer, and in turn pays the seller when the buyer has received and approved the auctioned merchandise. eBay's Billpoint service enables buyers to pay for auctioned items by credit card or electronic check. Neither the escrow service nor the Billpoint, however, renders eBay a seller. Both are merely additional services which promote the provident and efficient use of eBay's auction service, irrespective of the legality or illegality of the item being auctioned. These additional features are available with respect to all goods and services auctioned-they are not limited to recordings, much less to illegal recordings.

**\*3** Plaintiff attempts to draw a distinction between eBay's interactive service, which he argues is based on a sales model, and other interactive services which are based on bulletin board models. While the majority of cases addressing CDA immunity may fit the bulletin board description, nothing in those cases or in the statutory language so limits the CDA's application. A principal objective of the immunity provision is to encourage commerce over the Internet by ensuring that interactive computer service providers are not held responsible for how third parties use their services. "It is the policy of the United States... to preserve the vibrant and competitive free market that presently exists for the Internet and other interactive computer services, unfettered by Federal or State regulation." (47 U.S.C.A. § 230(b)(2).) This policy is based in part on Congress' finding that "[i]ncreasingly Americans are relying on interactive media for a variety of political, educational, cultural, and entertainment services." (47 U.S.C.A § 230(a)(5).) To accomplish this objective, the immunity extends beyond the publication of harmful material over the Internet, and encompasses the distribution of such material in transactions effected over the Internet. (See *Doe*

*v. America Online* (Fla.Dist.Ct.App.1998) 718 So.2d 385, (review granted, April 12, 1999, 729 So.2d 390) (immunity extends to action by a mother against America Online for selling and distributing pornographic material of her minor son in violation of Florida law).) Plaintiff's attempt to impose responsibility on eBay as the seller of items auctioned over its service is no different from the unsuccessful attempts that have been made to hold computer service providers liable as distributors rather than as publishers of defamatory or pornographic materials. (*Doe v. America Online, supra,* 718 So.2d 385; *Zeran, supra,* 129 F.3d 327, 332.)

At bottom, plaintiff's contention is that eBay should be held responsible for failing to monitor the products auctioned over its service. eBay must know, plaintiff asserts, that illicit recordings are being auctioned over its service. The very description of some recordings (*e.g.,* "bootleg" tapes) identifies some as contraband so that, plaintiff contends, eBay must be deemed to have notice that these may not lawfully be sold, and by failing to intervene must be deemed to have knowingly joined in the unlawful sale. However, cases decided under the CDA uniformly have held that notice of postings which indicate illegality does not defeat immunity. (See *Zeran, supra,* 129 F.3d at 331-334, *Doe v. America Online, supra,* 718 So.2d at 388-389.) The courts have recognized that imposing liability based on notice of content in the interactive computer service context would create an incentive for providers to restrict speech and abstain from self-regulation, thereby defeating the purposes of section 230. (*Ibid.*)

The record reflects that at any given time, eBay has over 4 million listings on its website, approximately 275,000 in the music category alone. (Plaintiff's Material Facts, ¶ 12, pg. 7.) However many of these products may be contraband, and however many it might be possible for defendant to identify as such, Congress intended to remove any legal obligation of interactive computer service providers to attempt to identify or monitor the sale of such products. While such a service may be aware that a fraction

Not Reported in Cal.Rptr.2d                                                                                          Page 4
Not Reported in Cal.Rptr.2d, 2000 WL 1705637 (Cal.Superior), 56 U.S.P.Q.2d 1852
(Cite as: Not Reported in Cal.Rptr.2d)

of the large volume of data exchanged over its facilities involves unlawful activity, and might be able to detect a certain portion of those, the threat of liability for failing to monitor effectively would, in the judgment of Congress, deter companies such as eBay from making their service available as widely and as freely as possible. Moreover, removing any legal obligation to monitor was thought to encourage voluntary efforts to screen out offensive or unlawful materials that might not be made by service providers if the failure to detect an inappropriate use of their system could be a predicate for liability. (*Zeran, supra,* 129 F.3d at 331.) The record reflects that eBay has adopted procedures to curtail the use of its service to sell inappropriate items. Plaintiff contends that these measures are inadequate, but imposing liability for defendant's failure to do more would require precisely the monitoring of third party content that Congress determined should not be mandated.

*\*4* While the description of a recording as "bootleg" certainly suggests that the recording is one that may not lawfully be sold, an inspection of the product nonetheless may be necessary to be sure.[FN1] Moreover, if eBay were responsible for permitting the sale of unauthorized recordings over its service, the company would be obliged to investigate in countless cases where the description of the item was more ambiguous, or where information from other sources provided a basis for suspicion. And if liability were imposed for the sale of unauthorized recordings in violation of the Penal Code provisions relied on here, there is no reason why liability would not extend to the auction of any other form of contraband, or of goods or services that violated some other legal duty that eBay was bound to know or that was brought to its attention. The burden that such an obligation would place on a service such as eBay likely would force it to cease, or at least significantly restrict, its operations. If such an obligation is to be imposed, it is Congress that must be asked to re-evaluate the immunity conferred by section 230.

> FN1. In some cases, falsely describing an article as illicit may add to its value. *See,*

*e.g.,* the lyrics to the Credence Clearwater hit song "Bootleg":
"Take you a glass of water,
make it against the law,
See how good the water tastes
When you can't have any at all."
*See also* the Eminem hit song, "My Name Is ... (Bootleg Version)," which may be considerably more popular than the alternative version, "My Name Is..."

There is, to be sure, some point at which the existing immunity would no longer apply. Although the limits of the immunity have not yet been clearly defined, any limitation placed on the immunity presumably would begin at the point at which providing otherwise lawful goods or services with knowledge that they are being put to an illegal use becomes the commission, or the aiding and abetting, of a crime. Criminal liability in such circumstances normally requires the intent to further or facilitate the crime. (See *People v. Lauria* (1967) 251 Cal.App.2d 471; *People v. Beeman* (1984) 35 Cal.3d 547; *United States v. Blankenship* (7th Cir.1992) 970 F.2d 283.) Using the rather extreme hypothetical situation discussed at the hearing, if an interactive computer service were shown to be actively involved in the sale of drugs or other contraband, the fact that sales were consummated over the computer service would not necessarily provide a shield from liability. In order for liability to arise and the immunity to be lost, it would be necessary to show actual, rather than constructive, knowledge of illegal sales, and some affirmative action by the computer service, beyond making its facilities available in the normal manner, designed to accomplish the illegal sales. (See *People v. Lauria, supra; People v. Beeman, supra;* compare also *Wilcox v. First Interstate Bank of Oregon* (D.Ore.1985) 605 F.Supp. 592, 594, affd. as mod. (9th Cir.1987) 815 F.2d 522; *C-O-Two Fire Equipment Co. v. United States* (9th Cir.1952) 197 F.2d 489, cert. den. (1952) 344 U.S. 892 (mere parallel activity by competitors does not constitute illegal agreement to restrain trade absent conduct inconsistent with best interests of competitors considered independently).) The uncontroverted

Not Reported in Cal.Rptr.2d                                                    Page 5
Not Reported in Cal.Rptr.2d, 2000 WL 1705637 (Cal.Superior), 56 U.S.P.Q.2d 1852
(Cite as: Not Reported in Cal.Rptr.2d)

circumstances in this case do not rise to such a level.

**\*5** Accordingly, defendant's motion for summary judgment must be GRANTED.

Cal.Super.,2000.
Stoner v. eBay, Inc.
Not Reported in Cal.Rptr.2d, 2000 WL 1705637 (Cal.Superior), 56 U.S.P.Q.2d 1852

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Slip Copy                                                                                                                        Page 1
Slip Copy, 2006 WL 2506318 (E.D.Pa.), 39 Communications Reg. (P&F) 430
(Cite as: Slip Copy)

**C**
Voicenet Communications, Inc. v. Corbett
E.D.Pa.,2006.

United States District Court,E.D. Pennsylvania.
VOICENET COMMUNICATIONS, INC., et al.
v.
Thomas W. CORBETT, Jr., et al.
**Civil Action No. 04-1318.**

Aug. 30, 2006.

Ellen C. Brotman, John Rogers Carroll, Carroll & Brotman, Philadelphia, PA, for Plaintiff.
Andrew B. Adair, William F. Holsten, Holsten & Associates, Media, PA, for G. Michael Green.
Christin E. Connolly, Frank A. Chernak, Lorena E. Ahumada, Ballard Spahr Andrews & Ingersoll LLP, Philadelphia, PA, for Diane E. Gibbons, Martin McDonough and Thomas Thiel.
Sue Ann Unger, Office of Attorney General, Litigation Section, Philadelphia, PA, for Thomas W. Corbett, Jr.

*MEMORANDUM AND ORDER*
McLAUGHLIN, J.
*1 The plaintiffs, Usenet newsreader and internet service providers, have sued several Commonwealth and local law enforcement officials under 42 U.S.C. § 1983 for violations of their constitutional and statutory rights in connection with the execution of a search warrant on the plaintiffs' premises on January 21, 2004.[FN1] The defendants have moved to dismiss counts II through VI of the complaint, which allege deprivations of rights under the Communications Decency Act, 47 U.S.C. § 230 ("CDA"); the Electronic Communications Privacy Act ("ECPA"), Pub.L. No. 99-508, 100 Stat. 1848 (1986) (codified as amended in scattered sections of 18 U.S.C.); Pennsylvania's Internet Child Pornography Law, 18 Pa.C.S. § 7621 *et seq.* ("ICPL"); the Commonwealth Attorneys Act, 71 Pa.C.S. § 732-101 *et seq.*; and the Fourth and Fourteenth Amendments.[FN2]

FN1. The plaintiffs have voluntarily dismissed their claim for civil rights conspiracy under 42 U.S.C. § 1985 (count VII). (Jan. 27, 2006 Hr'g Tr. at 13.)

FN2. The defendants have not moved to dismiss count I, for deprivation of freedom of speech under the First and Fourteenth Amendments, or count VIII, for violation of the Commerce Clause. These claims go forward.

The Court will grant the defendants' motion in part, and deny it in part. Specifically, the Court will dismiss the plaintiffs' due process claims based on alleged violations of the ICPL and the Commonwealth Attorneys Act. The Court will also dismiss the plaintiffs' ECPA claim. The CDA claim may go forward, but only to the extent that the plaintiffs seek declaratory or injunctive relief; the defendants are entitled to qualified immunity from damages because the plaintiffs' rights under the CDA were not clearly established at the time of the alleged violation. The Fourth Amendment claim may go forward because it is too early for the Court to determine whether all of the defendants reasonably relied on the search warrant in question.

*I. Facts*

The Court set forth the facts as alleged in the complaint in its July 15, 2004, Memorandum and Order denying the plaintiffs' motion for a preliminary injunction, and incorporates that discussion herein.[FN3]

FN3. When considering a motion to dismiss under Fed.R.Civ.P. 12(b)(6), a court accepts all facts and allegations listed in the complaint as true and construes them in the light most favorable to the plaintiff. *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 249 (1989); *Rocks v. City of Phila.*, 868 F.2d 644, 645 (3d Cir.1989). "[A] complaint should not be dismissed for failure to state a claim unless it appears

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                Page 2
Slip Copy, 2006 WL 2506318 (E.D.Pa.), 39 Communications Reg. (P&F) 430
(Cite as: Slip Copy)

beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957).

## II. Analysis

To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution or laws of the United States, and show that the alleged deprivation was committed by a person acting under color of state law. *West v. Atkins,* 487 U.S. 42, 48 (1988). The questions presented in this motion to dismiss are whether the plaintiffs have alleged a deprivation of rights under the CDA, the ECPA, and/or the Fourth and Fourteenth Amendments. The defendants do not dispute that they were acting under color of state law.

### A. *Count II-Deprivation of Rights Under the Communications Decency Act*

The CDA provides, in relevant part: "No provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." 47 U.S.C. § 230(c)(1). The CDA further provides: "No cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section." 47 U.S.C. § 230(e)(3).

In count II of the complaint, the plaintiffs allege that the defendants violated their rights under the CDA by enforcing against them 18 Pa.C.S. § 6312, a state statute that criminalizes the knowing distribution and possession of child pornography. (Compl.¶¶ 52, 77.) The defendants have moved to dismiss count II on the grounds that: 1) the CDA does not confer an enforceable right, privilege, or immunity within the meaning of § 1983; and 2) to the extent that the CDA does confer an enforceable right, it provides immunity from only civil, not criminal, liability.

**\*2** Despite the defendants' arguments, the Court is persuaded that the plaintiffs have stated a § 1983

claim based on a violation of their rights under the CDA. The Court finds that all of the defendants are entitled to qualified immunity from money damages, however, because the plaintiffs' rights were not clearly established at the time of the actions giving rise to this litigation.

### 1. *The CDA Confers an Enforceable Right, Privilege, or Immunity Within the Meaning of § 1983*

A plaintiff asserting a § 1983 claim based on a violation of a federal statute must show that the statute confers an enforceable right, privilege or immunity within the meaning of § 1983. *Wilder v. Virginia Hosp. Ass'n,* 496 U.S. 498, 508 (1990). A federal statute confers a right that *presumably* can be enforced through § 1983 when three conditions are met:

First, Congress must have intended that the provision in question benefit the plaintiff. Second, the plaintiff must demonstrate that the right assertedly protected by the statute is not so "vague and amorphous" that its enforcement would strain judicial competence. Third, the statute must unambiguously impose a binding obligation on the States. In other words, the provision giving rise to the asserted right must be couched in mandatory rather than precatory terms.

*Blessing v. Freestone,* 520 U.S. 329, 340-341 (1997) (internal citations omitted).[FN4]

> FN4. Even if the plaintiff satisfies these three conditions, the defendant can rebut the presumption of enforceability by showing that Congress precluded § 1983 remedies, either expressly, or implicitly, by creating a comprehensive enforcement scheme that would be incompatible with § 1983 remedies. *Id.* at 341. The defendants have not argued that Congress has precluded § 1983 remedies in the CDA.

The defendants do not dispute that the CDA provisions in question are intended to benefit the plaintiff.[FN5] Nor do the defendants argue that the right created by the CDA is too "vague and

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2006 WL 2506318 (E.D.Pa.), 39 Communications Reg. (P&F) 430
(Cite as: Slip Copy)

Page 3

amorphous" for a court to enforce. The defendants argue only that the CDA does not impose any binding obligations on the State, i.e. the defendants, because it merely provides an affirmative defense.

> FN5. The defendants assumed, for the purposes their motion, that the plaintiffs were an "interactive computer service" under the CDA. (Defs.' Mot. to Dismiss Br. at 11 n. 5.)

The defendants cite to two decisions by Courts of Appeals in other circuits that refer to the CDA as an "affirmative defense," *Doe v. GTE Corp.*, 347 F.3d 655 (7th Cir.2003), and *Zeran v. America Online, Inc.*, 129 F.3d 327 (4th Cir.1997). These decisions do not address whether the CDA creates a right that can be enforced through § 1983, however. Even if the Court agrees that the CDA can be used as an affirmative defense, the question remains-does the CDA also impose a binding obligation on the defendants?

In *Golden State Transit Corp. v. City of Los Angeles*, 493 U.S. 103 (1989), the Supreme Court held that a statute that "denies [a] sovereign the authority to abridge a personal liberty" imposes a binding obligation on the State. *Id.* at 112. In that case, the defendant city refused to renew the plaintiff taxicab company's franchise unless the company settled its labor dispute with its union. The company brought suit under § 1983, alleging that the city's actions violated the National Labor Relations Act ("NLRA"). *Id.* at 104.

The Court noted that the text of the NLRA did not explicitly demand any duties of the State. In an earlier case, *Machinists v. Wisconsin Employment Relations Comm'n*, 427 U.S. 132 (1976), however, the Court had found that the NLRA gave parties to a collective-bargaining agreement the right to bargain with each other "free of governmental interference," thus creating a "free zone from which all regulation, whether federal or state, is excluded." *Golden State Transit*, 493 U.S. at 110-111 (internal quotations omitted). The *Golden State Transit* Court described the *Machinists* rule as

"akin to a rule that denies either sovereign the authority to abridge a personal liberty;" unless and until Congress decided to retract that statutorily-conferred liberty, "it is a guarantee of freedom for private conduct that the State may not abridge." *Id.* at 112. Thus, the Court held, the company could enforce its NLRA rights via a § 1983 suit. *Id.*

*3 Here, the text of the CDA itself tells all parties, including the State, not to treat a provider or user of an interactive computer service as the publisher of information posted by someone else. Moreover, it does so in mandatory terms. 47 U.S.C. § 230(c)(1) and (e)(3). Like the NLRA, the CDA has created a "free zone" protecting providers and users of interactive computer services from state action that would hold them accountable for information posted by others. Thus, under the reasoning of *Golden State Transit*, the CDA does impose a binding obligation on the defendants-and confers a right that presumably can be enforced through § 1983.

### 2. The CDA Confers Immunity from Inconsistent State Criminal Laws

The defendants also argue that the plaintiffs cannot state a claim under the CDA because it only provides immunity from civil, not criminal, liability. To determine the scope of the CDA, the Court must begin with the text of the statute. *See, e.g., BedRoc Ltd., LLC v. Western Elite, Inc.*, 541 U.S. 176, 183 (2004) (statutory interpretation begins with the statutory text). Standing alone, subsection (c)(1) of the CDA is not helpful. It states that a provider of interactive computer services should not be "treated" as the publisher or speaker of information posted by others, but does not specify whether that prohibition refers to treatment in the civil and/or criminal contexts. When subsection (c)(1) is read in conjunction with subsection (e)(3), however, the meaning of the statute becomes clear: no "cause of action" may be brought, and no "liability" may be imposed, under any state law that treats a provider of interactive computer services as the publisher or speaker of information provided by others.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                    Page 4
Slip Copy, 2006 WL 2506318 (E.D.Pa.), 39 Communications Reg. (P&F) 430
**(Cite as: Slip Copy)**

The terms "liability" and "cause of action" encompass criminal as well as civil actions. Black's Law Dictionary defines "liability" as "the quality or state of being legally obligated or accountable; legal responsibility to another or to society, enforceable by civil remedy *or criminal punishment." Black's Law Dictionary* 932 (8th ed.2004) (emphasis added). The term "cause of action" is more commonly used to refer to civil actions, but the United States Court of Appeals for the Third Circuit has referred to a criminal prosecution as a "cause of action" in at least two instances. *See Bartnicki v. Vopper,* 200 F.3d 109, 114 (3d Cir.1999) (Federal Wiretapping Act creates civil and criminal causes of action); *Electronic Laboratory Supply Co. v. Cullen,* 977 F.2d 798, 808 (3d Cir.1992) (referring to federal statutes that create both criminal and civil causes of action). The CDA does not contain any language that limits the terms "liability" or "cause of action" to the civil context.

When subsection (e) is examined as a whole, it becomes even more clear that sub-subsection (e)(3) gives interactive computer service providers immunity from state criminal laws that are inconsistent with the CDA. Subsection (e) is entitled "Effect on other laws." Sub-subsection (1) provides that nothing in the CDA shall be construed to impair the enforcement of certain federal statutes governing obscenity and the sexual exploitation of children, "or any other *Federal* criminal statute." 47 U.S.C. § 230(e)(1) (emphasis added). In other words, sub-subsection (1) only states that federal criminal statutes will trump the CDA.

*4 Statutes should be interpreted to give effect, if possible, to every clause and word. *Duncan v. Walker,* 533 U.S. 167, 174 (2001) (internal quotations omitted). The defendants' interpretation of the CDA would render the word "Federal" in sub-subsection (1) superfluous, in violation of this rule of statutory interpretation.

Moreover, if Congress had wanted state criminal statutes to trump the CDA as well, it knew how to say so. For example, sub-subsection (2) provides

that nothing in the CDA shall be construed to limit or expand *"any* law pertaining to intellectual property." 47 U.S.C. § 230(e)(2) (emphasis added). Sub-subsection (4) provides that nothing in the CDA shall be construed to limit the application of the ECPA "or *any similar State law."* 47 U.S.C. § 230(e)(4) (emphasis added). If Congress had wanted all criminal statutes to trump the CDA, it could have written sub-subsection (1) to cover "any criminal statute" or "any similar State criminal statute." Instead, sub-subsection (1) is limited to federal criminal statutes. When Congress includes particular language in one provision of a statute but omits it in another, courts generally presume that Congress acted intentionally and purposefully. *Duncan,* 533 U.S. at 173 (internal quotations omitted).

The defendants argue that the CDA allows for the operation of state criminal laws by relying on the first sentence of subsection (e)(3), which provides that a state may enforce "any State law that is consistent with [the CDA]." This argument is inapposite because the plaintiffs' claim is that the enforcement of Pennsylvania's child pornography law against them is not consistent with the CDA, as they did not provide such pornography themselves.

Because the plain language of the CDA provides internet service providers immunity from inconsistent state criminal laws, the Court need not examine the statute's legislative history. *See BedRoc Ltd.,* 541 U.S. at 183 (statutory interpretation ends with the statutory text if the text is unambiguous). *See also Chicago v. Environmental Defense Fund,* 511 U.S. 328, 337 (1994) (courts should not rely upon language in a committee report when that language is not used in the statute); *United States v. $8,221,877.16 in U.S. Currency,* 330 F.3d 141, 160 (3d Cir.2003) ("[W]e are not persuaded to rethink our interpretation of the clear language in [the statute] on the basis of a few sentences in a Committee Report and the government's views as to Congress's motives .").

*3. Plaintiffs Have Alleged a Violation of Their Right to Immunity Under the CDA*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2006 WL 2506318 (E.D.Pa.), 39 Communications Reg. (P&F) 430
(Cite as: Slip Copy)

Page 5

Having established that the CDA confers a § 1983-enforceable right upon internet service providers and users to not be "treated" under state criminal laws as the publisher or speaker of information provided by someone else, the question remains: have the plaintiffs alleged a violation of that right? The complaint alleges that the defendants obtained and executed a warrant to seize the plaintiffs' servers and subscriber records, but does not allege that the defendants took any further action against the plaintiffs.

**\*5** The Court is not certain that law enforcement officials "treat" an internet service provider as the publisher or speaker of information provided by others whenever they prepare or execute a search warrant against a provider. The Court cannot conclude at this time that the defendants here did not wrongly "treat" the plaintiffs, however. In their affidavit of probable cause, defendants Michelle Deery and Martin McDonough state that they believe that the plaintiffs violated certain state criminal laws against the possession and distribution of child pornography. (Search Warrant Applicat'n.) But the plaintiffs allege-and the Court must accept as true-that they did not provide any child pornography themselves. (*See* Compl. ¶¶ 34, 49.) Special Agent Deery and Detective McDonough's statement in the affidavit of probable cause thus raises a question of whether, in obtaining and executing the warrant, the defendants treated the plaintiffs as the publishers or speakers of information provided by others. The defendants have never fully addressed whether the plaintiffs may state a claim under the CDA based on the execution of a warrant alone.

### 4. *Defendants Have Qualified Immunity from Damages*

Although the Court finds that the plaintiffs have stated a § 1983 claim based on a violation of their right to immunity under the CDA, the defendants are entitled to qualified immunity from money damages on this claim because the right was not clearly established at the time of the alleged violation. "[G]overnment officials performing

discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982). Official action is protected by qualified immunity unless the unlawfulness of the action is apparent in the light of pre-existing law. *Anderson v. Creighton,* 483 U.S. 635, 639 (1987).

The parties have not identified, and the Court has not found, any cases extending the CDA's immunity provisions to state criminal laws. Considering the CDA's express purpose of encouraging the development and use of technologies that *block* obscene material, as well as the lack of case law regarding immunity from criminal liability, the Court finds that the alleged unlawfulness of the defendants' actions was not apparent in the light of pre-existing law.

The plaintiffs cite *Grant v. City of Pittsburgh,* 98 F.3d 116 (3d Cir.1996) for the proposition that a district court should not make a determination regarding qualified immunity until the parties have had an opportunity to develop facts about the individual officers' alleged conduct. *Grant* is inapposite to the determination of qualified immunity on the plaintiffs' CDA claim. In *Grant,* the district court had concluded that the right at stake was clearly established. The Court of Appeals did not question that conclusion; it remanded so that the district court could determine if each defendant's actions violated that right. *Id.* at 122-123. Here, the Court has determined as a matter of law that a right to immunity from state criminal laws under the CDA was not clearly established. The defendants' particular actions are therefore irrelevant-nothing they could have done would have violated a "clearly established" right under the CDA.

**\*6** In sum, count II may go forward, but only to the extent that the plaintiffs have requested declaratory and injunctive relief.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                              Page 6
Slip Copy, 2006 WL 2506318 (E.D.Pa.), 39 Communications Reg. (P&F) 430
**(Cite as: Slip Copy)**

B. *Count III-Deprivation of Rights Under the Electronic Communications Privacy Act*

The ECPA prohibits the unauthorized access of any "facility through which an electronic communication service is provided." 18 U.S.C. § 2701. The ECPA permits a governmental entity, however, to obtain the contents of communications and subscriber records from internet service providers after obtaining an appropriate warrant, court order, or subpoena. 18 U.S.C. § 2703.FN6

> FN6. The ECPA was enacted in 1986 as a comprehensive amendment to the federal wiretap law. Pub.L. No. 99-508, 100 Stat. 1848. The provisions of the ECPA at issue here are in Title II of the statute, 18 U.S.C. §§ 2701-11, which is sometimes referred to as the Stored Wire and Electronic Communications and Transactional Records Access Act or the Stored Communications Act. The Court will adopt the parties' usage and refer to the statute in this Opinion as the ECPA.

In count III of the complaint, the plaintiffs allege that the defendants violated their rights under the ECPA because they seized and accessed the plaintiffs' servers and subscriber records without securing a valid warrant. The defendants have moved to dismiss count III on the grounds that: 1) Congress has implicitly precluded the plaintiffs from enforcing the ECPA via § 1983 by giving the ECPA its own remedial scheme; and 2) the defendants acted pursuant to a valid warrant under the ECPA.

The Court finds that the ECPA's remedial scheme precludes § 1983 remedies. The comprehensive civil remedies provided by the ECPA, 18 U.S.C. § 2707(b)-(c), indicate that Congress intended these remedies to supplant relief under § 1983. As the plaintiffs' § 1983 claims are preempted, the Court need not address the defendants' arguments about the validity of the warrant.

As noted above in section A.1, a plaintiff asserting a § 1983 claim based on a violation of a federal statute must show that the statute confers an enforceable right, privilege, or immunity within the meaning of § 1983. *Wilder*, 496 U.S. at 508. Once a plaintiff makes this showing, there is a rebuttable presumption that the statutory right is enforceable under § 1983. *Blessing v. Freestone*, 520 U.S. 329 (1997). A defendant may, in turn, rebut this presumption by demonstrating that Congress specifically foreclosed a remedy under § 1983, either expressly in the statute itself, or implicitly by creating "a comprehensive enforcement scheme that is incompatible with individual enforcement under § 1983 ." *Id.*

Here, the defendants do not dispute that the ECPA created an enforceable right within the meaning of § 1983. Instead, the defendants argue that Congress implicitly precluded § 1983 remedies for violations of the ECPA by setting forth a comprehensive remedial scheme within the statute.

Whether a statutory enforcement scheme is sufficiently comprehensive to preclude the availability of § 1983 was most recently considered by the U.S. Supreme Court in *City of Rancho Palos Verdes v. Abrams,* 544 U.S. 113 (2005). In that case, the plaintiff sought to bring a § 1983 claim to vindicate rights under the Telecommunications Act of 1996 ("TCA"), even though the TCA itself provided for private judicial enforcement of its provisions.

The Supreme Court began its analysis by noting that, because the express provision of one method of enforcement in a statute suggests Congress intended to preclude others, "[t]he provision of an express, private means of redress in the statute itself is ordinarily an indication that Congress did not intend to leave open a more expansive remedy under § 1983." *Abrams*, 544 U.S. at 121.

*7 The Supreme Court then reviewed its prior decisions on the preclusion of § 1983 claims and found that the dividing line between cases in which it had held that § 1983 was available and those in which it had held § 1983 precluded was "the existence of a more restrictive private remedy for

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                      Page 7
Slip Copy, 2006 WL 2506318 (E.D.Pa.), 39 Communications Reg. (P&F) 430
(Cite as: Slip Copy)

statutory violations." *Id.* In cases where the Court had found § 1983 precluded, the statutes at issue contained comprehensive remedial schemes that were more restrictive than § 1983, and the Court held those remedial schemes would be undermined if plaintiffs could circumvent them by resorting to broader remedies available under § 1983.[FN7] In cases where the Court had found § 1983 available, the statutes at issue "did not provide a private judicial remedy (or, in most of the cases, even a private administrative remedy) for the rights violated."[FN8]

> FN7. *Id.,* citing *Middlesex Cty. Sewerage Auth. v. National Sea Clammers Assn.,* 453 U.S. 1, 14, 19-20 (1981) (holding that § 1983 actions were impliedly precluded by the comprehensive, but more restrictive, remedial scheme available under the Federal Water Pollution Control Act, which among other restrictions, required 60 day notice to potential defendants before filing suit); *Smith v. Robinson,* 468 U.S. 992, 1011-1012 (1984) (holding that § 1983 claims were impliedly precluded by the more restrictive remedial scheme of the Education of the Handicapped Act, which included mandatory administrative proceedings and which did not allow for the recovery of attorneys' fees).

> FN8. *Id.* (emphasis in original omitted), citing *Blessing,* 520 U.S. at 348 (finding § 1983 not precluded by a provision of Title IV because the statute "contain[ed] no private remedy-either judicial or administrative-through which aggrieved persons [could] seek redress"); *Livadas v. Bradshaw,* 512 U.S. 107, 133-134 (1994) (finding § 1983 not precluded by the National Labor Relations Act because there was a "complete absence" in the Act of any provision for the relief requested); *Golden State Transit Corp. v. Los Angeles,* 493 U.S. 103, 108-109, (1989) (finding § 1983 not precluded because there was no comprehensive enforcement scheme under

the labor statutes at issue for the relief requested); *Wilder,* 496 U.S. at 521 (finding § 1983 not precluded by the Medicaid Act because it "contain[ed] no ... provision for private judicial or administrative enforcement" comparable to those in cases where the Court had found § 1983 precluded); *Wright v. Roanoke Redevelopment and Housing Authority,* 479 U.S. 418, 427 (1987) (finding § 1983 not precluded by the Housing Act because it did not contain a private judicial remedy).

The Supreme Court specifically declined to hold, however, that the existence of a private judicial remedy, by itself, conclusively establishes a congressional intent to preclude § 1983 relief. Instead, the Court found that the "ordinary inference" that the existence of a comprehensive private remedy precluded § 1983 relief could be overcome "by textual indication, express or implicit, that the remedy is to complement, rather than supplant, § 1983." *Id.* at 123.

Turning to the specifics of the TCA, the Supreme Court found that the statute's remedial scheme was comprehensive, but more restrictive, than relief under § 1983. Although the TCA allowed plaintiffs a remedy against the government action at issue, its remedial scheme required plaintiffs to file suit within thirty days of an alleged violation and required courts to hear and decide cases on an expedited basis. In addition, the TCA did not allow for attorney's fees and did not clearly provide for compensatory damages. *Id.* at 122-123. The TCA therefore "adds no remedies to those available under § 1983, and limits relief in ways that § 1983 does not." *Id.* at 22. Based on these facts, the Supreme Court held the TCA's more limited remedial scheme was inconsistent with, and therefore supplanted by, § 1983. *Id.*

Evaluating the ECPA under the analysis set forth in *Abrams* reveals it to be significantly different from the TCA and the other statutes previously considered by the Supreme Court. Like the TCA

Slip Copy         Page 8
Slip Copy, 2006 WL 2506318 (E.D.Pa.), 39 Communications Reg. (P&F) 430
(Cite as: Slip Copy)

and the statutes at issue in *Sea Clammers* and *Smith,* the other cases where the Supreme Court found § 1983 preempted, the ECPA has a comprehensive remedial scheme. Unlike the statutes in those cases, however, the remedies provided by the ECPA are not significantly more restrictive than those available under § 1983, but are instead roughly equivalent.

The ECPA provides for all the remedies available under § 1983-declaratory relief, actual damages, attorney's fees and costs, and punitive damages for willful violations. 18 U.S.C. § 2707(b)-(c). Moreover, the ECPA provides for even greater relief than § 1983 in one respect: even if an ECPA plaintiff's actual damages are nominal, he is entitled to receive at least $1,000 in a successful suit. 18 U.S.C. § 2707(c). The procedures required by the ECPA are also no different from a § 1983 claim. Relief under the ECPA has no preconditions or restrictions like the 30 day time limit for filing suit under the TCA. Only with respect to the statute of limitations is an ECPA claim potentially more restrictive than a claim under § 1983. The ECPA's statute of limitations is two years, 18 U.S.C. § 2707(f), but the statute of limitations for § 1983 depends on state law and may be as long as four years or more.[FN9]

> FN9. In actions under § 1983, federal courts apply states' statutes of limitations for personal injury. *Garvin v. City of Phila.,* 354 F.3d 215, 220 (3d Cir.2003). For claims arising in states, such as Florida and New York, where statutes of limitations for personal injury are longer than two years, claims under the ECPA may be time-barred when claims under § 1983 are not. *See, e.g., Chappell v. Rich,* 340 F.3d 1279 (11th Cir.2003) (Florida's four year statute of limitations applies to § 1983 claims). Conversely, in states where personal injury statutes of limitations are one year, like Tennessee, an ECPA claim will be available after a § 1983 claim has become time-barred. *See, e.g., Ling v. Herrod,* 2006 WL 2239101 at 2

(W.D.Tenn. Aug. 3, 2006) (Tennessee's one year statute of limitations applies to § 1983 claims). Here, the plaintiffs' § 1983 claims are governed by Pennsylvania's two year statute of limitations, meaning that for this case, the statute of limitations for an ECPA claim and the plaintiffs' § 1983 claim is the same. *See Garvin,* 354 F.3d at 220.

**\*8** The issue here, then, is whether a statute like the ECPA, containing a comprehensive private judicial remedy roughly equivalent to that in § 1983, can be considered to be inconsistent with § 1983 and therefore preempt it. Neither the submissions of the parties nor the Court's own research has identified any previous decisions addressing this situation.

To resolve the issue, the Court will apply the shifting presumptions set out in *Abrams.* The existence of a private judicial remedy in the ECPA does not conclusively establish that § 1983 is precluded, but it creates an "ordinary inference that the remedy provided in the statute is exclusive." *Abrams,* 544 U.S. at 124. This inference can be "overcome by textual indication, express or implicit, that the remedy is to complement, rather than supplant, § 1983." *Id.* at 124.

Here, nothing in the text of the ECPA implicitly or explicitly indicates that its remedial scheme is to complement rather than supplant § 1983. The remedy available in the ECPA is complete, providing for the same spectrum of compensatory and exemplary damages, plus attorneys' fees and costs, as does § 1983. The procedures for filing suit under the ECPA and under § 1983 are equivalent. As there is no significant difference between the remedies available under the two statutes, a litigant seeking to vindicate his rights under the ECPA has no need to resort to § 1983 and can obtain full and complete relief under the remedial provisions of the ECPA itself. Accordingly, the comprehensive remedial scheme in the ECPA can be fairly said to replace or supplant, rather than complement, the remedies available under § 1983.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Additional support for this conclusion can be drawn from ECPA § 2708 which states that: "[t]he remedies and sanctions described in this chapter [ECPA §§ 2701-12] are the only judicial remedies and sanctions for non-constitutional violations of this chapter." Although this language was enacted principally to ensure that violations of the ECPA would not be used as the basis for excluding evidence under the statutory exclusionary rule of 18 U.S.C. § 2515,[FN10] its plain meaning would also seem to forbid violations of the ECPA from being used as the basis for claims under other federal laws, including § 1983.

> FN10. Although the Senate Report accompanying the introduction of the ECPA contains no explanation of § 2708, the Report does discuss essentially identical language in Title I of the ECPA, 18 U.S.C. § 2518(10(c). The Report explains that this language was added at the request of the Justice Department to ensure that "[i]n the event that there is a violation of law of a constitutional magnitude, the court involved in a subsequent trial will apply the existing Constitutional law with respect to the exclusionary rule" and that the statutory exclusionary rule of Title II or the Omnibus Crime Control and Safe Streets Act of 1968 would not apply." S.Rep. No. 99-541, at 23, *reprinted in* 1986 U.S.C.C.A.N. at 3577 (1986).

Under the analysis set out in *Abrams,* therefore, in the absence of any indication in the ECPA that Congress intended to allow resort to § 1983 as a complementary means of enforcing the statute, the Court is left with the "ordinary inference" that ECPA's comprehensive remedial provisions preclude § 1983 relief. Accordingly, Count III of the plaintiffs' complaint will be dismissed.

### C. Count IV-Deprivation of Due Process (Based on Violation of the Internet Child Pornography Law)

Pennsylvania's Internet Child Pornography law ("ICPL") requires an internet service provider to remove or disable access to child pornography after the Attorney General obtains a court order and notifies the service provider. 18 Pa.C.S. §§ 7622-7628. In count IV of the complaint, the plaintiffs argue that the defendants deprived them of due process by failing to follow the order application and notice procedure set forth in the ICPL. The Court will dismiss count IV because the defendants did not have a duty to follow the ICPL's procedures.

*9 Pennsylvania has enacted at least two laws that concern child pornography. Section 6312 of the Pennsylvania Crimes Code, enacted in 1977, makes it a crime to knowingly produce, possess, or distribute child pornography. 18 Pa.C.S. § 6312(b)-(d) and Credits.

The ICPL, enacted in 2002, makes it a crime for an internet service provider to fail to:
remove or disable access to child pornography items residing on or accessible through its service in a manner accessible to persons located within this Commonwealth within five business days of when the Internet service provider is notified by the Attorney General pursuant to section 7628 (relating to notification procedure) that child pornography items reside on or are accessible through its service.

18 Pa.C.S. § 7622 and Credit; 18 Pa.C.S. § 7624 (setting forth the penalties for successive violations of § 7622).

The ICPL further provides that: 1) the Attorney General or district attorney may apply to the court of common pleas for an order to remove or disable child pornography items; 2) the court may enter such an order ex parte; and 3) the Attorney General must notify the internet service provider within three days of receiving a copy of the order. 18 Pa.C.S. §§ 7626-7628.

The plaintiffs have not alleged that the defendants have investigated or prosecuted them for possible violations of the ICPL. Instead, the plaintiffs have alleged, and the record shows, that the defendants seized the plaintiffs' servers to investigate possible

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                        Page 10
Slip Copy, 2006 WL 2506318 (E.D.Pa.), 39 Communications Reg. (P&F) 430
**(Cite as: Slip Copy)**

violations of 18 Pa.C.S. § 6312. The plaintiffs argue nevertheless that the defendants had a duty to follow the procedures set forth in the ICPL.

Neither the text of the ICPL or the principles of statutory construction support the plaintiffs' position. Nothing in the ICPL requires law enforcement officials to seek to remove or disable access to child pornography items. Nor does anything in the ICPL require officials to follow the procedures set forth in the ICPL when they are trying to enforce or investigate violations of other statutes.

A new statute, such as the ICPL, does not repeal or limit the enforcement of an older statute, such as § 6312, unless the new statute explicitly so provides, or unless the two statutes are irreconcilable. *See United States v. Boffa,* 688 F.2d 919, 932 (3d Cir.1982) ("A new statute will not be read as partially repealing a prior statute unless a 'positive repugnancy' exists between the two."); *In re Holton Estate,* 159 A.2d 883, 886 (Pa.1960) ( "Statutes are never presumed to make any innovation in the rules or principles of the common law or prior-existing law beyond what is expressly declared in their provisions.") (internal quotations omitted).

The ICPL does not contain any language expressly repealing or limiting the application of existing child pornography statutes. Nor are the ICPL and § 6312 irreconcilable; they criminalize different kinds of conduct. Section 6312 makes it a crime for anyone to knowingly possess or distribute child pornography. The ICPL makes it a crime for an internet service provider to fail to remove or disable access to child pornography upon receiving notice of a court order to do so, whether or not the provider knew about the child pornography prior to the court order.

**\*10** The plaintiffs point to § 7623 of the ICPL, which provides that "[n] othing in [the ICPL] may be construed as imposing a duty on an Internet service provider to actively monitor its service or affirmatively seek evidence of illegal activity on its service," to support their argument that they cannot

be the subject of a search warrant investigating possible violations of 18 Pa.C.S. § 6312. But the fact that an internet service provider does not have a duty to monitor its service for child pornography does not mean that it cannot be held liable if it actually knowingly disseminates child pornography. Nor does it mean that an internet service provider cannot be searched for evidence of crimes committed by other people.

Because the Court is dismissing the plaintiffs' ICPL claim on the ground that the defendants did not have a duty to follow the ICPL's procedures, the Court will not address the defendants' alternate grounds for dismissal, that a violation of the ICPL does not give rise to a due process claim under § 1983.

### D. *Count V-Deprivation of Due Process by Attorney General Defendants (Based on Violation of the Commonwealth Attorneys Act)*

In count V of the complaint, the plaintiffs allege that defendants Thomas W. Corbett, Jr., the Attorney General of the Commonwealth of Pennsylvania, and Michele L. Deery, a Special Agent of the Office of Attorney General, (hereinafter the "Attorney General Defendants") investigated the plaintiffs even though they were not authorized to do so under the Commonwealth Attorneys Act, 71 Pa.C.S. § 732-101, *et seq.* (hereinafter the "Attorneys Act"). The Attorney General Defendants have moved to dismiss count V on the grounds that they were authorized to investigate, and that even if they were not, a violation of the Attorneys Act does not give rise to a § 1983 claim.

The Attorneys Act provides, in relevant part, that the Attorney General shall have the authority to investigate and prosecute any matter "[u]pon the request of a district attorney who lacks the resources to conduct an adequate investigation or the prosecution of the criminal case or matter." 71 Pa.C.S. § 732-205(a)(3) (regarding prosecutions); 71 Pa.C.S. § 732-206(a) (regarding investigations). The parties dispute whether the Attorney General

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                    Page 11
Slip Copy, 2006 WL 2506318 (E.D.Pa.), 39 Communications Reg. (P&F) 430
**(Cite as: Slip Copy)**

Defendants acted pursuant to a proper request from a district attorney in this matter.

Even if the Court assumes that the Attorney General Defendants acted without a proper request and thereby violated the Attorneys Act, the Court will dismiss count V because: 1) to the extent the plaintiffs are asserting a right to the uninterrupted possession of their equipment and records, that claim is more properly analyzed under, and is subsumed by, the unreasonable search and seizure claim in count VI; and 2) the plaintiffs do not otherwise have a constitutionally protected liberty or property interest in the Attorney General Defendants' compliance with the Attorneys Act.

The violation of a state statute does not, in itself, provide a basis for a § 1983 claim. *West,* 487 U.S. at 48 (Section 1983 plaintiffs must allege the violation of a right protected by the Constitution or a federal statute); *Benn v. Universal Health Sys., Inc.,* 371 F.3d 165, 174 (3d Cir.2004) ("Section 1983 does not provide a cause of action for violations of state statutes."). The violation of a state law only gives rise to a § 1983 claim if the violation implicates a constitutional right. Here, the plaintiffs claim that the Attorney General Defendants' violation of the Attorneys Act violated their right to due process under the Fourth and Fourteenth Amendments.

**\*11** At the outset, the Court notes that the Fourth Amendment confers a right to be free from unreasonable searches and seizures; it does not address "due process" as such. To the extent that the plaintiffs are arguing that the Attorney General Defendants' alleged violations of the Attorneys Act deprived them of their right to be free from unreasonable search and seizure, the plaintiffs' claim must be analyzed under the Fourth Amendment. *See Graham v. Connor,* 490 U.S. 386, 395 (1989) (where "the Fourth Amendment provides an explicit textual source of constitutional protection against [the governmental conduct in question], that Amendment, not the more generalized notion of 'substantive due process' must be the guide for analyzing" the claim); *Doe v.*

*Groody,* 361 F.3d 232, 238 n. 3 (3d Cir.2004) (same).

Where, as here, the defendants acted pursuant to a search warrant, the relevant Fourth Amendment questions are whether the warrant was sufficiently particular and supported by probable cause, and whether it was objectively reasonable for the defendants to rely on the warrant. Count VI of the complaint raises precisely these questions. The Court will dismiss the plaintiffs' Fourth Amendment-based claims in count V because they are subsumed by count VI.[FN11]

> FN11. The Court will allow the Fourth Amendment claim to go forward for the reasons stated in the following section. To guide the parties in any continued litigation, however, the Court notes here that a violation of the Attorneys Act does not constitute a per se violation of the Fourth Amendment. In *Commonwealth v. Goodman,* 500 A.2d 1117 (Pa.Super.1985) (en banc), the Pennsylvania Superior Court found that the Attorney General's office had conducted an unauthorized investigation in violation of the Attorneys Act. The court held nevertheless that the investigation did not violate the Fourth Amendment, and that evidence obtained from the investigation need not be suppressed. *Id.* at 1129-31.
>
> In addition, several Courts of Appeals have held that law enforcement officials acting beyond the scope of their authority under state law do not necessarily violate the Fourth Amendment. *See, e.g., Guest v. Leis,* 255 F.3d 325, 334 (6th Cir.2001) (search and seizure by officers acting outside their jurisdiction under state law did not violate the Fourth Amendment); *United States v. Mikulski,* 317 F.3d 1228, 1233 (10th Cir.2003) (officers' "apparent violation of state law" in making an arrest outside their jurisdiction did not amount to a federal violation); *Pasiewicz v. Lake County Forest Preserve District,* 270 F.3d

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                   Page 12
Slip Copy, 2006 WL 2506318 (E.D.Pa.), 39 Communications Reg. (P&F) 430
**(Cite as: Slip Copy)**

520, 526-527 (7th Cir.2001) (although a "blatant disregard of state law and the chain of command could weigh on the scales of reasonableness," officers' extraterritorial arrest in violation of state law was not per se unreasonable under the Fourth Amendment); *Abbott v. Stone,* 30 F.3d 994, 998 (8th Cir.1994) (same). The Court is persuaded by these decisions that a violation of the Attorneys Act does not automatically constitute a violation of the Fourth Amendment.

To the extent that the plaintiffs are arguing that they have a right-apart from any Fourth Amendment right-to have the Attorney General Defendants comply with the Attorneys Act, the plaintiffs' claim fails. The Fourteenth Amendment prohibits deprivations of liberty and property without due process of law. U.S. Const. amend. XIV. But the expectation of receiving a certain process under state law is not, without more, a liberty interest protected by the Due Process Clause. *Olim v. Wakinekona,* 461 U.S. 238, 251 (1983).

In *United States v. Jiles,* 658 F.2d 194 (3d Cir.1981), cited with approval in *Olim,* the United States Court of Appeals for the Third Circuit considered whether a Pennsylvania statute prohibiting law enforcement officers from releasing a defendant's juvenile records to other law enforcement officials without a court order created a substantive property or liberty interest on the defendant's behalf. To answer that question, the court had to "ascertain whether the state law directly conferred a substantive right on the defendant or merely created an administrative plan to help the state regulate its officers' conduct." *Id.* at 200. The court found that the statute created a procedure to protect juveniles from having their records released to the public, but did not create any protectible interests in the defendant because law enforcement agencies were meant to have access to the records. *Id.*

Here, the Court finds that the Attorneys Act also

"merely created an administrative plan to help the state regulate its officers' conduct." The Act does not expressly provide for any cause of action in the event of a violation. It does not protect persons from being investigated or prosecuted by the Attorney General. *See Goodman,* 500 A.2d at 1129-1130 ("[T]he intention of the General Assembly in enacting the [Attorneys Act] was to allocate the prosecutorial powers, and thereby the investigatory powers, of the Commonwealth between the elected Attorney General and the individual, elected district attorneys. Nothing in the statute itself or in its available legislative history indicates that the General Assembly considered the Act would in any way involve the protection of the constitutional rights of criminal defendants.") (internal citations omitted). Because the Attorneys Act does not create a protectible liberty or property interest, the plaintiffs cannot state a due process claim based on the Attorney General Defendants' alleged noncompliance with the Act.

*E. Count VI-Unreasonable Search and Seizure*

**\*12** Finally, the defendants have moved to dismiss the Fourth Amendment claim in count VI on the basis that they reasonably relied on a duly-issued search warrant. The plaintiffs challenge the validity of the warrant on a number of grounds. The plaintiffs allege that: 1) certain defendants made material misstatements in, and omitted material information from, the warrant application; 2) the warrant was overbroad, in violation of the First Amendment; 3) the defendants exceeded the scope of the warrant when executing it; and 4) the defendants' actions in obtaining and executing the warrant violated the plaintiffs' statutory rights. The Court concludes that a decision on these issues would be premature, and will deny the motion without prejudice.

In moving to dismiss count VI, the defendants do not fully address the First Amendment implications of the Fourth Amendment claim. Nor do the defendants move to dismiss the First Amendment claim in count I. This is a sufficient reason to deny the motion as premature. Although the Supreme

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                    Page 13
Slip Copy, 2006 WL 2506318 (E.D.Pa.), 39 Communications Reg. (P&F) 430
**(Cite as: Slip Copy)**

Court has held that the same probable cause standard applies to all searches, the Court has also stated that the constitutionality of the seizure of presumptively protected materials cannot be analyzed without reference to the First Amendment. *Compare New York v. P.J. Video, Inc.,* 475 U.S. 868, 875 and n. 6 (1986) *and Zurcher v. Stanford Daily,* 436 U.S. 547, 564-565 (1978) *with Fort Wayne Books, Inc. v. Indiana,* 489 U.S. 46, 63-64 (1989) ("[W]hile the general rule under the Fourth Amendment is that any and all contraband, instrumentalities, and evidence of crimes may be seized on probable cause ... it is otherwise when materials presumptively protected by the First Amendment are involved. It is the risk of prior restraint, which is the underlying basis for the special Fourth Amendment protections accorded searches for and seizure of First Amendment materials that motivates this rule.") (internal citations and quotations omitted).

In addition, it is too early to conclude as a matter of law that the warrant and its execution complied with the more traditional reasonableness requirements of the Fourth Amendment.

As to qualified immunity, it is correct that a law enforcement officer may rely on a duly issued search warrant, unless it is objectively unreasonable for him to do so. Considering the facts alleged in the complaint in the light most favorable to the plaintiffs, however, the plaintiffs have stated the claim that a reasonable officer in each of the defendants' positions would have known that the warrant was unconstitutional.

An appropriate Order follows.

### ORDER

AND NOW, this 30th day of August, 2006, upon consideration of the defendants' Motion to Dismiss Counts II though VII of the Complaint (Doc. No. 59), the plaintiffs' opposition, and the parties' post-oral argument briefs, and after an oral argument on January 27, 2006, IT IS HEREBY ORDERED that the motion is GRANTED IN PART and DENIED IN PART for the reasons set out in the

accompanying Memorandum.

**\*13** The Motion is GRANTED as to Counts III, IV, and V, and as to Count II to the extent it seeks monetary relief. The Motion is DENIED as to Count VI, and as to Count II to the extent it seeks declaratory or injunctive relief.[FN1]

> FN1. Count VII of the complaint was voluntarily dismissed by the plaintiffs.

E.D.Pa.,2006.
Voicenet Communications, Inc. v. Corbett
Slip Copy, 2006 WL 2506318 (E.D.Pa.), 39 Communications Reg. (P&F) 430

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d                                                    Page 1
Not Reported in F.Supp.2d, 2006 WL 176100 (D.D.C.)
(Cite as: Not Reported in F.Supp.2d)

**H**
Wells v. Allstate Ins. Co.
D.D.C.,2006.
Only the Westlaw citation is currently available.
United States District Court, District of Columbia.
Eunice WELLS, et al., Plaintiffs,
v.
ALLSTATE INSURANCE CO., et al., Defendants.
No. Civ.A. 00-0760-LFO.

Jan. 24, 2006.

David Errol Tompkins, Lewis & Tompkins, PC, Peter A. Chapin, Sacks & Chapin, PC, Washington, DC, Thomas Joseph Minton, Goldman & Minton, P.C., Washington, MD, for Plaintiffs.
Amy L. Bess, John J. Calkins, Sonnenschein Nath & Rosenthal, Washington, DC, David C. Jacobson, Sonnenschein Nath & Rosenthal, LLP, Chicago, IL, Karl Michael Tilleman, Steptoe & Johnson, Phoenix, AZ, for Defendants.

*MEMORANDUM*
OBERDORFER, J.
*1 Plaintiff Eunice Wells brought a class action lawsuit against Allstate, alleging that Allstate violated the D.C. Consumer Protection Act when it failed to disclose to its customers that it treated claims from policyholders who are represented by counsel differently than those who are not so represented. Plaintiff subsequently added Charles Rawlings as a party, and now seeks to name Rawlings as a representative of a sub-class of Allstate policyholders. Currently pending is Defendants' Motion for Summary Judgment on Charles Rawlings's claims under the Consumer Protection Act.

Despite the long and somewhat tortured history of this case, the sole issue here is whether the general release that Rawlings signed bars his claims under the D.C. Consumer Protection Act. For reasons explained below, the release does not bar these claims, and Allstate's Motion for Summary Judgment is accordingly denied.

I. Background and Procedural History

Plaintiff Eunice Wells, an Allstate policyholder, was hit by a car crossing the street on January 2, 1998. The driver identified himself with a fictitious name and pager number and left the scene. She suffered a broken leg, which required hospitalization and surgery. Accordingly, Wells sought to recover under her Allstate uninsured motorist coverage; Allstate refused to settle; and Wells subsequently sued Allstate. She also moved for certification as representative of a class allegedly to have suffered from Allstate's violations of the D.C. Consumer Protection Act. Wells alleged that Allstate, *inter alia,* failed to disclose that it resisted paying on uninsured motorist claims, and that it adopted a "scorched earth litigation tactic" against policyholders who litigated after refusing to settle.

The case was removed to federal courts. There Wells amended her complaint to allege that, if uninsured motorist claimants were represented by counsel, Allstate referred their claims to a special unit, which, as a tactic, deliberately and regularly took far more time to pay represented claimants than it took to pay claimants who did not have counsel.

An August 12, 2002 Order certified a class of Allstate policyholders to include those who "(1) between March 20, 1997 and October 19, 2000, (2) made a claim for uninsured motorist benefits which Allstate paid in part or in full, (3) for, inter alia, bodily injury, and (4) at some or all points during the claims process were represented by counsel." *Wells v. Allstate Ins. Co.,* 210 F.R.D. 1, 2 (D.D.C.2002). The D.C. Circuit dismissed Defendant's appeal from the certification. *See In re Allstate Ins. Co.,* 2002 U.S.App. LEXIS 23581 (D.C.Cir. Nov. 14, 2002). The case was subsequently referred to a Magistrate Judge for supervision of discovery, class issues, and possible settlement.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 2
Not Reported in F.Supp.2d, 2006 WL 176100 (D.D.C.)
**(Cite as: Not Reported in F.Supp.2d)**

In April 2003, Wells moved to join Charles Rawlings as a party plaintiff. Rawlings was also a policyholder who settled an uninsured motorist claim with Allstate. He signed Allstate's general release agreement in exchange for a settlement payment of $22,500. A month later Wells moved to amend the class definition to include Rawlings. These motions were also referred to the Magistrate Judge.

**\*2** After further proceedings related to Rawlings, in October 2004 Wells moved to qualify Rawlings as a class representative. In November 2004 Allstate moved for summary judgment on Rawlings's claims, arguing that the general release Rawlings signed waived them. Upon referral, the Magistrate Judge issued her Report and Recommendation, suggesting that the Defendants' motion be denied. The Report was squarely based on what was purported to be the preclusive effect of this court's previous ruling on class certification. More specifically, the Report concluded that (1) there were no material facts in dispute; (2) the only remaining legal issue was whether "Rawlings' claim fails as a matter of law because he signed a general release that unambiguously discharges the claim he asserts here"; and (3) in the context of ruling on class action typicality requirements, this court had held earlier that the general release at issue "would not preclude participation in a class action premised on misrepresentation under the Consumer Protection Act, with damages based on delay in settlement ..." *See* Aug. 24, 2005 Report and Recommendation, at 6-8.

In September 2005, Allstate filed objections to the Report and Recommendation, to which Wells filed a response a few days later. Allstate argued that, as previously held in the class certification opinion, "in ruling on a motion for class certification, a court does not reach the merits of plaintiff's case, but assumes allegations pled in the complaint are true." As a result, the previous holding in the class certification context was not dispositive of the issue at summary judgment. Wells's response ignored this argument. Instead Wells relied on the Magistrate Judge's conclusion that the release issue was

already decided in the certification ruling.

Thus, the plaintiffs were directed in a September 15, 2005 Order to brief the merits of whether the general release precluded Rawlings's Consumer Protection Act claim. Plaintiffs, however, again failed to address the merits, and again simply reargued the contention that the legal effect of the garden variety release had already been decided. Thereafter, an October 28, 2005 Order directed plaintiffs to show cause why summary judgment should not be granted for failure to prosecute.

Wells's response finally addressed the merits of the issue, which sets the stage for this summary judgment ruling.

## II. Legal Effect of Allstate's Garden-Variety Release

### A. *Material Facts at Issue*

The Magistrate Judge concluded that there were no material facts in dispute, and Allstate agreed. *See* Allstate's Objections to the Magistrate's Report and Recommendation Concerning its Motion for Summary Judgment against the Claims of Charles Rawlings, at 2 n. 1. Wells maintains that there is a genuine issue of material fact as to whether Rawlings "received compensation for, and gave a release for a multitude of alleged violations of the D.C. Consumer Protection Act." *See* Plaintiffs' Statement of Material Facts, at 6. However, Wells failed to dispute any of the facts enumerated in Allstate's Statement of Material Facts, as required under the Local Rules. *See* Local Civ. R. 56.1. In addition, as the Magistrate Judge correctly concluded, Wells's "fact" is a legal, not a factual, issue. Thus, there are no material facts at issue.

### B. *The Release*

**\*3** The foregoing considered, Allstate's summary judgment motion presents one legal issue: does Allstate's garden variety release, signed by Rawlings, bar his claims under the Consumer Protection Act?

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                    Page 3
Not Reported in F.Supp.2d, 2006 WL 176100 (D.D.C.)
(Cite as: Not Reported in F.Supp.2d)

The release in pertinent part states as follows:

In consideration of the payment of *Twenty Two Thousand Five Hundred* dollars by Allstate, the receipt of which is hereby acknowledged, the undersigned hereby forever releases and discharges Allstate from any and all liability and from any and all contractual obligations whatsoever under the coverage designated above of Policy No. *698149830* issued to *Charles Rawlings* by Allstate and arising out of [x] bodily injuries, [ ] property damages sustained by *Charles Rawlings* due to an accident on or about the *21* day of *October, 2000.*

Allstate argues that this provision unconditionally releases Allstate from "any and all liability." At oral argument, counsel for Allstate clarified that this does not literally mean "any and all liability" *in perpetuum.* Instead, this provision means that Rawlings has forever discharged any claims arising out of the accident, including, Allstate argues, the manner in which Allstate subsequently handled his claim. Moreover, even if the "any and all liability" provision applied only to the October 21, 2000 accident, Allstate maintains that this would still preclude a claim under the Consumer Protection Act.

Each of these arguments, and Wells's responses, are addressed below.

### 1. *"Any and All Liability"*

Allstate urges that the "any and all liability" phrase stands alone; the phrase beginning with "under the coverage designated above" only modifies the "any and all contractual obligations" language.

Under District of Columbia law, "[a] release is a form of contract, and the rules of contract construction govern its interpretation." *GLM P'ship v. Hartford Cas. Ins. Co.,* 753 A.2d 995, 998 (D.C.2000) (citation and internal quotations omitted). "Since insurance contracts are written exclusively by insurers, courts generally interpret any ambiguous provisions in a manner consistent with the reasonable expectations of the purchaser of the policy." *Smalls v. State Farm Mutual Auto. Ins. Co.,* 678 A.2d 32, 35 (D.C.1996) (citations

omitted). Moreover, a contract "must be interpreted as a whole, giving a reasonable, lawful, and effective meaning to all its terms." *1010 Potomac Assocs. v. Grocery Mfrs. of Am., Inc.,* 485 A.2d 199, 205 (D.C.1984) (citations omitted).

In this light, a fair reading of the release is that the phrase "any and all liability" is modified by the reference to the accident, and does not stand alone. First, this interpretation gives meaning to the second clause regarding contractual obligations. If "any and all liability" stood alone, then there would be no need for the remaining provisions of the release. Second, it is inconceivable that Rawlings intended to waive all liability against Allstate for any claims of fraud. Rawlings did not know about the alleged fraud when he signed the release, and consequently could not have waived a fraud claim.

### 2. *Release from Liability*

**\*4** Even if the "any and all liability" language is modified by the reference to the accident, Allstate argues the release includes any claims under the Consumer Protection Act. Wells responds that, as a general matter, a party cannot release a claim that was unknown to him when he signed the release. In this light, Rawlings could not have waived a Consumer Protection Act claim, because he did not know that it existed.

Wells relies on *Wells v. Rau,* 393 F.2d 362 (D.C.Cir.1968) in support. In that case, appellant Wells was involved in a car accident in May 1963. A month later, his insurer came to his house to discuss the pending claim from the accident. Wells gave him a $367.89 bill for his expenses. The insurance agent asked him if he had any injuries, and Wells replied that he bruised his knees. The agent said, "[w]ell, let's give you a hundred dollars for your knees." Wells responded that "this was fine with me." Wells then signed a general release and received a check for $467.89. *Id.* at 363.

A month after he signed the release, he developed severe pains in his neck and shoulders. A physician eventually determined that he had ruptured a disk in his neck which required an operation. The

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                      Page 4
Not Reported in F.Supp.2d, 2006 WL 176100 (D.D.C.)
**(Cite as: Not Reported in F.Supp.2d)**

insurance company refused to pay the medical bills for this operation, and Wells filed suit. The trial court dismissed Wells's complaint, but the D.C. Circuit reversed. It held that a party who signs an insurance release in exchange for payment for one type of injury does not release a subsequently discovered injury claim. The court quoted from Corbin on Contracts: if an insurance settlement "was made in contemplation of one kind of injury, minor in character such as a flesh bruise, when in fact but unknown to the parties, there was a very different injury such as a broken back, the settlement or release may be voidable by mistake." *Id.* at 364 (quoting Corbin, 6 Contracts, at 181-82 (1962)).

The logic of *Rau* applies equally here. The "injury" that was discovered after signing the release was due to Allstate's alleged fraud. Wells could not have reasonably known about the fraud when he signed the release. The fraud created an injury that was not known or knowable by Wells when he signed the release. On this basis, the release does not fairly cover Wells's claims under the Consumer Protection Act.

Allstate attempts to distinguish *Rau* on two main grounds. First, Allstate alleges that the *Rau* holding was factually specific and did not establish a broad rule. It quotes the court's observation that "[i]t is not a new idea that these release cases, involving as they do the invocation of the equitable powers of the court to avert injustice, are heavily affected by their own facts and do not lend themselves neatly to generalized legal rules." Allstate's Reply re Summary Judgment, at 2 (quoting *Rau*, 393 F.2d at 364). This discussion, however, was in the context of distinguishing another case that it had decided, which had much less favorable facts than in *Rau*. Moreover, to the extent that equitable decisions are fact-dependent, the perpetuation of fraud on an unsuspecting policyholder makes it a *more* compelling case for a court to determine that an insured made a mistake in agreeing on the release.

*\*5 Allstate would also distinguish *Rau* on the theory that Rawlings knew about any delay in

settlement, or even underpayment, when he signed the release. The appellant in *Rau,* in contrast, did not know about his severe injury. This analysis confuses the wrongdoing with the harm. Rawlings did not know about Allstate's alleged two-track system of processing claims when he signed the release. He may have known about the *effect* of the fraudulently concealed system of delay or underpayment, but did not know about the system itself, or that the delay for or underpayment of represented claimants was intentional, discriminatory, and fraudulent.

In addition, Allstate relies heavily on *GLM P'ship v. Hartford Cas. Ins. Co.*, 753 A.2d 995 (D.C.2000) to argue that a release with general language should not be interpreted narrowly and should bar any subsequent claims. In that case, GLM insured one of its buildings with Hartford. Although GLM originally carried over $842,000 in fire insurance for the building, Hartford informed GLM (through an insurance agent) that GLM was over-insuring the building, the value of which was only about $600,000. GLM agreed and reduced its fire insurance coverage to $600,000, with annual adjustments for inflation.

The building was subsequently destroyed by fire. Hartford paid GLM a total of $763,066.67, of which $674,960 was the total amount of fire insurance coverage (as adjusted for inflation). *Id.* at 996. As part of the settlement, GLM signed a "Sworn Statement in Proof of Loss." This statement "acknowledged that GLM agreed with Hartford as to the total amount of loss to the building, the actual cash value of the property at the time of the fire, and the amount of insurance coverage." *Id.* at 997. GLM also signed a statement agreeing that payment received from Hartford was " 'full payment, release and discharge of all claims or demands' against Hartford 'arising from or connected with' the fire loss." *Id.*

Three years after the fire, GLM filed a claim for negligence against Hartford, arguing that Hartford negligently reduced coverage on the building by undervaluing the property and miscounting the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                  Page 5
Not Reported in F.Supp.2d, 2006 WL 176100 (D.D.C.)
**(Cite as: Not Reported in F.Supp.2d)**

square footage of the building. GLM also alleged that Hartford failed to automatically adjust the coverage for inflation for the years 1992 and 1993. Finally, "GLM claimed that Hartford negligently failed to offer GLM the option of environmental and site cleanup insurance." *Id.* at 997.

The district court dismissed the suit, and the court of appeals affirmed. It concluded that the general release agreement barred claims for negligence against Hartford. It held that the release "unambiguously purports to release Hartford from any claims for loss brought by GLM, whether on the contract or otherwise." *Id.* at 998 (citation omitted).

GLM's negligence claim is readily distinguished from the case at bar. There was no allegation in *GLM* that Hartford willfully misrepresented any facts to GLM. Instead, GLM essentially argued that Hartford did not perform its duties with the proper degree of care. Moreover, most of the allegations underlining GLM's claims were "facts" that GLM should have known about when it signed the "Sworn Statement in Proof of Loss," including, for example, the square footage of its own building and the need for environmental cleanup insurance.

**\*6** Here, in contrast, plaintiffs allege that defendants willfully concealed from policyholders Allstate's two-track system for processing claims. As defense counsel conceded at oral argument, there is no suggestion that Rawlings knew about this alleged system when he signed the release. The waiver of negligence claims in *GLM* is not in tension with plaintiffs' claims here.

Defendants also argue that parties to a release should be able to rely upon a waiver of liability to achieve certainty and finality. Defendants point to the statement in *FDIC v. Parvizian, Inc.,* 944 F.Supp. 1 (D.D.C.1996). *Parvizian* held that " '[i]t is fundamentally important that parties be able to rely on the explicit language of written contracts.... This policy applies with special forces to release, which are designed to resolve disputes out of court- not to spawn litigation." ' *Id.* at 4 (quoting *Hershon*

*v. Bigraltar Bldg. & Loan Ass'n, Inc.,* 864 F.2d 848, 853 (D.C.Cir.1989)).

It is indeed important for parties to be able to rely on the explicit language of an agreed-upon release. An essential predicate to reaching agreement, however, is the assumption that one party has not willfully misled the other. Absent that predicate, the agreement is not enforceable by the misleading party. Plaintiffs allege that Allstate willfully misrepresented its policy concerning its treatment of claims of policyholders represented by counsel. This is not what *Parvizian* contemplated or endorsed.

### 3. *Waiver of Fraud as Contrary to Public Policy*

As an additional consideration, not raised by the parties (*cf. United States v. Duran,* 96 F.3d 1495, 1510 (D.C.Cir.1996); *Kelso v. U.S. Dep't of State,* 13 F.Supp.2d 1, 7 (D.D.C.1998)), from a policy perspective Rawlings could not release Allstate from "any and all liability." Courts generally do not allow parties to waive intentional torts, particularly when tainted with fraud. In *Avianca, Inc. v. Corriea,* 1992 U.S. Dist. LEXIS 4709 (D.D.C.1992), the court determined that a broad, unqualified indemnity clause did not waive fraud claims. As the court explained, the "indemnity clause does not explicitly except willful conduct, yet any other reading would appear to violate common sense and what the court finds to be the intent of the parties." *Id.* at \*32. In addition, under New York law, courts "may interpose the barrier of public policy when an exculpatory clause could be interpreted to permit fraudulent or malicious conduct." *Id.* at \*32-33; *see also* Grace McLane Giesel, 15 *Corbin on Contracts* § 88.8 (2005) ("An agreement may contain a clause prohibiting any challenge to the bargain on the basis of fraud. Courts do not enforce such clauses."). As the Restatement (Second) on Contracts declares, a "term unreasonably exempting a party from the legal consequences of a misrepresentation is unenforceable on grounds of public policy." Restatement (Second) of the Law on Contracts § 196 (1981).

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                Page 6
Not Reported in F.Supp.2d, 2006 WL 176100 (D.D.C.)
(Cite as: Not Reported in F.Supp.2d)

**\*7** The policy prohibition against broad exculpatory clauses is particularly applicable here where Allstate allegedly violated the D .C. Consumer Protection Act. That Act is meant to protect the public and deter potentially fraudulent conduct. Allowing Allstate to escape sanction for fraudulent conduct merely because of plaintiffs' failure to raise the point would undermine this goal. For this independent reason, Allstate's argument that the release exculpates it from "any and all liability," including fraud, is unpersuasive.[FN1]

> FN1. The previous class certification opinion noted that "Allstate has a practice of requiring policyholders to sign a release form as a condition of settlement, and those releases would likely preclude claims for underpayment, as opposed to a claim for delay in payment" *Wells v. Allstate Ins. Co.,* 210 F.R.D. 1, 11 (D.D.C.2002). Although there is some dispute about the exact nature of Rawlings's claims, defendants argue that they are for underpayment, and not delay. Thus, defendants contend that the statement quoted above from the certification ruling precludes Rawlings's underpayment claims. However, as defendants have mentioned several times, a class certification ruling necessarily does not reach the merits. *See id.* at 4. Accordingly, upon reflection and further analysis, I am persuaded that the underpayment/delay in payment distinction is not relevant to the legal consequence of the release, particularly where, as here, alleged fraud is an underlying gravamen of plaintiffs' claims.

### III. Conclusion

For the foregoing reasons, the accompanying Order denies Defendants' Motion for Summary Judgment as to the claims of Charles Rawlings.

D.D.C.,2006.
Wells v. Allstate Ins. Co.

Not Reported in F.Supp.2d, 2006 WL 176100 (D.D.C.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.